UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

HAMEED KHALID DARWEESH and
HAIDER SAMEER ABDULKHALEQ
ALSHAWI,

on behalf of themselves and others similarly
situated,

      *Petitioners*,

      v.

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"); JOHN KELLY, Secretary of DHS;
KEVIN K. MCALEENAN, Acting
Commissioner of CBP; JAMES T.
MADDEN, New York Field Director, CBP,

      *Respondents*.

**Memorandum of Law In Support Of
EMERGENCY Motion for Stay of
Removal**

Case No. 1:17-cv-00480

Date: January 28, 2017

## PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EMERGENCY STAY OF REMOVAL

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 7(b)(1) and Local Rule 7.1, Petitioners Hameed Khalid Darweesh and Haider Sameer Abdulkhaleq Alshawi move this Court to stay their removal during the pendency of their habeas petition. In early January 2017, Petitioners were both granted valid entry documents from the federal government to enter the United States. However, on the evening of January 27, 2017, U.S. Customs and Border Protection ("CBP") blocked both Petitioners from exiting John F. Kennedy International Airport ("JFK Airport") and detained them therein. CBP's detention of Petitioners was solely pursuant to an executive order issued on January 27, 2017 by President Donald J. Trump. Petitioners filed a habeas petition in the early morning on January 28, 2017, arguing that their continued detention violates their Fifth Amendment procedural and substantive due process rights, is ultra vires the immigration statutes, and violates the Administrative Procedure Act. Petitioner Darweesh was released from CBP custody subsequent to the filing of the complaint in this case, but, on information and belief, CBP continues to hold Petitioner Alshawi and dozens if not hundreds of other members of the proposed class at JFK and other airports around the country. Further, Defendants' continued unlawful detention of Petitioner Alshawi and members of the proposed class is part of a widespread pattern of unlawful detention of refugees, arriving aliens and other individuals from Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen legally authorized to enter the United States, but who have been or will be denied entry to the United States on the basis of the executive order. If removed, Petitioners face irreparable injury, including persecution and possible death in their home countries; issuance of stay of removal would not injure the government and is in the public interest.

Counsel for Petitioners have contacted government attorneys for Respondents to request

that the government voluntarily agree to a temporary stay of removal, but the government has not responded and has not agreed to a temporary stay for the Petitioners or members of the class they propose to represent.  Accordingly, Petitioners have no choice but to seek assistance from this Court to prevent the imminent repatriation of dozens and dozens of refugees, visa-holders, and other individuals from nations subject to the January 27 executive order. On behalf of themselves and all others similarly situated, Petitioners respectfully move this Court to grant a class-wide emergency stay of removal during the pendency of this habeas petition.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On January 27, 2017, one week after being inaugurated as the forty-fifth President of the United States, Donald Trump signed an executive order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO"). Citing the threat of terrorism committed by foreign nationals, the EO directs a variety of changes to the manner and extent to which non-citizens may seek and obtain admission to the United States, particularly (although not exclusively) as refugees. Among other things, the EO imposes a 120-day moratorium on the refugee resettlement program as a whole; indefinitely suspends the entry of Syrian nationals; and suspends entry of all immigrants and nonimmigrants referred to in section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), for 90 days. Nationals from seven countries, Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen, are covered under this EO.  *See* "Protecting the Nation from Foreign Terrorist Entry into the United States." *See* ECF No. 1, Ex. A ("January 27 EO" or "the EO").

Petitioner Hameed Khalid Darweesh is a 53-year-old citizen of Iraq and recipient of an Iraqi Special Immigrant Visa ("SIV"). As an interpreter, electrical engineer and contractor, Mr. Darweesh performed valuable work on behalf of the U.S. government in Iraq for over a decade. From March 2003 to September 2013, Mr. Darweesh was contracted by the U.S. government to

work in a variety of positions that placed him at substantial risk of being targeted, attacked and killed by anti-American militias and insurgents. Based on direct threats to his life and his over ten years of service, Mr. Darweesh was approved for and was issued an SIV on January 20, 2017 to relocate to the United States. The SIV programs were created by Congress precisely to provide safety and refuge in the United States for Iraqis and Afghans who face or have faced serious threats on account of their faithful and valuable service to the United States. *See generally* Refugee Crisis in Iraq Act of 2007, 8 U.S.C. § 1157 note at 1241-49 and the Afghan Allies Protection Act of 2008, 8 U.S.C. § 1101 note at 601-02.

Mr. Darweesh and his family, a wife and three children, received their SIV documentation on January 25, 2017. Because of the sensitive and dangerous nature of Mr. Darweesh's situation, the family immediately boarded a flight from Erbil, Iraq to New York City, via Istanbul, and arriving in the United States in the early evening of January 27, 2017. While CBP eventually processed his family and released them with their passports, CBP continued to hold Mr. Darweesh for additional screening, not permitting him to contact either his family or attorneys who were present at JFK and made multiple attempts to meet with him. Sometime around noon on January 28, 2017, CBP released Mr. Darweesh from custody, although the terms of his release remain unknown.

