UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
HAMEED KHALID DARWEESH and,
HAIDER SAMEER ABDULKHALEQ
ALSHAWI,

on behalf of themselves and others similarly
situated,

                           Petitioners,

    --against—

DONALD TRUMP, President of the United States;
U.S. DEPARTMENT OF HOMELAND SECURITY
("DHS"); U.S. CUSTOMS AND BORDER
PROTECTION ("CBP"); JOHN KELLY,
Secretary of DHS; KEVIN K. MCALEENAN,
Acting Commissioner of CBP; and JAMES T.
MADDEN, New York Field Director, CBP,

                           Respondents.
------------------------------------------------------------------X

Case No. 1:17-cv-00480

**MEMORANDUM OF LAW IN SUPPORT OF THE
NEW YORK ATTORNEY GENERAL'S MOTION TO INTERVENE
IN THE COMBINED PETITION FOR WRIT OF HABEAS CORPUS AND
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .............................................................................................................................2

    I. The NYAG Should Be Permitted to Intervene as of Right ................................2

        A. The NYAG's Motion is Timely ..............................................................3

        B. The NYAG Has a Substantial Interest in the Subject Matter
           of This Action ........................................................................................3

        C. Disposition of the Orginial Action May Impair the NYAG's
           Ability to Protect The State's Interests ...................................................7

        D. The Original Parties Cannot Adequately Protect the Interests
           of the State ..............................................................................................9

    II. Alternatively, the NYAG Should Be Allowed to Intervene by Permission......10

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AB v. Rhinebeck Cent. Sch. Dist.*,
   224 F.R.D. 144 (S.D.N.Y. 2004) ...................................................................................9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) .......................................................................................................7

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
   250 F.3d 171 (2d Cir. 2001) ..........................................................................................9

*Chao v. Local 1104 Commc'ns Workers*,
   No. CV-06-5896, 2007 WL 1231616 (E.D.N.Y. Apr. 26, 2007) ..................................9

*Commack Self–Serv. Kosher Meats, Inc. v. Rubin*,
   170 F.R.D. 93 (E.D.N.Y. 1996) ....................................................................................3

*Common Cause New York v. Bd. of Elec.*,
   No. 16 Civ. 6122, dkt. #28 (E.D.N.Y. Jan. 30, 2017) ...................................................2

*Friends of the E. Hampton Airport, Inc. v. FAA*,
   No. 15-CV-0441(JS)(ARL), 2016 U.S. Dist. LEXIS 25541
   (E.D.N.Y. Feb. 29, 2016) ..............................................................................................3

*H.L. Hayden Co. v. Siemens Med. Sys. Inc.*,
   797 F.2d 85 (2d Cir. 1986) ....................................................................................10, 12

*Home Ins. Co. v. Liberty Mut. Ins. Co.*,
   No. 87 Civ. 0675 (SWK), 1990 WL 188925 (S.D.N.Y. 1990) .....................................7

*Kaliski v. Bacot*,
   320 F.3d 291 (2d Cir. 2003) ........................................................................................10

*New York v. 11 Cornwell Co.*,
   695 F.2d 34 (2d Cir. 1982) ............................................................................................7

*New York v. Mid-Hudson Medical Group*,
   877 F. Supp. 143 (S.D.N.Y. 1995) ................................................................................7

*New York v. Walkill*,
   No. 01-Civ-0364 (CM), 2001 U.S. Dist. LEXIS 13364
   (S.D.N.Y. Mar. 16, 2001) ..............................................................................................7

*Sackman v. Liggett Group*,
   167 F.R.D. 6 (E.D.N.Y. 1996) .................................................................................... 11

*Trbovich v. United Mine Workers*,
   404 U.S. 528 (1972) ................................................................................................... 9

*U.S. Postal Serv. v. Brennan*,
   579 F.2d 188 (2d Cir. 1978) .................................................................................... 10

*U.S. v. Pitney Bowes, Inc.*,
   25 F.3d 66 (2d Cir. 1994) ...................................................................................... 3, 10

