# EXHIBIT A

**NEW YORK STATE ATTORNEY GENERAL'S
[PROPOSED] COMPLAINT  IN INTERVENTION**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

HAMEED KHALID DARWEESH and
HAIDER SAMEER ABDULKHALEQ
ALSHAWI,

on behalf of themselves and others similarly
situated,

         *Petitioners*,                       Case No.: 17-cv-00480

PEOPLE OF THE STATE OF NEW YORK,
by ERIC T. SCHNEIDERMAN, ATTORNEY
GENERAL OF THE STATE OF NEW
YORK,

         *Intervenor-Plaintiff*,

              v.

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"); JOHN KELLY, Secretary of DHS;
KEVIN K. MCALEENAN, Acting
Commissioner of CBP; and JAMES T.
MADDEN, New York Field Director, CBP,

         *Respondents*.

-----------------------------------------------------------X

## [PROPOSED] COMPLAINT TO INTERVENE IN
## PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## __INTRODUCTION__

    1.     On behalf of the people of the State of New York, the Office of the Attorney

General for the State of New York ("NYAG") brings this action to protect the rights of New

York residents; the economic welfare, health, and well-being of its citizenry; and the interests of New York's employers, hospitals, and educational institutions. President Trump's January 27, 2017, Executive Order is his attempt to fulfill an oft-repeated campaign promise to ban Muslims from entering the United States. The Executive Order bars the entry of many individuals, including New Yorkers, who are lawfully authorized to enter this country on the basis of previously issued immigration documents. The Executive Order thus immediately suspended the constitutional and statutory rights of many New Yorkers who are part of the fabric of our communities.

2.      The Executive Order has caused immediate and serious harm to the people of the State of New York. New York residents and their family members, including many who are legally authorized to live in and enter this country, have been prevented from exercising their legal immigration rights—and indeed have been detained at New York's airports when they attempted to exercise those rights—solely because of the Executive Order. The ban has harmed New York's educational institutions by preventing the return, employment, or enrollment of students, faculty, and researchers. New York-based individuals have been induced to withdraw from international academic and research conferences, and individuals from abroad have been deterred from registering for or attending conferences here in New York. Hospitals—including safety-net facilities providing care for some of our most vulnerable populations—have found staff physicians, medical residents, and other health care professionals unable to return or join their ranks. And from small businesses to large corporations, New York's financial, technology, and other sectors have had to limit business-related travel by employees to foreign countries in the face of the uncertainties created by the Executive Order, injuring existing business activities and potentially inhibiting future business ventures.

3.      In the Executive Order, the President directed agencies to stop people from entering the country because their country of origin is one of seven Muslim-majority nations; or because they are attempting to flee personal persecution or a homeland ravaged by war, such as Syria. And this ban applies even when the individual seeking entry is already legally authorized to live in or enter the United States.

4.      The sweeping breadth and lack of clarity surrounding the Executive Order's provisions have resulted in immigration authorities implementing its provisions inconsistently. Based on this experience, New York residents or their family members seeking entry into the United States have been prevented from doing so; and some have canceled and been unable to make plans to travel abroad because of a legitimate fear that they will be prevented from boarding flights when trying to return to the United States or denied entry at the border.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361. This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. § 2201 *et seq*. This Court may also grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of New York.

## PARTIES

7.      The intervenor-plaintiff is New York Attorney General Eric T. Schneiderman on behalf of the People of the State of New York.

8.      The defendants are:

(a)      Donald J. Trump, who is sued in his official capacity as the President of the United States;

(b)      The U.S. Department of Homeland Security ("DHS"), a cabinet department of the United States federal government with the primary mission of securing the United States;

(c)      John Kelly, the Secretary of DHS, who is sued in his official capacity;

(d)      The U.S. Customs and Border Protection ("CBP"), an agency within DHS, with the primary mission of detecting and preventing the unlawful entry of persons and goods into the United States;

(e)      Kevin K. McAleenan, the Acting Commissioner of CBP, who is sued in his official capacity; and

(f)      James T. Madden, the Director of the New York Field Office of CBP, who is sued in his official capacity.

## STATEMENT OF FACTS

**History of President Trump's Plan to Create a Ban on the Entry of Muslims into the United States**

9.      On December 7, 2015, then-candidate Donald Trump issued a "Statement on Preventing Muslim Immigration," in which he called for a "total and complete shutdown of Muslims entering the United States." As of the date of this filing, this statement remains on the President's website.[1]

---

[1]      Donald   J.   Trump   Statement   on   Preventing   Muslim   Immigration   (Dec.   7,   2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration      (last

10.     While campaigning, President Trump made repeated statements in support of a proposed ban on Muslims entering the United States. For instance, on March 10, 2016, candidate Trump stated in an interview, "I think Islam hates us . . . We have to be very vigilant. We have to be very careful. And we can't allow people coming into this country who have this hatred of the United States."[2]

11.     Later in his campaign, President Trump modified the wording of his proposal and began referring to it as a ban on individuals from certain countries. Despite the change in language, President Trump made clear that this proposal was still intended to bar Muslims from entering the United States. During an interview on July 24, 2016, President Trump was asked whether by focusing on areas with a proven history of terrorism he was pulling back from his proposed Muslim ban. President Trump responded, "I actually don't think it's a rollback. In fact you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."[3]

12.     After he was elected, President Trump continued to support proposals to bar Muslims from entering the United States. For instance, on December 22, 2016, President Trump was asked whether he was rethinking his plans to bar the entry of Muslims and establish a Muslim registry. President Trump responded, "You know my plans all along," and added that a

---

visited Feb. 1, 2017).

