UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMEED KHALID DARWEESH, et al., <br><br> on behalf of themselves and others similarly situated, <br>         *Petitioners*, <br><br>         v. <br><br> DONALD TRUMP, President of the United States, et al., <br><br>         *Respondents*. | **Memorandum of Law in Support of Motion to Enforce Court Order** <br><br> Case No. 1:17-cv-00480 (CBA) <br><br><br> Date: February 7, 2017 |

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION TO ENFORCE COURT ORDER BY COMPELLING (1) DISCLOSURE OF LIST OF INDIVIDUALS DETAINED; AND (2) RETURN OF INDIVIDUALS REMOVED**

Pursuant to Federal Rule of Civil Procedure 7(b) and Local Rule 7.1, Petitioners Hameed Khalid Darweesh and Haider Sameer Abdulkhaleq Alshawi, on behalf of members of the proposed class, respectfully move this Court to enforce its January 28, 2017 order requiring Respondents to provide Petitioners' counsel with a list of all individuals detained and/or removed pursuant to the January 27, 2017 Executive Order ("EO"). Docket Text Order, Jan. 28, 2017, 10:15 PM (EST). Petitioners also request that the Court order the return of individuals removed on the basis of the EO and its implementing instructions after Petitioners' motion for class certification was filed, at which point this Court's jurisdiction over the putative class had attached.

First, Petitioners request that, pursuant to its January 28 order, the Court order Respondents to produce a list of all putative class members who have been held by Respondents

1

at any U.S. airport pursuant to the EO. *See id.*; *see also* Decl. of My Khanh Ngo ("Ngo Decl."), Ex. A (Order, *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB) (E.D. Va. Feb. 3, 2017) (Brinkema, J.), ECF No. 38, (requiring the government to provide a "list of all persons who have been denied entry to or removed from the United States since" the EO in litigation similar to this case)). It has now been ten days since this Court issued its order and, despite repeated written requests by Petitioners' counsel (including after the February 2 status conference), Respondents have yet to produce the list.

Second, as stated in Petitioners' previous Emergency Motion for Clarification and Enforcement of Order, ECF No. 9, multiple putative class members were removed pursuant to the EO after the filing of the motion for class certification. Petitioners have compiled several declarations documenting removals after the commencement of this action or entry of the Court's nationwide order on January 28. *See infra* Part II. Many were detained by the government for hours without food, coerced into signing forms they did not understand, and expressly denied the opportunity to consult with counsel. In light of the troubling circumstances of these removals, Petitioners respectfully request that this Court order the return of all individuals who were removed pursuant to the EO since the filing of Petitioners' motion for class certification at 5:43 AM on January 28, 2017.[1]

---

[1] As ordered by the U.S. District Court in Seattle, *see* Order at 5-6, *Washington v. Trump*, No. 2:17-cv-00141 (W.D. Wash. Feb. 3, 2017), ECF No. 52, the government has offered to assist with the return of individuals that Petitioners identify as having had their visas revoked. *See* Ngo Decl., Ex. I (Letter from Steven A. Platt to Muneer Ahmad (Feb. 6, 2017)); *see also infra* Parts II, II.D. However, the Seattle order may be vacated at any time, and Petitioners have not received a list of all individuals who were returned to their countries of origin, making it impossible to identify the full list of individuals unlawfully removed.

2

I. **Disclosure of List of Names Pursuant to This Court's Order**

The government has already been ordered to produce a list of "individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." Docket Text Order, Jan. 28, 2017, 10:15 PM (EST). However, despite repeated written requests for this list, Respondents have yet to provide Petitioners' counsel with *even one name* of any person held at any U.S. airport or returned to a foreign port. *See* Ngo Decl., Exs. B–I (email and letter correspondence with government counsel). To date, Petitioners still have not received the list in spite of multiple subsequent requests. *See* Ngo Decl. Ex. I (Letter from Steven A. Platt to Muneer Ahmad (Feb. 6, 2017)) (reiterating the government's position that no individuals are currently detained, and declining to provide the names of all those detained since the motion for class certification was filed).

