## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

HAMEED KHALID DARWEESH and
HAIDER SAMEER ABDULKHALEQ
ALSHAWI,

on behalf of themselves and others similarly
situated,

Case No. 1:17-cv-00480

*Petitioners*,

v.

Date: February 7, 2017

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"); JOHN KELLY, Secretary of DHS;
KEVIN K. MCALEENAN, Acting
Commissioner of CBP; JAMES T.
MADDEN, New York Field Director, CBP,

*Respondents*.

## DECLARATION OF MY KHANH NGO

I, My Khanh Ngo, upon my personal knowledge and in accordance with 28 U.S.C. §
1746, hereby declare as follows:

1. I am a law student intern with the Jerome N. Frank Legal Services Organization
   at Yale Law School. I am over eighteen years of age and I understand the
   obligations of an oath.

2. All of the exhibits attached hereto are true and accurate copies of the originals.

3. Exhibit A is a true and accurate copy of the Order, *Aziz v. Trump*, No. 1:17-cv-
   116 (LMB/TCB) (E.D. Va. Feb. 3, 2017), ECF No. 38.

4. Exhibit B is a true and accurate copy of the Email from My Khanh Ngo, Law
   Student Intern, Jerome N. Frank Legal Services Organization, to Scott Dunn,
   Assistant U.S. Attorney, E.D.N.Y. (Jan. 30, 2017, 7:20 A.M. EST).

5.  Exhibit C is a true and accurate copy of the Email from Steven A. Platt, Trial Attorney, U.S. Dep't of Justice, to My Khanh Ngo (Jan. 30, 2017, 9:33 P.M. EST).

6.  Exhibit D is a true and accurate copy of the Email from My Khanh Ngo to Steven A. Platt (Jan. 31, 2017, 9:23 A.M. EST).

7.  Exhibit E is a true and accurate copy of the Email from Steven A. Platt to My Khanh Ngo (Jan. 31, 2017, 9:49 P.M. EST).

8.  Exhibit F is a true and accurate copy of the Email from My Khanh Ngo to Steven A. Platt (Feb. 1, 2017, 3:51 P.M. EST).

9.  Exhibit G is a true and accurate copy of the Letter from Muneer I. Ahmad, Supervising Attorney, Jerome N. Frank Legal Services Organization, to Steven A. Platt (February 2, 2017, 11:47 P.M. EST).

10. Exhibit H is a true and accurate copy of the Letter from Steven A. Platt to Muneer I. Ahmad (February 3, 2017, 3:59 P.M. EST).

11. Exhibit I is a true and accurate copy of the Letter from Steven A. Platt to Muneer I. Ahmad (February 6, 2017, 7:46 P.M. EST).

12. Exhibit J is a true and accurate copy of the of the table of contents and Chapter 17 of the Customs and Border Protection Inspector's Field Manual (Apr. 19, 2007).

13. Exhibit K is a true and accurate copy of the District Court Order, *Vayeghan v. Kelly*, No. 17-0702 (C.D. Cal. Jan. 29, 2017), ECF No. 5.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge.

Dated: February 7, 2017

Respectfully submitted,

My Khanh Ngo, Law Student Intern
Jerome N. Frank Legal Services Org.
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

2

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TAREQ AQEL MOHAMMED AZIZ, et al.,      )
                                       )
            Petitioners,               )
                                       )
      v.                               )          1:17-cv-116 (LMB/TCB)
                                       )
DONALD TRUMP, President of the         )
      United States, et al.,           )
                                       )
            Defendants.                )

                          ORDER

      For the reasons stated in open court, it is hereby

      ORDERED that the Temporary Restraining Order entered by this Court on January 28,

2017, be and is extended through Friday, February 10, 2017; and it is further

      ORDERED that the defendants provide the Commonwealth of Virginia with a list of all

persons who have been denied entry to or removed from the United States since the Executive

Order entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" was

signed and who, as of 8:00 a.m. Eastern Standard Time, on Friday, January 27, 2017, had a

residence in the Commonwealth of Virginia and had lawful permanent resident status, an

immigrant visa (or accompanying family or spousal visa), a valid student visa (or accompanying

family or spousal visa), or a valid work visa (or accompanying family or spousal visa) by the close

of business on Thursday, February 9, 2017.

      The Clerk is directed to forward copies of this Order to counsel of record.

      Entered this 3rd day of February, 2017.

Alexandria, Virginia

                                                  /s/ _____
                                                  Leonie M. Brinkema
                                                  United States District Judge

# EXHIBIT B

**Wednesday, February 1, 2017 at 10:49:38 PM Eastern Standard Time**

**Subject:** [Wirac] Order regarding List of Detained and/or Removed Class Members

**Date:** Monday, January 30, 2017 at 7:20:09 AM Eastern Standard Time

**From:** My Khanh Ngo (sent by wirac-bounces@mailman.yale.edu <wirac-bounces@mailman.yale.edu>)

**To:** Scott.Dunn@usdoj.gov, steven.a.platt@usdoj.gov

**CC:** wirac@mailman.yale.edu, Karen Tumlin, Stephen Poellot, Keaney, Lee Gelernt, Becca Heller, Cecillia Wang, Justin Cox, Melissa@ahi.its.yale.edu, Jadwat, Omar@ahi.its.yale.edu

Mr. Dunn and Mr. Platt,

At the motion hearing on the evening of January 28, 2017, Judge Donnelly instructed the Government "to provide a list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." We are contacting you to request that you immediately send us a list, updated daily, of all individuals detained across the country based on the Executive Order, including anyone previously detained and removed.

Many thanks,
My Khanh

==
My Khanh Ngo
Law Student Intern
Jerome N. Frank Legal Services Organization
mk.ngo@ylsclinics.org
█████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.   If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

# EXHIBIT C

**Subject:** Re: [Wirac] Order regarding List of Detained and/or Removed Class Members
**Date:** Monday, January 30, 2017 at 9:33:31 PM Eastern Standard Time
**From:** Platt, Steven A. (CIV) (sent by wirac-bounces@mailman.yale.edu <wirac-bounces@mailman.yale.edu>)
**To:** My Khanh Ngo, Dunn, Scott (USANYE)
**CC:** wirac@mailman.yale.edu, Karen Tumlin, Stephen Poellot, Melissa Keaney, Lee Gelernt, Becca Heller, Cecillia Wang, Justin Cox, Omar Jadwat

Dear Ms. Ngo,

I wanted to touch base about your request. Unfortunately, I do not have anything to provide you yet, but I will keep you updated.

Best,

Steve

Steven A. Platt
Trial Attorney
U.S. Department of Justice | Civil Division | Office of Immigration Litigation | District Court Section
P.O. Box 868 | Ben Franklin Station | Washington, DC 20044
███████████ | (202) 305-7000 (fax) | steven.a.platt@usdoj.gov
[Description: Description: Description: cid:image001.jpg@01CA8936.0709C300]
_____
The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it and immediately contact the sender.
Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.


From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
Sent: Monday, January 30, 2017 7:20 AM
To: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov>; Platt, Steven A. (CIV) <splatt@CIV.USDOJ.GOV>
Cc: wirac@mailman.yale.edu; Cecillia Wang <cwang@aclu.org>; Lee Gelernt <LGELERNT@aclu.org>; Omar Jadwat <OJadwat@aclu.org>; Justin Cox <cox@nilc.org>; Becca Heller <Bheller@refugeerights.org>; Stephen Poellot <spoellot@refugeerights.org>; Melissa Keaney <keaney@nilc.org>; Karen Tumlin <tumlin@nilc.org>
Subject: Order regarding List of Detained and/or Removed Class Members

Mr. Dunn and Mr. Platt,

At the motion hearing on the evening of January 28, 2017, Judge Donnelly instructed the Government "to provide a list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." We are contacting you to request that you immediately send us a list, updated daily, of all individuals detained across the country based on the Executive Order, including anyone previously detained and removed.

Many thanks,
My Khanh

==
My Khanh Ngo
Law Student Intern

Jerome N. Frank Legal Services Organization
mk.ngo@ylsclinics.org<mailto:mk.ngo@ylsclinics.org>
█████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.   If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

_____
Wirac mailing list
Wirac@mailman.yale.edu
http://mailman.yale.edu/mailman/listinfo/wirac

# EXHIBIT D

Wednesday, February 1, 2017 at 10:50:15 PM Eastern Standard Time

**Subject:** Re: [Wirac] Order regarding List of Detained and/or Removed Class Members
**Date:** Tuesday, January 31, 2017 at 9:23:42 AM Eastern Standard Time
**From:** My Khanh Ngo (sent by wirac-bounces@mailman.yale.edu <wirac-bounces@mailman.yale.edu>)
**To:** Platt, Steven A. (CIV)
**CC:** wirac@mailman.yale.edu, Karen Tumlin, Stephen Poellot, Keaney, Lee Gelernt, Melissa@ahi.its.yale.edu, Becca Heller, Dunn, Scott (USANYE), Justin Cox, Cecillia Wang, Jadwat, Omar@ahi.its.yale.edu

Mr. Platt:

Thank you for your message. It has already been two and a half days since the Court ordered Respondents to provide these lists. Please confirm that you will provide us a list by 5 p.m. today of all individuals detained under the Executive Order, including those previously detained and released or removed, and confirm that you will update this list daily. If we don't receive a list by 5 p.m. today, we will be seeking intervention from the Court.

My Khanh

On Jan 30, 2017, at 21:36, Platt, Steven A. (CIV) <Steven.A.Platt@usdoj.gov> wrote:

> Dear Ms. Ngo,
>
> I wanted to touch base about your request. Unfortunately, I do not have anything to provide you yet, but I will keep you updated.
>
> Best,
>
> Steve
>
> Steven A. Platt
> Trial Attorney
> U.S. Department of Justice | Civil Division | Office of Immigration Litigation | District Court Section
> P.O. Box 868 | Ben Franklin Station | Washington, DC 20044
> ██████████████ | (202) 305-7000 (fax) | steven.a.platt@usdoj.gov
> [Description: Description: Description: cid:image001.jpg@01CA8936.0709C300]
> _____
> The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it and immediately contact the sender.
> Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
>
>
> From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
> Sent: Monday, January 30, 2017 7:20 AM
> To: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov>; Platt, Steven A. (CIV) <splatt@CIV.USDOJ.GOV>
> Cc: wirac@mailman.yale.edu; Cecillia Wang <cwang@aclu.org>; Lee Gelernt <LGELERNT@aclu.org>; Omar Jadwat <OJadwat@aclu.org>; Justin Cox <cox@nilc.org>; Becca Heller <Bheller@refugeerights.org>; Stephen Poellot <spoellot@refugeerights.org>; Melissa Keaney <keaney@nilc.org>; Karen Tumlin <tumlin@nilc.org>
> Subject: Order regarding List of Detained and/or Removed Class Members

Mr. Dunn and Mr. Platt,

At the motion hearing on the evening of January 28, 2017, Judge Donnelly instructed the Government "to provide a list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." We are contacting you to request that you immediately send us a list, updated daily, of all individuals detained across the country based on the Executive Order, including anyone previously detained and removed.

Many thanks,
My Khanh

==
My Khanh Ngo
Law Student Intern
Jerome N. Frank Legal Services Organization
mk.ngo@ylsclinics.org<mailto:mk.ngo@ylsclinics.org>
█████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.  If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

# EXHIBIT E

**Subject:** Re: [Wirac] Order regarding List of Detained and/or Removed Class Members

**Date:** Tuesday, January 31, 2017 at 9:49:55 PM Eastern Standard Time

**From:** Platt, Steven A. (CIV) (sent by wirac-bounces@mailman.yale.edu <wirac-bounces@mailman.yale.edu>)

**To:** My Khanh Ngo

**CC:** wirac@mailman.yale.edu, Karen Tumlin, Stephen Poellot, Melissa Keaney, Lee Gelernt, Becca Heller, Dunn, Scott (USANYE), Justin Cox, Omar Jadwat, Cecillia Wang

Dear Ms. Ngo,

Judge Donnelly has ordered us to provide a list of persons who are detained under the January 27 Executive Order. There are two agencies relevant to this list: Customs and Border Protection, and Immigration and Customs Enforcement. At this time, we are not aware of CBP detaining any individual anywhere in the country under the Executive Order. By "detained", I do not mean individuals who are being processed at a port of entry.

CBP hopes to confirm this statement within the next day. CBP can confirm at this time, however, that there are no individuals being detained under the Executive Order at JFK Airport in New York.

ICE can confirm that it is not currently detaining any individuals under the Executive Order.

As you know, Judge Donnelly directed the parties to work together concerning this matter. If you are aware of any individuals being unlawfully detained, please let us know and we will find out what's going on.

We are doing our best to give you concrete information and firm assurances. I will provide a status update tomorrow, by 5pm EST at the latest but hopefully earlier.

Best,

Steve


-------- Original message --------
From: "Platt, Steven A. (CIV)" <splatt@CIV.USDOJ.GOV>
Date: 1/31/17 5:03 PM (GMT-05:00)
To: My Khanh Ngo <mk.ngo@ylsclinics.org>
Cc: "Dunn, Scott (USANYE)" <Scott.Dunn@usdoj.gov>, wirac@mailman.yale.edu, Cecillia Wang <cwang@aclu.org>, Lee Gelernt <LGELERNT@aclu.org>, Omar Jadwat <OJadwat@aclu.org>, Justin Cox <cox@nilc.org>, Becca Heller <Bheller@refugeerights.org>, Stephen Poellot <spoellot@refugeerights.org>, Melissa Keaney <keaney@nilc.org>, Karen Tumlin <tumlin@nilc.org>
Subject: RE: Order regarding List of Detained and/or Removed Class Members

Dear Ms. Ngo,

We are still working to get confirmation from our client agencies. We hope to have that later tonight for you.

Steve

From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
Sent: Tuesday, January 31, 2017 9:24 AM
To: Platt, Steven A. (CIV) <splatt@CIV.USDOJ.GOV>
Cc: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov>; wirac@mailman.yale.edu; Cecillia Wang <cwang@aclu.org>; Lee Gelernt <LGELERNT@aclu.org>; Omar Jadwat <OJadwat@aclu.org>; Justin Cox <cox@nilc.org>; Becca Heller

<Bheller@refugeerights.org>; Stephen Poellot <spoellot@refugeerights.org>; Melissa Keaney <keaney@nilc.org>; Karen Tumlin <tumlin@nilc.org>
Subject: Re: Order regarding List of Detained and/or Removed Class Members

Mr. Platt:


Thank you for your message. It has already been two and a half days since the Court ordered Respondents to provide these lists. Please confirm that you will provide us a list by 5 p.m. today of all individuals detained under the Executive Order, including those previously detained and released or removed, and confirm that you will update this list daily. If we don't receive a list by 5 p.m. today, we will be seeking intervention from the Court.