Petitioner Sameer Abdulkhaleq Alshawi is a 33-year-old citizen of Iraq and recipient of a Follow to Join ("FTJ") visa category F2A. Mr. Alshawi was awarded with the visa by the U.S. Department of State on January 11, 2017 to join his wife, Duniyya Alshawi, and seven-year-old son, both lawful permanent residents residing in Houston, Texas. *See generally* 8 U.S.C. § 1157(c)(2)(A); 8 C.F.R. § 207.7(a) (spouse or child of refugee "shall be granted refugee status if accompanying or following-to-join the principal alien"). From 2006 to 2007, Ms. Alshawi

3

worked as an accountant for Falcon Security Group, a U.S. contractor, along with her brother in human resources. In 2010, insurgents in Iraq targeted the family based on their association with the U.S. military, attempting to kidnap Ms. Alshawi's brother and detonating an IED on Mr. Alshawi's sister-in-law's car, killing her husband and severely injuring her and her daughter. Fearing for their safety, the family relocated to Erbil, Iraq, and Ms. Alshawi and her son applied for refugee status in January 2011.

Upon information and belief, Ms. Alshawi and her son were approved to travel to Houston through the Priority 2-Direct Access Program (P2-DAP) in January 2014, and they have since adjusted their statuses to that of lawful permanent residents. Ms. Alshawi subsequently filed for a FTJ visa for her husband, which was approved by U.S. Citizenship and Immigration Services (USCIS) on October 9, 2014. Mr. Alshawi obtained a U.S. Visa Foil Type ZZ (Visa 93) on January 11, 2017, with a notation in his passport that the foil was prepared at Department of Homeland Security (DHS) request. Despite this visa, Mr. Alshawi was detained by CBP once he arrived at JFK Airport the evening of January 27, 2017, and was permitted to meet with his attorneys who were present at the airport and made multiple attempts to meet with him. Upon information and belief, Mr. Alshawi remains in the custody of CBP at JFK Airport, is not being permitted to apply for asylum or other forms of protection from removal, and is in imminent risk of being returned to Iraq against his will despite the grave danger he faces there.

In addition to Petitioners Darweesh and Alshawi, upon information and belief, there are numerous others individuals detained at JFK Airport and nationwide who are either refugees or visa holders, including lawful permanent residents and dual citizens, from Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen. Each of these similarly situated individuals has been detained and questioned by CBP officials, denied entry to the United States, and subject to the

4

threat of return to the country form which their travel originated, regardless of their presentation of valid entry documents, their status in the prior country, and possible claims qualifying them for protections under 8 U.S.C. § 1101(a)(42) and 8 U.S.C. § 1225(b)(1)(A)(ii). The illegal detention is based solely pursuant to the President's January 27th EO.

In the morning of January 28, 2017, Petitioners filed a habeas petition arguing that the January 27th EO is unlawful as applied to Petitioners and that their continued detention based solely on the executive order violates their Fifth Amendment procedural and substantive due process rights, is ultra vires the immigration statutes, and violates the Administrative Procedure Act. ECF No. 1. Further, Petitioners filed a Motion for Class Certification or Representative Habeas Action, seeking declaratory and injunctive relief to prohibit the policy, pattern, and practice of Respondents detaining class members and prohibiting class members from entering the United States solely on the basis of the EO despite their valid entry documents. ECF No. 4.

## ARGUMENT

Adjudication of a motion for stay of removal requires that the Court consider four factors: (1) whether the stay applicant demonstrates a strong likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). With regard to the first factor, this Court has held that *Nken* "did not suggest that this factor requires a showing that the movant is 'more likely than not' to succeed on the merits." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37 (2d Cir. 2010). Rather, this ruling codified an earlier holding that a noncitizen may obtain a stay from this Court without demonstrating that the likelihood of ultimate success is greater than 50 percent. *See Mohammed v. Reno*, 309 F.3d 95,

5

102 (2d Cir. 2002).

In Petitioners' case, all four factors counsel in favor of the granting of a stay.

**I.   Petitioner is Likely to Succeed on the Merits**

Petitioners' habeas petition alleges five counts against Respondents: (1) Respondents' actions in denying Petitioners the opportunity to apply for asylum, taken pursuant to the EO, violate the procedural due process rights guaranteed by the Fourteenth Amendment; (2) Respondents' actions in seeking to return Petitioners to the countries they fled, taken pursuant to the EO, deprive Petitioners of their rights under 8 U.S.C. § 1231(b) and the Convention Against Torture without due process of law; (3) Respondents' actions in seeking to return Petitioners, taken pursuant to the EO, deprive Petitioners of their statutory and regulatory rights; (4) Respondents' actions taken pursuant to the EO violate the equal protection component of the Due Process Clause of the Fifth Amendment; and, (5) Respondents' actions in detaining and mistreating Petitioners and members of the proposed class were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the Administrative Procedure Act.

**A.  Counts One and Two – Procedural Due Process Claims**

First, CBP acting pursuant to the EO, unlawfully denied their liberty interests under the due process clause of the Fifth Amendment.  Petitioners Darweesh and Alshawi are physically present in the United States with valid entry documents, and have been denied the ability to apply for asylum or withholding protections under the Convention Against Torture.