*United States v. City of New York*,
   07-CV-2067, 2012 WL 314353 (E.D.N.Y. Feb. 1, 2012) ................................... 10, 11

*Wells Fargo Bank, N.A. v. Levin*,
   No. 15-2773 (LDW) (AYS), 2016 U.S. Dist. LEXIS 74410,
   (E.D.N.Y. June 6, 2016), *report and recomm. adopted by*
   2016 U.S. Dist. LEXIS 100508 (E.D.N.Y. July 22, 2016), .................................... 11

**FEDERAL RULE OF CIVIL PROCEDURE**

24(a)(2) ................................................................................................................ passim
24(b)(1)(B) ................................................................................................................ 10
24(b)(2) ..................................................................................................................... 10

New York Attorney General Eric T. Schneiderman, on behalf of the People of the State of New York ("NYAG"), respectfully submits this Memorandum of Law in support of the NYAG's Motion to Intervene in this combined Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief. Intervention as of right is warranted here because the NYAG satisfies the four factors set out in Federal Rule of Civil Procedure 24(a)(2). Alternatively, the NYAG should be granted permission to intervene because —in addition to these factors—intervention here would not unduly delay or prejudice the adjudication of the rights of Petitioners or Respondents, and the Proposed Complaint in Intervention ("Proposed Complaint"), attached as Exhibit A, shares common questions of law and fact with the original Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Petition") filed in this action.

## PRELIMINARY STATEMENT

On January 27, 2017, President Donald Trump issued an executive order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("Executive Order"), which set off a chaotic series of events that has infringed the civil rights of many New York residents and continues to threaten the public health and the economic, social, and cultural welfare of New York State. As set forth in the Proposed Complaint, beginning on the night of January 27, 2017, federal agents began to detain and/or refoul individuals arriving into U.S. airports—including John F. Kennedy Airport ("JFK") in New York City—who are nationals of the seven countries designated by the Executive Order. Still more nationals of those seven countries have been, and continue to be, unable to travel to New York State, where they live, work, study, or have family.

Implementation of the Executive Order is disrupting the lives and violating the civil rights of many New York residents. It also harms interests particular to New York State. The Executive

Order threatens numerous sectors of the New York State economy, including finance and technology, that rely heavily upon the talents and contributions of immigrants—including those who are nationals of the seven countries designated by the Executive Order. The Executive Order likewise harms New York State's academic institutions, which host some of the highest concentrations of foreign students of any in the nation; and in doing so, the Executive Order further damages the New York economy. In addition, the Executive Order harms the public health of New York State by, *e.g.*, threatening the continuous employment of doctors supplying medical care at hospitals in some of the most impoverished neighborhoods across the state. Finally, as courts have frequently observed, the State of New York has a quasi-sovereign interest in protecting civil rights generally within its jurisdiction.

The NYAG requests that the Court allow it to intervene in the subject action to vindicate both the rights of affected New York State residents and the quasi-sovereign interests of the State, which are unique to the State and which may not be adequately represented by the Petitioners.

## ARGUMENT

**I.     The NYAG Should Be Permitted to Intervene as of Right.**

Federal Rule of Civil Procedure 24(a)(2) provides that a court must grant intervention to anyone who makes a timely motion, asserts an interest relating to the subject of the action, and is situated such that disposition of the action without the movant "may as a practical matter impair or impede the movant's ability to protect its interest"—"unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *see, e.g., Common Cause New York v. Bd. of Elec.*, No. 16 Civ. 6122, dkt. #28 (E.D.N.Y. Jan. 30, 2017) (Garaufis, J.) (granting NYAG motion to intervene). As discussed *infra*, the NYAG is entitled to intervene as of right in this action, having satisfied all four requirements under Rule 24(a)(2).

-2-

### A. The NYAG's Motion is Timely.

Timeliness is evaluated based on the totality of the circumstances, including: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994) (citations omitted).