[2] Theodore Schleifer, *Donald Trump: "I think Islam hates us*," CNN (March 10, 2016), http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/.

[3] Interview with Donald Trump, Meet the Press (July 24, 2016), http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706.

recent attack in Berlin, which was claimed by the Islamic State, had proven him "[o]ne hundred percent correct."[4]

**The January 27, 2017 Executive Order**

13.     On January 27, 2017, seven days after he was inaugurated, President Trump signed the Executive Order. Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017). The Executive Order asserts that numerous foreign-born individuals have been convicted of or implicated in terrorism-related crimes, among them "foreign nationals who entered the United States after receiving visitor, student, or employment visas, or who entered through the United States refugee resettlement program." The Executive Order further states that it is the policy of the United States "to protect its citizens from foreign nationals who intend to commit terrorist attacks" in the United States and "to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes."

14.     The Executive Order limits the ability of non-citizens to enter the U.S in a number of ways.

15.     Section 3(c) of the Executive Order suspends for 90 days the entry of immigrants and non-immigrants from countries referred to in Section 217(a)(12) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1187(a)(12). Thus, non-citizens from seven countries—Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—may not enter the U.S. for 90 days from the date of the Executive Order, *i.e.*, from January 27, 2017. By its terms, the ban on entry applies even to immigrants and non-immigrants who have previously been authorized to enter the country and individuals who have already been issued visas.

---

[4] Abby Phillip and Abigail Hauslohner, *Trump on the Future of Proposed Muslim Ban, Registry: "You Know My Plans,"* Wash. Post (Dec. 22, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/12/21/trump-on-the-future-of-proposed-muslim-ban-registry-you-know-my-plans/?utm_term=.5ca749ae4685.

16.     Section 5(a) of the Executive Order also places a 120-day moratorium on the U.S. Refugee Admissions Program. Section 5(c) states that the "entry of nationals of Syria as refugees is detrimental to the interests of the United States" and thus "suspend[s] any such entry until such time as [President Trump has] determined that sufficient changes have been made to the [U.S. Refugee Admissions Program] to ensure that admission of Syrian refugees is consistent with the national interest."

17.     Section 5(e) of the Executive Order further states that, notwithstanding the 120-day moratorium on refugee resettlement, the U.S. Secretaries of State and Homeland Security may, on a case-by-case basis, jointly decide to admit individuals to the United States as refugees if the admission of those individuals is in the "national interest." Section 5(e) explicitly states that the "national interest" arises in those cases in which "the person is a religious minority in his country of nationality facing religious persecution." Section 5(b) confirms the religious focus of the refugee moratorium by providing that, if and when the U.S. Refugee Admissions Program resumes, the Secretaries of State and Homeland Security shall "prioritize" religious-persecution refugee claims where "the religion of the individual is a minority religion in the individual's country of nationality."

**The Discriminatory and Unconstitutional Objectives of the Executive Order**

18.     After taking office, President Trump made clear that his purpose in issuing these immigration restrictions remained focused on Muslims. *See supra* ¶¶ 9-12. After signing the Executive Order on January 27, 2017, President Trump stated, "I am establishing new vetting

measures to keep radical Islamic terrorists out of the United States . . . We don't want them here."[5]

19.    The Executive Order on its face favors refugee applicants belonging to "minority religions" in the applicant's country of origin. President Trump has admitted that the purpose of this provision is to favor Christians over other persons of other religions.

20.    During an interview on Christian Broadcast News on January 27, 2017, President Trump stated that Christian refugee applicants would receive priority: "[Christians] have been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."[6]

21.    President Trump's close associates confirmed that the proposed ban on individuals from particular areas was simply a method for implementing President Trump's Muslim ban. On January 28, 2017, the day after the signing of the Executive Order, Rudolph Giuliani, a close advisor to President Trump, was asked whether the ban had anything to do with religion. Mr. Giuliani replied, "I'll tell you the whole history of it. So when [President Trump] first announced it, he said 'Muslim ban.' He called me up. He said, 'Put a commission together.

---

[5] Dan Merica, *Trump Signs Executive Order to Keep Out "Radical Islamic Terrorists"*, CNN (Jan. 30, 2017), http://www.cnn.com/2017/01/27/politics/trump-plans-to-sign-executive-action-on-refugees-extreme-vetting/.

[6] Dan Brody, *President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBS News, The Brody File (Jan. 27, 2017), http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-president-trump-says-persecuted-christians-will-be-given-priority-as-refugees.

-8-

Show me the right way to do it legally.' . . . . And what we did was, we focused on, instead of religion, *danger* — the areas of the world that create danger for us."[7]

22.     In addition to the Muslim ban, President Trump has proposed several other measures targeted specifically at Muslims.

23.     During an interview on November 16, 2015, President Trump stated, "You're going to have to watch and study the mosques, because a lot of talk is going on at the mosques." When asked in the same interview whether he would consider shutting down mosques, he responded, "I would hate to do it, but it's something that you're going to have to strongly consider."[8]

24.     On November 20, 2015, during an interview, President Trump was asked whether he would create a database to track Muslims in the United States. He responded, "I would certainly implement that. Absolutely." When asked whether Muslims would be legally obligated to register with that database, he stated, "They have to be—they have to be."[9]

25.     The First Amendment's Establishment Clause forbids the government from favoring or disfavoring particular religions.

26.     Despite this prohibition, Defendants have repeatedly demonstrated through their actions and statements, *see supra* ¶¶ 9-24, their intent to discriminate against Muslims on the basis of religion.