The government's attempts to justify its failure to comply with this Court's order are untenable. The government's stated position is that persons who have been held at airports, often for hours, are merely being "processed," and so fall outside the order. *See* Ngo Decl., Ex. E (Email from Steve Platt to My Khanh Ngo, (Jan. 31, 2017)) ("At this time, we are not aware of CBP [or ICE] detaining any individual anywhere in the country under the Executive Order. By 'detained', I do not mean individuals who are being processed at a port of entry."). Similarly, the government contends that Judge Donnelly intended merely a one-time snapshot of persons held now, rather than a cumulative list of those who have been held at airports pursuant to the EO. *Id.* ("ICE can confirm that it is not *currently detaining* any individuals under the Executive Order." (emphasis added)). Later, before the Court, counsel for the government argued that its disclosure obligation was limited to those held "*solely* on the basis of [the] Executive Order," Status Conf. Tr. 21:10, Feb. 2, 2017 (emphasis added), adding limitations not present in Judge Donnelly's

3

order. Finally, in a letter to Petitioners' counsel dated February 6, 2017, the government represented that it did not consider individuals who "voluntarily" agreed to removal to fall within Judge Donnelly's order. Ngo. Decl., Ex. I.

As explained below, the government's cramped reading of this Court's order is incorrect. Whether Respondents deem the confinement of class members at airports as "processing" or "detention," putative class members in this habeas action were plainly in Respondents' custody, and the Court's order plainly was intended to require the production of a list of class members' names. Nor can the government seriously argue that Judge Donnelly intended to compel the disclosure of putative class members based on a one-time snapshot of those held at a particular instant in time, days after the order issued, rather than as a list of all those who have been and are being held pursuant to the EO.

Finally, this case challenges the holding or return of anyone based on the January 27 EO and its implementing instructions, including a directive issued that same day revoking tens of thousands of visas. *See* Letter of Edward J. Ramotowski, Deputy Asst. Sec'y, Bureau of Consular Affairs, Dep't of State (Jan. 27, 2017), ECF No. 20-1. This recovation, which was subsequently reversed, *see* Letter of Edward J. Ramotowski, Deputy Asst. Sec'y, Bureau of Consular Affairs, Dep't of State (Feb. 3, 2017), ECF No. 50-1, affected many putative class members, who remain stranded abroad. *See infra* Part II. The Court therefore should order the government to provide a list of all those putative class members who have been held by Respondents at any U.S. airport pursuant to the EO, including those returned, whether based on a purported "voluntary" withdrawal of an application for admission, visa revocation pursuant to the Department of State's instruction implementing the EO, or otherwise. Although the government has offered to assist in returning any removed individuals, *see* Ngo Decl., Ex. I, only

4

by providing such a list can the parties effectuate the purpose of the TRO: to "preserve [the] status quo" before the issuance of the EO. Stay Hr'g Tr. 18:15, Jan. 28, 2017, ECF No. 17.

### A. There Is No Relevant Distinction Between Detention and "Processing"

As an initial matter, the government's position that individuals being "processed at a port of entry" are not being held is untenable. An individual who is referred to secondary inspection, questioned, and held (often for hours) would be considered held or "detained" under any reasonable understanding of that term. Moreover, the U.S. Customs and Border Protection ("CBP") Inspector's Field Manual ("IFM")—an official CBP publication—specifically explains that "[d]uring an inspection at a port-of-entry, detention begins when the applicant is referred into secondary or waits for processing." Ngo Decl., Ex. J at 17.8 (CBP Inspector's Field Manual); *see also id.* (explaining that when a person is "referred by an officer for further inspection" and is taken to "a secondary inspection area, POE ['point-of-entry'] hold room, or any other designated and/or assigned secure area for less than 24 hours," they are in "short-term detention").[2] The declarations attached to this motion demonstrate that many individuals subject to the EO were held in just this way, often for hours. *See, e.g.*, Decl. of Sara Yarjani ("Yarjani Decl.") ¶ 39. Accordingly, "processing" is simply holding by another name. The Court's order,