My Khanh

On Jan 30, 2017, at 21:36, Platt, Steven A. (CIV) <Steven.A.Platt@usdoj.gov<mailto:Steven.A.Platt@usdoj.gov>> wrote:
Dear Ms. Ngo,

I wanted to touch base about your request. Unfortunately, I do not have anything to provide you yet, but I will keep you updated.

Best,

Steve

Steven A. Platt
Trial Attorney
U.S. Department of Justice | Civil Division | Office of Immigration Litigation | District Court Section
P.O. Box 868 | Ben Franklin Station | Washington, DC 20044
█████████████ | (202) 305-7000 (fax) | steven.a.platt@usdoj.gov<mailto:steven.a.platt@usdoj.gov>
[Description: Description: Description: cid:image001.jpg@01CA8936.0709C300]
_____
The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it and immediately contact the sender.
Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.


From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
Sent: Monday, January 30, 2017 7:20 AM
To: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov<mailto:Scott.Dunn@usdoj.gov>>; Platt, Steven A. (CIV) <splatt@CIV.USDOJ.GOV<mailto:splatt@CIV.USDOJ.GOV>>
Cc: wirac@mailman.yale.edu<mailto:wirac@mailman.yale.edu>; Cecillia Wang <cwang@aclu.org<mailto:cwang@aclu.org>>; Lee Gelernt <LGELERNT@aclu.org<mailto:LGELERNT@aclu.org>>; Omar Jadwat <OJadwat@aclu.org<mailto:OJadwat@aclu.org>>; Justin Cox <cox@nilc.org<mailto:cox@nilc.org>>; Becca Heller <Bheller@refugeerights.org<mailto:Bheller@refugeerights.org>>; Stephen Poellot <spoellot@refugeerights.org<mailto:spoellot@refugeerights.org>>; Melissa Keaney <keaney@nilc.org<mailto:keaney@nilc.org>>; Karen Tumlin <tumlin@nilc.org<mailto:tumlin@nilc.org>>
Subject: Order regarding List of Detained and/or Removed Class Members

Mr. Dunn and Mr. Platt,

At the motion hearing on the evening of January 28, 2017, Judge Donnelly instructed the Government "to provide a

list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." We are contacting you to request that you immediately send us a list, updated daily, of all individuals detained across the country based on the Executive Order, including anyone previously detained and removed.

Many thanks,
My Khanh

==
My Khanh Ngo
Law Student Intern
Jerome N. Frank Legal Services Organization
mk.ngo@ylsclinics.org<mailto:mk.ngo@ylsclinics.org><mailto:mk.ngo@ylsclinics.org>
██████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.   If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

_____
Wirac mailing list
Wirac@mailman.yale.edu
http://mailman.yale.edu/mailman/listinfo/wirac

# EXHIBIT F

**From:** **My Khanh Ngo**  mk.ngo@ylsclinics.org
**Subject:** Re: Order regarding List of Detained and/or Removed Class Members
**Date:** February 1, 2017 at 3:51 PM
**To:** Platt, Scott A. (CIV)  Steven.A.Platt@usdoj.gov
**Cc:** **Dunn, Scott (USANYE)**  Scott.Dunn@usdoj.gov,  wirac@mailman.yale.edu,  **Cecillia Wang**  cwang@aclu.org,  **Lee Gelernt**
LGELERNT@aclu.org,  **Omar Jadwat**  OJadwat@aclu.org,  **Justin Cox**  cox@nilc.org,  **Becca Heller**  Bheller@refugeerights.org,
**Stephen Poellot**  spoellot@refugeerights.org,  **Melissa Keaney**  keaney@nilc.org,  **Karen Tumlin**  tumlin@nilc.org

Dear Mr. Platt,

Thank you for the current information and the promise to provide further and more concrete information.

However, the government's delay in providing this information makes this response unfortunately inadequate.  The Court ordered this information produced to us on Saturday.  It is now Wednesday.  The government's delay has meant that we have been unable to adequately confirm whether the government has been complying with the stay order, which was the point of the ordered list.  Under these circumstances, we understand the Court's order to require a list of everyone who is or was detained under the Executive Order since the stay was entered, including those who were detained and deported.

In light of the long delay in hearing from the government and this non-response, we intend to seek intervention from the Court.

Best,
My Khanh


On Jan 31, 2017, at 9:49 PM, Platt, Steven A. (CIV) <Steven.A.Platt@usdoj.gov> wrote:

Dear Ms. Ngo,

Judge Donnelly has ordered us to provide a list of persons who are detained under the January 27 Executive Order. There are two agencies relevant to this list: Customs and Border Protection, and Immigration and Customs Enforcement. At this time, we are not aware of CBP detaining any individual anywhere in the country under the Executive Order. By "detained", I do not mean individuals who are being processed at a port of entry.

CBP hopes to confirm this statement within the next day. CBP can confirm at this time, however, that there are no individuals being detained under the Executive Order at JFK Airport in New York.

ICE can confirm that it is not currently detaining any individuals under the Executive Order.

As you know, Judge Donnelly directed the parties to work together concerning this matter. If you are aware of any individuals being unlawfully detained, please let us know and we will find out what's going on.

We are doing our best to give you concrete information and firm assurances. I will provide a status update tomorrow, by 5pm EST at the latest but hopefully earlier.

Best,

Steve


-------- Original message --------
From: "Platt, Steven A. (CIV)" <splatt@CIV.USDOJ.GOV>
Date: 1/31/17 5:03 PM (GMT-05:00)
To: My Khanh Ngo <mk.ngo@ylsclinics.org>
Cc: "Dunn, Scott (USANYE)" <Scott.Dunn@usdoj.gov>, wirac@mailman.yale.edu, Cecillia Wang <cwang@aclu.org>, Lee Gelernt <LGELERNT@aclu.org>, Omar Jadwat <OJadwat@aclu.org>, Justin Cox <cox@nilc.org>, Becca Heller <Bheller@refugeerights.org>, Stephen Poellot <spoellot@refugeerights.org>, Melissa Keaney <keaney@nilc.org>, Karen Tumlin <tumlin@nilc.org>
Subject: RE: Order regarding List of Detained and/or Removed Class Members

Dear Ms. Ngo,

We are still working to get confirmation from our client agencies. We hope to have that later tonight for you.

Steve

From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
Sent: Tuesday, January 31, 2017 9:24 AM
To: Platt, Steven A. (CIV) <splatt@CIV.USDOJ.GOV>
Cc: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov>; wirac@mailman.yale.edu; Cecilia Wang <cwang@aclu.org>;
Lee Gelernt <LGELERNT@aclu.org>; Omar Jadwat <OJadwat@aclu.org>; Justin Cox <cox@nilc.org>; Becca
Heller <Bheller@refugeerights.org>; Stephen Poellot <spoellot@refugeerights.org>; Melissa Keaney
<keaney@nilc.org>; Karen Tumlin <tumlin@nilc.org>
Subject: Re: Order regarding List of Detained and/or Removed Class Members

Mr. Platt,


Thank you for your message. It has already been two and a half days since the Court ordered Respondents to
provide these lists. Please confirm that you will provide us a list by 5 p.m. today of all individuals detained under the
Executive Order, including those previously detained and released or removed, and confirm that you will update this
list daily. If we don't receive a list by 5 p.m. today, we will be seeking intervention from the Court.

My Khanh

On Jan 30, 2017, at 21:36, Platt, Steven A. (CIV) <Steven.A.Platt@usdoj.gov<mailto:Steven.A.Platt@usdoj.gov>>
wrote:
Dear Ms. Ngo,

I wanted to touch base about your request. Unfortunately, I do not have anything to provide you yet, but I will keep
you updated.

Best,

Steve

Steven A. Platt
Trial Attorney
U.S. Department of Justice | Civil Division | Office of Immigration Litigation | District Court Section
P.O. Box 868 | Ben Franklin Station | Washington, DC 20044
███████████████ | (202) 305-7000 (fax) | steven.a.platt@usdoj.gov<mailto:steven.a.platt@usdoj.gov>
[Description: Description: Description: cid:image001.jpg@01CA8936.0709C300]
_____
The contents of this message may be privileged and confidential. If this message has been received in error, please
delete it without reading it and immediately contact the sender.
Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this
message without the permission of the author.


From: My Khanh Ngo [mailto:mk.ngo@ylsclinics.org]
Sent: Monday, January 30, 2017 7:20 AM
To: Dunn, Scott (USANYE) <Scott.Dunn@usdoj.gov<mailto:Scott.Dunn@usdoj.gov>>; Platt, Steven A. (CIV)
<splatt@CIV.USDOJ.GOV<mailto:splatt@CIV.USDOJ.GOV>>
Cc: wirac@mailman.yale.edu<mailto:wirac@mailman.yale.edu>; Cecilia Wang
<cwang@aclu.org<mailto:cwang@aclu.org>>; Lee Gelernt <LGELERNT@aclu.org<mailto:LGELERNT@aclu.org>>;
Omar Jadwat <OJadwat@aclu.org<mailto:OJadwat@aclu.org>>; Justin Cox <cox@nilc.org<mailto:cox@nilc.org>>;
Becca Heller <Bheller@refugeerights.org<mailto:Bheller@refugeerights.org>>; Stephen Poellot
<spoellot@refugeerights.org<mailto:spoellot@refugeerights.org>>; Melissa Keaney
<keaney@nilc.org<mailto:keaney@nilc.org>>; Karen Tumlin <tumlin@nilc.org<mailto:tumlin@nilc.org>>
Subject: Order regarding List of Detained and/or Removed Class Members

Mr. Dunn and Mr. Platt,

At the motion hearing on the evening of January 28, 2017, Judge Donnelly instructed the Government "to provide a
list of individuals detained, pursuant to the January 27, 2017 Executive Order, to the petitioner's counsel." We are

contacting you to request that you immediately send us a list, updated daily, of all individuals detained across the country based on the Executive Order, including anyone previously detained and removed.

Many thanks,
My Khanh

==
My Khanh Ngo
Law Student Intern
Jerome N. Frank Legal Services Organization
mk.ngo@ylsclinics.org<mailto:mk.ngo@ylsclinics.org><mailto:mk.ngo@ylsclinics.org>
█████████

PRIVILEGED AND CONFIDENTIAL
This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure.   If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise.  Instead, please notify me immediately by return e-mail (including the original message in your reply) and by telephone and then delete and discard all copies of the e-mail.

# EXHIBIT G

# The Jerome N. Frank Legal Services Organization

### YALE LAW SCHOOL

''

February 2, 2017

*Via Email (Steven.A.Platt@usdoj.gov)*
Stephen Platt, Esq.
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – District Court
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

      Re:    *Darweesh et al. v. Trump et al.,* 17-cv-00480 (CBA)

Dear Mr. Platt,

      We are writing to follow up on our email correspondence on January 30, January 31, and February 1, in which we have asked the government to provide Plaintiffs' counsel with the list of names ordered by Judge Donnelly on January 28.  Following today's status conference, we reiterate this request. Specifically, we request that the government provide us with the names of the following: (1) all individuals who have been held in the government's custody upon arrival at a U.S. port of entry on the basis of the January 27 Executive Order or its implementing instructions (including but not limited to the Department of State visa revocation letter of January 27), regardless of whether they were ultimately released into the United States or not; and (2) all individuals who have been removed from the United States on the basis of the January 27 Executive Order or its implementing instructions (including but not limited to the Department of State visa revocation letter of January 27).  Please confirm that you will update these lists on a daily basis.

      Because this is the fourth time we are requesting the government's compliance with the court's order, we ask that you provide the requested information by 2 pm on Friday, February 3rd.  If we do not receive the information by then, we plan to file an appropriate motion with the court.

      Sincerely,

      Muneer I. Ahmad, Esq.
      *Counsel for Plaintiffs*

# EXHIBIT H



**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation
District Court Section

*P.O. Box 868, Ben Franklin Station*
*Washington, D.C. 20044*

<u>Via email</u>

February 3, 2017

Muneer I. Ahmad, Esq.
P.O. Box 208215
New Haven, CT 06250

      Re: *Darweesh, et al. v. Trump, et al.*, 17 Civ. 480 (CBA)

Dear Mr. Ahmad,

      I am in receipt of your letter dated February 2, 2017. Judge Donnelly's January 28, 2017, order directed us to provide a list of all individuals the Government is currently detaining solely on the basis of the January 27, 2017, Executive Order. We reiterate that the number of individuals on the list is zero. As of yesterday—and as of today to the best of our knowledge—U.S. Customs and Border Protection is not detaining anyone in a U.S. airport on the basis of the Executive Order or any of its implementing instructions.

      Although the requests you make in your letter are better suited for discovery, we are evaluating whether it is possible to provide that information now. We are contacting our clients to determine what information is available. We are not able to provide a response by today at 2:00pm as you ask, but we should have a response by Monday, February 6, 2017.

      We remain committed to working with you and remaining in compliance with court orders. Your co-counsel have repeatedly referenced "reports" of individuals being unlawfully detained. As I said in my email on Tuesday evening, if you think that is happening, please let us know, including the names of the specific travelers, and we will find out what is going on. Starting that dialogue—not seeking court intervention—will be the most expeditious way for us to resolve any disconnect.

                      Very truly yours,

                      *Steven a. Platt*

                      Steven A. Platt
                      *Counsel for Respondents*

# EXHIBIT I



**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation
District Court Section

*P.O. Box 868, Ben Franklin Station*
*Washington, D.C. 20044*

<u>Via email</u>

February 6, 2017

Muneer I. Ahmad, Esq.
P.O. Box 209090
New Haven, CT 06250

      Re: *Darweesh, et al. v. Trump, et al.*, 17 Civ. 480 (CBA)

Dear Mr. Ahmad,

      I write in further response to your letter dated February 2, 2017.

      As of 12:00 PM on Monday, February 6, 2017, U.S. Customs and Border Protection ("CBP") records reflect that no individual subject to the Executive Order, who arrived and applied for admission at a United States airport after the signing of the Executive Order, was placed in a removal proceeding by CBP or otherwise removed from the United States.

      As of 12:00 PM on Monday, February 6, 2017, CBP records reflect that CBP is not currently detaining any individual subject to the Executive Order who arrived and applied for admission at a United States airport.

      These representations do not include individuals who were admitted to the United States, or individuals who were denied entry, voluntarily withdrew their applications for admission and departed for a foreign destination. With that said, for those individuals who were in transit when the Executive Order was issued and upon landing were denied entry, withdrew their applications, and departed for a foreign destination, CBP has been facilitating their travel back to the United States on an individual basis and subject to approval by CBP leadership. If you are aware of any individuals who were in transit when the Executive Order was issued and upon landing were denied entry, withdrew their applications, and departed for a foreign destination, but have received no assistance from CBP in traveling back to the United States, please provide me with

the identity of such individuals and we can discuss the prospect of facilitating their travel back to the United States.