Additionally, due process requires that arriving immigrants be afforded those statutory rights granted by Congress and the principle that "[m]inimum due process rights attach to statutory rights." *Dia v. Ashcroft,* 353 F.3d 228, 239 (3d Cir.2003) (alteration in original)

6

(quoting *Marincas v. Lewis,* 92 F.3d 195, 203 (3d Cir.1996)). *See also Clark v. Martinez*, 543 U.S. 371 (2005) (demonstrating that immigrants who have not yet been admitted are not categorically excluded from these protections). The Immigration and Nationality Act provides that "[a]ny alien who is physically present in the United States or who arrives in the United States. . . irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b)." 8 U.S.C. § 1158(a)(1). In particular Congress has given asylum seekers the right to present evidence to an Immigration Judge, 8 U.S.C. § 1229a(b)(4)(B), the right to move to reconsider any decision that the applicant is removable, 8 U.S.C. § 1229a(c)(5), and most importantly for the purposes of this appeal, the right to judicial review by a court of appeals of final agency orders denying asylum on the merits and directing removal, 8 U.S.C. § 1252(a)(2)(B)(ii). Under United States law as well as human rights conventions, the United States may not return ("*refoul*") a noncitizen to a country where she may face torture or persecution. *See* 8 U.S.C. § 1231(b); United Nations Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). Petitioners' ability to apply for asylum and withholding under CAT is therefore required by the due process clause, before they may be subject to removal. The EO, however, categorical prohibition on evaluating asylum and CAT claims deprives petitioners of any legal process.

In *Landon v. Plasencia* the Supreme Court held that in evaluating immigrants' procedural due process rights when seeking admission to the United States that "the courts must consider the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural

safeguards." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Petitioners' interests in this case are weighty: they both stand to lose the right to live and work in "this land of freedom." *Id.*; *see also Bridges v. Wixon*, 326 U.S. 135, 154, (1945) (noting that individuals have a liberty interest in proper procedures being applied in deportation proceedings). Both Petitioners Darweesh and Alshawi also have considered interests in avoiding deprivation of life and torture if forced to return to Iraq, and have strong connections to the United States including Lawful Permanent Resident immediate family members. *Landon,* 459 U.S at 34 (recognizing family and personal connections within the United States as an individual interest). Mr. Darweesh has reason to believe he will be tortured on killed by terrorists currently searching for him and his family in Iraq. ECF No. 1, ¶ 21; Mr. Alshawi similarly has had family members who were targets of kidnapping and fears for his life. ECF No. 1, ¶ 44. Additionally, because Petitioners have already been through substantial procedural screenings and approved for admission (through SIV and Follow to Join (FTJ) visa category F2A screenings), the government's interest "in efficient administration of the immigration laws" has already been satisfied. *Landon v. Plasencia*, 459 U.S. at 34. The liberty interests of petitioners and extreme risks of injury that will result from arbitrary deprivation of Petitioners' rights are therefore substantial and well-recognized by existing precedent, and their denial of admission without the ability to apply for asylum or withholding under CAT offends due process clause of the Fifth Amendment.

### B.  Count Three – *Accardi* Claim

Respondents' actions in seeking to return Petitioners to Iraq, taken pursuant to the EO, deprive Petitioners of their statutory and regulatory rights in violation of *Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which stands for the principle that agencies must comply with their own regulations. *See Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir. 1991) (holding that remand was

8

required where immigration judge failed to comply with regulations that existed for alien's benefit, regardless of whether error resulted in prejudice); *see also Vitarelli v. Seaton*, 359 U.S. 535 (1959) (reinstating Interior Department employee after removal in violation of Department regulations). The Supreme Court has explained that this principle is grounded in the Fifth Amendment's guarantee of due process, as well as administrative common law and the nature of legislative rulemaking. In the Second Circuit, *Accardi* relief is available when the agency failure to follow regulations prejudiced the outcome, was so egregious as to shock the conscience, or deprived our plaintiffs of fundamental rights. *Rajah v. Mukasey*, 544 F.3d 427, 447 (2d Cir. 2008).

The Immigration and Nationality Act and implementing regulations, including 8 U.S.C. § 1225(b)(1) (expedited removal), 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. § 1158 (asylum), and 8 U.S.C. § 1231(b)(3) (withholding of removal), and the United Nations Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note), entitle Petitioners to an opportunity to apply for asylum, withholding of removal, and CAT relief. These provisions also entitle Petitioners to a grant of withholding of removal and CAT relief upon a showing that they meet the applicable legal standards.

Respondents' actions in seeking to return Petitioners to Iraq, taken pursuant to the EO, deprive Petitioners of their statutory and regulatory rights under the above provision. This error was clearly prejudicial in that Petitioners and members of the proposed class were offered no opportunity to apply for the above relief. In particular, DHS's failure to follow its own regulations in affording Petitioners and members of the proposed class an opportunity to apply

9

for asylum and other forms of humanitarian relief constitute an *Accardi* violation and should be set aside.