The NYAG's motion is timely because it comes only four days after Petitioners commenced this action and only five days after President Trump issued the Executive Order. Courts in the Second Circuit have found intervention timely where permission was sought much longer after the original plaintiffs filed their complaint. *See, e.g., Commack Self-Serv. Kosher Meats, Inc. v. Rubin,* 170 F.R.D. 93, 100 (E.D.N.Y. 1996) (motion to intervene as of right found timely when filed 46 days after plaintiffs amended their complaint). Further, the NYAG's request to intervene will not delay any proceedings or prejudice the original parties' rights. Respondents have not yet filed a responsive pleading to the Petition, and the NYAG is prepared to comply with the Court-ordered schedule for future proceedings in this matter. Petitioners have consented to the NYAG's request to intervene, counseling against any finding of prejudice as to them. The attorney for Respondents stated that he did not consent to the NYAG's motion to intervene but also did not object. Accordingly, under the totality of the circumstances, the NYAG's motion is timely.

### B. The NYAG Has a Substantial Interest in the Subject Matter of This Action.

A movant seeking intervention under Rule 24(a)(2) must establish that its interest in the litigation is "direct, substantial, and legally protectable." *Friends of the E. Hampton Airport, Inc. v. FAA*, No. 15-CV-0441(JS)(ARL), 2016 U.S. Dist. LEXIS 25541, at *17-18 (E.D.N.Y. Feb. 29, 2016) (internal quotations and citations omitted). New York State has a substantial interest

in the legality and enforceability of the Executive Order because implementation of the Executive Order has already harmed, and threatens continued harm to, (i) various sectors of the New York State economy, (ii) the functioning and vitality of New York's academic institutions, (iii) the public health and staffing of New York's health providers, and (iv) the quasi-sovereign interest New York State has in protecting the civil rights of all of its residents.

First, the Executive Order threatens New York State's economy through its impact upon the State's essential industries—in particular, New York's financial and technology sectors, which rely heavily upon the employment and contributions of foreign nationals—including many nationals of the seven countries designated by the Executive Order.  The Chief Executive Officer ("CEO") of J.P. Morgan Chase, which is headquartered in New York and employs tens of thousands of individuals in Manhattan alone, has stated that the Executive Order affects "a number of our outstanding employees—all of whom have adhered to our country's immigration and employment processes—who have come to the United States to serve our company, clients and communities."  Similarly, Michael Corbat, CEO of Citigroup, also headquartered in New York, stated that he was "concerned about the message the executive order sends, as well as the impact immigration policies could have on our ability to serve our clients and contribute to growth."  (Proposed Compl. ¶¶ 60, 62.)  Harm to New York's leading industries affects not only the general economic health of the State, but also affects its fiscal health and the tax base upon which the State can draw for its own budget.

Second, the Executive Order harms the functioning and economic bottom line of both public and private academic institutions in New York State.  The City University of New York has 807 undergraduate students currently enrolled who are affected by the Executive Order, and also currently employs 46 visa-holders affected by the Executive Order.  The State University

of New York enrolls 22,140 international students from 180 different countries. Of those students, 320 are affected by the Executive Order. (*See id.* ¶¶ 47-48.)

New York has an interest in cultivating diverse, multicultural, and international academic communities. But the Executive Order has already limited, and will continue to limit, the ability of international students and faculty—including those who are nationals of the seven countries designated in the Executive Order—to travel to, study, and provide instruction in New York.

In addition to restricting the benefits that flow from diverse and international student bodies, the Executive Order also harms the economic health of academic institutions in New York and the State's economy at large. In 2015, international students from the seven affected countries who were enrolled in New York State institutions contributed *$30.4 million* to New York State's economy, which includes direct payments for tuition and fees and living expenses. (*See id.* ¶ 49.) The disruption to enrollment of international students that the Executive Order causes directly decreases the revenue flowing to those public and private academic institutions, to their detriment, and to the detriment of New York State's taxing authorities.

The Executive Order further harms the strength of New York State's academic institutions by limiting the ability of those institutions to attract global talent. An Associate Vice Chancellor of New York University's Global Programs has expressed concern about being able to attract top international scholars, who may have reservations about relocating to the United States in light of the Executive Order—especially if they are from Muslim-majority countries. (*See id.* ¶ 44.) A similar concern was expressed by Columbia University, which noted the profound impact the Executive Order will have on the University because it bars many scholars who enrich and contribute to the institution. (*See id.* ¶ 43.)