---

[7] *Available at* Amy B. Wang, *Trump asked for a "Muslim Ban," Giuliani Says – and Ordered a Commission to do it "Legally,"* Wash. Post (Jan. 29, 2016), https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.c6c40237e00d.

[8] *Trump: We Must Watch and Study Mosques*, MSNBC (Nov. 16, 2015), http://www.msnbc.com/morning-joe/watch/trump-we-must-watch-and-study-mosques-567563331864.

[9] Vaughn Hillyard, *Donald Trump's Plan for a Muslim Database Draws Comparison to Nazi Germany*, NBC News (Nov. 20, 2015), http://www.nbcnews.com/politics/2016-election/trump-says-he-would-certainly-implement-muslim-database-n466716.

**Defendants' Conflicting and Changing Interpretations and Implementation of the Executive Order**

27.     Defendants' publicly stated interpretation and application of the Executive Order have changed several times since it was initially signed, causing confusion and apprehension among many law-abiding individuals with ties to New York State who are unable to carry on their normal lives because of the uncertainty created by this ever-changing situation.

28.     President Trump signed the Executive Order on January 27, 2017.  At 4:30 p.m. that same day, the DHS issued a directive to its CBP agents to enforce the Executive Order.

29.     Preliminary guidance sent by CBP to airlines on January 27, 2017 stated that "lawful permanent residents are not included [in the ban] and may continue to travel to the USA."[10]

30.     However, on January 28, 2017, senior officials at the White House told several press outlets that the Executive Order *did* cover lawful permanent residents outside the country, that such residents needed a waiver to re-enter the United States, and that waivers would be granted on a case-by-case basis. While these officials stated that lawful permanent residents in transit back to the United States could obtain a hardship exemption under the order, they revealed that they had yet to work out how to define "in transit" or "hardship."[11]

31.     Beginning on January 28, 2017, CBP agents began denying entry to lawful permanent residents. Other lawful permanent residents were prevented from boarding flights to the United States from the covered countries.

---

[10] Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN (Jan. 30, 2017), http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/index.html.

[11] Michael Edison Hayden & Benjamin Siegel, *Green Card Holders Fall Under Trump's Executive Order*, ABC News (Jan. 28, 2017), http://abcnews.go.com/Politics/green-card-holders-fall-trumps-executive-order/story?id=45113679.

32.     On January 29, 2017, White House Chief of Staff Reince Priebus was asked in an interview about the inclusion of lawful permanent residents in the Executive Order. Priebus responded, "as far as green card holders moving forward, it doesn't affect them."  However, when asked to clarify whether the Executive Order applies to green card holders, Mr. Priebus stated, "Well, of course it does. If you're traveling back and forth, you're going to be subjected to further screening."[12]

33.     Later, on January 29, 2017, DHS Secretary John Kelly stated, "In applying the provisions of the President's Executive Order, I hereby deem the entry of lawful permanent residents to be in the national interest. Accordingly, absent the receipt of significant derogatory information indicating a serious threat to public safety and welfare, lawful permanent resident status will be a dispositive factor in our case-by-case determinations."[13]

34.     Differing interpretations of the Executive Order have also caused confusion for dual nationals. Dual nationals are individuals who were born in or are nationals of one of the seven countries covered by the Executive Order, but are also nationals of a second country not covered by the Executive Order.

35.     On January 28, 2017, State Department officials stated that dual nationals from one of the seven covered countries would not be permitted to enter the United States.[14]

---

[12] Alexandra Jaffee, *Priebus: Immigration Order "Doesn't Include" Green Card Holders, But Anyone Traveling to Banned Countries Will Be "Subjected to Further Screening*," NBC News (Jan. 29, 2017), http://www.nbcnews.com/politics/politics-news/priebus-immigration-order-doesn-t-include-green-card-holders-anyone-n713731 .

[13] Press Release, DHS, Statement by Sec'y John Kelly on the Entry of Lawful Permanent Residents into the United States (Jan. 29, 2017), https://www.dhs.gov/news/2017/01/29/statement-secretary-john-kelly-entry-lawful-permanent-residents-united-states.

[14] Dan Merica, *How Trump's Travel Ban Affects Green Card Holders and Dual Citizens*, CNN (Jan. 29, 2017), https://www.dhs.gov/news/2017/01/29/statement-secretary-john-kelly-entry-lawful-permanent-residents-united-states.

36.     However, guidance provided to airlines on January 29, 2017 stated that dual nationals are exempt from the restrictions created by the Executive Order.[15]

37.     Most recently, upon information and belief, personnel of the U.S. Citizenship and Immigration Services—the division of DHS that is charged with processing immigrant visa petitions, naturalization petitions, and asylum and refugee applications—have been instructed not to take any final action on applications from nationals of the seven countries targeted by the Executive Order.  This includes petitions for asylum, permanent residency, or naturalization.

**The Executive Order Profoundly Harms New York and its Residents**

38.     New York is home to more than 4.4 million foreign-born residents, who comprise 22.5 percent of the State's population. More than 15,000 of these residents were born in one of the seven affected countries.[16]

39.     In 2016, New York resettled 5,830 refugees, of whom 803 were refugees from Syria.[17]

40.     Beginning on January 27, 2017, individuals returning to New York State whose country of origin was one of the seven designated by the Executive Order have been detained at airports and other ports of entry pursuant to the Executive Order. The Executive Order has significantly harmed the overall health and well-being of New York and its people, as well as its business interests and economy.

---

[15] *Id*.

[16] U.S. Census Bureau, *2011-2015 Am. Cmty. Survey 5-Year Estimates*, B05002: Place of Birth by Nativity and Citizenship Status; Universe: Total Population, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_5YR/B05002/0400000US36.