---

[2] While CBP may change how it defines "detention" for its own purposes or for consistency in its manuals, CBP is not free to change the definition of detention in the broader context of habeas actions such as this one. In this context, the most natural interpretation of the Court's order is that it encompasses all individuals who had been subject to the challenged detention. *See* 28 U.S.C. § 2241 (extending writ of habeas corpus to individuals "in custody under or by color of the authority of the United States"). However, CBP has not been transparent regarding even its own terminology. In 2013, CBP began to phase out use of the IFM and phase in use of the Officer's Reference Tool ("ORT"). Despite a 2013 FOIA request pursuant to 5 U.S.C. § 552 by the American Immigration Lawyers Association, CBP still has refused to release the ORT, making the IFM the most recent public evidence of CPB's interpretation of the meaning of "detention." Complaint, *American Immigration Law Association v. Dep't Homeland Security*, 1:16-cv-02470 (D.D.C. Dec. 19, 2016), ECF No. 1.

5

issued as an exercise of its habeas authority, concerned all putative class members whom Respondents held or had held pursuant to the EO. As a result, the names of these individuals "processed" under the EO must be disclosed to Petitioners.

### B. The Court's Order Requires Disclosure of All Individuals Who Have Been Detained Under the EO Since the Filing of the Motion for Class Certification

The context of the Court's order for the list makes clear the broad scope of the relief contemplated. This suit was brought on behalf of all individuals who were stopped at an airport, held there, and threatened with removal from the country. By issuing a stay based on Petitioners' habeas petition, Judge Donnelly conveyed the Court's concern about maintaining the status quo for all individuals held in government custody pursuant to the EO. The Court's order was not limited to a snapshot of individuals detained at one point in time. At the hearing held on January 28, 2017 preceding the Court's order, Respondents' counsel stated it would be "more difficult than it sounds" to provide a list of who was being detained, because "[p]eople are coming in all the time." Stay Hr'g Tr. 17:14–15. The Court, aware that the list of individuals held was likely to fluctuate, nevertheless ordered the government to produce the list. *Id.* at 17:17; Order, ECF No. 8.

Moreover, at the January 28 hearing, Petitioners specifically requested that the Court order production of a list for the purpose of facilitating "communicat[ion] with specific individuals." Stay Hr'g Tr. 16:21. Counsel for Petitioner pointed out at the hearing that the manner of locating class members at that time was primarily through "happenstance," *id.* at 17:2–3, and indicated that a reason for the list was to identify class members that counsel would not know of otherwise, *id.* at 16:22–17:3. When Respondents' counsel resisted, the Court agreed with Petitioners that "the whole point of this hearing is to preserve this status quo[,]" *id.* at 18:14–15, and that it would not be "unduly burdensome to identify the people that we're talking

6

about here within the specific class[,]" *id*. at 18:17–19. Counsel for Petitioner further expressed his concern "about the person and probably other people who are about to get on the plane," *id*. at 19:9–10, and the Court clarified that "[n]obody is to be removed in this class," *id.* at 19:15–16 (emphasis added). The Court's order for a list of detained individuals was thus intended to preserve the status of individuals who had rightful permission to enter the United States prior to the EO—a purpose that could only be achieved through disclosure of the names of *all* individuals held by CBP and ICE, including those held for any amount of time or otherwise "in custody" under the EO.

In similar litigation, Judge Brinkema of the Eastern District of Virginia has ordered the government to produce a similar list covering anyone denied entry or removed under the EO, since the EO was issued. *See* Ngo Decl., Ex. A. Similar to this Court's order, the order issued in *Aziz* was not limited in time, and, as such, the order issued in this case should likewise be interpreted to encompass all individuals held pursuant to the EO.

### C. The Order is Not Limited to Requiring Disclosure of Individuals Held Based "Solely" Under the Executive Order

Contrary to the plain text of the Court's order and this Court's instructions during the January 28 hearing, Respondents seek to limit the order further by adding qualifications the Court never imposed. *Compare* Docket Text Order, Jan. 28, 2017, 10:15 PM (EST) (directing Respondents "to provide a list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel"), *with* Steven Platt, Status Conf. Tr. 21:11–14 (asserting list would be a "null set" because "neither [CBP] or [ICE] . . . *are detaining* anyone *solely* under this executive order" (emphases added)) *and* Ngo Decl., Ex. I (Feb. 6, 2017, Letter from Steven A. Platt to Muneer I. Ahmad) (asserting that individuals who "voluntarily withdrew

7

their applications for admission and departed for a foreign destination" were not removed pursuant to the EO, and thus not part of the required list).