Very truly yours,

Steven A. Platt

Steven A. Platt
*Counsel for Respondents*

2

# EXHIBIT J

Chapter 1.    Organization and Content of the U.S. Customs and Border
Protection (CBP) Inspector's Field Manual (IFM).

Chapter 2.    Mission and Conduct of Inspections Officers.

    2.1    Mission Statement
    2.2    Authority
    2.3    Reserved
    2.4    The Inspector and the Public
    2.5    Uniforms, Badges and Identification
    2.6    The Work Environment
    2.7    Reporting Unusual Incidents
    2.8    Hostage Situations
    2.9    Dealing with Attorneys and Other Representatives
    2.10   Land Border Integrity Program (Added 6/23/99; IN99-22)

Chapter 3.    The Organization of Inspections.

    3.1    (Chapter removed and reserved 2/10/06; CBP 17-06)
    3.2    (Chapter removed and reserved 2/10/06; CBP 17-06)
    3.3    (Chapter removed and reserved 2/10/06; CBP 17-06)
    3.4    (Chapter removed and reserved 2/10/06; CBP 17-06)

Chapter 4.    Conducting Research.

    4.1    General Considerations
    4.2    Sources and Organization of Immigration Law
    4.3    Basic Research Methods
    4.4    Factual Research and Service Data Bases
    4.5    (Removed 2/10/06; CBP 17-06)

I.    Policies and Procedures: Application for Admission. Each chapter from 11 through 18 describes the policies and procedures peculiar to persons included in the chapter title. Other special topics discussed within each chapter are noted in the chapter descriptions.

Chapter 11.   Persons Exempt Inspection.

    11.1   Inspection and Examination
    11.2   Members of the U.S. and NATO Armed Forces
    11.3   American Indians Born in Canada

Chapter 12.   United States Citizens and Other Nationals.

    12.1   Inspection of U.S. Citizens
    12.2   Evidence of Citizenship

12.3   Oral Testimony
12.4   United States Passports
12.5   United States Passport Waivers
12.6   Other Documentary Evidence
12.7   Loss of Citizenship
12.8   Non-Citizen Nationals
12.9   Northern Mariana Islanders
12.10 Nationals of Former Trust Territories


Chapter 13.  Returning Residents.

13.1   Inspection of Returning Lawful Permanent Residents (LPRs)
13.2   Returning Residents Lacking Evidence of Alien Registration
(Revised 5/16/05; CBP 9-05)
13.3   Returning Military Dependents
13.4   Question of Meaningful Departure
13.5   Returning Residents with SB-1 Visas
13.6   Readmission of Temporary Residents
13.7   Conditional Residents


Chapter 14.  New Immigrants.

14.1   Inspecting New Immigrant Applicants
14.2   Passport Requirements
14.3   Inspection of Family Groups
14.4   Immigrant Visa Admission Processing Procedures
14.5   Admission of Certain Immigrant Children without Immigrant Visas
14.6   Conditional Residents
14.7   Immigrant Commuters


Chapter 15.  Nonimmigrants and Border Crossers.

15.1   General Considerations and Processing Instructions (Revised
5/16/05; CBP 9-05)
15.2   Passports
15.3   Visas
15.4   Requirements and Procedures for Nonimmigrant Classes
15.5   NAFTA Admissions
15.6   Transit without Visa Admissions
15.7   Visa Waiver  Program
15.8   Guam Visa Waiver Program
15.9   Border Crossing Card (BCC) Admissions
15.10 Entry of Nonimmigrant Workers during Labor Disputes
15.11 Special Interest Aliens (Revised IN02-34)
15.12 Correction of Erroneous Admissions
15.13 Nationals of Former Trust Territories

15.14 Hong Kong Travel Documents
15.15 Cancellation of Nonimmigrant Visas under Section 222(g) of the Act.
15.16 Student and Exchange Visitor (SEVIS) Processing

Chapter 16. Special Classes.

16.1 Parole
16.2 Refugee Admissions
16.3 Asylees and Asylum Applicants
16.4 Temporary Protected Status (TPS) Cases

Chapter 17. Inadmissible Aliens.

17.1 Deferred Inspection (Revised 5/16/05; CBP 9-05)
17.2 Withdrawal of Application for Admission
17.3 Fraudulent Documents
17.4 False Claims to U.S. Citizenship
17.5 Waivers
17.6 Preparing Removal or Prosecution Hearings
17.7 Temporary Inadmissibility under section 235(c)
17.8 Detention of Aliens at Ports-of Entry
17.9 Medical Referrals
17.10 Abandonment of Lawful Permanent Resident Status
17.11 Asylum Claims/Safe Third Country Agreement with Canada. (Revised 2/23/05; CBP 8-05)
17.12 Bonds
17.13 Visa Waiver Program Cases
17.14 Lookout Intercepts
17.15 Expedited Removal
17.16 Members and Representatives of Terrorist Organizations
17.17 Technical Notes
17.18 Use of Interpreters and Interpreter Services

Chapter 18. Criminal Prosecution  (Added INS-TM2)

18.1 General
18.2 Criminal Offenses Under the INA
18.3 Types of Arrest
18.4 Arrest Authority
18.5 Arrests Based on IBIS or National Crime Information Center (NCIC) Information
18.6 Warrantless Searches and Seizures
18.7 Degrees of Suspicion
18.8 Criminal Action Procedures
18.9 Procedures after the Arrest

18.10 Jurisdiction and Venue
18.11 Case Presentation
18.12 General Rules of Evidence
18.13 Definitions

II.      Special Policies and Procedures for Land, Air, Sea, Preinspection and Preclearance Stations, Special Programs.  Each chapter from 21 through 27 contains a discussion of policies and procedures specific to the type of inspection named in the chapter heading.  Other special topics for each chapter are noted.

Chapter 21    Land Border Inspection (Added INS-TM2)

21.1    Land Border Inspection Procedures
21.2    Secondary Inspection
21.3    Persons Arriving by Common Carrier
21.4    Land Border Inspection Responsibilities
21.5    Mexican Border Crossing Cards
21.6    Canadian Border Crossing Cards
21.7    Use of Form I-94
21.8    Commuters
21.9    Northern Border Inspection System (NorBIS)
21.10  Secure Electronic Network for Traveler's Rapid Inspection
(SENTRI)
21.11  Facilities Inspections
21.12  Emergency Procedures during Canadian Air Traffic Controller
Strikes
21.13  Entry of Commercial Truck Drivers into the United States


Chapter 22.  Airport Procedures.

22.1    General
22.2    Inspection Systems
22.3    Primary Inspection Procedures
22.4    Secondary Referrals
22.5    Inspection of Air Crewmembers
22.6    Processing Arrival Manifests and Flight Logs
22.7    Departure Manifest Procedures
22.8    Progressive Clearance
22.9    Emergency Procedures during Canadian Air Traffic Controller Strikes
22.10  Inspection of International-to-International (ITI) Transit Passengers
(Heading changed 11/17/98; IN99-04)


Chapter 23.  Seaport Inspection.

23.1    General
23.2    Exceptions to Inspection Requirements

23.3    Inspecting Cargo Vessels
23.4    Inspecting Cruise Ships
23.5    Payoff and Discharge of Crewmembers
23.6    Refusals
23.7    Deserters and Abscondees
23.8    Stowaways
23.9    Mustering
23.10         Revocation of Landing Permits
23.11         Performance of Longshore Work by Crewmembers
23.12         Parole of Alien Crewmembers
23.13         Vessels Remaining beyond 29 Days
23.14   Ship Intelligence Cards
23.15         Departure Manifests
23.16         United States-Based Fishing Vessels
23.17   Vessels Serving on the Outer Continental Shelf (OCS)
23.18         Asylum Claims by Vessel Crewmembers or Stowaways
23.19         Special Interest Vessels/Non-Entrant Countries
23.20         Seaport database queries


Chapter 24.   Preinspection and Preclearance (Added INS-TM2)


24.1    General
24.2    Foreign Preinspection and Preclearance Procedures
24.3    Departure Controls at Guam, Puerto Rico, and the U.S. Virgin Islands
24.4    Emergency Procedures during Canadian Air Traffic Controller
Strikes


Chapter 25.   Private Aircraft and Vessels (Added INS-TM2)


25.1    Canadian Small Boat Permit Program
25.2    Procedures for Inspecting Private Aircraft
25.3    Inspection of Private Vessels
25.4    Snowmobiles
25.5    GATE Program


Chapter 26.   Special Programs (Added INS-TM2)


26.1    INS Port Passenger Accelerated Service System (PORTPASS,
DCL, APP SENTRI)
26.2    Advance Passenger Information System (APIS)
26.3    Carrier Consultant Program (CCP)
26.4    Inspections Response Teams (IRT)
26.5    Immigration and Naturalization Service Passenger Accelerated
Inspection System (INSPASS)
26.6    Inspections Canine Program

Chapter 27    Departure Controls (Added INS-TM2)

    27.1    General
    27.2    Prevent Departure Procedures
    27.3    Aliens Seeking to Depart without Evidence of Compliance with
Federal Income Tax Laws
    27.4    Protective Custody
    27.5    Verification of Departure
    27.6    Departure Controls at Guam, Puerto Rico and the U.S. Virgin
Islands

Chpater 28    Missing or Abducted Children and Runaways (Added INS-TM2)

    28.1    Introduction
    28.2    Related Legislation
    28.3    Abductions, Internal Abductions and Runaways
    28.4    Primary Inspection
    28.5    Secondary Inspection
    28.6    Lookouts
    28.7    Sources of Assistance
    28.8    Child Sex Tourism

III.  Support Services, Tools and Equipment.

Chapter 31    Service Records (Added INS-TM2)

    31.1    Introduction to Service Records Systems
    31.2    Systems Security Requirements
    31.3    Introduction to Service Automated Systems
    31.4    Image Storage and Retrieval System
    31.5    Posting, Maintaining, and Cancellation of Lookouts
    31.6    Lookout Intercepts
    31.7    Responding to Inquiries Concerning Lookout Records
    31.8    Regional Random Quality Review of INS Permanent Lookout
Records
    31.9    ████████████████████. (Added 2/16/06; CBP 18-06)

Chapter 32.    Intelligence (Added INS-TM2)

    32.1    INS Intelligence Program - General
    32.2    Intelligence Collection Requirements; Instructions for Completing
an Intelligence Report (Forms G-392 and G-392A)
    32.3    The OASIS Database [Reserved]
    32.4    Headquarters INS Intelligence Bulletin Board
    32.5    INS Forensic Document Laboratory (INS/FDL)

    32.6   EPIC Operations; Instructions for Completing Report of
Documented False Claim to Citizenship (Form G-329)
    32.7   Interpol


Chapter 33   Multi-Agency Automated Systems (Added INS-TM2)

    33.1   Interagency Border Inspection System (IBIS)
    33.2   National Crime Information Center (NCIC)
    33.3   National Law Enforcement Telecommunications System (NLETS)
    33.4   The California Law Enforcement Telecommunication System
(CLETS)


Chapter 34   Tools and Equipment (Added INS-TM2)

    34.1   General
    34.2   Firearms and Other Defensive Equipment
    34.3   ███████████████████████
    34.4   ███████████████████
    34.5   ██████████
    34.6   ████████████
    34.7   Photophones
    34.8   Machine Readable Document Readers
    34.9   ██████████████
    34.10  Admission Stamps and Security Ink
    34.12  Government Vehicles
    34.13  Audio Visual Equipment


IV.  Management and Administrative Activities.

Chapter 41   Liaison Activities (Added INS-TM2)

    41.1   Liaison with Federal Inspection Agencies
    41.2   International Agreements and Border Liaison
    41.3   Liaison with International Air and Sea Carriers and Foreign
Governments
    41.4   Liaison with Other Federal Agencies
    41.5   Liaison with Port Authorities; Inspectional Facilities

Chapter 42   Transportation Agreements (Added INS-TM2)

    42.1   General Considerations
    42.2   Transit Agreements
    42.3   Visa Waiver  Program (VWP) Agreements
    42.4   Guam Visa Waiver Program (GVWP) Agreements
    42.5   Preinspection or Preclearance Agreements

42.6    Foreign Territory or Adjacent Islands Agreements
42.7    Landing Rights and Carrier Requirements
42.8    Progressive Clearance
42.9    Section 273(e) Memorandum of Understanding (MOU) (Added
IN99-34)

Chapter 43.  Fines and Liquidated Damages (Added INS-TM2)

43.1    General
43.2    Administrative Fine Violations
43.3    Processing Administrative Fines at Ports-of-Entry
43.4    Passengers Arriving from Contiguous Territory
43.5    Processing Administrative Fines at the National Fines Office
43.6    Processing Liquidated Damages at Ports-of-Entry
43.7    Processing of Liquidated Damages by National Fines Office
43.8    Civil Document Fraud Penalties

Chapter 44   Conveyance Seizures (Added INS-TM2)

44.1    Background
44.2    Violations
44.3    Probable Cause
44.4    Seizure Justification
44.5    Procedure
44.6    Conveyance Appraisal
44.7    Custody and Storage
44.8    Notification
44.9    Personal Interview
44.10   Returns Prior to Forfeiture
44.11   Procedure for Return
44.12   Judicial Forfeiture
44.13   Administrative Forfeiture
44.14   Disposal
44.15   Disposal by the United States Marshals Service

Chapter 45   Bonds.