### C.  Count Four – Equal Protection

Petitioners claim a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, on the ground that the EO constitutes intentional discrimination by the federal government on the basis of religion and national origin. As the Second Circuit has explained, intentional discrimination by a government actor can be demonstrated in multiple ways:

> First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227-29 (1995). In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977).

*Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).

Discrimination on the basis of religion is a violation of equal protection. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) (citing religion as an "inherently suspect distinction"); *see also Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring); *McDaniel v. Paty*, 435 U.S. 618, 644 (1978) ("In my view, the Religion Clauses—the Free Exercise Clause, the Establishment Clause, the Religious Test Clause, Art. VI, cl. 3, and the Equal Protection Clause as applied to religion—all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."). Similarly, "national origin . . . [is] so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473

U.S. 432, 440 (1985). Therefore, a government action based on animus against, and that has a discriminatory effect on, Muslims or individuals from the countries in question violates the equal protection component of the Due Process Clause.

Petitioners allege that their rights under the equal protection component of the Due Process Clause will be violated by government action that will be applied in a discriminatory fashion. Applying a general law in a fashion that discriminates on the basis of a suspect classification violates the Due Process Clause. *See Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). President Trump made it clear while signing the EO that it will be applied particularly against Muslims and that Christians will be given preference. *See* Michael D. Shear & Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim Countries,* N.Y. Times (Jan. 27, 2017), https://www.nytimes.com/2017/01/27/us /politics/trump-syrian-refugees.html ("[President Trump] ordered that Christians and others from minority religions be granted priority over Muslims."); Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees, Promises Priority for Christians*, Wash. Post (Jan. 27, 2017), https://www.washingtonpost.com/world/national-security/trump-approves-extreme-vetting-of-refugees-promises-priority-for-christians/2017/01/27/007021a2-e4c7-11e6-a547-5fb9411d332c_story.html?utm_term=.c30584b100c2. It is clear from the President's public statements that the EO will be applied in a manner that disfavors individuals of one religious group, Islam, and favors individuals of other religious groups. This differential application will violate the equal protection component of the Due Process Clause.

Petitioners allege that their rights under the equal protection component of the Due Process Clause were violated by government action motivated by forbidden discriminatory animus against individuals from certain countries and Muslims and with a discriminatory effect

against individuals from certain countries and Muslims. *See Jana-Rock Const., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) ("Government action . . . violates principles of equal protection 'if it was motivated by discriminatory animus and its application results in a discriminatory effect.'"); *see also Hunter v. Underwood*, 471 U.S. 222 (1985); *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 605-13 (2d Cir. 2016). "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Petitioners challenging such facially neutral laws on equal protection grounds bear the burden of making out a "prima facie case of discriminatory purpose." To establish a prima facie case of discriminatory purpose, the Second Circuit has applied "the familiar *Arlington Heights* factors." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d at 606 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 at 266-7). The *Arlington Heights* test looks to the impact of the official action, whether there has been a clear pattern unexplainable on other grounds besides discrimination, the historical background of the decision, the specific sequence of events leading up to the challenged decision, and departures from the normal procedural sequence. Substantive departures may also be relevant "if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 266-7.

In this case, the *Arlington Heights* factors are clearly met. The impact of the EO will clearly fall disproportionately on Muslims and individuals from the countries cited in the EO. As an initial matter, when asked about his proposed ban on Muslims in a July 2016 interview with NBC's Meet the Press, the then Republican presidential nominee explained, "I'm looking now at territory. People were so upset when I used the word 'Muslim': 'Oh, you can't use the word

12

"Muslim."' Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." *See* Jenna Johnson, Donald Trump Is Expanding His Muslim Ban, Not Rolling It Back, Washington Post (July 24, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/07/24/donald-trump-is-expanding-his-muslim-ban-not-rolling-it-back/?utm_term=.139272f67dd2. Consistent with this statement, the countries targeted by the EO are all majority Muslim.

When signing the EO, furthermore, President Trump publicly promised that under the EO, preference will be given to Christians from the "countries of concern." *See* Michael D. Shear & Helene Cooper, *Trump Bars Refugees and Citizens of 7 Muslim Countries,* N.Y. Times (Jan. 27, 2017), https://www.nytimes.com/2017/01/27/us/politics/trump-syrian-refugees.html ("[President Trump] ordered that Christians and others from minority religions be granted priority over Muslims."); Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees, Promises Priority for Christians*, Wash. Post (Jan. 27, 2017), https://www.washingtonpost.com/world/national-security/trump-approves-extreme-vetting-of-refugees-promises-priority-for-christians/2017/01/27/007021a2-e4c7-11e6-a547-5fb9411d332c_story.html?utm_term=.c30584b100c2. It is clear from the President's public statements that the EO is intended not only to target Muslim-majority countries, but also to have a disparate impact between Muslims and Christians from the same countries.

The historical background of this decision reveals a long line of public statements by President Trump indicating animus towards Muslims. *See* Theodore Schleifer, *Donald Trump: 'I think Islam hates us'*, CNN (Mar. 10, 2016), http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us. The sequence of events leading up to this decision reveals that President Trump has long publicly stated that he plans to ban Muslims from entering the United States.