Third, the Executive Order has already harmed and continues to harm the public health of New York State by limiting the State's ability to staff its hospitals and medical institutions. For example, as a result of the Executive Order, a second-year resident at Interfaith Medical Center in Brooklyn—one of New York's safety-net hospitals—was denied entry back into the United States when he attempted to leave Sudan after a visit to his family. The doctor is a Sudanese citizen who possesses a valid H-1B visa for foreign workers in specialty occupations. He has been unable to return to work. As the Executive Director of the Committee for Interns and Residents has reported to the NYAG, even the shortage of one physician has a significant impact on safety-net hospitals and the patients they treat. (*See id.* ¶ 55.)

The Executive Order also restricts the ability of New York medical institutions to freely exchange ideas and scientific knowledge with international partners. For example, the Weill Cornell Medical College in Manhattan—through a partnership with the Qatar Foundation for Education, Science, and Community Development—hosts at least 17 students who hold passports from one of the seven nations identified in the Executive Order. The ability of these students to travel to conferences or other academic gatherings has been and is being limited by the Executive Order. (*See id.* ¶ 53.)

But perhaps most significant to the public health of New York State is the damage the Executive Order has already done, and continues to do, to the staffing of New York's "safety net" hospitals, which treat some of New York State's most impoverished, high-needs communities. The Committee for Interns and Residents has identified dozens of resident physicians in New York City alone who are affected by the Executive Order, including paid and volunteer resident physicians who serve safety-net hospitals. These individuals include, for

-6-

example, the Sudanese second-year resident at Interfaith Medical Center whose circumstances are described above.

Fourth, the Executive Order harms the State of New York through its deprivation of the civil rights of New York residents. As courts have frequently observed, the State has a quasi-sovereign interest in protecting the civil rights of all residents within its jurisdiction. *See, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 609 (1982) (noting the "political, social, and moral damage" resulting from discrimination and observing there is "no doubt that a State could seek, in the federal courts, to protect its residents from such discrimination").[1]

The extensive state interests set forth above demonstrate that New York State has a substantial interest in the subject matter of this action.

### C. Disposition of the Original Action May Impair the NYAG's Ability to Protect The State's Interests.

"Rule 24 only requires a showing . . . that the disposition of the action may as a practical matter impair or impede [the movant's] ability to protect" its interest, but the movant "need not demonstrate that a substantial impairment of its interest will result." *Home Ins. Co. v. Liberty Mut. Ins. Co.,* No. 87 Civ. 0675 (SWK), 1990 WL 188925, at *5 (S.D.N.Y. 1990) (granting motion to intervene). Disposition of this action may impair the NYAG's ability to protect the State's interests in at least two ways. First, an adverse ruling against the Petitioners, and in favor

---

[1] *See also New York v. 11 Cornwell Co.*, 695 F.2d 34, 38-40 (2d Cir. 1982) (discussing New York State's quasi-sovereign interest in protecting the civil rights of individuals with mental disabilities), *modified on other grounds*, 718 F.2d 22 (2d Cir. 1983) (en banc); *New York v. Mid-Hudson Medical Group*, 877 F. Supp. 143, 147 (S.D.N.Y. 1995) (discussing New York State's quasi-sovereign interest in protecting civil rights of hearing-impaired individuals); *New York v. Walkill,* No. 01-Civ-0364 (CM), 2001 U.S. Dist. LEXIS 13364, at *3 (S.D.N.Y. Mar. 16, 2001) (discussing New York State's quasi-sovereign interest in protecting the civil rights of women against gender profiling by police).

of Respondents—*e.g.*, on the legality of the Executive Order—would impair New York's ability to protect the interests set forth in Section I.B, *supra*.