[17] Refugee Processing Center, Bureau of Population, Refugees, and Migration, Dep't of State, *http://ireports.wrapsnet.org* (MX – Arrives by Destination and Nationality).

**The Executive Order Hampers Work in the Fields of Technology, Computers and Engineering**

41.     On January 30, 2017, more than 2,000 New York business and technology leaders signed a letter to President Trump, explaining that the Executive Order "threaten[s] those immigrants who are our current and future neighbors, friends, colleagues, customers, and even bosses."[18] Indeed, technology companies with a significant presence in New York have publicly decried the effect of the Executive Order on their businesses. For example, Google (6,000 employees in New York), Apple (4,400 employees in New York), Amazon (3,700 employees in New York), and Microsoft (2,000 employees in New York) have stated that the travel ban disrupts their operations by impeding their employees' abilities to travel for business, affecting vendor and client relationships, and undermining their ability to compete in hiring from the global talent pool.[19]

42.     The concerns of these industry leaders are borne out by the NYAG's interviews of several people directly affected by the Executive Order,[20] including:

     a.     An Iranian vice president of a leading structural engineering firm who teaches at Columbia University and is a lawful permanent resident in the United States. He has already been forced to cancel plans to travel to an engineering conference in Europe, and fears the indefinite impact of the travel ban on his personal and professional life.

---

[18] Ltr. from Tech: NYC to Pres. Donald Trump (Jan. 30, 2017), https://www.technyc.org/trumpeo/.

[19] *See generally* Brian Fung and Herman Wong, *"Apple Would Not Exist Without Immigration": Companies at Trump's Tech Summit React to His Travel Ban*, Wash. Post (Jan. 29, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/01/29/apple-would-not-exist-without-immigration-companies-at-trumps-tech-summit-react-to-his-travel-ban/?utm_term=.0aee0bd707b3.

[20] Unless otherwise noted, allegations concerning persons directly affected by this Executive Order are based upon interviews by the NYAG of such persons. These accounts are intended to be illustrative of the types of harm experienced by New Yorkers.

b.      An New York University ("NYU") computer science Ph.D. student from Iran, who is seeking to advance his research by attending topical conferences abroad. He is now unable to make pre-planned trips to such conferences because he risks being unable to return.

**The Executive Order Hurts New York State's Educational Institutions and Prevents New York Students from Continuing their Studies**

43.      The Executive Order stifles the open exchange of knowledge, ideas, and scholarship between New York educational institutions and the affected countries—preventing New York schools from benefitting from the talents of students and scholars from these countries. Indeed, institutions such as Columbia University have noted the profound impact this Executive Order will have on their mission because it bars many scholars—both students and faculty—from enriching and contributing to these institutions.

44.      Colleges and universities within New York State are concerned that they could face difficulty attracting top international scholars, who may have reservations about relocating to the United States in light of the Executive Order—especially if they are from Muslim-majority countries.

45.      New York institutions of higher learning are leaders in cultivating diverse and international academic communities. According to the Institute of International Education ("IIE"), in 2015 there were almost 1,000 foreign nationals from the affected countries studying in New York on temporary visas.[21]

46.      For the last three years, NYU has had more international students enrolled than

---

[21] The majority of these foreign nationals have F1 student visas or J1 visas, which afford foreign students cultural and educational exchange opportunities in the United States. This figure does not include U.S. citizens, permanent residents, undocumented people, people with deferred action status, refugees/asylees, or any students of U.S. institutions who are not physically present in the United States, such as online students residing in another country or students at a U.S. university's international branch campus.

any other university in the United States. In 2015, NYU had 15,543 international students, including students from the affected countries.

47.     The State University of New York ("SUNY") is the largest comprehensive system of higher education in the United States, with 64 college and university campuses located within 30 miles of every home, school and business in the state. SUNY enrolls 22,140 international students from 180 different countries. Of those students, 320 are affected by the Executive Order.

48.     As of fall 2015, the City University of New York ("CUNY") enrolls 245,279 students in its undergraduate program; 36.2 percent of those students are foreign born. CUNY has 807 undergraduate students who are affected by the Executive Order. CUNY also employs 46 visa-holders from the affected countries.

49.     The Executive Order will inflict great financial injury on New York State, as international students provide substantial contributions to New York State's economy. Based on information from Open Doors and the U.S. Department of Commerce, the IIE estimates that in 2015, international students from the seven affected countries who were enrolled in New York State institutions contributed *$30.4 million* to New York State's economy, which includes direct payments for tuition and fees and living expenses. This figure does not include indirect economic benefits, such as the contributions of international students and scholars to innovation in academic and medical research.

50.     The New York-based students who have been prevented from continuing their studies include an Iranian Ph.D. student at CUNY's Graduate Center on a student visa, who was detained in Abu Dhabi when she tried to return to New York after winter break and was then

sent back to Iran, where she remains today.[22]

51.    The Executive Order also has prevented scholars from contributing to New York's rich academic community. For example, an Iranian citizen who has a Ph.D. in Mechanical Engineering was granted an EB-2 National Interest Waiver (which is provided to foreign nationals who have demonstrated that their permanent residence would be in the "national interest" of the United States) and received an offer to teach mechanical engineering at a private university in New York State, but because of the Executive Order she will be unable to relocate to New York from Iran.