First, the government appears to draw a spurious distinction between denying entry "solely" under the EO and, for example, turning an individual away for lack of a valid travel document, such as a visa that had been revoked pursuant to the EO. *See* Letter of Edward J. Ramotowski, Deputy Asst. Sec'y, Bureau of Consular Affairs, Dep't of State (Jan. 27, 2017), ECF No. 20-1 (noting the provisional visa revocation was undertaken "in implementation of section 3(c) of the Executive Order"). The government's distinction is hollow, as either procedure derives from the EO. The Court's order also does not in any way qualify the clause "pursuant to the January 27, 2017 Executive Order." Docket Text Order, Jan. 28, 2017, 10:15 PM (EST). Rather, as Judge Donnelly noted, the purpose of the TRO is to "preserve [the] status quo." Stay Hr'g Tr. 18:15. Thus, it is intended to preserve the status of individuals who had rightful permission to enter the United States prior to the EO. As a result, Petitioners respectfully ask that the Court require Respondents to disclose the names of all individuals held for any period of time as a result of this directive and any other implementing instructions pursuant to the EO.

Second, the government claims that some removed individuals departed "voluntarily" by withdrawing their applications for admission and departing the United States, and that disclosure of such individuals is not required. Ngo Decl., Ex. I. But as the declarations included with this motion indicate, several proposed class members were intimidated and coerced into withdrawing their applications under conditions that cannot, under any reasonable interpretation, be construed

8

as voluntary.[3] *See infra* Part II. In some cases, the EO itself was the coercive instrument used by the government to procure the "voluntary" withdrawals of applications for admission. Decl. of Snober ¶ 12; Abushamma Decl. ¶ 8. The government's effort to evade the Court order by characterizing the removals as "voluntary" highlights the need for disclosing the list of all putative class members who have been held by Respondents at any U.S. airports. Without such a list, Petitioners will be unable to identify all the individuals who were denied entry on the basis of the EO, whether thorugh its direct application or through coercion.

### D. The Purpose of the List Requires Broad Disclosure

The original and continuing need for the list is clear. Petitioners' counsel seeks information solely in the possession of the government in order to identify and communicate with class members, monitor compliance with the Court's stay order, and seek remedy for noncompliance and other violations of class members' rights. But the government's interpretation stymies each of these purposes. A single snapshot of those held at a given moment of Respondents' choosing provides Petitioners' counsel no meaningful information and no ability to monitor the government's compliance; a snapshot of those "detained"—according to the government's groundless definition—affords even less. Finally, this Court should rule that Respondents must provide Petitioners with a list of all individuals held in order to allow Petitioners to pursue appropriate remedies for class members who were wrongfully detained or returned. *Cf.* Ngo Decl., Ex. E (Email from Steven A. Platt to My Khanh Ngo (Jan. 31, 2017,

---

[3] Shortly before this filing, on February 7, 2017, Petitioners provided Respondents with a list of individuals who were intimidated and coerced into signing withdrawal applications, some of whom have still been unable to secure transport back to the United States. While the Government offered to "discuss the prospect of facilitating []travel back to the United States" for certain class members of whom Petitioners are "aware," *see* Ngo Decl. Exh. I, the government's failure to provide the list makes it difficult if not impossible for Petitioners and their counsel to identify all individuals who were unlawfully removed.

9

9:49 PM EST)) ("If you are aware of any individuals being unlawfully detained, please let us know . . ."). Without the list ordered by the Court, counsel has been able to monitor Respondents' compliance with the Court's order only through ad hoc reports from noncitizens, family members, and attorneys around the world who are able to contact Petitioners' counsel.