45.1    Posting, Cancellation and Breaching of Maintenance of Status
Bonds
45.2    Posting a Bond
45.3    Procedures for Acceptance of a Bond
45.4    Control of Bonds
45.5    Call up Procedures
45.6    Transfer of Bonds
45.7    Grounds for Cancellation of a Bond
45.8    Procedures for Bond Cancellation

45.9    Grounds for Breaching a Bond
45.10   Procedures for Bond Breaches
45.11   Designation of Attorney in Fact

Chapter 46    Fees (Added INS-TM2)

46.1    General
46.2    Cash Collection at Ports-of-Entry

Chapter 47    Statistical Reporting for Ports-of-Entry (Added INS-TM2)

47.1    General
47.2    Required Reports
47.3    Workforce Analysis Model (WAM)
47.4    Port OfficeManagement System (POMS)
47.5    Performance Analysis System (PAS)
47.6    Records of Inadmissible Passenger System (RIPS)

Chapter 48    Overtime Policy and Audits (Added INS-TM2)

48.1    Overtime Policy
48.2    Overtime Audits

Inspector's Field Manual

## Chapter 17:  Inadmissible Aliens

| | |
|---|---|
| 17.1 | Deferred Inspection |
| 17.2 | Withdrawal of Application for Admission |
| 17.3 | Fraudulent Documents |
| 17.4 | False Claims to U.S. Citizenship |
| 17.5 | Waivers |
| 17.6 | Preparing Removal or Prosecution Hearings |
| 17.7 | Temporary Inadmissibility under section 235(c) |
| 17.8 | Detention of Aliens |
| 17.9 | Medical Referrals |
| 17.10 | Abandonment of Lawful Permanent Resident Status |
| 17.11 | Asylum Claims |
| 17.12 | Bonds |
| 17.13 | Visa Waiver  Program Cases |
| 17.14 | Lookout Intercepts |
| 17.15 | Expedited Removal |
| 17.16 | Mernbers and Representatives of Terrorist Organizations. |
| 17.17 | Technical Notes |
| 17.18 | **Use of Interpreters and Interpreter Services** |

**References:**

**INA:**            Sections 212, 235, 240, 241.

**Regulations:**      8 CFR 212, 235, 240, 241.

## 17.1   Deferred Inspection. (Revised 5/16/05; CBP 9-05)

(a) General. A deferred inspection may be used when an immediate decision concerning admissibility cannot be made at a port-of-entry (POE) and the officer has reason to believe that doubts about the alien's admissibility can be overcome through:

- presentation of additional evidence;
- further review of the case (including perhaps a review of an existing A file);

**Inspector's Field Manual**

- the posting of a maintenance of status and departure bond; or
- other similar action that can only be conducted at the onward location.

In such cases the inspecting officer shall defer the inspection to the office having jurisdiction over the area where the alien will be staying. Deferred inspections may be necessary to review an existing file or some other documentary evidence essential to clarifying admissibility. The inspecting officer shall defer for a specific purpose, and not as a way to transfer a difficult case to another office. The inspecting officer should normally only use deferrals when it appears the case would probably be resolved in the alien's favor, with limited exceptions. The officer shall not defer an alien who is not expected to establish his or her admissibility. Before an alien is deferred, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

When deferring an alien, the inspecting officer shall query at a minimum the IDENT, SQ11, Central Index and IAFIS, if available, databases in order to determine if any adverse information exists that would preclude the alien being paroled into the United States for deferred inspection and to provide additional information regarding the case. The deferring officer shall note the results on Form I-546, Order to Appear for Deferred Inspection as noted below.

The deferring officer should take the following factors into consideration when making a decision on whether to defer the inspection:

- The likelihood that the alien will be able to establish admissibility;
- The type of documents lacking, and the ability to obtain necessary documentation;
- The alien's good faith efforts to obtain necessary documents prior to arrival at the POE;
- The verification or establishment of the alien's identity and nationality;
- Age, health, and family ties;
- Other humanitarian considerations;
- The likelihood that the alien will appear;
- The nature of possible inadmissibility (i.e. criminal history, previous violations, etc.); and,
- The potential danger posed to society if the alien were to be paroled.

If the alien is clearly inadmissible or may pose a security risk or danger to society, the officer shall not defer the inspection. Instead, the officer shall place the alien in removal proceedings or allow him or her to withdraw his or her application for admission. For information regarding clearance of certain air cargo crewmembers, see Chapter 22.5(f)

(b) Deferral Procedures.

(1) Authorization: The responsibility to authorize a deferred inspection is delegated to the level of port director, assistant port director, or chief inspector at the GS-13 level and above. Express approval from the designated official is required before any inspection can be deferred. Current field guidance on approval authority can be found in CBP policy memorandum "Delegation of Immigration Authority Under Customs and Border Protection (CBP) (T# 03-0495)" dated May 22, 2003 and Exercise of Discretion – Additional Guidance, dated July 20, 2004.

### Inspector's Field Manual

(2)  A-file: If an A-file does not exist, the deferring officer shall open one.  To determine if an A-file exists, query the Central Index System.  If there is an existing A-file, the deferring officer should indicate the file number and files control office on the Form I-546 so that the onward office can locate or request the file before the alien appears.  In the event of an existing A-file, the deferring officer shall place all documentation in a temporary "T" file (unless the deferring officer has access to the A-file itself).  The deferring officer shall forward the A-file or T-file containing the Form I-546 to the onward office within 24-hours of the scheduling of the deferred inspection.

(3)  Each applicant whose inspection is deferred shall be photographed and fingerprinted on Form FD-249.  Only one set needs to be completed.  The set of fingerprints shall be maintained with the other information related to the alien and forwarded to the onward office in the A-file.  This set of fingerprints is kept in the A-file or T-file (until consolidated with the A-File) and used if the alien fails to appear for his or her scheduled deferred inspection.

(4)  Form I-94:  Parole the applicant for a brief period, generally not to exceed 30 days, sufficient for the paperwork to arrive at the onward office and for the applicant to obtain any necessary evidence to establish admissibility (additional guidelines related to parole can be found in Chapter 16.1 of this field manual).

Stamp the departure and arrival portion of the Form I-94, with a parole stamp and endorse to indicate:

- Date to which deferred/paroled
- "DE, Deferred Inspection" (Purpose)
- Deferring port code
- Action date
- The officer's admission stamp number
- Onward office code

Place the alien's right index fingerprint on the reverse of the departure portion of the Form I-94.

(5)  Deferred Inspection Documentation.  All individuals scheduled for a deferred inspection are to be enrolled in the Enforcement Tracking System (ENFORCE). Generally, deferred inspections are documented on a Form I-546 and a Form I-259, Notice to Detain, Remove or Present Alien, if appropriate.  General guidelines for creating a deferred inspection record in ENFORCE are as follows:

(A)     Complete the Biographical Screen; an A-number is required.  When finished, click on the Apprehension Screen.

(B) Apprehension Screen:

- Record the documents presented and arrival information.
- The Arrival/Departure Form I-94 number is mandatory.

I-LINK

### Inspector's Field Manual

• Click "Charges" then record the section of law and description of the inadmissibility.

• Record the U.S. and foreign address fields.

• Capture as much information as possible on the remaining tabs i.e. relatives, work information, scars etc.

(C)   Select "Forms", then generate the forms necessary to document the deferred inspection.

i.  Form I-546 Data Collection Screen:  A deferred inspection places additional unscheduled work on the onward office.  Appearance for deferred inspection may place additional burdens on the applicant who may, in many cases, be required to spend considerable time and money to comply with the required deferral procedures.  Ensure that the information provided to the onward office is sufficient to allow the onward office to complete the deferred inspection in a single appearance.

ENFORCE contains a table of all deferred inspection sites.  To retrieve the list, type in the first three-letters of the desired deferred inspection location or scroll through the alphabetical list in the "Address (Site)" data entry field.  When selecting the "deferred inspection" disposition category, ENFORCE will display only deferred inspection sites in the "Reporting Address" drop down menu. Specific scheduling information such as hours and days of operation, telephone number and zip code are not encoded in the table.  Some local offices conduct deferred inspections only on certain days of the week, or during certain hours, and may have specific room numbers for deferred applicants.  Therefore, all secondary stations at POEs are to have current information on hours of operation, addresses and telephone numbers of CBP offices that handle deferred inspections available to verify scheduling information.  Refer to http://cgovstaging/xp/cgov__Stage/toolbox/contacts/deferred_inspection/ for a complete listing.  When scheduling the deferred inspection, identify a specific reporting date and a time block, rather than a specific time.  There may be instances where the applicant is required to call the deferred inspection office directly to schedule an appointment.  All individuals scheduled for a deferred inspection are to be given the telephone number of the onward office's deferred inspection unit.

The recommending officer must complete the "Detail" block in the following manner:

• Ensure that the information is complete and accurate for the inspector at the onward office by specifically stating the purpose of the deferral;
• Identify any documentation that the applicant is expected to produce;
• Record the results of the database queries;
• Annotate the name and title of the official that authorized the deferred inspection;
• Record the telephone number of the deferred inspection office: and,
• Identify the FCO of the existing A-file, if available.

ii.  Form I-259 Data Collection Screen:  The creation of the Form I-259 is required for deferred inspections created at the air and sea ports-of-entry.  Form I-259 shall be served on the affected carrier or on the captain of a private aircraft or vessel.  Generally,

## Inspector's Field Manual

the CBP Officer should select the fourth block "Notice of potential liability under section 241(c), (d), or (e) of the Act". In the event the alien is formally ordered removed, an amended Form I-259 should be created by checking the second block "Notice to Remove the Alien from The United States on __ at __", inserting the appropriate date and POE. The amended Form I-259 should be issued to the carrier responsible for removing the alien to the last port of embarkation prior to arrival in the United States. Follow local guidelines and procedures for authorization to detain an alien for removal.

iii. Q & A: Depending on the complexity of the case, the deferring office may wish to capture additional information using a question and answer format.

(E) Print Forms:

- Review the data for accuracy.
- Place a legible parole stamp in the "Details" block of the applicant's copy of the Form I-546. Endorse in the same manner as the Form I-94, as described above.
- Attach copies of the amended Form I-259 to the Form I-546 in the A-file or T-file.
- The CBP Officer processing the deferred inspection is to sign the line identified as "Signature of Recommending Officer".

The supervisory CBP Officer will verify that the details on the forms are correct and sign the Form I-546 in the space provided.

(F) Return to the IDENT screen and perform a search and enroll. Do not book the individual in IAFIS.

(6) Close Out:

(A) Verify that the applicant understands what documentation is necessary to overcome the inadmissibility when appearing for the deferred inspection. Prior to departing the secondary processing area, the applicant shall be given:

- the departure section of the Form I-94

- the appointment copy of the Form I-546 with a specific reporting date and a time block, rather than a specific time. In some instances, the applicant will need to contact the deferred inspection office to schedule the appointment.

(B) The deferring officer shall complete the Interagency Border Inspection System (IBIS) secondary screen indicating a deferral. In the remarks section, enter the office deferred to, date of inspection, and reason for deferral.

(C) A-file/T-file: The deferring officer shall include all forms generated in the A-file or T-file along with any other documents relevant to the inspection. The A-file or T-file is to be forwarded to the onward office within 24 hours of scheduling the deferred inspection. Follow local procedures for deferrals within the same field office.

(D) Reporting Requirements: The Form G-22.1 should be completed to indicate the

I-LINK

### Inspector's Field Manual

category and reason for the deferred inspection.

(E) Retention Requirements: A copy of Form I-546 shall be maintained at the deferring office until the ENFORCE record reflects that the case has been completed. Once completed, the deferring office may shred/destroy the original paperwork. POEs are responsible for monitoring the cases deferred to an onward office by reviewing the results of the deferred inspection in IO-95 or ENFORCE.

(c) Processing a Deferred Inspection at the Onward Office. The inspecting officer at the onward office should have received the deferral paperwork in advance of the applicant's appearance. It is the responsibility of the onward office to locate and request an already existing A-file, which should be reviewed prior to the applicant's appearance.

• If the applicant is found admissible, a new Form I-94 shall be executed using the office symbol of the onward office and the current date as the date of admission. The officer should ensure that the name, date of birth and country of citizenship written on the new Form I-94 is exactly the same as the information recorded on the Form I-94 issued at the time of the deferred inspection.
• If the inspecting officer concludes that the alien is inadmissible, the officer shall complete processing according to appropriate guidelines, which can be found in Chapters 17.2 through 17.17 of this field manual.

Upon completion of the deferred inspection, use IO-95 to create a new record within IBIS to show the deferred inspection results. Indicate the disposition on the Form I-546 included in the A-file. Forward the original deferred Form I-94 departure section and the new arrival section to the recipient indicated in Appendix 15-8 for data entry, if required. Record the final disposition of the deferral in ENFORCE. Query by event number, then record the outcome of the deferred inspection in the disposition data entry field located in the Form I-546 Data Collection Screen.

The Form G-22.1 should be completed to indicate the disposition of the deferred inspection. The disposition shall be noted on the Form G-22.1 under other (PORT = Other) secondary inspections operation report, complete other columns as appropriate.

(d) No Shows. The onward office is to monitor the cases referred for a deferred inspection. Cases should not be pending longer than 30 days after the expiration of the scheduled appointment, unless the applicant has requested an extension. If an alien fails to appear for his or her deferred inspection, a Form I-862, Notice to Appear shall be executed using the information listed on the Form I-546 and mailed to the address provided. All information related to the case shall be added to the A-file. A lookout must be posted in IBIS. All aliens who have lookouts posted shall be reported on the G-22.1 under "IBIS lookout entered". Criminal penalties and the possible pursuit of a criminal warrant under 8 U.S.C. 1325 shall be pursued on a case-by-case basis. All related information shall be forwarded to the CBP Prosecutions Unit (CBP Enforcement Officers) and/or U.S. Immigration and Customs Enforcement to allow further follow-up of the case. All aliens who fail to appear and for whom prosecution is pursued shall be reported of the Form G-22.1 under "Prosecutable Cases Referred to INV". Query ENFORCE by event number, in the "disposition" data entry field located in the Form I-546 Data Collection Screen, to record the action taken.

I-LINK

## Inspector's Field Manual

(e) Attorney Representation at Deferred Inspection.  At a deferred inspection, an applicant for admission is not entitled to representation. See 8 CFR 292.5(b). However, an attorney may be allowed to be present upon request if the supervisory CBP Officer on duty deems it appropriate. The role of the attorney in such a situation is limited to that of observer and consultant to the applicant.

(f) Medical Deferrals.  When deferring inspection for a medical ground of inadmissibility under INA Section 212(a)(1), consult with the Public Health Service (PHS) before permitting the alien to proceed.  If the alien is required to submit to further medical examination prior to reporting to the onward office, return all medical documents including local PHS certification and x-rays to the applicant in a sealed envelope for presentation to the doctor, medical clinic, or PHS facility as instructed.  If the alien is to report first to the onward CBP office, forward the medical documents with the deferral papers directly to the onward office.

## 17.2   Withdrawal of Application for Admission.

(a) General.  A nonimmigrant applicant for admission who does not appear to the inspecting officer to be admissible may be offered the opportunity to withdraw his or her application for admission rather than be detained for a removal hearing before an immigration judge or placed in expedited removal.  An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued.  Before allowing an alien to withdraw, you must be sure that the alien has both the intent and the means to depart immediately from the United States.  See section 235(a)(4) of the Act and 8 CFR 235.4.

Withdrawal is strictly voluntary and should not be coerced in any way.  It may only be considered as an alternative to removal proceedings when the alien is not clearly admissible. Occasionally, POE workload, personnel resources, and availability of detention space may affect whether you will allow withdrawal or pursue removal proceedings before an immigration judge.  However, in cases where the alternative to withdrawal is expedited removal, workload and detention space are less significant considerations.