*See, e.g*, Donald J. Trump, *Donald J. Trump Statement On Preventing Muslim Immigration*,

(Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-

preventing-muslim-immigration ("Donald J. Trump is calling for a total and complete shutdown

of Muslims entering the United States until our country's representatives can figure out what is

going on."); Abby Phillip and Abigail Hauslohner, *Trump on the Future of Proposed Muslim*

*Ban, Registry: 'You know my plans'*, Wash. Post (Dec. 22, 2016), https://www.washingtonpost

.com/news/post-politics/wp/2016/12/21/trump-on-the-future-of-proposed-muslim-ban-registry-

you-know-my-plans/?utm_term=.a22a50598ea3.

     The EO also represents a substantive departure from previous policy. The named

petitioners or their families provided important assistance to the United States military, because

of which they were offered entry to the country. Detaining individuals who provided valuable

support to our military, at risk of their lives, is not justified by the factor given by the

decisionmaker in favor of the decision: America's national security. As Major General Paul D.

Eaton testified before Congress, this would endanger, not protect our national security: "We have

a moral obligation to assist those who have allied themselves in our mission in Iraq. Failure to

keep the faith with those who have thrown their lot in with us will hurt us; will certainly hurt us

in future counterinsurgency efforts." *Iraqi Volunteers, Iraqi Refugees: What is America's*

*Obligation?: Hearing before the Subcomm. on The Middle East and South Asia of the H. Comm.*

*on Foreign Affairs*, 110th Cong. 34 (2007) (Statement of Major General Paul D. Eaton USA,

Ret.).

     Given the disparate impact of the EO, a historical background of public statements of

animus against Muslims, the specific sequence of promises by President Trump that he would

"ban" Muslims, and the substantive departure from prior policy on the basis of factors that

14

strongly favor a decision other than the one reached, the *Arlington Heights* factors are clearly met. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 266-7. Petitioners have therefore asserted a prima facie claim of discriminatory purpose and of discriminatory impact. It is the government's burden to rebut the resulting "presumption of unconstitutional action." *Washington v. Davis,* 426 U.S. 229, 241 (1976).

### D.  Count Five – Administrative Procedure Act

Finally, Defendants' actions in detaining and mistreating Petitioners and other members of the proposed class were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 706(2)(A)-(D).

The scope of this Court's review is delineated by 5 U.S.C. § 706, which provides that the "reviewing court *shall . . .*  hold unlawful and set aside agency action . . . found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] (D) without observance of procedure required by law . . . ." 5 U.S.C. § 706(2) (emphasis added).  The APA provides further that, "[t]o the extent necessary to decision and when presented, the reviewing court *shall* decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706 (emphasis added). Under the APA, this Court reviews errors of *de novo*. *Andrew Lange, Inc. v. F.A.A.*, 208 F.3d 389, 391 (2d Cir. 2000).

15

Respondents detained and mistreated Petitioners and other members of the proposed class solely pursuant to the January 27th EO, which expressly discriminates against Petitioners on the basis of their country of origin and was substantially motivated by animus toward Muslims, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment. *See supra* Part I-C. The EO exhibits hostility to a specific religious faith, Islam, and gives preference to other religious faiths, principally Christianity. Respondents' actions were therefore "contrary to constitutional right, power, privilege, or immunity, in violation of § 706(2)(B).

Further, the INA forbids discrimination in issuance of visas based on a person's race, nationality, place of birth, or place of residence. 8 U.S.C. § 1152(a)(1)(A). This section establishes a non-discrimination principle that extends to the agency's processing of applicants for entry at the border. Were this not so, this section would have no practical effect, since CBP could simply deny entry to individuals based on the above prohibited characteristics to individuals whom DHS had otherwise duly issued a visa. Respondents' detention and mistreatment of Petitioners and other members of the proposed class, despite their possession of valid entry documents, is therefore contrary to the INA and in violation of 5 U.S.C. § 706(2)(C).

As set forth in Parts I-A, *supra*, Respondents' actions also violated procedural requirements of the Fifth Amendment and the Immigration and Nationality Act by seeking to return Petitioners and members of the proposed class to their home countries without the opportunity to present claims for asylum or other forms of humanitarian protection. Individuals arriving at United States ports of entry must afforded an opportunity to apply for asylum or other forms of humanitarian protection and be promptly received and processed by United States authorities. 8 U.S.C. § 1158(a)(1); *see also id.* § 1225(b)(1)(A)(ii). The Immigration and Nationality Act and implementing regulations, including 8 U.S.C. § 1225(b)(1) (expedited

removal), 8 C.F.R. §§ 235.3(b)(4), 208.30, and 1003.42; 8 U.S.C. § 1158 (asylum), and 8 U.S.C. § 1231(b)(3) (withholding of removal), and the United Nations Convention Against Torture ("CAT"), implemented in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note), entitle Petitioners to an opportunity to apply for asylum, withholding of removal, and CAT relief. Petitioners' actions, in violating the procedural requirements of the Due Process Clause of the Fifth Amendment and these various statutory provisions, also violate § 706(2)(D) of the APA, which prohibits agency action taken "without observance of procedure required by law."