Second, Petitioners filed the instant action as a putative class action, seeking to represent individuals from the seven affected countries "who are legally authorized to enter the United States, but who have been or will be denied entry to the United States" based on the Executive Order. (ECF No. 4, ¶ 7.) But New York State seeks to vindicate the interests of a swath of New York residents that is broader than the proposed class. As noted above, there are New York residents harmed by the Executive Order who have not yet been denied entry into the United States—*i.e.*, those originating from the seven affected countries who fear leaving the U.S. in the first instance out of concern they will later be detained or not permitted to re-enter. For example, a Canadian-Libyan dual citizen born in Benghazi, and completing her Master's Degree at NYU on an F1 visa, had made plans to complete a religious pilgrimage (Umrah) in March 2017 to Makkah, Saudi Arabia that was organized by the university's Islamic Center. However, because the Executive Order could prevent her reentry into the U.S., she is considering cancelling her journey. (Proposed Compl. ¶ 69.)

An Iranian vice president of a leading structural engineering firm, who teaches at Columbia University and is a lawful permanent resident in the United States, faces similar harm. He has already been forced to cancel plans to travel to an engineering conference in Europe, and fears the indefinite impact of the travel ban on his personal and professional life. (*Id.* ¶ 42(a).)

Petitioner's proposed class does not include all of the New York residents whose interests the NYAG seeks to protect, and an adverse or even narrow ruling by the Court on behalf of the proposed class could impair New York's ability to protect the interests of all of its affected

residents.  *Cf. AB v. Rhinebeck Cent. Sch. Dist.,* 224 F.R.D. 144, 157 (S.D.N.Y. 2004) (holding government's ability to protect its interest may be impaired where private plaintiffs could settle discrimination case without seeking relief as broad in scope as the government seeks).

### D. The Original Parties Cannot Adequately Protect the Interests of the State.

Under Rule 24(a)(2), the burden to demonstrate inadequacy of representation is "minimal."  *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001).  *See also Chao v. Local 1104 Commc'ns Workers*, No. CV-06-5896, 2007 WL 1231616, at *2 (E.D.N.Y. Apr. 26, 2007) ("with respect to the adequacy of representation, the burden on an intervenor is to show that such representation 'may be' inadequate and, therefore, 'should be treated as minimal'") (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

The NYAG meets this minimal burden.  As set forth in the Proposed Complaint, the NYAG brings this action to protect its unique interests in the State's economy, academic institutions, public health, and the civil rights of all New York residents—interests which are not, and could not, be fully represented by the Petitioners.  Furthermore, a significant number of New York's residents are affected by the Executive Order, including more than 15,000 state residents who were born in one of the seven affected countries, and thousands of refugees resettled in New York.  (Proposed Compl. ¶¶ 38-39.)  Thus, any resolution of Plaintiffs' claims without the NYAG's participation will impact New York State's ability to fully protect the health, economy, and well-being of all New Yorkers, and will not adequately represent the State's interests in this action.

## II.     <u>Alternatively, the NYAG Should Be Allowed to Intervene by Permission.</u>

In the alternative, the NYAG respectfully requests that the Court exercise its discretion and permit intervention under Fed. R. Civ. P. 24(b)(1)(B). When deciding whether to permit intervention, courts consider "substantially the same factors" as for intervention as of right. *Kaliski v. Bacot*, 320 F.3d 291, 300 n.5 (2d Cir. 2003); *see also U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 191-92 (2d Cir. 1978) (listing, *inter alia*, factors considered for intervention as of right when ruling on permissive intervention). The discussion in Section I, *supra* demonstrates that the NYAG has satisfied these criteria.

The "principal consideration" for permissive intervention is "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *See Pitney Bowes,* 25 F.3d at 73 (quoting Fed. R. Civ. P. 24(b)(2)). As noted above, Plaintiffs have consented to the NYAG's motion to intervene. The Respondents have not yet filed a responsive pleading to Petitioners' Combined Petition and Complaint, and the NYAG is prepared to comply with the schedule ordered by this Court. These facts establish that intervention will neither unduly delay this action nor prejudice the adjudication of the claims of the existing parties.