52.    Similarly, a British-Iraqi dual citizen who is a fellow at the Center for Global Energy Policy at Columbia University and was in London at the time the Executive Order was signed, was unable to attend a speaking engagement at Columbia University on February 1, 2017. The speaking engagement was a mandatory component of his fellowship. Conflicting messages from government agencies about the scope of the Executive Order compelled him to cancel his trip from London to New York. He has two upcoming speaking engagements in the United States at which he would be speaking in his capacity as a fellow, but is considering cancelling them because he is fearful of being detained. He is unsure whether he will be able to continue the fellowship.

**The Executive Order Hinders the Provision of Health Care in New York State**

53.    New York's health care institutions rely on physicians who come from all over the world to provide health care to New Yorkers and to train and teach the next generation of medical professionals in New York. The Executive Order impedes those important activities by barring the entry of physicians from the affected countries, including many who are already

---

[22] This information was confirmed in an interview with CUNY faculty.

providing essential services in New York. Weill Cornell Medicine, for example, has developed a partnership with the Qatar Foundation for Education, Science and Community Development and currently has at least 17 students who hold passports from one of the seven designated countries.

54.     The Executive Order has been particularly harmful to a number of New York's "safety-net" hospitals, which treat some of New York State's most high-needs communities. Dozens of resident physicians in New York City alone are affected by the Executive Order. This includes paid and volunteer resident physicians who serve safety-net hospitals, particularly in primary care units.

55.     As a result of the Executive Order, a second-year resident at Interfaith Medical Center in Brooklyn—one of New York's safety-net hospitals—was denied entry back into the United States when he attempted to leave Sudan after a visit to his family. The doctor is a Sudanese citizen who has a valid H-1B visa for foreign workers in specialty occupations. He has been unable to return to work. As the Executive Director of the Committee for Interns and Residents has reported to the NYAG, even the shortage of one physician has a significant impact on safety-net hospitals and the patients they treat.

**The Executive Order Impedes Life-Saving Medical Research in New York State**

56.     Individuals from the affected countries are currently engaged in critical medical research in New York, and New York has a strong interest in ensuring that such individuals remain able to contribute to medical and other research in New York going forward. The Executive Order interferes with ongoing research by preventing individuals from the affected countries from entering or re-entering the country, and by preventing them from traveling abroad to attend conferences, collaborate with other scientists and institutions, and otherwise advance their research.

-17-

57.     For example, the Executive Order has impeded the research of a legal permanent resident from Iran who moved to the United States to obtain her Ph.D. in biochemistry from Harvard University, and is currently researching neurobiology at the Weill Cornell Medical College of Cornell University. The ban prevents her from traveling to international scientific conferences. The ability to travel is essential to her career in advancing the treatment of human neurological diseases.

58.     The Executive Order has also deterred individuals from the affected countries from continuing or beginning to conduct research in New York. An Iranian-Canadian dual citizen who is a Ph.D. student at Cornell University Medical School—and is currently conducting cutting-edge research into leukemia treatments at Memorial Sloan Kettering Cancer Center—had planned to continue her cancer research in the United States after finishing her Ph.D. in the next few months. She is now unsure whether she will be able to apply for a work visa or become a lawful permanent resident.

**The Executive Order Will Negatively Affect New York's Financial Sector**

59.     New York City is a global hub for the finance industry, which employs nearly half a million New Yorkers, including many immigrants from the affected countries. The Executive Order directly affects such individuals and deters them from joining or staying with financial firms in New York.

60.     Jamie Dimon, the Chief Executive Officer (CEO) of J.P. Morgan Chase, which is headquartered in New York and employs tens of thousands of people in Manhattan alone, has stated that the Executive Order affects "a number of our outstanding employees—all of whom have adhered to our country's immigration and employment processes—who have come to the

-18-

United States to serve our company, clients and communities."[23]

61.     Lloyd Blankfein, the CEO of Goldman Sachs, also headquartered in New York, has spoken out against the Executive Order, stating that "For us to be successful, our men and women must reflect the diversity of the communities and cultures in which we operate…. We must attract, retain and motivate people from many backgrounds and perspectives."[24]

62.     Michael Corbat, CEO of Citigroup, which is also based in New York, has said that he is "concerned about the message the executive order sends, as well as the impact immigration policies could have on our ability to serve our clients and contribute to growth."[25]

**The Executive Order Harms Families**

63.     The Executive Order directly harms New York residents from the affected countries who are deterred from visiting their families abroad due to a legitimate fear that they will be unable to reenter the country.

64.     An Iranian-Canadian scientist at the Memorial Sloan Kettering Cancer Center, whose research uses computational biology and clinical statistics to improve the lives of cancer patients, purchased an airplane ticket to visit her 75-year-old mother and elderly in-laws in Tehran over the Persian New Year in March. This family is now devastated that she and her husband must cancel their visit, because her employer has advised her not to travel outside the United States.

---

[23] Oscar Williams-Grut and Portia Crowe, *JPM Memo on Trump's Travel Ban: We have an "Unwavering Commitment" to Our Staff*, Business Insider (Jan. 30, 2017), http://www.businessinsider.com/jpmorgan-jpm-memo-on-donald-trumps-travel-ban-policy-2017-1 .

[24] Nathan Vardi, *Goldman Sachs CEO Lloyd Blankfein Opposes Trump Travel Ban*, Forbes (Jan. 30, 2017), http://www.forbes.com/sites/nathanvardi/2017/01/30/goldman-sachs-ceo-lloyd-blankfein-opposes-trump-travel-ban/#7775028558d1 .

[25] Portia Crowe, *Here's the Strongly Worded Memo Citi's CEO Sent Out about the Immigration Ban*, Business Insider (Jan. 30, 2017), http://www.businessinsider.com/citigroup-ceo-corbat-on-trump-immigration-ban-2017-1.