Ultimately, the government's position on the list is unjustifiable. In essence, the government contends it may delay more than a week after the Court's order without providing any information about individuals detained pursuant to the EO, unilaterally modify the Court's own words, and then invent arbitrary distinctions in order to announce that the list the Court ordered is a "null set" because no one is *currently* held as the government chooses to understand that term. Whether Respondents have taken this position as a result of the chaos engendered by this EO or for some other reason, the government's proffered interpretations would deprive the Court's order of any significance.

## II.    The Return of Individuals Removed

With this motion, Petitioners submit declarations establishing that Respondents removed eleven individuals[4] pursuant to the EO, after the Petitioners filed their motion for class certification. *See infra* Part II.A. There are likely many more. At least one of these removals took place after the Court issued a nationwide order staying removal.[5] Because the government has not identified individuals removed pursuant to the EO, *see supra* Part I, it is plausible that the government has carried out additional removals in violation of this Court's order. At the

---

[4] The eleven individuals include the eight named declarants and their family members.
[5] Petitioners understand that many putative class members signed forms, often under coercion, agreeing to withdraw their applications for admission, and were then subsequently placed on planes returning them to the country from which they had traveled. Petitioners use the term "removal" to refer to the process by which Respondents implemented the EO to prohibit class members' entry to the United States, resulting in their forced departures.

10

moment, the government is offering to assist with the return of some individuals, as required by the temporary restraining order entered by the U.S. District Court in Seattle. The government has filed an emergency appeal of the Seattle order, however, and because that order may be vacated at any time, and because it will soon expire in any event, Petitioners request an order from this Court for the return of putative class members. See also Stay Hr'g Tr. 13:14-15 (Judge Donnelly finding "likelihood of success" of class certification motion). Removals of class members based on the EO are unlawful, including those removals based upon State Department guidance implementing the EO through the revocation of visas. In light of Respondents' unlawful actions, this Court should exercise its inherent and statutory authority to order the return of all those individuals removed pursuant to the EO since the filing of the motion for class certification at 5:43 AM EST on January 28, 2017.

### A. Respondents Removed Numerous Class Members After the Motion for Class Certification Was Filed

Despite being on notice of putative class members' challenge to removal based on the Executive Order, the government effectuated numerous removals after Petitioners filed their motion for class certification. The removals of Hind Elbashir, Sara Yarjani, and Yahya Aburomman, detailed below, are illustrative of the declarations accompanying this memorandum, and indicate troubling practices the government engaged in after the filing of this lawsuit and class certification motion. While some of these individuals have since returned to the United States at their own cost, and with the help of extraordinary efforts by individual lawyers, others remain abroad.

#### 1. Hind Elbashir

Putative class member Hind Elbashir traveled to Orlando, Florida on Saturday, January 28, 2017 to care for her sister and her sister's children. Decl. of Hind Elbashir ¶ 2, ¶¶ 4–5. Her

sister was about to give birth and needed assistance to care for her newborn baby and her son with severe autism. *Id.* ¶ 5. Ms. Elbashir received a B-2 visa on January 11, 2017 and planned to stay with her sister for one month to provide this crucial support. *Id.* ¶¶ 5–6, 8. However, when Ms. Elbashir arrived at the airport on January 28 at 10:30 AM EST, she was denied entry based on the EO, which had been issued while she was in transit. *Id.* ¶¶ 9, 11–12, 16. Ms. Elbashir was detained in a secondary processing room by CBP for approximately ten hours before being coerced into leaving the United States on Lufthansa Flight No. 465, which left on or around January 28 at 9:10 PM EST. *Id.* ¶¶ 24–28; *see also id.* Ex. B (List of Historical Flight Departure Times for Lufthansa Flight Number 465). At least ten other individuals from countries with visa bans under the EO were returned on the same flight. *Id.* ¶ 25; *see also* Decl. of Rashid Gibril Ali ¶¶ 4, 10.