In exercising your discretion to permit withdrawal, you should carefully consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, that justice would be ill-served if an order of removal were issued.  In light of the serious consequences of issuing an expedited removal order, which includes a 5-year bar to re-entry, the decision of whether to permit withdrawal should be based on a careful balancing of relevant favorable and unfavorable factors in order to reach an equitable decision.  Such factors might include, but are not limited to:

(1) The seriousness of the immigration violation;

(2) Previous findings of inadmissibility against the alien;

(3) Intent on the part of the alien to violate the law;

I-LINK

**Inspector's Field Manual**

(4) Ability to easily overcome the ground of inadmissibility (i.e., lack of documents);

(5) Age or poor health of the alien; and

(6) Other humanitarian or public interest considerations.

An expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant.  For example, where counterfeit or fraudulent documents are involved, an expedited removal order is normally the appropriate response.   On the other hand, in a situation where the alien may have innocently or through ignorance, misinformation, or bad advice obtained an inappropriate visa but has not concealed information during the course of the inspection, withdrawal should ordinarily be permitted.   Where an immigration violation has not yet occurred, and the determination of inadmissibility is based on the alien's ignorance of permissible activities or on a judgment of the alien's future intent, the factors cited above should be carefully weighed in deciding whether to permit withdrawal or issue an expedited removal order.  Where the travel documents presented are prima facie valid, you should consider whether the violation warrants the serious consequences of a formal removal.   If the alien may readily overcome the inadmissibility by obtaining proper documents, the alien may be permitted to withdraw his or her application for admission and should also be appropriately advised of the necessary forms and requirements to overcome the grounds of inadmissibility.

Under section 222(g) of the INA, as amended by IIRIRA, when an alien has remained in the United States beyond the period of his or her authorized stay, the alien's visa is considered to be void, even though no action may have been taken to physically cancel the visa.  In a case when an alien could not have been reasonably expected to know that his or her visa is void, but the alien is otherwise admissible except for the lack of valid nonimmigrant visa, withdrawal of application for admission may be considered.   However, if the facts of the case indicate particularly egregious immigration violations, such as long-term or repeated previous overstays, unauthorized employment in the United States, or that the alien is again likely to remain beyond his or her authorized stay or otherwise violate his or her status, an expedited removal order may be appropriate.

An applicant who withdraws his or her application for admission is not considered formally removed and therefore does not require permission to reapply for admission to the United States.  Once the reason for the inadmissibility is overcome, the alien may be eligible to apply for a new visa or admission to reenter the United States.

(b) Jurisdiction.  Generally, a withdrawal will be taken at the port-of-entry or following a deferred inspection.   However, there will be instances where a detained alien, prior to or during the expedited removal credible fear process, is permitted to withdraw his or her application for admission.  Any INS officer involved in the continuing processing of an arriving alien may, after obtaining authorization in accordance with local procedures, offer withdrawal if the situation warrants.   Withdrawal during the later stages of the expedited removal and credible fear process should be the exception rather than the normal course of action.   All facts,

I-LINK

## Inspector's Field Manual

circumstances, and factors relating to the case should be carefully considered. In expedited removal cases, several units within INS may have already invested considerable time and resources in pursuing expedited removal of the alien. In order to preserve a unified expedited removal process and uniformity of decision, asylum officers may wish to consult with other units involved to obtain any additional information concerning the case which may affect the decision to permit withdrawal.

(c)  Withdrawal Procedures.  If, after obtaining supervisory concurrence in accordance with local procedures, you decide to permit an applicant to withdraw, complete the necessary paperwork.  Once an applicant is granted permission to withdraw, prepare Form I-275, Withdrawal of Application for Admission/Consular Notification. The I-275 must clearly state the reasons for inadmissibility in the remarks block.  A sworn statement should be taken and attached to the I-275.  If the alien is inadmissible under section 212(a)(6)(C) or (7) and would have been subject to expedited removal if not permitted to withdraw, the sworn statement should be taken using Form I-867A&B.  Check any appropriate boxes on the I-275. The alien must sign the I-275, acknowledging that the action is entirely voluntary.  The alien should be given a copy of the I-275 and any sworn statement taken, unless the Form I-275 contains classified or sensitive information.  Prepare and serve an I-259 on the appropriate carrier to effect removal.  Complete the I-94, endorsing both sections with:  "WD - Application for Admission Withdrawn.  (Stamp number), (Port), and (Date)."  On the reverse of the I-94, indicate the file number, if appropriate, in Block 20.  In Block 26, under Itinerary/Comments, write the grounds of inadmissibility, and "I-275 served.  To be removed via (flight number) on (date)".  Also include removal flight information on the front of the departure portion of the I-94. Cancel the nonimmigrant visa, and note the visa page "22 CFR 41.122(h)(3)."  In a case where the alien may, through ignorance, bad advice, or misinformation, have inadvertently arrived with inadequate documents or an improper visa, and there was no fraud involved and you are satisfied that the alien will depart in order to comply with admissibility requirements, a visa may be left intact for future use.

Prepare a packet in a sealed envelope for immigration officials in the country to which the alien is being returned, containing the alien's travel document and a copy of the Form I-275 or other relevant information that may be needed by the immigration officials in the ongoing country. Where practical, advise INS offices overseas by phone or fax of aliens moving through their jurisdiction.  Forward the original of the I-275 and sworn statement to the consulate where the visa was issued.  Route the arrival I-94 for data entry and deliver the departure I-94 to the carrier to be submitted with other departure I-94s for the outbound flight.  Maintain a copy of all relating documents, including the pertinent passport pages and other evidence at the port of arrival for 6 months.    Refer to Chapter 21.2 for special Canadian border procedures and to Chapter 17.15(f) for specific instructions relating to withdrawal of application for admission by minors.

(d) Return Transportation Arrangements.  An alien who is permitted to withdraw must depart immediately from the United States, or as soon as return transportation can be arranged.  If the alien arrived at an airport or seaport, arrange for departure on the next available transportation either back to the country where the alien boarded the flight or vessel, or to another country if the alien is entitled to enter that country.  In instances where the alien is being returned to a third country through a foreign transit point, every possible effort must be made to ensure that

I-LINK

### Inspector's Field Manual

an immediate and continuous transit will be ensured. If the alien does not have either a return ticket or the carrier has not otherwise agreed to transport the alien, removal proceedings should be instituted. If the alien has an open ticket, make sure satisfactory confirmed return transportation arrangements are made. If the alien arrived at a land border port-of-entry, he or she is not permitted to enter the United States, and is simply returned to the contiguous territory from which he or she arrived.

(Chapter 17.2 revised 12/22/97; IN98-05)

## 17.3   Fraudulent Documents.

(a) General. Any passport, visa, alien registration card, or other document presented by an applicant for admission is potentially a counterfeit or altered document, a document procured by fraud or a genuine document being presented by an imposter. As document quality has improved, so has the ability of document vendors to create better quality counterfeits. Tools for detecting fraudulent documents are discussed in Chapter 34. A discussion of the Forensic Document Laboratory and other Intelligence support activities are contained in Chapter 32. The El Paso Intelligence Center (EPIC) can also be of assistance in detecting fraudulent documents. EPIC may be contacted in writing at: EPIC; 11339 SSG Sims St.; El Paso, TX 79908-8098; Att: ICS or by calling (915) 564-2000. See Chapter 32 for further discussion of EPIC functions.

Once you have determined a document is fraudulent or is being presented by other than the rightful holder, in addition to processing the holder as an inadmissible alien, you must insure that information about the document is properly routed to INS Intelligence for dissemination to others. It is important that information be distributed promptly, since document vendors often produce multiple documents using the same techniques. In order to effectively identify such documents, one of the most valuable assets is current, accurate intelligence information. Local ports generally have one or more designated inspectors assigned as collateral intelligence officers to insure such information is properly routed to and from other officers.

Local ports tend to have patterns for the types of documents encountered which are most likely to be fraudulent. Birth and baptismal certificates, which have no national standards, are the most commonly counterfeited, altered, or improperly issued documents. Familiarize yourself with security checkpoints of documents regularly presented at your port-of-entry. (Revised IN98-13)

(b) Counterfeit or Altered Document. Alteration of documents occurs in several ways: changing data on a valid document to fit the description of the alien applicant, photo substitution, and page substitution are the most common. Counterfeiting of birth records and other similar documents is also commonplace, counterfeiting of entire passports happens less frequently. Some attempts are excellent, others fairly crude. Always examine documents with laminated photos, such as border crossing cards, outside any case or holder so you can feel any relamination. This is a good practice, even at land border primary locations. Familiarity with document alerts and passport studies provided by the Intelligence Division will also make

**Inspector's Field Manual**

detection of this type of fraudulent document easier.   Following are tips for passport examination.

- Examination of a passport begins with the cover.  Look for the quality and clarity of printing, color, thickness and even spelling.  Check the shape and cut of corners.

- Next inspect the inside pages for known watermarks and background printing, as well as any other known security checkpoints.  Again, examine spelling and print quality.  Check the alignment of pages and the shape and cut of corners.  Perforations should generally be sharp, distinct and evenly aligned.

- Review the data page or pages of the document.  Handwritten entries should be made with the same color ink, without overwritten or blotched entries.  Typed entries should all be with the same typeface and consistency of ink.

- Examine the photo page for signs of double lamination, cuts in the lamination, excessive glue, or wrinkling.  Inspect wet or dry seals overlapping the photo.  Seals should be aligned and distinct.  The seal impression on the reverse side of the page should match that of the front.

- Examine the page immediately opposite the photo page for grommet or staple indentations.   Such indentations should match the grommet or staple attaching the photo.

- Examine the binding for jagged or enlarged stitching holes.  Stitching should be evenly spaced.

(c)  Genuine Document Presented by Imposter.  Careful questioning of an applicant regarding the nature of the visit and the particulars of how the visa was obtained, and close scrutiny of the photo and biographic data on the travel document will assist you in determining if the bearer is the rightful holder of the passport or visa. Immigration officers have delegated authority, pursuant to 22 CFR 41.122(h) to cancel genuinely issued visas which have been removed from the original travel document or which are presented by other than the rightful holder.  Whenever such action is taken, prepare Form I-275 to advise the issuing consulate.

(d)  Genuine Document Obtained by Fraud.  Among the more difficult tasks you face as an inspector is making a determination that a passport, visa or, other document   issued by competent authority was based on a fraudulent application or agency error.  While it is not possible for you to readjudicate the underlying basis of eligibility for every document presented, you should be aware of the general requirements for various immigration benefits and know what relevant questions to ask an applicant for admission when you become suspicious.  As INS automated systems improve, you have at your disposal more information from agency files upon which to inquire.  Access to INS automated systems is discussed in Chapter 31. Your observation of the applicant's demeanor and his or her responses to simple questions are the best tool for uncovering this type of fraud.

I-LINK

### Inspector's Field Manual

(e) H-1B Fraud Refusal Notification Report. Pursuant to Section 108 of the "American Competitiveness in the Twenty-First Century Act" (Public Law 106-313), when an H-1B petition is revoked because the alien obtained the H-1B visa through fraud or misrepresentation, the Service will recapture the H-1B visa number. Any revocation based on fraud will restore an H-1B visa number to the total number of aliens who may be issued a visa in the fiscal year in which the petition is revoked. The H-1B Fraud Refusal Notification Report (Appendix 17-7) shall be used in all cases where an H-1B visa fraud determination has been made at a Port-of-Entry. A copy of Form I-275, Withdrawal of Application for Admission/Consular Notification, shall be included to further indicate the basis for the action. This information substantiating an incident of H-1B fraud shall be forwarded, via facsimile, to the service center where the petition was approved. That service center will notify the petitioner of the revocation and will update the computer system to correctly reflect the H-1B visa numerical limitation change.

(Added IN01-14)

## 17.4   False Claims to U.S. Citizenship.

(a) General. You must always be alert to the possibility that an alien may attempt entry by falsely claiming United States citizenship. The claim may be either an oral claim or one supported by an authentic or fraudulent document. The best defense against false claims to U.S. citizenship is your own instinct as an inspector. The most obvious clues in detecting a false claim are nervous actions or reactions on the part of the applicant or language patterns that don't fit the claim to citizenship.

If the applicant claims recent naturalization, that may be sufficient to convince you he or she is a U.S. citizen or it may prompt further questions, or a check of the Central Index.

Become familiar with the persons at your port who can assist you in the questioning of a suspected false claim. A native Spanish speaker, familiar with various local accents and idioms, is more likely to quickly detect, for example, a Central American claiming birth in Puerto Rico. Learn the procedures used by various local officials involved in issuing citizenship documents; request original or certified copies of documents which are presented.

A word of caution -- Never refer a person to secondary as a false claim simply because the person is belligerent, disrespectful or suspected of being under the influence of alcohol or other drugs. Refer him or her when you have some reason to believe the person is an alien attempting to commit a fraud.

A new ground of inadmissibility for false claims to U.S. citizenship was added to §212(a)(6)(C)(ii) of the Act by IIRIRA, for representations made on or after the date of enactment, September 30, 1996. Aliens who make a false claim to U.S. citizenship therefore are subject to the expedited removal provisions of §235(b)(1) of the Act. See Chapter 17.15 for expedited removal procedures.

**Inspector's Field Manual**

(b)  Procedures.   Once you have made a determination that an applicant for admission is making an false claim U.S. citizenship, process the case as an expedited removal case or permit withdrawal of application for admission.  In order to prevent the improper removal of a U.S. citizen without hearing or review, a provision was added to the regulations in 8 CFR 235.3(b)(5) to provide for a review of the expedited removal order by an immigration judge.  As with any claim to U.S. citizenship, every effort should be made to either verify or disprove the claim prior to proceeding with issuance of a removal order.  Only those cases where you are absolutely not satisfied that the person is a U.S. citizen should result in a removal order.  To refer the case to a judge, use Form I-863, executing block 4 of the form.  In cases of claims supported by documentation, in addition to the above, complete Form G-329, Documented False Claim to Citizenship, and forward it to the appropriate address listed in Appendix 15-8.  Attach the original documents, unless they are being used as evidence, a complete set of the alien's fingerprints on Form FD-249, and a photograph.  If original documents are needed for other purposes, attach a photocopy.  If a genuine document is being presented by an imposter, obtain, if possible, biographic and family information relating to the person to whom the document relates.  [Detailed instructions on preparing Form G-329 are contained in Chapter 32.6.]