For all of the reasons set forth in this section, Petitioners' challenged actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In addition, Respondents' actions were arbitrary and capricious for their failure to consider "all relevant issues and factors." *Long Island Head Start Child Dev. Servs. v. N.L.R.B.*, 460 F.3d 254 (2d Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48-49 (1983)). Under *State Farm*, for an agency action to survive arbitrary-and-capricious review, it "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation omitted). This "hard look" standard exceeds the "rational basis" standard applied under the Due Process Clause. *Id.* at 43 n.9. Here, the Government has failed to consider many relevant issues and factors, including evidence regarding the low risk to U.S. citizens posed by refugees, the relative risk presented by those arriving on different visa categories.

## II.     Without a Stay of Removal, Petitioners Face Irreparable Harm

Along with the likelihood of success on the merits, the irreparable injury inquiry is one of "the most critical" factors in adjudicating stay applications. *Nken*, 556 U.S. at 433. Without a stay of removal, Petitioners and class members will suffer irreparable harm for three main reasons: (1) near certain return to their country of origin, where they may face threats of persecution, death, and torture, (2) inability to effectively communicate with legal counsel from outside the United States; and, (3) the harm that would be inflicted on Petitioners' and class members' families, who are lawfully present in the United States.

Mr. Darweesh and Mr. Alshawi, as well as members of the proposed class, likely face serious bodily harm, persecution, and death absent a stay of removal. Both Mr. Darweesh and Mr. Alshawi either worked for the United States government and its contractors in Iraq, or have ties to immediate family members that did so. *See* ECF No. 1, ¶¶ 4, 18-20, 43. Due to this association, Mr. Darweesh faced repeated threats from militant groups within Iraq, leading him to apply for a Special Immigrant Visa to leave Iraq and come to the United States. *Id.* ¶¶ 20-22. Similarly, Mr. Alshawi's wife worked for a U.S. contractor, the Falcon Security Group in Iraq. *Id.* ¶ 43. Due to this association, local insurgents targeted Mr. Alshawi's family, killing his sister-in-law's husband and inflicting serious bodily harm on his sister-in-law and niece. *Id.* ¶ 44. As a result, Mr. Alshawi's wife applied for refugee status, and, after arriving in the United States, filed a "Follow to Join" visa for Mr. Alshawi.

Nevertheless, despite the fact that Petitioners and class members have lawful entry documents, *see id.* ¶¶ 30, 46, Respondents will likely return them to the country from which their travel originated or their country of origin, placing their lives in imminent danger. *See* EO Sec. 3(c); 8 U.S.C. § 1231(b)(1)(A) (arriving aliens denied entry "shall be removed to the country in which the alien boarded the vessel or aircraft on which the alien arrived in the United States").

Congress itself has expressed grave concern for the plight that individuals in Petitioners' position face. *See* H.R. 110-158 at 2 (2007) ("The[] work [of Iraqi and Afghani translators] for the United States government often makes them targets of death squads, militias, and al-Qaeda. Many translators and interpreters are forced into hiding and are unable to escape this threat."); *The Plight of Refugees*, *Hearing Before the S. Judiciary Comm.*, 110 Cong. Rec. 2 (2007) (statement of Sen. Ted Kennedy) (noting severe danger many refugees face).

Other members of the proposed class, which according to statements by CBP officials, include at least "dozens and dozens" of additional individuals detained at JFK Airport (not to mention an unknown number of additional persons detained at other airports across the nation), also face a strong likelihood of serious bodily, persecution, and death due to enforcement of the EO. Many putative class members have been previously screened by the U.S. Refugee Admissions Program to determine whether they have "well-founded fear of persecution", *see* 8 U.S.C. § 1101(42), and issued a visa for entry to the United States as a form of humanitarian protection. Members of the proposed class are fleeing the world's most war-torn and violent countries, which have prompted a massive exodus as innocent victims like class member flee to safety in recent years. *See, e.g.*, 162 Cong. Rec. S4354 (2016) (Statement of Sen. Leahy) ("Over the past 5 years, the world has witnessed millions of Syrians desperately fleeing the terror inflicted by ISIS and Bashar Al-Assad's regime …. As a humanitarian leader among nations, the United States must play a significant role in efforts to resettle those displaced by this devastating conflict."); Anne Barnard, *Death Toll From War in Syria Now 470,000, Group Finds,* N.Y. Times (Feb. 11, 2016), https://www.nytimes.com/2016/02/12/world/middleeast/death-toll-from-war-in-syria-now-470000-group-finds.html; Chris Hughes*, Half a Million Refugees gather in Libya to Attempt Perilous Crossing to Europe,* The Guardian (June 6, 2015), https://www.the

guardian.com/world/2015/jun/06/cameron-merkel-at-odds-resettle-refugees-europe-migration.

Thus, denial of entry to United States – despite preapproved and lawful entry documents – places

Petitioners and class members in grave danger, given that they lack legal status anywhere other

than the United States and their country of origin. *See* ECF No. 1, ¶¶ 30, 46 (describing

Petitioners' entry documents).