Moreover, under Rule 24(b), a timely applicant may be permitted to intervene when an applicant's claims or defense and the main action share a common question of law or fact. Fed. R. Civ. P. 24(b); *see also United States v. City of New York*, No. 07-CV-2067, 2012 WL 314353, at *3 (E.D.N.Y. Feb. 1, 2012) ("first requirement" for permissive intervention is a "claim or defense that shares with the main action a common question of law or fact"), *aff'd in part, vacated in part on other grounds*, 717 F.3d 72 (2d Cir. 2013). Courts also consider whether intervenors "will significantly contribute to full development of the underlying factual issues" and "just and equitable adjudication of the legal question presented." *H.L. Hayden Co. v.*

-10-

*Siemens Med. Sys. Inc.*, 797 F.2d 85, 89 (2d Cir. 1986) (internal quotations omitted); *see also City of New York*, 2012 WL 314353, at *3 (additional factors considered include "whether the putative intervenor will benefit from the application, the nature and extent of its interests, whether its interests are represented by the existing parties, and whether the putative intervenor will contribute to the development of the underlying factual issues").

Ultimately, permissive intervention lies in the Court's discretion. *See Wells Fargo Bank, N.A. v. Levin*, No. 15-2773 (LDW) (AYS), 2016 U.S. Dist. LEXIS 74410, at *5 (E.D.N.Y. June 6, 2016), *report and recomm. adopted by* 2016 U.S. Dist. LEXIS 100508 (E.D.N.Y. July 22, 2016) (granting motion to intervene); *Sackman v. Liggett Group*, 167 F.R.D. 6, 22-23 (E.D.N.Y. 1996) (granting motion to intervene).

The Proposed Complaint shares common questions of law and fact with the Petition. Factually, both concern the implementation of the Executive Order since January 27, 2017, and its effect upon the ability to enter the United States of individuals who are nationals of the seven countries designated in the Executive Order. Both the Petition and Proposed Complaint specifically allege the harms that have befallen nationals of Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen who have sought to enter the United States. Legally, both allege that implementation of the Executive Order violates similar provisions of federal law, including the Immigration and Nationality Act, the Administrative Procedures Act, and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. (*Compare* ECF No. 1, ¶¶ 57-74, *with* Ex. A, ¶¶ 77-132.)

While the NYAG's claims are similar to those presented in the instant action, the NYAG's Proposed Complaint also includes essential additional facts for the Court to consider. For example, in addition to seeking to protect the interests of New York residents—*i.e.*, those

separated from their families, or unable to leave or return to the U.S. for work, academic, or personal commitments—the NYAG also seeks to vindicate New York State's unique interests in its economy, academic institutions, public health, and the general vindication of the civil rights of its residents. These interests suggest that the NYAG is uniquely situated and would "significantly contribute to full development of the underlying factual issues." *H.L. Hayden Co.*, 797 F.2d at 89 (internal quotations omitted). Therefore, the NYAG's intervention would further ensure that a "just and equitable adjudication of the legal questions presented" is reached. *Id.*

\*

For the foregoing reasons, the NYAG respectfully requests that the Court grant its motion to intervene in this action. A proposed order is attached as Exhibit B.

                Respectfully submitted,

                **ERIC T. SCHNEIDERMAN**
                Attorney General of the State of New York

                _____

*Of Counsel*:

Justin Deabler
Sania Khan
Anjana Samant
  Assistant Attorneys General
Civil Rights Bureau

Adam Pollock
Mark Ladov
  Assistant Attorneys General

                Lourdes M. Rosado[*]
                  Bureau Chief
                Jessica Attie
                  Special Counsel
                Civil Rights Bureau

                Anisha Dasgupta
                  Deputy Solicitor General

                Andrew W. Amend
                  Senior Assistant Solicitor General

              Office of the New York State
                Attorney General
              120 Broadway
              New York, New York 10271
              Tel. (212) 416-8250
              Fax (212) 416-8074
              Lourdes.Rosado@ag.ny.gov

Dated:      February 2, 2017
              New York, New York

---

[*] Admission pending.