65.     An Iranian who moved to the United States in 2013 for graduate studies at SUNY New Paltz currently assists with National Institute of Health-funded research into brain structure, diseases, and drug effects. He has been trying for several months to get an interview appointment for his family to visit him in the United States. He was finally able to secure a visa appointment for his family on February 16, 2017, but because of the Executive Order appointments for all Iranians—including his family's visa appointment—were suddenly cancelled. As a result, the Executive Order is forcing him to choose between seeing his family and staying here to keep his job.

66.     The Executive Order also has separated an Iranian Ph.D. student at Columbia Business School from his wife, who is now unable to leave Iran. His wife, who holds a Ph.D. in Electrical Engineering, had returned to Iran to visit her parents. Under the Executive Order, she is now barred from re-entry. This Columbia student is now trapped in a dilemma that no person should face: he can complete his Ph.D. at a leading U.S. university, where he is at the forefront of advancing research, or he can abandon his Ph.D. studies to re-unify his family.

67.     A 75-year-old woman from Libya with Parkinson's disease who has a pending application to become a lawful permanent resident, was detained upon her return to JFK. She was on her way back from visiting her sister in Libya, who was terminally ill and died during the visit. She had been granted permission to travel due to her sister's illness, yet she was still denied entry into the U.S. upon her return.

68.     A lawful permanent resident of Queens, New York traveled to Iran on January 15, 2017, to attend his brother's funeral. He has lived in the United States since 1978, studied at Pace University, and his wife, daughter, and son are all U.S. citizens. He is scheduled to return to New York on February 6, 2017. However, because of the Executive Order and the erratic

manner of enforcement, it is uncertain whether he will be permitted to board a flight for the U.S. or be allowed to enter upon arrival at JFK.

**The Executive Order Chills the Free Exercise of Religion**

69.     A Canadian-Libyan dual citizen who was born in in Benghazi is here on an F1 visa to complete her Master's Degree at NYU. She had made plans to complete a religious pilgrimage (Umrah) to Makkah, Saudi Arabia in March 2017; the trip is being organized by the Islamic Center at NYU. She has been forced to consider cancelling her journey because she would be ineligible to reenter under the Executive Order.

## <u>PROCEDURAL HISTORY</u>

70.     Petitioners in the underlying action are Hameed Khalid Darweesh, an Iraqi husband and father of three, and Haider Sameer Abdulkhaleq Alshawi, an Iraqi husband and father. Both had been granted visas due to their association with the United States military, after the federal government deemed them not to pose threats to the United States. They landed at JFK on January 27, 2017, and were detained and prevented from exiting the airport solely pursuant to the Executive Order.

71.     On Saturday, January 28, 2017, the Petitioners filed a Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injuctive Relief with this Court ("Petition") (ECF No. 4).

72.     The Petition alleges that the Executive Order is unlawful as applied to the two named Petitioners as well as all others similarly situated. The Petition alleges five causes of action under various legal authorities, including the Fifth Amendment to the United States Constitution; the Immigration and Nationality Act and its implementing regulations; the United Nations Convention Against Torture, as implemented in the Foreign Affairs Reform and Restructuring Act

of 1998; and the Administrative Procedure Act.

73.      The Petition requested the Court issue a writ of habeas corpus requiring the Respondents to release the named Petitioners and other members of the proposed class; issue an injuction ordering the Respondents not to detain any individual solely on the basis of the Executive Order; enter a judgment declaring that the Respondents' detention of the named Petitioners and other members of the proposed class is and will be contrary to law; and award the named Petitioners and other class members reasonable costs and attorneys' fees.

74.      Also on January 28, 2017, the Petitioners filed an Emergency Motion for Stay of Removal (ECF No. 6) on behalf of themselves and all others similarly situated.

75.      A hearing was held on the same date, after which the Court issued its January 28, 2017 temporary restraining order (ECF No. 8). After noting the Petitioners' strong likelihood of success in establishing that the removal of Petitioners and those similarly situated would violate their rights to due process and equal protection under the U.S. Constitution, the Court enjoined the Respondents from removing individuals with refugee aplications approved by U.S. Citizenship and Immigration Services as part of the U.S. Refugee Admissions Program; holders of valid immigrant and non-immigrant visas; and other individuals from Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen who are legally authorized to enter the United States.

76.      On January 29, 2017, out of concern that the Respondents were not complying with the Court's January 28, 2017 order, Petitioners filed an Emergency Motion for Clarification and Enforcement of Order (ECF No. 9). In the motion, Petitioners stated that their counsel had received repeated reports that individual members subject to the Court's January 28, 2017 order had been placed on planes, possibly deported, and were subject to intimidation to sign removal orders—at JFK and Los Angeles International Airports—after issuance of the Court's order. Accordingly,

Petitioners moved the Court to clarify that its January 28, 2017 order is nationwide in scope and order the Respondents to enforce the stay of removal.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Fifth Amendment-Equal Protection)

77.     The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

78.     The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

79.     The Executive Order was motivated by animus and a desire to harm a particular group, as demonstrated by statements made by Defendants concerning their intent and their proposed applications of those provisions.

80.     The terms and application of the Executive Order are arbitrary and cannot be sufficiently justified by federal interests.

81.     Sections 3 and 5 of the Executive Order target individuals for discriminatory treatment based on their country of origin and/or religion, without lawful justification.