### 2. Sara Yarjani

Putative class member Sara Yarjani, a citizen of Iran and permanent resident of Austria traveling on an F-1 student visa, landed at the Los Angeles International Airport ("LAX") from Oslo, Norway at 8:35 PM PST on January 27, 2017. Yarjani Decl. ¶¶ 7–8. Ms. Yarjani was then detained by a CBP agent and taken to a back room. *Id.* ¶¶ 9–10. An officer who identified himself as a "case worker" questioned her and informed her that she was not admissible to the United States because her student visa was no longer valid. *Id.* ¶¶ 13–14. The officer presented Ms. Yarjani with two options: 1) comply by signing a form and agreeing to leave voluntarily, or 2) be forcibly removed with a reentry ban of one to five years or longer. *Id.* ¶ 15. Ms. Yarjani felt she had no choice but to comply and sign the form. *Id.* She was prohibited from calling anyone until her interview and paperwork had been completed. *Id.* ¶ 16. She was then sent back to the detention room. *Id.* ¶ 17. Ms. Yarjani was detained for nearly twenty-three hours at LAX before

boarding a flight departing the United States on January 28, 2017 at approximately 7:30 PM PST, after the issuance of this Court's order. *Id.* ¶¶ 37, 39.

### 3. Yahya Aburomman

CBP officers removed class member Yahya Aburomman after 5:00 PM CST on Monday, January 30, nearly *two full days* after the Court's order enjoining such removals was issued. Decl. of Yahya Aburomman ¶ 24. Mr. Aburomman is a Jordanian citizen holding a Jordanian passport that indicates he was born in Syria, one of the seven countries covered by the EO. *Id.* ¶¶ 1, 5. Jordan, however, is not on the list of seven countries covered by the EO. *See* EO, Sec. 3(c). Mr. Aburomman came to the United States on a B-1/B-2 visa in order to visit U.S.-citizen family members. Aburomman Decl. ¶¶ 2, 4. Upon his arrival at O'Hare Airport on January 29, 2017, CBP officers noticed his passport stated he was born in Syria and as a result held and questioned him for six hours. *Id.* ¶¶ 5, 11. The officers coerced him into signing papers agreeing to departure by threatening him with permanent banishment from the United States. *Id.* ¶ 19. After he signed the papers against his will, he was held in a locked cell in the airport for 20 hours. *Id.* ¶ 22. He was not permitted to speak to his brother, who was waiting for him at arrivals, or his lawyer. *Id.* ¶¶ 23, 25. Mr. Aburomman was subsequently returned to Jordan on January 30 via Lufthansa flight L431 to Frankfurt. *Id.* ¶ 25.

### B. This Court Should Order Class Members' Return to the United States

This Court has both inherent authority and statutory authority to order relief to potential class members removed pursuant to the EO and its implementation. 28 U.S.C. § 1651; *United States v. New York Tel. Co.*, 434 U.S. 159, 173 (1977) ("The Court has consistently applied the [All Writs] Act flexibly . . . ."); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 404 (S.D.N.Y. 2004) (noting that courts have both inherent and statutory authority to issue rulings to effectuate

relief). Exercising these powers, courts regularly order the return of deported individuals in appropriate circumstances. *See, e.g.*, *Sutuc v. Attorney General*, No 15-2425 (3d Cir. June 19, 2015); *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 408 (S.D.N.Y. 2004); *Dennis v. INS*, No. CIV.A. 301CV279SRU, 2002 WL 295100 (D. Conn. Feb. 19, 2002). Indeed, at least one other federal court has already done so for an individual removed pursuant to the EO. *See Vayeghan v. Kelly*, No. 17-0702, ECF No. 5 (C.D. Cal. Jan. 29, 2017), Ex. K ("Respondents shall transport Petitioner back to the United States and admit him under the terms of his previously approved visa.").

Here, an order requiring Respondents to return and admit putative class members removed subsequent to the filing of Petitioners' motion for class certification at 5:43 AM EST on January 28, 2017, *see* Mot. for Class Cert., ECF No. 4, is appropriate. Putative class members removed by the government were entitled to be heard on their application for a writ of habeas corpus. *See Boumediene v. Bush*, 553 U.S. 723, 779 (2008). The government's removal of putative habeas class members once it was on notice that they challenge their removal is contrary to principles of habeas jurisdiction, as the court must be in control of the body of the person so that it can be assured of its ability to provide effective relief. For this reason, the Court should order the return of the individuals who, at the time of the filing of the class certification motion, became putative class members challenging their removal.