## 17.5  Waivers.

(a)  General.  The grounds of inadmissibility applicable to aliens are established by §212 of the Act.  There are a series of exemptions and waivers for various grounds of inadmissibility.  Exemptions refer to statutory or regulatory constructions whereby certain classes of aliens are not subject to inadmissibility, under specific circumstances, based on certain general provisions relating to inadmissibility.  No application or adjudication is needed when an alien is exempt from a ground of inadmissibility.  For example, many aliens are, by regulation, exempt the general passport and visa requirements.  Generally, waivers refer to specific applications, filed individually, and adjudicated to remove temporarily or permanently one or more specific grounds of inadmissibility.  Waivers are available to immigrants pursuant to sections 211(b), 212(a)(3)(D)(iv), 212(a)(9)(B)(v), 212(d)(11), 212(d)(12), 212(e), (g)(1), (g)(2), (g)(3), (h), (i), and (k).  Waivers are available to nonimmigrants under sections 212(d)(1), (d)(3), (d)(4), and (l).  Additionally, certain qualifying aliens are eligible for automatic waivers under sections 212(m) and (o).  No application or fee is required for such automatic waivers.   There are a variety of situations involving inspection of aliens requiring waivers of inadmissibility.  In many instances the need for a waiver has been determined and adjudication of a waiver has been completed before the alien arrives at the port-of-entry.  In such cases, the nonimmigrant visa will be noted or the alien will possess a notice of action approving the waiver.  In other instances, the need for a waiver will be determined during the inspection process and the matter can often be resolved during secondary inspection.

(b)  Permanent Residents Without Valid Alien Registration Documents.  During the inspection process, you may be required to process a waiver under section 211(b) of the Act if a returning resident is not in possession of his or her alien registration card or reentry permit.  If the applicant is otherwise admissible, complete Form I-193, Application for Waiver of Passport and/or Visa, collect the required fee, stamp the I-193 and passport with your admission stamp

## Inspector's Field Manual

and endorse them "211(b)." Before approving such a waiver, query the applicant's status in Central Index to verify the validity of his or her lawful permanent residence. See Chapter 13.2 for a discussion of this and other options for admitting returning residents. If you deny a waiver under section 211(b) of the Act, the application may be renewed in removal proceedings before an immigration judge.

There are a number of precedent decisions relating to section 211(b) waivers. In *Matter of Abdoulin*, 17 I&N Dec 458 (BIA 1981), the Board ruled that denial of a waiver by the district director did not constitute a definitive adjudication of abandonment of permanent residence. In *Matter of Muller*, 16 I&N Dec. 637 (BIA 1978), the Board discussed factors to be considered in determining the issue of abandonment. Other relating precedents relating to abandonment of residence and entitlement to a waiver include: *Matter of Davis*, 16 I&N Dec. 514 (BIA 1978); *Matter of Delgadillo*, 15 I&N Dec. 395 (BIA 1975); *Matter of Galvan*, 14 I&N Dec. 518 (BIA 1974); *Matter of Castro*, 14 I&N Dec. 492 (BIA 1974); *Matter of Montero*, 14 I&N Dec. 399 (BIA 1973); *Matter of Wu*, 14 I&N Dec. 290 (Regional Commissioner 1973); *Matter of Hoffman-Arvayo*, 13 I&N Dec. 750 (BIA 1971); *Matter of Wighton*, 13 I&N Dec. 683 (BIA 1970, 1971); *Matter of Salviejo*, 13 I&N Dec. 557 (BIA 1970); *Matter of Escalante*, 13 I&N Dec. 223 (BIA 1969); and *Matter of Vielma-Ortiz*, 11 I&N Dec. 414 (BIA 1965).

(c)   Waivers for New Immigrants.   An alien inadmissible from the U.S. under section 212(a)(5)(A) or (7)(A)(i), who is in possession of an immigrant visa may, if otherwise admissible, be admitted by applying to the district director at the port-of-entry at which the alien arrived for a waiver on Form I-193, under the conditions described in §212(k) of the Act and 8 CFR 212.10. This waiver is available to correct such technical defects as when a consular official has placed an improper classification symbol on the visa or where classification has changed due to the alien turning 21 years of age subsequent to visa issuance. It is available both at a port-of-entry at the time of initial admission or **nunc pro tunc**. No fee is required. Adjudicate the application and attach the form to the immigrant visa packet. If denied, application for a section 212(k) waiver may be renewed before an immigration judge in removal proceedings.

Precedent decisions involving application for a section 212(k) waiver of section 212(a)(5)(A) include: *Matter of Morgan*, 13 I&N Dec. 283, (BIA 1979); *Matter of Ortega*, 13 I&N Dec. 606 (BIA 1970); *Matter of Ulanday*, 13 I&N Dec. 729 (BIA 1971); *Matter of Paco*, 12 I&N Dec. 599 (BIA 1968); *Matter of Thompson*, 13 I&N Dec. 1 (BIA 1968); *Matter of Welcome*, 13 I&N Dec. 352 (BIA 1969); and *Matter of Rodriques*, 13 I&N Dec. 746 (BIA 1971).

Precedent decisions involving application for a section 212(k) waiver of section 212(a)(7)(A)(i) include: *Matter of Pierce*, 17 I&N Dec. 456 (BIA 1980); *Matter of S- B-*, 7 I&N Dec. 298 (BIA 1956); *Matter of Alarcon*, 17 I&N Dec. 574 (BIA 1980); and *Matter of Khan*, 14 I&N Dec. 122 (BIA 1972).

A waiver of the passport requirement, using the I-193 procedure described above, is also provided in 8 CFR 211.2. Other waiver provisions applicable to new immigrants are normally adjudicated in advance. Approval of such waivers should be indicated by the consular official on the immigrant visa, OF-155A.

**Inspector's Field Manual**

(d) Nonimmigrants.

(1) Section 212(d)(3)(A). Nonimmigrants who are inadmissible to the United States, and who require a visa, must apply in advance for a waiver under section 212(d)(3)(A) of the Act. Joint concurrence by the Secretary of State and the Attorney General is required for approval. The alien usually applies for the waiver in conjunction with the application for a nonimmigrant visa. Once approved, the section of law under which the waiver was approved and any special limitations will be noted on the visa. If otherwise admissible, enter the waiver information and any restrictions on the reverse side of the I-94 in the appropriate blocks.

(2) Section 212(d)(3)(B). Inadmissible nonimmigrants who are already in possession of a nonimmigrant visa, or who are exempt the requirement for a visa, must apply for authorization under section 212(d)(3)(B) of the Act to the district director having jurisdiction over the intended port-of-entry. Application is made on Form I-192, Application for Advance Permission to Enter as a Nonimmigrant. Adjudication procedures are discussed in detail in Chapter 42 of the *Adjudicator's Field Manual*. If such application has been approved, the alien will be in possession of Form I-194, Notice of Approval of Advance Permission to Enter as a Nonimmigrant. If otherwise admissible, enter the section 212(d)(3) authorization information, the file number, and the FCO code on the reverse side of the Form I-94, along with any conditions or restrictions.
[IN 02-08]

(3) Section 212(d)(4)(A) Waiver of Passport and/or Visa.

(A) An authorizing official, as designated in the memorandum Delegation of Immigration Authority Under Customs and Border Protection (CBP) (TC#03-0495), dated May 22, 2003, has the discretion to grant a 212(d)(4)(A) waiver only if the alien clearly demonstrates that an unforeseen emergency prevented him or her from acquiring the appropriate passport or visa. Currently, this authority is delegated to the port director at the GS-13 level and above. See generally Matter of LeFloch, 13 I. & N. Dec. 251, 255-56 (BIA 1969) 212(d)(4)(A) waiver of student visa denied after U.S. consulate incorrectly informed B visa holder that no student visa was necessary; no unforeseen emergency); Matter of V, 8 I. & N. Dec. 485, 485-87 (BIA 1959) (no unforeseen emergency where alien had ample opportunity in advance of travel to obtain a visa). The term "unforeseen emergency" as used in 8 CFR 212.1(g) generally means:

(i) an alien arriving for a medical emergency;
(ii) an emergency or rescue worker arriving in response to a community disaster or catastrophe in the United States;
(iii) an alien accompanying or following to join a person arriving for a medical emergency;
(iv) an alien arriving to visit a spouse, child, parent, or sibling who within the

I-LINK

### Inspector's Field Manual

past 5 days has unexpectedly become critically ill or who within the past 5 days has died; or

(v) an alien whose passport or visa was lost or stolen within 48 hours of departing the last port of embarkation for the United States.

(B) In a case where a section 212(d)(4)(A) waiver is under consideration, the alien should complete Form I-193 and remit the appropriate fee. In the remarks block of the Form I-193, the immigration officer shall precisely describe the unforeseen emergency that prevented the alien from obtaining the proper documentation before arriving in the United States. In addition, the officer shall describe precisely why a reasonable person in the alien's position could not have anticipated the emergency that predicated his or her arrival in the United States without the proper documents. Mark "n/a" in the block designated for Department of State concurrence on the Form I-193. Where an authorizing official favorably adjudicates an application for a section 212(d)(4)(A) waiver, the admitting officer shall stamp the passport using the regular admission stamp, note the class of admission (i.e., B-1, B-2, etc.), and write, "212(d)(4)(A) unforeseen emergency waiver" in the alien's passport under the admission stamp. The admitting officer shall also make the same notation on the reverse side of both the arrival and departure portion of Form I-94.

(C) An authorizing official may also, on a case-by-case basis, approve a 212(d)(4)(A) waiver should individual unforeseen emergency circumstances arise that do not fall within the scope of an unforeseen emergency as described above. This authority shall also apply to those individuals who are officially acting in the capacity of the port director (GS-13 and above) or higher level.

(D) The official who authorizes a waiver under paragraph (d)(3)(C) of this chapter (i.e., the previous paragraph) shall maintain a log that precisely describes the emergency that prevented the alien from acquiring the required documents before arriving in the United States. In addition, before granting any such waiver, the authorizing official shall describe precisely why a reasonable person in the alien's position could not have anticipated the emergency that predicated his or her arrival in the United States without the proper documents. Finally, the official who authorizes a waiver under paragraph (d)(3)(C) of this chapter shall adhere to the procedures identified in paragraph (d)(3)(B) of this chapter regarding the execution of the Form I-193 and marking the passport.r regarding the execution of the Form I-193 and marking the passport.

(e) Headquarters Responsibility for Certain Waivers under Section 212(d)(3)(A) of the Act.

(1) General. Oversight of waivers of inadmissibility for nonimmigrants is the responsibility of the Inspections Program. The Act stipulates that the Secretary of State may recommend

I-LINK

### Inspector's Field Manual

the waiver and the Attorney General may grant or deny.  Normally, the recommendations are made to the Service at the overseas districts.  Certain categories, however, are elevated to the "seat of government" level as detailed below. [See 8 CFR 212.8.]

In making the recommendation to the Service, Section 40.111 of the Foreign Affairs Manual (FAM) instructs State Department officers to include:

- The relevant humanitarian, political, economic or public relations factors;

- a statement (where applicable) that DOS is satisfied  the alien has a residence abroad which he or she has no intention of abandoning;

- a statement that the alien is properly classified as a nonimmigrant;

- the officer's precise recommendation and the reasons therefor.

FAM guidance to consular officers specifies that a waiver may be requested (except as precluded by statute) for any nonimmigrant alien whose presence would not be detrimental to the United States and that the law does not require that recommendations be limited to exceptional, humanitarian or national interest cases.  It further states: "Thus, while the exercise of discretion and good judgment is essential, generally, consular officers may recommend waivers for any legitimate purpose such as family visits, medical treatment (whether or not available abroad), business conferences, tourism, etc."  It goes on, however: "In cases of ineligibility for other than security reasons, the consular officer must weigh additional considerations as recency and seriousness of the crime or offense, type of disability, reasons for the proposed travel to the United States and the probable consequences, if any, to the public interests of the United States."

Although the FAM provides guidance for State Department officers, the Service is not bound by it.  The inspector should consider all of the above and also consider that the Congress has deemed these aliens inadmissible to the United States.  In considering the waiver weigh the benefit, if any, to the United States should the waiver be granted. In situations where the proposed visit is for the purpose of medical treatment, consider whether such treatment is available to the alien abroad. Granting of waivers of these grounds should not be  routine and available just for the asking.

(2) Mandatory Referrals.  Although any case may be referred to the Department of State Visa Office by a consular officer for  consideration of a recommendation to HQINS, there are certain cases in  which  the FAM mandates the referral:

- Any case where it is requested by the alien or an interested party in the U.S. that it be forwarded;

- Any case where the consular officer knows or has reason to believe that pertinent considerations not available at the post may be available to or through the Department;

## Inspector's Field Manual

- Prior refusals;

- Any case where the alien's presence or activities in the U.S. might become a matter of public interest or of foreign relations significance;

- Any case in which the Department has mandated an advisory opinion be sought;

- The case of any alien who is a national of a country which the U.S. does not recognize or with which we have no diplomatic relations;

- The case of any alien not classifiable under INA Section 101 (a) (15) (A) or (G) but destined on official business to the United Nations;

- Cases of any SILEX or BUSVIS/SILEX alien and of certain CHINEX or BUSVIS/CHINEX aliens;

- The case of any Soviet applying for an I visa;

- Any case involving 212(a)(3)(B);

- Any cases in which the consular officer recommends a term of greater than one year.

(3) Limitations. Multiple entry waivers are not to be given to an alien who:

- Has a mental or physical disorder;

- Is a narcotic drug addict or a narcotic trafficker (multiples have been granted before in special cases with DEA/Customs/FBI involvement);

- Is afflicted with a communicable disease;

- Was convicted of a CIMT and is less than 5 years post-release;

- Prostitution related activity within 10 years of visa application.

(4) Silent Waivers. The majority of cases referred to HQINS involve either aliens involved with terrorism or illegal drug activity in which the Drug Enforcement Agency or another federal agency requests a "silent waiver" or some other special handling for cases in which the consular officer recommends greater than one year validity. In the terrorist-related cases, request the FBI position on the recommendation and consider any objections presented. If the objections of the FBI cannot be overcome to their satisfaction by travel restrictions or some other consideration, the case should be referred to the Department of Justice's Office of Intelligence Policy and Review (OIPR). In the drug cases, require

**Inspector's Field Manual**

detailed information as to what the alien is expected to do and what benefit exists for the U.S. Do not accept simple assurances. If the requesting law enforcement agency is requesting the "silent waiver" to effect an alien's arrest, the alien to be arrested should be at such a significant level within the criminal organization that the arrest materially affects it, or there should be some other significant gain in the case to justify the expense to the United States.

In all cases, place any restrictions that you feel are necessary. Some examples might be: geographical (4 block radius of the U.N.); port-of-entry (arrive at JFK only); time (3 days); advance itinerary (usually requested by the FBI), etc. on a case-by-case basis.