Second, Petitioners and other class members will face extreme difficulty in pursuing their

claims to lawful entry to the United States if removed from the United States. Respondents have

detained Petitioners and other members of the proposed class and are holding or have held them

in temporary detention facilities. ECF No. 1, ¶¶ 4-5. If Respondents continue to detain members

of the proposed class and permit access to them, counsel and Petitioners will be able to

communicate, gather facts, and ensure that Petitioners are adequately represented in their

removal claims. In contrast, removal will significantly hinder counsel's ability to contact their

clients, provide for interpretation, and identify other class members that detained pursuant to the

January 27 EO.

While all class members' removal or forced departure from the United States should be

stayed, stays of removal are especially justified in Petitioners' cases given their status as class

representatives. *See* ECF No. 4, ¶¶ 28-38. Petitioners have submitted a motion to certify a class

in which they serve as representatives, *see* ECF No. 4, and thus removing them would severely

impede their ability to adequately represent the class. *See United States ex. rel. Sero v. Preiser*,

506 F2d 1115, 1125-26 (2d Cir. 1974) (outlining standards for representative habeas class

actions).

Finally, Petitioners' and putative class members' U.S. citizen, Lawful Permanent

Resident, and immigrant family members present in the United States will face certain

irreparable harm if Respondents forced Petitioners' departure. Indeed, Respondents have prevented Petitioners from reuniting with family members, who were either already present in the United States or released upon departing the plane in JFK. *See* ECF No. 1, ¶¶ 32-33, 41-42. The forced separation has already provoked fear and emotional trauma among Petitioners' family members, as they face the strong possibility that they may not see their husband or father again. *See* Michael D. Shear & Nicholas Kulish, *Trump's Order Blocks Immigrants at Airports, Stoking Fear Around Globe*, N.Y. Times (Jan. 28, 2017), https://www.nytimes.com/2017/01/28/us /refugees-detained-at-us-airports-prompting-legal-challenges-to-trumps-immigration-order.html (describing the reactions of Mr. Alshawi's family to his continued detention in JFK and the possibility that he may be removed). Should Respondents remove Petitioners and other class members, they and their family members will likely face years, if not a lifetime of separation – or may never see each again, should class members be forced to return to the danger in their countries of origin. Thus, Petitioners and class members face a clear and strong threat of irreparable injury, and this factor weighs strongly in favor of granting the motion to stay.

### III. The Issuance of a Stay Will Not Substantially Injure the Government, and the Public Interest Lies in Granting Petitioner's Request for a Stay of Removal

The Court in *Nken* found that the last two stay factors, injury to other parties in the litigation and the public interest, merge in immigration cases because Respondent is both the opposing litigant and the public interest representative. *Nken*, 556 U.S. at 435. The Court also noted that the interest of Respondent and the public in the "prompt execution of removal orders" is heightened where "the alien is particularly dangerous" or "has substantially prolonged his stay by abusing the process provided to him." *Nken*, 556 U.S. at 436 (citations omitted). Here, neither of these factors nor any other factors exist to suggest that the Respondent or the public have any interest in Petitioners' removal beyond the general interest noted in *Nken*. Furthermore,

the *Nken* Court recognized the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *See Nken*, 556 U.S. at 436. The Petitioners in this case would both face substantial harm if removed, as would their families, shifting the balance of hardship in favor of staying their removal.

Mr. Darweesh is not a danger or a threat to the United States, and he faces substantial harm if removed. He faithfully served the U.S. government for over ten years, for which he was granted a Special Immigrant Visa (SIV) after facing serious threats on account of his service. Before he was approved for the SIV, he passed through an interview at the U.S. Embassy in Baghdad, security background checks, and a medical examination. *See* Complaint, ¶¶ 28-29, ECF No. 1.

From March 20, 2003 to September 30, 2013, Mr. Darweesh worked as an interpreter for the U.S. Army 101st Airborne and the 91st Engineering Unit at the Baghdad Airport, among other U.S. contracting roles. *Id.* ¶¶ 18-19. As a result of Mr. Darweesh's association with the U.S. Armed Forces, he was targeted by both the Baghdad police and men he had strong reasons to believe were terrorists. *Id.* ¶¶ 20-21. Because of those threats and his service to the U.S. government, Mr. Darweesh applied for and received an Iraqi Special Immigrant Visa, a program specifically created to provide protection to Iraqis and Afghans who face or have faced serious threats on account of their service to the United States. *Id.* ¶¶ 22-23.

In addition, this Court should consider the harm that Mr. Darweesh's wrongful removal would cause his family members. Mr. Darweesh is married and has three children, the youngest of whom is seven years old. His wife and children also received SIVs and were able to make it through passport control and customs, where they were separated from their husband and father. Nicholas Kulish and Manny Fernandez, *Refugees Detained at U.S. Airports; Trump Immigration*

*Order is Challenged* (Jan. 28, 2017). Because Mr. Darweesh is neither particularly dangerous nor did he "substantially prolong his stay by abusing the process provided to him," the public interest in preventing his wrongful removal outweighs the government's general interest in prompt removal, especially in light of the substantial harm he faces and the harm his wife and children would suffer if he were removed.