82.     For example, Section 3 of the Executive Order suspends entry into the U.S. even of persons holding valid visas to live, work, and study in the U.S. The specific process for applying for each of these visas differs by category, but applicants are always rigorously screened—often by multiple agencies of the U.S. government—before a visa can be approved. The Petition in this case describes the procedures required by the Iraqi Special Immigrant Visa (SIV) program, and the extensive screening applied to Petitioner Hameed Khalid Darweesh between his application for an SIV on or about October 1, 2014 and the visa issuance on January 20, 2017. *See* Petition ¶¶ 23-30.

-23-

83.     Through their actions above, Defendants have violated the equal protection guarantee of the Fifth Amendment.

84.     Affected persons who were abroad at the time that the Executive Order was signed have been or will be unable to travel to or return to New York. Affected persons who are currently in New York have been chilled from leaving New York to visit family, conduct business or research, or undertake other lawful activities—including religious travel—for fear of being unable to reenter the United States upon their return.

85.     Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

86.     Defendants' violations cause ongoing harm to the State of New York itself.

**Second Cause of Action**
**(First Amendment-Establishment Clause)**

87.     The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

88.     The Establishment Clause of the First Amendment prohibits the federal government from officially preferring one religion over another.

89.     Sections 3 and 5 of the Executive Order are intended to disfavor Islam and favor Christianity, as confirmed by statements made by Defendants concerning their intent and their proposed application of these provisions.

90.     The Executive Order suspends entry into the United States of immigrants and nonimmigrants from seven Muslim-majority countries and bans refugees from Syria, also a Muslim-majority country. Several statements by Defendants confirm that this selection of countries was intended to, and in effect does, serve as a proxy for a ban on Muslims entering the

-24-

United States. President Trump has repeatedly expressed his intent to enact a Muslim ban and has intimated on more than one occasion that he would disguise the ban as a facially neutral immigration provision ostensibly based on territory rather than religion. *See supra* ¶¶ 11-12.

91.     The Executive Order favors claims of religious persecution by religious minorities. Although Section 5 of the Executive Order does not on its face specify any particular religious denomination, Defendant Trump's statements have confirmed that the purpose of this provision is to favor Christianity. *See supra* ¶ 20.

92.     The Executive Order also stigmatizes Islam. By singling out Islam for disfavored treatment, the Executive Order conveys a message to New Yorkers (Muslims and non-Muslims alike) that Islam is uniquely threatening and dangerous. In addition, the Executive Order invokes negative stereotypes about Muslims by referring, for instance, to "honor" killings and other "acts of gender-based violence against women." In signing the Executive Order, Defendant Trump pledged to "keep radical Islamic terrorists"—as opposed to "terrorists" or "radical terrorists"—"out of the United States."

93.     The Executive Order's stigmatization of Islam harms New Yorkers. Such stigma threatens to chill Muslims in New York from practicing their religion openly, by causing them to fear hostility from others. For instance, even before the Executive Order was issued, on January 25, 2017, a man at JFK threatened and kicked a Muslim airline worker who was wearing a hijab and then told her, "Trump is here now" and "he will get rid of all of you."[26] This incident demonstrates the real risk that governmental expressions of animus toward Muslims will translate into private violence—risks that are magnified when animus toward Muslims is formalized in official communications such as the Executive Order.

---

[26] Christopher Mele, *Man Kicked J.F.K. Airport Worker Wearing Hijab, Prosecutor Says*, N.Y. Times (Jan. 26, 2017), https://www.nytimes.com/2017/01/26/nyregion/queens-ny-jfk-attack.html.

94.     Muslims in New York are also injured by the government's condemnation of their religion, which itself is a cognizable harm under the Establishment Clause.

95.     Through their actions above, Defendants have violated the Establishment Clause of the First Amendment.

96.     Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

97.     Defendants' violations cause ongoing harm to the State of New York itself.

**Third Cause of Action**
**(Fifth Amendment-Procedural Due Process)**

98.     The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

99.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their liberty interests without due process of law.

100.     Where Congress has granted statutory rights and has authorized procedures applicable to arriving and present non-citizens, minimum due process rights attach to those statutory rights. For example, many types of U.S. visas authorize the visa-holder to reside and work in the United States for a set period of time, and to bring the visa-holder's family members to join him or her for the duration of the visa-holder's authorized stay.

101.     The Executive Order and the agency defendants' implementation of that Order has the effect of generally barring the re-entry into the United States of persons from the seven designated countries even when they hold certain types of U.S. visas and would otherwise be eligible for re-entry into the United States. Such action separates those visa holders from their spouses and children, who may have remained behind in the United States. It also places the

-26-

holders of employment-related visas at risk of losing their qualifying work.

102.    New York has many residents who have been granted legal permanent resident status, H-1B visas, and other similar authorizations to live and work in the United States. Affected persons who were abroad at the time that the Executive Order was signed have been or will be unable to travel to or return to New York. Affected persons who are currently in New York have been chilled from leaving New York to visit family and conduct business, for fear of being unable to reenter the United States upon their return.

103.    The Executive Order deprives New York residents and other individuals of their statutorily granted rights to live and work in the United States without providing them any notice or opportunity to be heard.

104.    By their actions, defendants have and are violating the procedural due process rights of such individuals.

105.    Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

106.    Defendants' violations cause ongoing harm to the State of New York itself.

**Fourth Cause of Action**
**(Violation of Federal Statutes and Regulations)**

107.    The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

108.    Individuals arriving at a port of entry in the United States, including those arriving by airplane, are entitled to certain rights and procedures specified by federal immigration laws and regulations. For example, lawful permanent residents, regardless of their country of origin, cannot be summarily excluded from the United States. Even where expedited

removal procedures would otherwise apply, the relevant provisions state that an immigration officer "shall not order [a lawful permanent resident] removed." 8 C.F.R. § 235.3(b)(5)(ii).