Additionally, the Court retains jurisdiction over any individuals already removed pursuant to the Executive Order. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968); *see also United States ex rel. Meadows v. State of New York*, 426 F.2d 1176, 1182 (2d Cir. 1970). Ordering return would also be consistent with this Court's finding that class members are likely to prevail

14

on the merits of their claims and that there is "imminent danger" of "substantial and irreparable injury" if removed. Decision and Order, ECF No. 8; *see also* Mot. for Class Cert., ECF No. 4.

### C. The Government's Coercive Tactics Warrant Ordering Return of Putative Class Members Who Withdrew Their Applications for Admission

The attached declarations illustrate that the implementation of the EO was shot through with coercion compounded by the denial of access to counsel and translation services. Removals based on such coercion are unlawful and the Court should order the return of affected members of the proposed class.

A noncitizen's decision to withdraw an application for admission to the United States must be voluntary, or it is not legitimate. *See* 8 C.F.R. § 235.4. Respondents subjected class members to repeated threats and barred them from accessing counsel so as to coerce them into signing waivers. *See, e.g.*, Snober Decl. ¶ 20 (stating that Mr. Snober and his young children witnessed CBP officials handcuff a man in a detention room while other CBP officials had their hands on their guns); Abushamma Decl. ¶¶ 8–9, 13–15, 20 (stating that CBP agents refused Ms. Abushamma's repeated requests to speak with her immigration attorney, told her that she would be forcibly removed from the United States and banned from the country for five years unless she signed a waiver form, and did not provide her with any food until after she had signed a waiver form); Aburomman Decl. ¶ 19 (stating that CBP agents told Mr. Aburomman that he would be barred from reentering the United States "for the rest of [his] life" if he did not agree to his removal).

A decision made under threat—like many of the decisions made by the declarants here—is not voluntary. The government's claim that those who "voluntarily withdrew their applications for admission" under such threats did so neither pursuant to the EO nor involuntarily, *see* Ngo Decl., Ex. I, is mistaken. As courts have explained in the analogous context of voluntary

15

departure, it is coercive for an immigration official to present a noncitizen with the option of leaving the United States while threatening her with the negative possible consequences of seeking to remain. *See Orantes-Hernandez v. Smith*, 541 F. Supp. 351, 373 (C.D. Cal. 1982) (describing how an "interrogative environment and the omissions in the information provided by INS agents" can constitute coercion). Voluntariness may be negated where there are threats of lengthy detention, removal regardless of efforts made to remain, and other negative immigration consequences. *See Orantes-Hernandez v. Thornburg*, 919 F.2d 549, 562 (9th Cir. 1990). Indeed, even where such threats are "accurate descriptions of what may in fact occur," it is nonetheless true that "without any notice of rights, such accurate descriptions are improper." *Smith*, 541 F. Supp. at 373 (internal quotation marks omitted).

In the voluntary departure setting, "any waiver of rights made pursuant to a signature on a voluntary departure form must be effectuated willingly and with full knowledge of the effects of one's actions." *Maria S. v. Garza*, 2015 WL 4394745 at *5 (S.D. Tex. 2015). That was not always the case here. Further, noncitizens who do not speak English must be able to understand deportation proceedings to voluntarily waive their rights. *United States v. Ramos*, 623 F.3d 672, 680-81 (9th Cir. 2010). Yet, class members who did not understand the waiver forms were denied access to translators. *See* Alhaffar Decl. ¶¶ 8–9 (stating that CBP agents denied Ms. Alhaffar's request for a translator); *cf.* Decl. of Manar ¶ 14 (stating that CBP agents refused to explain form waiving rights). Thus, class members signed these forms without full consent or knowledge as to the consequences of so doing.

The results have been devastating for many removed individuals. As the attached declarations demonstrate, class members have been traumatized, were separated from their spouses, and missed critical family events due to their unlawful removal. *See, e.g.*, Elbashir Decl.