(Paragraph (e) added by IN97-08)

## 17.6   Preparing Removal or Prosecution Hearings.

(a) General. If you determine that an alien is inadmissible, and the grounds of inadmissibility cannot be resolved readily and the alien does not elect to withdraw (or is not afforded the opportunity), you must prepare necessary paperwork for a removal proceeding before an immigration judge or for prosecution. Most often, an alien will be detained or paroled until the hearing date. An alien who is inadmissible under section 212(a)(6)(C) or (7) is subject to the expedited removal provisions of section 235(b)(1) and should be processed in accordance with Chapter 17.15. If such an alien is also being charged with additional grounds of inadmissibility, follow the procedures below.

(b) Preparing the Case. There are a number of steps to be taken to refer a case for a removal hearing or for prosecution. Complete, accurate case preparation is extremely important. Prepare cases for prosecution according to guidelines set by the local U.S. Attorney. The following steps must be taken in each case referred to an immigration judge for removal proceedings:

(1) Take a complete sworn statement from the alien, concerning all pertinent facts. Collect any additional evidence relevant to the case which is discovered during the inspection process. Use Form I-263A as a jurat to close the statement. Provide a copy of the statement to the alien and retain copies for the Service file and record of proceedings.

(2)    Prepare three copies of Form I-862, Notice to Appear. If the alien is being held in Service custody, indicate that fact and location of the facility where the alien is detained in the address block. If the alien is not being held in Service custody, enter the complete address and phone number where the alien can be reached and provide the alien with Form EOIR-33 to report any change of address. If the aliens's mailing address is different than

## Inspector's Field Manual

the physical address, include both. Check the first box and provide a brief narrative description of the facts of the alien's arrival and inadmissibility under description of charges. Standard language for all charges under section 212(a) is available through most automated forms systems used by the Service. Fill in the complete citation for the provision of law (e.g. 212(a)(2)(A)(i)(I)) under which the alien is being charged. Enter the complete address of the appropriate Immigration Court in the space provided. The Notice to Appear must ordinarily include the time and place of the hearing. Obtain a date and time for the hearing using the EOIR ANSIR system, or following established local procedures. In unusual situations when a hearing date and time cannot be obtained, such as when there is a computer system outage, indicate " to be set" in the appropriate data field. Advise the alien, in a language that he or she can understand, of the time and place of the hearing and of the consequences of failure to appear. Sign and date the I-862. Normally, a hearing may not be conducted sooner than 10 days after service of the Notice to Appear. If the alien wishes to waive this time period and have an immediate hearing (or as soon as one can be arranged), have the alien sign the section entitled "Request for Prompt Hearing." Serve the I-862 on the alien and provide him or her with a current list of organizations and programs prescribed in 8 CFR 292 which provide free legal services.

Serve one copy of the I-862 on the alien, unless the alien is to be released and deferred to an onward office, in which case the service is accomplished by the onward office.

(3) Photograph and fingerprint the alien on FD-249 fingerprint cards (three sets). Distribution of the fingerprints should be made in accordance with the procedures set forth in chapter 18.9(c). Be sure to properly code the fingerprint cards with the proper United States Code citation, since the FBI will not clear cards without such codes. Following are examples of codes that may be used:

| | | |
|---|---|---|
| • | 18 U.S.C. 1544 | Photo substitutions |
| • | 18 U.S.C. 1546 | Counterfeit immigrant visa |
| • | 8 U.S.C. 1306 | Counterfeit INS documents, such as alien registration |
| • | 18 U.S.C. 911 | False claims to U.S. citizenship (imposters, photo substitution of U.S. passport) |
| • | 18 U.S.C. 1001 | Other (fraudulent documents, imposter, no documents, etc.) |

(4) If the alien is to be detained, consult 8 CFR 236.1(e) to ensure that, if required, the appropriate consular official is immediately notified of the alien's detention, even if the alien requests that this **not** be done. Notify the alien that he or she may communicate with a

I-LINK

## Inspector's Field Manual

consular official.

(5) Complete local procedures for authorization and arrangement of detention, if appropriate. If the alien is being detained pending the removal hearing, complete a Form I-94 for NIIS entry notated: "I-862 served - Detained at _____ for removal proceedings on (date). (Date), (Place), (Officer)." Section 235(b)(2) of the Act, as amended by IIRIRA, provides the detention authority for arriving aliens placed into removal proceedings under section 240. This provision is functionally equivalent to the old 235(b), and does not require issuance of a Warrant of Arrest.

(6) In cases involving fraudulent documents, if the sworn statement includes an admission of the fraud, no forensic analysis may be required prior to the hearing. If there is no admission, consider forwarding the fraudulent document to the Forensic Document Laboratory (FDL) for analysis. [See Chapter 32 for details on using FDL services.]

(7) Search for existing Service records in CIS and other appropriate automated systems. If an "A" file exists, create a temporary file and request the permanent file for the hearing, otherwise, open a new file. [Chapter 31 contains detailed information on use of Service data bases.]

(8) At air and seaports, serve the carrier with Form I-259, Notice to Detain, Remove, or Present Aliens, and check the appropriate boxes to advise the carrier of potential liability for removal and to order the carrier to remove the alien when the removal process is finished.

(9) If the alien is to be released for an removal hearing at an onward office, complete a Form I-546, Notice to Appear for Deferred Inspection, following procedures set forth in Chapter 17.1. In such cases, the I-862 will be served by the onward office. Although ordinarily not an option, this procedure is may be appropriate for determining whether to institute removal proceedings in cases involving returning permanent residents.

(10) Prepare two identical sets of all documents to be submitted as evidence: one for the Service file, and one for the Immigration Court.

(c) Post-hearing actions.

(1) Alien ordered admitted. Complete the inspection process as you would any other admission, including processing a new Form I-94, noting the remarks block "ordered admitted by immigration judge". Collect any prior departure I-94, stamp the reverse with your admission stamp and forward for data entry.

When the immigration judge orders the admission of a detained alien or an alien at a land border, and the decision is not final because the Service's appeal time has not tolled, an appeal has not been decided, or the decision has been certified to the Board of Immigration Appeals, release and parole the alien unless particular facts, such as an alien's serious criminal background, warrant other action.

I-LINK

## Inspector's Field Manual

(2) Alien ordered removed. Complete and serve Form I-296, Notice to Alien Ordered Removed/Departure Verification, on the alien, checking the appropriate box to indicate the duration of the penalty imposed and the reason for such penalty. The penalty for an aggravated felony may be imposed on such felon, even if the alien was not charged as being inadmissible as an aggravated felon in this proceeding. Forward one set of fingerprints on Form FD-249 to the FBI. At the time of actual removal, a photograph and a pressed print of the alien's right index finger should be placed on the Service copy of the I-296, the alien should sign the form, and the particulars of the departure entered on the form for retention in the file. Cancel the alien's visa or border crossing card, if appropriate, and complete and distribute Form I-275 as described in Chapter 17.2. Note the passport with the file number and action taken, for example: "Ordered Removed 12/1/97 NYC/Section 212(a)(2)(A)(i)(I)". Forward a copy of the removal order with the I-275 to the Department of State. Prepare a new I-94, endorse it with a parole stamp and note the stamp "For removal from the U.S. by (carrier name)", the date of removal, stamp number, port, and action date. Serve Form I-259 on the affected carrier, if appropriate.

In the case of an alien with an immigrant visa ordered removed, the immigrant visa packet, noted by the immigration judge, is retained in the file of the Executive Office for Immigration Review. Other procedures outlined above are the same.

(3) Alien permitted to withdraw during removal hearing. In a case where the immigration judge permits the alien to withdraw his or her application for admission prior to conclusion of a hearing, follow procedures described in Chapter 17.2.

(d) Removal proceedings involving lawful permanent residents.

(1) Meaningful Departure. If a returning lawful permanent resident appears inadmissible, first determine if he or she is an applicant for admission within the meaning of section 101(a)(13)(C) of the Act. See discussion in Chapter 13.

(2) Procedures. If you find that a lawful permanent resident is considered to be seeking admission and appears to have abandoned his or her permanent residence in the United States, there are several possible courses of action: deferred inspection, removal proceedings, nonimmigrant admission or parole and, occasionally, withdrawal of application for admission. In any case, temporarily lift, but do not destroy or return to the card facility, the Alien Registration Receipt Card (Form I-551). In instances where detention is not warranted, defer inspection for institution of removal proceedings, as described above in paragraph (b)(10) and Chapter 17.1. If you are going to schedule a removal hearing, follow applicable procedures above. In addition, issue a temporary I-551 in accordance with 8 CFR 264.5(g) and local procedures. Note the reverse of the temporary card: "Alien is scheduled for removal hearing - do not admit as LPR." Parole the alien for the time necessary to conclude the removal proceeding. Abandonment of residence is discussed in Chapter 17.10, below.

(3) If a lawful permanent resident appears to be inadmissible under section 212(a)(3)(A) (except clause (ii)), (B) or (C), notify your regional director, through the district director, of

I-LINK

**Inspector's Field Manual**

the facts of the case.

(e)  Proceedings Involving VWP Applicants Claiming Asylum.  When the immigration judge denies asylum to a refused VWP applicant, arrange for the alien to be removed on the first available transportation to the point of embarkation.

## 17.7  Temporary Inadmissibility under section 235(c).

(a)  General.  An immigration officer must, pursuant to section 235(c) of the Act, temporarily deny admission to the United States to any nonimmigrant who appears to be inadmissible under section 212(a)(3)(A) (other than clause (ii)), (B) or (C).  Such actions, although rare, are extremely serious and sensitive.

(b)  Procedures.  Basic procedures for temporary denial of entry are set forth in 8 CFR 235.8. Take a brief sworn statement from the alien, if possible.  Exercise caution in asking questions to insure you do not compromise classified information or confidential sources.  Complete and serve the alien with Form I-147, Notice of Temporary Inadmissibility.  Explain the action being taken and the right to submit a written representation.  Complete actions to remove the alien on the first available transportation.  Immediately prepare and submit a short memorandum to the district director containing the alien's name, date and place of birth, residence address, file number if known, port and date of temporary inadmission, and a summary of all pertinent facts developed during the inspection.  If the alien was entering as a delegate to a convention, provide the date and place of the convention and the sponsoring organization.  In sensitive, high profile cases, follow the procedures for reporting incidents described in Chapter 2.7. Institute checks with other law enforcement agencies to develop further information.  Prepare Form G-325A, mark it "Special Handling- I-147 served pursuant to 8 CFR 235.8" and forward it expeditiously to the district director.  Photocopy the data page, visa page, and any other pertinent pages from the alien's travel document.

If the alien previously resided in Canada, forward Form G-325B to the Service liaison officer in Ottawa.  When a current Canadian resident is to be temporarily denied admission on security-related grounds, notify the liaison officer in Ottawa by phone or fax, providing available personal data.  If the denial of admission is based on lookout information, the liaison officer should be so advised, and if the lookout is a temporary one, also provide a synopsis of the lookout. The liaison officer will consult available sources and provide information to the port normally within a few hours.  Delay action pending receipt of the response.

After five days, or upon receipt of the alien's written statement, prepare a detailed report for submission to the regional director. In addition to the information from the summary report, include other personal data such as marital status; the destination, duration, and purpose of the proposed visit; basis for temporary inadmissibility, including sources, reliability of informants, and identify what, if any, information is classified and an assessment of whether disclosure of the information would be prejudicial to the public interest, safety, or security of the United States. Attach a copy of any sworn statement taken, or explain why there was none. Attach the results of checks with other agencies. Make a recommendation as to whether or not the alien should be accorded a hearing by an immigration judge.

**Inspector's Field Manual**

(c) Canadian "Summary Conviction". An alien who is convicted of a theft offense punishable on summary conviction under section 334(b)(ii) of the Criminal Code of Canada as the only offense committed is not inadmissible to the United States on the basis of that conviction. [See General Counsel Opinion 92-36 for a detailed discussion of this issue.] (Added IN 99-30)

## 17.8  Detention of Aliens at Ports-of Entry.

(a)    General. During an inspection, officers have the authority to search without a warrant, take sworn statements, and detain applicants for admission to determine their admissibility into the United States. In cases where removal proceedings are being initiated, a decision relating to the detention of the applicant must be made. In some cases the detention needed is only of short duration (i.e., waiting for departure of flight, or preparation of case file, etc.) and transfer to a long-term detention facility is not practical. During an inspection at a port-of-entry, detention begins when the applicant is referred into secondary and waits for processing.

(b)    On March 9, 2004, the Office of Field Operations issued CBP Directive No. 3340-030A, which superseded Directive No. 3340-030 issued on July 26, 2001. This directive also supersedes previous port of entry detention procedures established under the former INS. Following is Directive No. 3340-030A:

SUBJECT:   SECURE DETENTION PROCEDURES AT PORTS OF ENTRY

1. PURPOSE. This Directive establishes national policy for the temporary detention of persons by U.S. Customs and Border Protection (CBP) in secure areas at Ports of Entry (POEs).

2. POLICY.

2.1 This policy shall pertain to the temporary detention of all persons who are detained in secure areas. This includes, but is not limited to, those persons suspected of terrorist activity, are under arrest, are awaiting confirmation on National Crime Information Center (NCIC) warrants, suspected as internal contraband carriers, aliens awaiting removal, transfer, or referral, or other processing involved in a secondary inspection, e.g. fuel tank exams.

3.    AUTHORITIES/REFERENCES. 19 U.S.C. §§ 482, 1461, 1581, 1582; 8 U.S.C. § 236; Title 8 Code of Federal Regulations 236.1(e) [8 CFR 236.1]; Personal Search Handbook (PSH), CIS HB 3300-04A revised November 1999; Physical Security Handbook CIS HB 1400-02A; Enforcement Handbook, Chapter 43, Detention, Arrest, and Handling Prisoners; Customs Directive 3340-028 (Physical Control of Suspects);

**Inspector's Field Manual**

Internal Operating Procedures Notification (IOPN), 00-19, "Accountability Requirements for Lost/Stolen Evidence, Drugs, Currency and Escaped Prisoners," dated April 26, 2000; Policy Memoranda dated April 11, 2003, April 25, 2003, May 13, 2003 relating to Severe Acute Respiratory Syndrome (SARS); Inspector's Field Manual, Chapter 17.

3.1 General.  CBP Officers have the combined statutory authority under Title 8 United States Code [8 USC], the Immigration and Nationality Act (INA) and Title 19 United States Code [19 USC].  It allows CBP officers to search without a warrant, take sworn statements, and detain applicants for admission to determine their admissibility into the United States, detain persons suspected of violating the customs, agriculture or other laws of the United States that are enforced at the border.  In cases where removal proceedings are being initiated, a decision relating to the detention of the applicant must be made.  In some cases the detention needed is only of short duration (i.e., waiting for departure of flight, or preparation of case file, etc.) and transfer to a long-term detention facility is not practical.  During an inspection at a port of entry (POE), detention begins when the traveler is referred into secondary and when processing is underway or subject is waiting processing.

4   DEFINITIONS.

4.1   U.S. Customs and Border Protection Officer.  Includes all legacy agency inspectors and canine enforcement officers.