Mr. Alshawi likewise does not pose a danger or threat to the United States and would face substantial harm if removed. Before granting his Follow to Join (FTJ) visa category F2A, the U.S. Embassy in Stockholm determined that Mr. Alshawi is not a security threat to the United States. *Id.* ¶ 41. He is attempting to join his wife, Duniyya Alshawi, and their seven-year-old son in Houston, Texas, where they have been living for 3 years. *Id.* ¶¶ 42, 45; *see also* Michael D. Shear & Nicholas Kulish, *Trump's Order Blocks Immigrants at Airports, Stoking Fear Around Globe*, N.Y. Times (Jan. 28, 2017), https://www.nytimes.com/2017/01/28/us /refugees-detained-at-us-airports-prompting-legal-challenges-to-trumps-immigration-order.html. Ms. Alshawi worked for a U.S. contractor from 2006-2007, as did her brother. *See* ECF No. 1, ¶ 43. As a result of their connection to the U.S. military, insurgents believed they were collaborators. *Id.* Then, "[i]n 2010, insurgents attempted to kidnap Ms. Alshawi's brother. A month later, an IED placed on Mr. Alshawi's sister-in-law's car detonated, killing her husband and severly injuring her and her daughter." *Id.* ¶ 44. After those incidents of violence, Mr. and Ms. Alshawi moved from Baghdad to Erbil, Iraq out of fear for their safety. *Id.*

Mr. Alshawi's wrongful removal would not only result in a serious risk of substantial harm to him, but would also cause harm to his wife and seven-year-old son. Ms. Alshawi and their son applied for refugee status in January 2011 and were approved to travel to Houston through the Priority 2-Direct Access Program (P2-DAP) in January 2014. *Id.* ¶ 45. They have

since adjusted status to become lawful permanent residents. *Id.* Ms. Alshawi filed for an FTJ visa

for her husband, and Mr. Alshawi obtained a U.S. Foil Type ZZ (Visa 92) on January 11, 2017,

prepared at the request of the Department of Homeland Security (DHS). *Id.* Mr. Alshawi and his

family face substantial harm if he were to be removed; thus, the balance of hardships weighs in

favor of staying his removal.

Respondent cannot make any particularized showing that granting Petitioners a stay of

removal would substantially injure its interests or conflict with the public interest in preventing a

wrongful removal, such that the third and fourth *Nken* factors would outweigh the hardship

Petitioners would face if removed.

## CONCLUSION

For the reasons stated above, this Court should grant Petitioners' motion for a stay of

removal.


DATED: January 28, 2017
New Haven, Connecticut



Respectfully submitted,

/s/ Michael J. Wishnie
Michael J. Wishnie (MW 1952)
Muneer I. Ahmad[†]
Elora Mukherjee (EM 4011)

David Chen, Law Student Intern*
Jordan Laris Cohen, Law Student Intern*
Susanna Evarts, Law Student Intern*
Aaron Korthuis, Law Student Intern*
Jordan Laris Cohen, Law Student Intern*
Katherine Haas, Law Student Intern*

Zachary-John Manfredi, Law Student
Intern*
My Khanh Ngo, Law Student Intern*
Megha Ram, Law Student Intern*
Victoria Roeck, Law Student Intern*
Thomas Scott-Railton, Law Student Intern*
Emily Villano, Law Student Intern*
Elizabeth Willis, Law Student Intern*
Jerome N. Frank Legal Services
Organization
P.O. Box 209090
New Haven, CT 06520-9090
Phone: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@yale.edu

Omar C. Jadwat**
Lee Gelernt (LG-8511)
Cecilia D. Wang (CW-8359)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
ojadwat@aclu.org
lgelernt@aclu.org
cwang@aclu.org

Jennifer Chang Newell[†]
Cody H. Wofsy[†]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 343-0770
jnewell@aclu.org
cwofsy@aclu.org

Mark Doss
Rebecca Heller
Julie Kornfeld
Stephen Poellot
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
URBAN JUSTICE CENTER
40 Rector St, 9th Floor
New York, NY 10006
Tel. (646)-602-5600
mdoss@refugeerights.org
bheller@refugeerights.org
jkornfeld@refugeerights.org
spoellot@refugeerights.org

Karen C. Tumlin[†]
Nicholas Espíritu[†]
Melissa S. Keaney[†]
Esther Sung[†]
NATIONAL IMMIGRATION
LAW CENTER
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Phone: (213) 639-3900
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

**Jonathan Polonsky**
**Kilpatrick Townsend & Stockton LLP**
1114 Avenue of the Americas
New York, NY  10036-7703
Tel. (212) 775 8703
jpolonsky@kilpatricktownsend.com

Justin B. Cox[†]
NATIONAL IMMIGRATION
LAW CENTER
1989 College Ave. NE
Atlanta, GA 30317
Phone: (678) 404-9119
cox@nilc.org

\*\*Application for admission forthcoming.
\* Motion for law student appearance forthcoming.
† Motion for admission *pro hac vice* forthcoming.
†† For identification purposes only. This motion has been prepared by a clinic operated by Yale Law School, but does not purport to present the school's institutional views, if any.

*Counsel for Petitioners*