109.     Sections 1158 and 1225 of the INA also entitle aliens present or arriving in the United States to apply for asylum. 8 U.S.C. §§ 1158, 1225.

110.     Section 1231 of the INA provides that an alien may not be removed to a country where his or her life or freedom would be threatened on certain specified grounds, and entitles an alien to attempt to make that showing. *Id.* § 1231(b)(3).

111.     The United Nations Convention Against Torture—implemented in the Foreign Affairs and Restructuring Act of 1998, Pub. L. 105-277, div. G, subdiv. B, title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note)—entitles certain individuals entering the country to apply for asylum, withholding of removal and CAT relief.

112.     Federal regulations set out detailed procedures for effectuating these and other statutory rights. For example, where an arriving alien subject to expedited removal "indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 C.F.R. 208.30." *See* 8 C.F.R. § 235.3(b)(1)(i), (4). If after that interview the asylum officer determines that the person does not have a credible fear of persecution or torture, the person has a right to review of the asylum officer's determination by an immigration judge. *Id.* § 235.3(b)(4)(i)(C); *see also id.* §§ 208.30(g), 1208.30(g)(2).

113.     Similarly, where such an individual asserts that he or she is has been granted the status of a lawful permanent resident, refugee, asylee or U.S. citizen, an immigration officer claim must attempt to verify the claim. *Id.* § 235.3(b)(1)(i), (5). If the officer is unable to do so,

the officer must, among other things, issue an expedited order of removal and refer the alien to an immigration judge to review the order. *Id.* § 235.3(b)(1)(i), (5); *see also id.* § 235.6(a)(2)(ii).

114.    On information and belief, individuals arriving from the seven designated countries have been denied the foregoing protections, in violation of the rights and procedures established by federal statutes and regulations.

115.    Defendants have therefore violated these statutes and regulations.

116.    Upon information and belief, these violations have harmed persons entering New York, including Petitioner Hameed Darweesh, an Iraqi citizen holding a Special Immigrant Visa, who was detained from January 27 through January 28, 2017 at JFK. Although he had a fear of persecution if he was returned to Iraq, he was not offered a credible fear interview.

117.    Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

118.    Defendants' violations cause ongoing harm to the State of New York itself.

### Fifth Cause of Action
### (Procedural Violation of the Administrative Procedure Act)

119.    The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

120.    The Administrative Procedure Act, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct formal rule making before engaging in action that impacts substantive rights.

121.    In implementing Sections 3 and 5 of the Executive Order, federal agencies have changed the substantive criteria by which individuals from affected countries may enter the United States and have restricted the scope of the protections that such individuals are afforded

under current laws and regulations.

122.     With respect to such individuals, the Executive Order effectively requires federal agencies to substitute the order's directives for the nation's detailed scheme of immigration statutes and regulations, including the provisions of the INA and Title 8 of the Code of Federal Regulations described above. No federal agency has followed the procedures required by the Administrative Procedure Act to amend or rescind the relevant regulations, which remain in force.

123.     Through their actions above, Defendants have violated the Administrative Procedure Act.

124.     Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

125.     Defendants' violations cause ongoing harm to the State of New York itself.

**Sixth Cause of Action**
**(Substantive Violation of the Administrative Procedure Act)**

126.     The NYAG realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

127.     The Administrative Procedure Act, 5 U.S.C. § 706(2), prohibits federal agency action that is arbitrary, unconstitutional, and contrary to statute.

128.     Federal agencies have acted arbitrarily and capriciously by implementing the Executive Order in inconsistent ways and by making conflicting statements about its application.

129.     For instance, as recounted above, Customs and Border Protection and the Department of Homeland Security have taken shifting positions on whether and how the Executive Order applies to legal permanent residents. Similarly, it remains unclear whether, as

State Department officials initially stated, the Executive Order bars dual nationals from the seven affected countries from entering the United States.

130.     In implementing Sections 3 and 5 of the Executive Order, federal agencies have taken unconstitutional and unlawful action, and acted arbitrarily and capriciously, in violation of the Administrative Procedure Act.

131.     Defendants' violations cause ongoing harm to individuals who live, work, and study in New York State; to the institutions that employ and educate such persons; and to the communities in which they reside.

132.     Defendants' violations cause ongoing harm to the State of New York itself.

## **PRAYER FOR RELIEF**

**WHEREFORE** the Intervenor-Plaintiff respectfully requests that the Court:

a.   Assume jurisdiction over this matter;

b.   Enter a judgment declaring that the Executive Order as a whole, and each of its specific provisions, violates federal law and is otherwise unconstitutional;

c.   Enjoin Defendants from implementing or enforcing the Executive Order and from detaining any individual and/or barring or removing any individual from the United States pursuant to the Executive Order; and

d.   Grant any other relief the Court deems necessary and proper.

Respectfully submitted,

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York

By:

_____
Lourdes M. Rosado[*]
   Bureau Chief
Jessica Attie
   Special Counsel
Civil Rights Bureau

Anisha Dasgupta
   Deputy Solicitor General

Andrew W. Amend
   Senior Assistant Solicitor General


Office of the New York State
   Attorney General
   120 Broadway
   New York, New York 10271
   Tel. (212) 416-8250
   Fax (212) 416-8074
   Lourdes.Rosado@ag.ny.gov

*Of Counsel*:

Justin Deabler
Sania Khan
Anjana Samant
   Assistant Attorneys General
Civil Rights Bureau

Adam Pollock
Mark Ladov
   Assistant Attorneys General

Dated:        February 2, 2017
              New York, New York

_____

[*] Admission pending.

-32-