16

¶ 5 (stating at Ms. Elbashir was coming to the United States to assist her sister's family with the birth of a new child and with care for another child with special needs); Alhaffar Decl. ¶¶ 14-15 (stating that Ms. Alhaffar has been separated from her husband, that she was "emotionally devastated" by her experience, and that she does not know when she will see him again); Snober Decl. ¶¶ 21, 24 (stating Mr. Snober's family was "very upset[,] . . . depressed," and that his children have remained "very agitated").

Because Respondents coerced individuals into removal, denied them access to translation and counsel, and needlessly traumatized them, this Court should order their return. At an absolute minimum, the Court should require the government to return individuals removed after the Court issued its order on the evening of January 28.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that this Court order Respondents to:

(1) Immediately produce a list of the names of all individuals who have been detained at any time, including those processed, pursuant to the Executive Order, and provide daily updated lists to counsel about these detainees;

(2) Immediately produce the names of individuals removed pursuant to the Executive Order since the filing of the motion for class certification, the countries to which they were removed, the flights on which they were removed, and the times at which they were removed, and provide daily updated lists to counsel about these individuals; and

(3) Return to the United States all individuals who were removed at any time after the filing of Petitioners' motion for class certification because of the Executive Order.

DATED: February 7, 2017
New Haven, Connecticut

Respectfully submitted,

Omar C. Jadwat[**]
Lee Gelernt (LG-8511)
Cecillia D. Wang (CW-8359)
Andre I. Segura[†]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
ojadwat@aclu.org
lgelernt@aclu.org
cwang@aclu.org
asegura@aclu.org

/s/ Michael J. Wishnie
Michael J. Wishnie (MW 1952)
Muneer I. Ahmad[**]
Elora Mukherjee (EM 4011)
Marisol Orihuela[†]
JEROME N. FRANK LEGAL SERVICES
ORGANIZATION[*]
YALE LAW SCHOOL[‡]
P.O. Box 209090
New Haven, CT 06520-9090
Phone: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@yale.edu

Mark Doss
Rebecca Heller
Julie Kornfeld
Stephen Poellot
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
URBAN JUSTICE CENTER
40 Rector St, 9th Floor
New York, NY 10006
Tel. (646)-602-5600
mdoss@refugeerights.org
bheller@refugeerights.org
jkornfeld@refugeerights.org
spoellot@refugeerights.org

Jennifer Chang Newell[††]
Cody H. Wofsy[††]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 343-0770
jnewell@aclu.org
cwofsy@aclu.org

Jonathan Polonsky
KILPATRICK TOWNSEND & STOCKTON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel. (212) 775 8703
jpolonsky@kilpatricktownsend.com

Karen C. Tumlin[††]
Nicholas Espíritu[††]
Melissa S. Keaney[†]
Esther Sung[†]
NATIONAL IMMIGRATION
LAW CENTER
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Phone: (213) 639-3900
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Justin B. Cox[†]
NATIONAL IMMIGRATION
LAW CENTER
1989 College Ave. NE
Atlanta, GA 30317
Phone: (678) 404-9119
cox@nilc.org

[**] Application for admission forthcoming.
[*] Law students working on behalf of the Legal Services Organization include Tiffany Bailey, Willem Bloom, Adam Bradlow, Catherine Chen, David Chen, Jordan Laris Cohen, Charles Du, Susanna Evarts, Katherine Haas, Amit Jain, My Khanh Ngo, Aaron Korthuis, Andrea Levien, Carolyn Lipp, Zachary Manfredi, Melissa Marichal, Adan Martinez, Joseph Meyers, Natalia Nazarewicz, Megha Ram, Victoria Roeck, Joseph (Yusuf) Saei, Thomas Scott-Railton, Yun Tang, Rachel Wilf, and Elizabeth Willis. Motions for law student appearance forthcoming.
[†] Motion for admission *pro hac vice* forthcoming.
[††] Appearing *pro hac vice*.
[‡] For identification purposes only. This motion has been prepared by a clinic operated by Yale Law School, but does not purport to present the school's institutional views, if any.

*Counsel for Petitioners*