4.2   Secure Area.  This refers to areas such as a detention cell, search room, interview room, or security office where an individual is detained for a temporary period of time out of public view and cannot flee.

4.3   Attended Area.  This refers to a location where a person is constantly in the physical presence of an officer in a secure area.

4.4   Unattended Area.  This refers to a detention cell, confinement area, or secure area where a detainee may be out of view of an officer.

4.5   Juvenile.  A person who has not reached his/her 18th birthday.

4.6   Patdown Search.  The term refers to the act of an officer searching for merchandise, including contraband, weapons, or documents hidden in the clothing a person is wearing or on their body.

4.7   POE Short-term Detention.  The temporary detention of a person at a POE while a case is being processed administratively or prepared for presentation for prosecution; pending parole, release, departure from the United States, or transfer of custody to another branch or agency; or while CBP makes arrangements for

### Inspector's Field Manual

longer term detention. Short-term detention begins with the subject being referred by an officer for further inspection and may take place in a secondary inspection area, POE hold room, or any other designated and/or assigned secure area for less than 24 hours.

4.8    POE Hold Room.   A confined area or secured room at a POE in which detained persons are temporarily held pending a secondary process, i.e., vehicle examination, adjudication, processing of documents, interviews, etc. Detention of a person in a POE hold room shall be for the least amount of time necessary.

NOTE:  At a POE where no hold rooms exist, and where operationally feasible, a segregated area away from the traveling public should be established within the port. Direct supervision and control of the detainee must be maintained.

4.9    POE Detention Cell.   A room where a person is placed who must be physically separated from the primary and/or secondary inspection areas, awaiting transfer to another detention facility or other Law Enforcement Agency (LEA), when constant surveillance of the subject is not feasible, and/or for ensuring the safety of both the traveling public and officers.

4.10   POE Search Room.   A private designated location that is designed for extensive search of a person and that prevents all but designated necessary personnel from viewing the subject. A POE search room may serve as a temporary hold room should separation from others be required or extra room needed.

5   RESPONSIBILITIES.

5.1 The Assistant Commissioner, Office of Field Operations, is responsible for policy oversight, which includes the formulation and implementation of guidelines and procedures.

5.2 Directors, Field Operations (DFOs) and Port Directors (PDs) are responsible for managing the implementation of this program and monitoring compliance with the procedures to ensure uniformity of application.

5.3 The PDs are responsible for ensuring that all Treasury Enforcement Communication System (TECS) reports (█████████████████████), detention logs, and any other reports pertaining to detentions are completed and reviewed. The reviews will determine the effectiveness of the procedures contained within this Directive, as well as, how well they are carried out.

5.4 Supervisors are responsible for ensuring that CBP officers under their direction are familiar with the guidelines set forth in this Directive.

I-LINK

**Inspector's Field Manual**

5.5 The U.S. Customs and Border Protection Basic Inspector Training Academy is responsible for incorporating this Directive into the appropriate training programs.

5.6 The PDs are responsible for identifying and ensuring that CBP officers under their direction are familiar with the areas that have been designated as detention cells, search rooms, or holding rooms.  Dual designation of a particular room is authorized, i.e., a detention cell may also be used as a search room.

6    DETERMINATION TO DETAIN.

6.1 Priority of Detention.  In cases where it is not possible to detain every person in a POE hold room, persons should be detained in the following priority:



6.1.1

    6.1.1.1

    6.1.1.2

    6.1.1.3

    6.1.1.4

    6.1.1.5

6.1.1

6.1.2

6.1.3

I-LINK

**Inspector's Field Manual**



6.1.4

## 7   DURATION OF DETENTION.

7.1 Short-term detention begins when the traveler/applicant is referred by a CBP officer for further inspection and may take place in a secondary inspection area, POE hold room, or any other designated area; and is for the least amount of time necessary to complete the inspection or processing.

7.2      As a rule, the maximum time an individual may be held in a secure area at a POE is no longer than ▮▮▮▮▮ Accordingly, every effort will be made to transfer, transport, remove, or release those in custody as quickly as is operationally feasible.

7.3 The PD will approve all detentions in secure areas that reach or exceed ▮▮ ▮▮▮▮

7.4 The DFO must be notified through the chain of command, if the detention period at the POE extends to ▮▮▮▮▮ or more.

7.5 A person placed in an unattended secure area will be checked ▮▮▮▮▮ ▮▮▮▮▮▮ , as the situation requires (see section 9.2). These checks will be annotated in the Detention Log [See Appendix 17-8]. For the purpose of tracking the duration of detention, the time will begin when the person is placed in a secure area. The tracking of time will be part of the Detention Log.

## 8   8   EXCEPTIONS TO SHORT-TERM DETENTION IN POE HOLD ROOMS.

8.1      Officers shall be sensitive to detained persons who are pregnant, on life-sustaining/lifesaving medication, appear ill, comprise family units (parent/adult with child/juvenile), or are persons of advanced age (over the age of 70) or unaccompanied juveniles (under the age of 18). [See section (9.27) of this Directive regarding Juvenile Detention Procedures and legacy Immigration Inspectors Field Manual (IFM) chapter 17.15(f)(5).]

8.2 For humanitarian reasons, the processing of secondary cases for these persons shall be expedited as quickly as operationally feasible.

8.3 To the extent possible, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Officers should ask the detainee whether medical treatment is necessary. If the

**Inspector's Field Manual**

detainee replies in the affirmative, or if medical treatment appears necessary, officers shall make appropriate arrangements. [See section 9.25 of this chapter regarding Medical Emergencies.]

8.4 Family units, persons of advanced age, and unaccompanied juvenile detainees

unless extraordinary and unforeseen circumstances exist.

8.5    In cases where family units are encountered but only the parent or legal guardian is detained, specific circumstances will dictate whether they should be separated from the juvenile who is not detained. If removing the juvenile from the parent or legal guardian is not feasible, arrangements should be made to keep the family unit together until a social service worker or an adult family member arrives to take custody of the juvenile.

8.6 Males and females shall be segregated at all times when in a POE detention cell (even if they claim to be married). Under no circumstances are detained persons under the age of 18 to be held with adult detainees, unless the adult is an immediate relative or recognized guardian who has been charged with the care and custody of the minor, and no other adult detainees are present in the hold room. Special treatment of juveniles is of paramount importance. [See section 9.27 of this chapter regarding Juvenile Detention Procedures.]

8   PROCEDURES.

9.1 Detention Log.   Port Directors will ensure that each POE maintains a detention log (manually and/or by computer) for all detainees placed in a POE detention cell. The officer handling the case shall enter the information relating to each detainee immediately upon placing him/her in a hold room and/or holding cell. For uniformity purposes, the attached Detention Log will be used at all locations for each unattended secure area and will contain an entry for each individual detained. The Detention Log will be maintained and filed at the POE ▮▮▮▮▮ Each entry will contain the information listed below.

 (a) Name of the person detained
 (b) Date of Birth (DOB)
 (c) Reason detained
 (d) Time & Date placed into hold room and/or holding cell
 (e) Time & Date removed
 (f) ▮▮▮▮▮ interval checks

I-LINK

**Inspector's Field Manual**

(g) Physical/Mental condition

(h) Officer's initials and comments

(i) Meals offered/eaten/declined

9.2     Detention Cell Monitoring.  Officers shall closely supervise detention cells at the POE when in use.  Officers shall monitor hold rooms ▮▮▮▮▮▮▮▮▮▮▮▮ noting in the log the time and officer's initials.  It's the responsibility of the supervisor to ensure that an officer is within visual or audible range of the hold room to allow detainees access to restroom facilities (if not incorporated in the detention cell) on a regular basis.

9.3     Individual Caution Sheet.  An Individual Caution Sheet [See Appendix 17-8] will be generated and posted near the entrance to the detention cell or in the secure area for those detainees who pose a special risk, i.e. diabetic requiring injections or possible suicide risk.  The sheet will be maintained until the detainee is released from CBP custody and the fact that there is a detainee with a Caution Sheet will be communicated to all CBP officers during shift change briefings/musters.  After the person is released or transferred to another agency or facility the Individual Caution Sheet will be retained on file ▮▮▮▮▮▮▮▮ For uniformity purposes, the form is attached.   The Individual Caution Sheet will contain at minimum the following check-off list to flag the detainee's special risk factor:

(a) Name and DOB

(b) Medical condition – requires prescribed medication

(c) Hostile or uncooperative

(d) Depression or suicidal

(e) Asylum Claimant

(f)  Juvenile

(g) Communicable Disease

(h) Other

9.4     Medical.   Whenever a CBP officer has reasonable suspicion that a traveler has a respiratory illness such as Severe Acute Respiratory Syndrome (SARS), the individual will be detained, and an Individual Caution Sheet generated.  In detaining and transporting them, follow established guidelines.  (SARS Policies Attached).

9.4.1 All persons placed in an unattended secure area at a CBP facility will be asked whether they have a medical problem or condition that may require some attention.   If they are currently taking any prescribed medications the CBP officers will identify the type of prescribed medication, when it was last taken, and when the next dosage is needed.

### Inspector's Field Manual

9.4.2 CBP officers will **not** administer or assist in injecting or administering medication. When an injection or administration of prescribed medication is necessary, Emergency Medical Services will be contacted. Prescribed oral medication in a properly identified container, with the specific dosage indicated, may be self-administered under the supervision of a CBP officer. Administration of prescribed medication, medical assistance, or refusal of the same, will be noted in the Individual Caution Sheet.

9.4.3 Officers will closely monitor and if possible segregate any detainee exhibiting signs of hostility, depression, or other symptomatic behavior (i.e. threats of suicide). In such cases, the officer will notify the shift supervisor and execute the Individual Caution Sheet. The Individual Caution Sheet must accompany the subject when transferred to another facility.

9.5 Asylees. When an asylum applicant is encountered, the CBP officer will transfer the applicant to a secure, attended, or unattended area as appropriate and an Individual Caution Sheet will be generated. Asylum applicants will be kept separate from other detainees to the extent possible and not placed in a detention cell unless otherwise indicated by their behavior. Officers should take note of signs of trauma, anxiety, or other factors relating to the case in determining the level of detention required.

9.6 Meals. Funding for meal service is not discretionary and is the responsibility of the local office through the DFOs. Officers shall provide a meal to any person, whether in a hold room or not, who is detained more than 6 hours (including secondary time or case preparation time). Juveniles, small children, toddlers, babies, and pregnant women shall have access to snacks, milk, or juice at all times. Regardless of the time in custody, officers shall provide a juvenile with meal service. In cases where an adult detainee requests a snack or meal due to extraordinary circumstances before the next meal service, the officer shall accommodate the request. Officers should be sensitive to the culinary cultural/religious dietary restrictions and/or differences of all detainees whenever feasible. A record of what type of meal is given to the detainee shall be logged. For an alien detained in a hold room, time of feeding or declination of a meal shall also be noted in the Detention Log.

9.7 Drinking Water. Drinking water shall be available in Styrofoam or paper cups for detainees requesting water. It is the responsibility of the supervisor to ensure that drinking water is available.

9.8 Restrooms. Access to restrooms shall be available to any detainees in a hold room or in the secondary inspection area. An officer of the same sex shall escort and closely monitor a detainee when using the restroom. Detainees using the

**Inspector's Field Manual**

restrooms shall have access to toilet items such as soap, toilet paper, female hygiene items, diapers, and wipes. **NOTE:** Access to restroom facilities may be restricted if the detained person is suspected of being an internal carrier.

9.9 Telephone. Officers shall notify every alien of his or her right to communicate by telephone with the consular or diplomatic officers of country of nationality in the United States when the removal of the alien cannot be accomplished immediately, and the alien must be placed in detention for longer than 24 hours.

9.9.1 In the cases of certain nationalities, if the alien is detained longer than 24 hours at the POE, existing treaties and CBP policy require that the service notify the appropriate consular or diplomatic officers about the alien's detention, even if the alien requests that this not be done. For the list of applicable countries, see 8 CFR 236.1(e).

9.9.2 Officers shall not mention any asylum claim or fear of persecution or torture expressed by the alien when contacting a consular official, nor shall they indicate the nature of the proceedings against the alien.

9.9.3 Dependent upon the length of detention and security risks, the Supervisor will determine whether or not the detainee will be allowed to communicate by telephone or in person with any other person, including consular officials. [See IFM chapter 17.15(b)(7) and 8 CFR 236.1(e).]

9.10      Detention Cells. The secure area where the detained person is placed must be cleared of all items that could be used as a weapon, to facilitate an escape, or to do bodily harm to the detainee or others. This includes purses, handbags, backpacks, and luggage. Weapons or improvised weapons may pose a significant risk to officer safety and care must be taken to minimize the subject's potential access to them.

9.10.1 Detention cells will routinely be thoroughly cleaned and sanitized and inspected for evidence of tampering.

9.10.2 Any problems encountered must be reported to the supervisor so that corrective action may be initiated.

9.11      Attended Area. When it is necessary to detain an individual in a work area, additional caution must be exercised to ensure the safety of the person and CBP employees.

**Inspector's Field Manual**

9.11.1 The person must be monitored at all times by at least one officer. The area within the person's direct reach must be cleared of all items that could be used as a weapon or to facilitate an escape.

9.11.2 Under no circumstances will evidence or other items that can be destroyed or pose a threat to any person be kept where they are accessible to a detained individual.

9.11.3 When possible, two CBP employees should be assigned to process and monitor persons detained at a CBP facility.

9.12  Search Procedures. Searches may, under certain conditions, be necessary to meet enforcement and/or security, or safety concerns. Under section 287(c) of the INA, officers have the authority to conduct a search of the person and personal effects of a person seeking admission if the officer has reasonable ground to suspect that ground of inadmissibility exists that may be disclosed by the search. All searches of detainees in CBP custody shall be conducted in a manner that is safe, secure, humane, dignified and professional.

9.12.1 All officers are to be aware of and comply with the enforcement standard on body searches and the CBP Personal Search Policy. Below are some of the policy guidelines and procedures for searches conducted at the border and functional equivalent of the border (POE) during the time of entry of a traveler for admission.

9.12.2 If a person is temporarily detained by CBP and must be placed in a secure area, CBP officers shall conduct a patdown in accordance with the guidelines established in Chapters 2 and 3 of the Personal Search Handbook and Chapter 43 of the Enforcement Handbook.

9.12.3 When a person has undergone a personal search in accordance with this Directive, the search shall be recorded in the appropriate TECS record using the *Reason for Search* code "

9.12.4 This Directive does not supersede the authority of a CBP Officer to conduct an immediate patdown or to secure a weapon if an officer suspects that a person may be armed.

9.12.5 This Directive does not supersede the authority of a CBP officer to