**Inspector's Field Manual**

conduct a lawful search incident to an arrest.

9.12.6  If an officer reasonably suspects merchandise or contraband is present as a result of the patdown search pursuant to paragraph 6.1, the CBP officer may conduct a more intrusive search to confirm or dispel suspicions, in accordance with the guidelines established in Chapter 4 of the Personal Search Handbook.

9.12.7  To ensure safety, prior to placing a person into a detention cell, officers shall empty the detainee's pockets of all sharp objects that may be used as weapons as well as all rope-like objects that the alien could use to injure him/herself.  Examples of these things are:

(a)
(b)
(c)
(d)
(e)



9.12.8  An officer may remove and examine ███████████████████████ to ensure there are no hidden items.  The items shall be returned to the individual and may not be confiscated until probable cause for arrest exists. However, if there are indications or articulable facts that may lead an officer to believe that the individual may attempt to harm themselves while in an unsecured, unmonitored area, then shoelaces, belts, neckties, and scarves may be removed.

9.13      Restraints Procedures.  The use of restraints on persons in CBP custody shall be conducted in a manner that is safe, secure, humane, and professional. When restraints are used, the officer must have reasonable articulable facts to support the decision.   Officers should employ only the amount of restraint reasonably necessary to ensure the safety of the detainee or others, and to prevent escape.  Officers should take into consideration known criminal activity, observed dangerous or violent behavior, verbal threats, and/or the nature of the inadmissibility of the individual in determining whether to use restraints, continue their use, or remove the restraints.

9.13.1  All Officers are to be aware of and comply with the Enforcement Standard on the Use of Restraints.  [See Enforcement Standard for the Use of Restraints and Customs Directive 3340-028 Physical Control of Suspects.]

9.13.2  In accordance with Customs Directive 3340-028 (Physical Control of

**Inspector's Field Manual**

Suspects), if an officer uses handcuffs solely for the safety of the officer and others, the officer should inform the restrained individuals that they are not under arrest and that the restraints are a temporary measure.

9.14    Escort Procedures.  Inspectors may provide escort services to remove or transport detainees.  Escorting officers are responsible for determining the need and level of restraints used at any time while escorting a detainee.  All detainees in CBP custody shall be escorted in a manner that is safe, secure, humane, and professional.   Whenever operationally feasible the escorting of persons will be conducted by two officers.

9.14.1 All officers are to be aware of and comply with the Enforcement Standard for Escorts.  [See Enforcement Standards for Escorts and the Use of Restraints for more detailed guidelines.]  Below are some of the policy guidelines for the escort and transport of those apprehended at entry.

(a) No detainee shall be transported/escorted without the assigned officer conducting a search of the detainee, except when exigent circumstances pose a safety hazard or danger to the officer, detainee or public.  In that case, a search shall be conducted as soon as it is practicable.   At minimum, a patdown search shall be performed and recorded in accordance with the Personal Search Policy.

(b) When escorting detainees in CBP vehicles, especially unaccompanied detainees of the opposite sex or minors, all officers shall maintain regular radio or telephonic communication with other CBP personnel, insofar as technologically possible and resources allow.

(c) Families, unaccompanied females, and unaccompanied minors shall be separated from unrelated adult males by separate passenger compartments or an empty row of seats.  If possible, these detainees shall be transported separately from other detainees.

(d) When transported in a CBP vehicle, detainees shall be restrained in accordance with the Use of Restraints Policy and placed in seatbelts (when practicable).

(e) The passenger section of all empty CBP vehicles and all immediate confinement areas shall be searched prior to, as well as following, each escort to ensure that no weapons or contraband have been hidden or left behind.

(f) When escorting a detainee in view of the general public (i.e., airport

I-LINK

**Inspector's Field Manual**

terminal) for removal from the United States, officers shall use care and discretion when handling and removing restraints from detainees to avoid undue concern by the traveling public and airline personnel.

9.15    Transfer Procedures. Every effort must be made to transfer, transport or release detainees in custody as quickly as possible. The DFOs or their designees shall develop local procedures in writing for authorization and arrangement for detention.

9.15.1  Once a detainee has been transferred to the custody of another agency and/or Detention and Removal, responsibility for the individual is transferred to that entity.

9.16    Control and Safeguarding Detainee Personal Property. The control and safeguarding of detainee personal property shall include the secure storage of funds, valuables, baggage and other personal property.

9.16.1 All property will be receipted on the appropriate form CBP-6051.

9.16.2 Initial and regularly scheduled inventories of all funds, valuables, and other property will be conducted and documented on a CBP-6051.

9.16.3 All items belonging to the detainee shall be placed in a properly marked plastic sealed bag, inventoried, and placed in a secure area.

9.16.4 A safe, secure designated storage area shall be assigned. [See Detention Standard on Accountability and Safeguarding of Detainee Funds and Personal Property.]

9.16.5 Officers shall use the following form:

(a) Form CBP-6051, Custody Receipt for Retained/Detained or Seized Property. Used when items or personal property are removed from a person and stored for safekeeping. CBP officers should turn over all items or evidentiary value with a CBP-6051 to the next person taking custody of the person, i.e., Special Agent or other federal, state or local law enforcement Officer. Guidelines for retaining personal effects/property from individuals that have been arrested are outlined in Customs memorandum, File: CO:TO:S:O SSJ, titled "Personal Effects," dated March 29, 1993.

(b) A logbook and inventory sheet will be maintained listing the detainee name, A-number if applicable, Form CBP-6051 number, date items were

I-LINK

**Inspector's Field Manual**

retained or seized, property description, name of officer(s) recording the property, and the date, time, officer(s) conducting the inventory.

9.16.6 Where operationally feasible, two officers will inspect all funds and property, including those items found in parcels, suitcases, bags, bundles and boxes, in the presence of the detainee to ensure officer safety and accountability. This procedure will also be followed when property is returned to a traveler subsequent to his or her release. All PDs or other management officials accountable for POE operations must ensure that appropriate procedures are in place and in use.

9.17    Fire, Building Evacuation and Medical Emergencies. Established written evacuation plans for the POE shall include directions for an officer to remove detainees from hold rooms in case of fire and/or other building evacuation. Such event and its duration must be annotated in the Detention Log.

9.17.1 Appropriate emergency services will be called in the event of a medical emergency (i.e., heart attack, difficulty breathing) during the detention of any person.

9.17.2 The CBP officer must notify the supervisor immediately of all medical emergencies.

9.17.3 If the detainee is removed for medical treatment, a CBP officer shall accompany the detainee and remain with the detainee until doctors determine whether the illness will require hospitalization.

9.17.4 If the detainee is not hospitalized the CBP officer must remain with the detainee until treatment is completed and then escort the detainee back to the POE.

9.17.5 If the detainee is hospitalized, the CBP officer shall notify the supervisor and await further instructions from the supervisor.

9.18    Special Notification Requirements. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9.19    Juvenile Detention Procedures. Special care must be exercised when processing and detaining persons under the age of 18. The CBP policy is outlined in 8 CFR 236.3 and must be strictly followed. [See IFM chapter 17.15 (f), Special Treatment of Minors.]

**Inspector's Field Manual**

9.19.1 At all stages of the inspection, detention, and removal process of a juvenile, officers shall take precautions to ensure the minor's rights are protected and that he or she is treated with respect and concern. Any detention following processing at the POE must be in accordance with the Flores v. Reno settlement. [See IFM Appendix 17-4, policy memorandum discussing Flores settlement.]

9.19.2 Minors will have access to restrooms, drinking water, food, and medical assistance if needed.

9.19.3 Minors will NOT be placed in short-term detention hold rooms, unless they have shown or threatened violent behavior, have a history of criminal activity, or there is an articulable likelihood of escape.

9.19.4 Minors will NOT be restrained unless they have shown or threatened violent behavior, have history of criminal activity, or there is an articulable likelihood of escape.

9.19.5 Minors will be allowed reasonable access to their parents or legal guardians if the supervisor believes it will be constructive. However, parent(s) or legal guardian(s) will not be allowed to inflict corporal punishment upon the juvenile while in the custody of CBP.

9.19.6 Unaccompanied minors must NOT be held with unrelated adults.

9.19.7 In situations where a female is nursing an infant, the infant will not be removed from the care of the mother (unless she poses a danger to the child). If a mother and infant must be separated for safety purposes, a social service worker must be contacted to take custody of the child.

9.20 Fingerprinting Individuals. When individuals are being fingerprinted, i.e., 10 digit hard print (excluding single digit IDENT prints), officers shall secure their firearms and chemical weapons in an approved firearms locker prior to beginning the process.

10 REPORTING REQUIREMENTS.

10.1 If a person makes a credible threat, assaults someone, is injured, is suspected of having SARS or any other communicable disease, escapes, or attempts to escape while in CBP custody, notification will be made to the PD, DFO, and Commissioner's Situation Room, ███████████ If a person escapes, notify all appropriate law enforcement agencies.

**Inspector's Field Manual**

10.2     If a person threatens or assaults a CBP officer, in addition to above requirements, notification will also be made to local field office of the FBI, or other Agencies as appropriate.

11 NO PRIVATE RIGHT CREATED. The procedures set forth in this Directive are for CBP internal use only and create no private rights, benefits, or privileges for any private person or party.

## 17.9   Medical Referrals.

(a) General. The U.S. Public Health Service (PHS) has statutory and regulatory responsibility to prevent the introduction, transmission, and spread of communicable disease from foreign countries into the United States. Applicable regulations are found in 42 CFR Parts 34 and 71. These responsibilities are delegated to the Centers for Disease Control and Prevention (CDC), National Center for Infectious Diseases, Division of Quarantine.

Quarantine stations are located at several major international airports. Each quarantine station has responsibility for all ports in an assigned geographic area. You should know which quarantine station has jurisdiction over your port. Historically, PHS quarantine stations have been referred to in the port community simply as "PHS" or "Public Health." As actual organizational names and assignments have changed over the years, that tradition has remained constant.

The Division of Quarantine is empowered to apprehend, detain, medically examine, or conditionally release individuals (including U.S. citizens) suspected of having one of the following diseases:

- Cholera and suspected cholera,
- Diphtheria,
- Infectious tuberculosis,
- Plague,
- Suspected smallpox,
- Yellow Fever,
- Suspected viral hemorrhagic fevers such as Lassa, Marburg, Ebola, Congo-Crimean and others not yet isolated or named, and
- Severe Acute Respiratory Syndrome (SARS).

Foreign quarantine regulations require that death or illness of an arriving international passenger or crew member is to be reported by the captain of the arriving ship or plane to the quarantine station having responsibility for the port of entry; however, illnesses

I-LINK

**Inspector's Field Manual**

are not always reported.

Whenever a Federal inspector has any questions regarding public health entry requirements for persons or importations, he or she should contact (day or night) the appropriate quarantine station or Division of Quarantine headquarters in Atlanta, Georgia. [A list of addresses and phone numbers for quarantine stations is contained in Appendix 17-2.]

(b) Inspection of Arriving Persons. The following guidelines relate to the inspection for medical purposes, of all arriving international passengers and crewmembers.

(1) Observe. Observe all arriving passengers and crew for signs and symptoms of illness, such as ███████████████████████████████████████████████████

███████████████████ A person is considered to be ill in terms of foreign quarantine regulations when symptoms meet the following criteria:

(A) Temperature of 100 degrees F. (38 C.) or greater which is accompanied by one or more of the following: rash, jaundice, glandular swelling, or which has persisted for 2 days or more;

(B) Diarrhea severe enough to interfere with normal activity or work.

(2) Detain. Hold ill passengers and crew, and ask for details about symptoms and itinerary. At a port-of-entry where a quarantine station is staffed, that station should be notified and a quarantine inspector will investigate. If there is no quarantine inspector at your port, the appropriate quarantine station should be notified. The quarantine station will release or conditionally release the ill person, or if the circumstances warrant, call a physician to conduct an examination and recommend appropriate action.

(3) Check Itinerary. It is sometimes necessary to check the itinerary of arriving persons because of the possibility of an outbreak of a communicable disease in a foreign area. Knowledge of the itinerary helps in determining the appropriate preventive measures. If this situation should arise, CDC will direct that each arriving person be asked if he or she has been in the infected country within a specified number of days. If so, the person is to be referred to the appropriate quarantine station.

(c) Medical Inspection of Arriving Aliens. The health-related grounds of inadmissibility of aliens under section 212(a) of the Act provide for the inadmissibility of any alien who:

(1) Is determined to have a communicable disease of public health significance

I-LINK

### Inspector's Field Manual

(currently, the same diseases previously classified as "Dangerous Contagious Diseases" which are: Chancroid; Gonorrhea; Granuloma Inguinale; Human Immunodeficiency Virus (HIV) Infection; Leprosy, infectious; Lymphogranuloma Venereum; Syphilis, infectious stage; and Tuberculosis, active.); or

(2) Seeks admission or adjustment as an immigrant and who has not been vaccinated against at least the following diseases: mumps, measles, rubella, polio, tetanus, diphtheria, pertussis, influenza type B and hepatitis B, and any other vaccinations recommended by the Advisory Committee on Immunization Practices; or

(3) Has or had a physical or mental disorder with associated behavior that poses or may pose a threat to the property, safety, or welfare of the alien or others; or

(4) Is a drug abuser or addict.

(d) Procedure. Inspectors should immediately advise the appropriate quarantine station when an immigrant arrives without medical documents or with incomplete medical documents. When processing aliens, do not keep the alien's chest X-ray film. This is an important medical document that the alien should retain as part of his or her permanent health records.

Refer to the appropriate quarantine station all aliens for whom a "Medical Hold" (Form CDC 75.40) should be issued. Candidates for a "Medical Hold" are:

(1) All aliens who are not routinely required to have a medical examination and who, upon arrival in the U.S., exhibit a physical condition which may render them inadmissible under section 212(a) of the Act;

(2) All aliens who are not routinely required to have a medical examination and who, upon arrival in the U.S., exhibit variations in behavior which may indicate a physical or mental disorder that may pose a threat to the property, safety, or welfare of the alien or others, and may be inadmissible under section 212(a) of the Act;

(3) All aliens who require a medical examination overseas (immigrants, refugees, fiancé(e)s of U.S. citizens and their minor children), but who arrive without evidence or with incomplete evidence of having had one performed, or with one that has expired. Satisfactory evidence can consist of a properly completed "Medical Examination of Applicants for United States Visas" (Form OF-157), with results of chest X-ray and serologic tests for syphilis and human immunodeficiency virus (HIV) infection indicated (**Note:** Chest X-ray and serologic tests are required for aliens 15 years of age and older); and

I-LINK

### Inspector's Field Manual

(4) All aliens with a Class A condition or a Class B condition including tuberculosis, not infectious; and Hansen's disease [leprosy], not infectious. These aliens should have a stamp imprinted on the face of their visa (Form OF-155A) as follows:

### CLASS A OR CLASS B
### REQUIRES ATTENTION
### OF USPHS AT POE

While consular officers normally stamp the OF-155A when an immigrant has a medical condition of public health concern, this is sometimes not done. The inspector should check all OF-157's whether or not the "Attention PHS" stamp is present.

When quarantine station personnel are not available to process aliens with these medical conditions, retain a copy of the OF-157. On the reverse side, write the alien's U.S. address, sponsor's name and address, arriving flight and date, port-of- entry, and the INS inspector's name. A photocopy of the alien's visa (OF-155A) is satisfactory in lieu of transcribing this information on the reverse of the OF-157 provided that the address is correct on the OF-155A and that the flight number and date of arrival are recorded on the OF-155A prior to making the photocopy. The OF-155A and/or OF-157 with requested information should be given, mailed, or sent by FAX to the appropriate quarantine station.

If the alien has a Class A communicable disease of public health significance, copies of the OF-157, OF-155A, and both sides of the Form I-601 (being changed to new Form I-724) waiver application should be given or mailed to the appropriate quarantine station. The statements to be completed by waiver applicants who are HIV positive or who have Hansen's disease will be affixed to the back of the I-601 waiver application by CDC Division of Quarantine staff. See IMMACT Wire #65 dated August 7, 1991 for further information.

If the alien has a Class A physical or mental disorder with associated harmful behavior, a copy of USPHS/CDC Form 4.422-1, "Statements in Support of Application for Waiver" should be given or mailed to the appropriate quarantine station, along with the OF-157, OF-155A, and I-601 (I-724).

**Note:** There is no waiver provision in the law for aliens applying for immigrant visas who are found to be excludable under section 212(a)(1)(A)(iv) of the Act for drug abuse or addiction. If an alien arrives with a visa indicating Class A drug abuse or addiction, please refer to the appropriate quarantine station.

(e) Special Procedures Pertaining to First Time Refugees and Asylees. Refugees and asylees normally arrive at ports where quarantine inspectors are assigned, but this may

### Inspector's Field Manual

not always be the case. Notify the appropriate quarantine station of all refugees and asylees entering the U.S. for the first time. If a quarantine inspector is not available to process the refugee or asylee, you will be asked to obtain the following information, normally by making copies of documents carried by the refugee or asylee. This information is necessary to ensure that all refugees and asylees receive a health screening and any appropriate immunizations or treatment at the place of resettlement:

- Name, date, country of birth, and sex of refugee,
- Language spoken,
- "A" Number,
- Name, address, and phone number of local sponsor,
- Name of principal sponsor (Voluntary Agency), and
- Date, place of arrival, and flight number.

(f) Suspected Tubercular Parolees. Every effort should be made to determine the tuberculosis status of parolees prior to release. Refer those who are suspected of having infectious tuberculosis to the appropriate quarantine station.

[Rev. IN 03-41]

## 17.10  Abandonment of Lawful Permanent Resident Status.

(a)  General. There are several possible actions when the inspecting officer has reason to believe an alien seeking admission with an alien registration card or SB-1 visa has actually abandoned lawful permanent residence. Refer to the discussion in Chapter 13 on this subject. In some instances, the applicant voluntarily wishes to relinquish his or her alien registration document and either enter as a nonimmigrant or depart from the U.S. immediately. Most often such aliens will already be in possession of a nonimmigrant visitor's visa. The inspecting officer must never coax or coerce an alien to surrender his or her alien registration document in lieu of a removal hearing.

(b)  Procedure for Documenting Abandonment of Residence. These instructions regarding the disposition of completed I-407 forms apply not only to Inspections personnel, but to all Service or Department of State employees involved in the execution of any I-407. In a situation where the alien does voluntarily relinquish his or her alien registration card, complete the Form I-407, Abandonment by Alien of Status as Lawful Permanent Resident. The alien must sign the I-407, acknowledging that the action is strictly voluntary.   Execute Form I-89, completing the appropriate blocks if the alien is surrendering Form I-551, Alien Registration Receipt Card.  If the alien is surrendering a previous edition, Form I-151, no I-89 is required.  Ordinarily, you should take a sworn statement in addition to completing Form I-407.   Attach the Alien Registration Receipt Card to the Form I-89, if completed, or the Form I-407.  Forward the I-89 (if completed), attached to the Form I-407 and additional sworn statements, to the Texas Service Center for CLAIMS/CIS data entry and document destruction.  After data entry and card

**Inspector's Field Manual**

destruction, the Service Center will forward the original Form I-407, I-89 and sworn statements to the appropriate FCO for filing in the original "A" file.

If the I-407 is executed in connection with an application for admission at a port-of-entry, admit the applicant as a nonimmigrant, following normal procedures for aliens with visas; or exercise the visa waiver option pursuant to section 212(d)(4) of the Act or the Visa Waiver Program. If the alien chooses to immediately depart the U.S., advise the alien that he or she may still be entitled to issuance of a temporary alien registration card, for reentry and a removal hearing, as described above in Chapter 17.6(d).

If the I-407 is being executed for an alien who is in the United States pursuant to admission as a lawful permanent resident and is not in removal proceedings, yet who wishes to relinquish resident status and depart from the United States, the alien should be granted a suitable period of time to effect voluntary departure, in accordance with current procedures.

Occasionally, you may receive an alien registration card surrendered by a resident alien either to the Service or to a transportation line, where the bearer has expressed an intention to relinquish residence. If the bearer has not yet departed and if time permits, take a sworn statement from him or her concerning the facts surrounding the abandonment and attach it to the I-407. If the bearer has already departed the U.S. and you are sure of the facts surrounding the abandonment, execute Form I-407, noting the departure information and other relevant facts. (Paragraph (b) revised 3/5/98; IN97-04)

(c) Restriction in the San Antonio District. The U.S. District Court for the Southern District of Texas prohibits immigration officers from soliciting or taking waivers of removal hearings in INS district 14. See **Leticia Sanchez-Hernandez et al c. Richard Casillas et al**, Civil Action No. L-78-4 2, April 10, 1981.

## 17.11 Asylum Claims/Safe Third Country Agreement with Canada. (Revised 2/23/05; CBP 8-05)

(a) General. The Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries (Safe Third Country Agreement) was signed on December 5, 2002. Final implementing regulations were published on November 29, 2004, with an effective date of December 29, 2004.

The Agreement provides a framework to determine which country is responsible for consideration of asylum or torture claims. With certain exceptions, the Agreement requires asylum-seekers to make the asylum claim in the country where they were last physically present (either Canada or the United States) upon arrival at a U.S.-Canadian land border port of entry. Unless they qualify for an exception under the agreement, asylum-seekers will generally have to seek protection in Canada if attempting to enter the United States from Canada, or in the United States if attempting to enter Canada

**Inspector's Field Manual**

from the United States.

(b) Exceptions.  The Agreement does not apply to persons who are citizens of Canada or the United States or who, not having a country of nationality, are habitual residents of Canada or the United States.

The Agreement contains numerous other exceptions.  Persons determined to qualify for one of these exceptions will be allowed to proceed with their asylum claim in the country to which they are seeking admission.

- Persons who have a spouse, parent, child, sibling, grandparent, grandchild, aunt, uncle, niece, nephew, or legal guardian in the other country, as long as the relative has lawful status (other than B-1/B-2 visitor status) or has a pending asylum claim in the country where the alien is seeking asylum (*the relative with a pending asylum claim must be 18 years of age or older; there is no age limit for relatives with other lawful status*);
- Unaccompanied minors, defined as an unmarried asylum claimant under the age of 18 who does not have a parent or legal guardian in either the United States or Canada (*this differs somewhat from common usage of the term "unaccompanied" for other purposes under the immigration laws*);
- Persons who have a validly issued visa or other valid admission document, other than for transit (*refers to genuine visas or travel documents issued to the alien by the U.S. government, including those that may have been obtained through misrepresentation, but does not include those obtained through identity fraud or issued in fraudulent or photo-subbed passports*);
- Persons who are not required to obtain a visa for the United States, but are required to have a visa for Canada (*currently no countries fall into this exception);*
- Additionally, the Agreement specifically includes a provision allowing each country to examine, at its own discretion, any asylum claim made to that country where it deems that it is in its public interest to do so.

(c) Applicability.  The Agreement applies only to arriving aliens at established land border ports of entry along the U.S.-Canada border, as defined in 8 CFR 100.4(c)(2), when the port is open for inspection and to certain aliens being deported from Canada (not pursuant to the Agreement) in transit through the United States.

Arriving aliens are defined in 8 CFR 1.1(q), and for purposes of the Agreement generally include:

- Persons presenting themselves for inspection at a port of entry;

- Persons coming or attempting to come into the United States through a port of

### Inspector's Field Manual

entry (whether or not by presenting themselves for inspection); and

* Persons apprehended or continuously observed crossing the land border by a port official within the physical boundaries of the port, and for this purpose, in the immediate vicinity of the port. Port runners who are observed attempting entry through the port and who are apprehended immediately in the vicinity of the port are considered arriving aliens. Persons who effect entry through a port of entry without detection and who are later apprehended are not subject to the Agreement.

Arrivals by train where the passengers on the train are inspected at the border or other designated place inland where the train arrives are considered land border arrivals for this purpose.

For purposes of the Agreement, ferry crossings along the Canadian border are not considered land border ports of entry.

The Agreement does not apply at preclearance stations in Canada, nor does it apply to aliens who attempt illegal entry between the ports of entry.

It does not apply at airports, except as noted below for aliens being removed from Canada, who claim asylum while in transit through the United States,

(d) Processing aliens subject to the Agreement. There are two distinct sets of processes, depending on whether the alien is an applicant for admission arriving from Canada and applying for asylum in the United States (an arriving alien pursuant to 8 CFR 1.1(q)), or whether the alien attempted to travel from the United States to apply for asylum in Canada and is being returned to the United States pursuant to the Agreement.

### Arriving Aliens - Asylum-seekers who arrive from Canada at a land border port of entry and apply for asylum in the United States.

Aliens arriving from Canada at a land border port of entry who request asylum or claim a fear of persecution or torture will be processed for expedited removal and referred to an asylum officer for a credible fear interview. Prior to proceeding with the credible fear interview, the asylum officer will conduct a threshold screening to determine whether an exception to the Agreement applies and the alien will be allowed to proceed with the credible fear interview. If the asylum officer determines that no exception applies, these individuals will be ordered removed by the asylum officer and returned to Canada and their asylum claim examined in accordance with the Canadian refugee status determination system.

### Inspector's Field Manual

CBP Officers at ports of entry are not to attempt to determine whether the Safe Third Country Agreement applies or whether the alien qualifies for any of the exceptions; that determination will be made by an asylum officer. However, any information that CBP Officers obtain through the inspection process that may have a bearing on the eligibility for an exception under the Agreement, such as the use of fraudulent documents, should be fully documented in the file.

(1)  Process for expedited removal in accordance with existing guidelines and refer for a credible fear interview. [See Chapter 17.15 concerning the expedited removal/credible fear process.]

(2) In addition to the Form M-444, Information about Credible Fear Interview, the alien shall be given a supplemental notice, Information about Threshold Screening Interview.

(3) Fax the Form I-860, I-867A&B, M-444, legal services provider list, and Information About Threshold Screening Interview to the Asylum Office having jurisdiction over the case. If there is other information in the file, such as the Form I-213 or I-275, that may assist the asylum officer in making the determination under the Agreement, fax that information as well. Information about the use of fraudulent documents or identity fraud, in particular, may have a bearing on the determination.

(4) Prepare Form I-160A, Notice of Refusal of Admission/Parole into the United States. Check the box "Refused admission and paroled into the United States", even though the alien will actually be initially detained in DHS custody rather than paroled. Give (or fax) one copy to Canadian Immigration authorities and have them stamp a second copy to be placed in the A file. This will ensure that Canada will take back the alien if no exceptions to the Agreement are found and the alien is to be returned to Canada.

(5) Seize any fraudulent documents in accordance with existing guidelines. Prepare a travel packet to include a photocopy of the document presented that includes copies of all the pages with cachets, notations, or visas on them, as well as the biometric pages. Also complete a Single Journey Letter on CBP letterhead with the traveler's photograph and fingerprints incorporated in it.  Place the packet in the A file to be used if or when the alien is returned to Canada.

(6) Pursuant to existing policy, unaccompanied minors (aliens under the age of 18) are not generally subject to expedited removal, and may qualify for an exception under the Agreement. The definition of unaccompanied minor as used in the Agreement differs somewhat from the definition of juvenile used for other immigration purposes; however, officers need not consider whether the alien meets the definition under the Agreement.  For general immigration purposes, a minor is

### Inspector's Field Manual

considered unaccompanied if not traveling with an adult relative (parent, brother, sister, aunt, uncle, or grandparent) or legal guardian. Unaccompanied minors claiming asylum will normally be placed in section 240 proceedings where the immigration judge will make the determination whether any exceptions apply under the Agreement and whether they will be allowed to apply for asylum in the United States. [See Chapter 17.15(f) for processing of minors].

(7) If an asylum-seeker expresses concerns about being placed in expedited removal and detained for a credible fear interview and asks to withdraw his or her asylum claim and application for admission, CBP may permit such withdrawal, in accordance with section 235(a)(4) and 8 CFR 235.4. The decision whether to permit withdrawal of application for admission rather than issue a removal order should take into consideration the seriousness of the inadmissibility and other factors. Aliens who presented fraudulent documents should normally not be permitted to withdraw their application for admission, except under extraordinary circumstances, although they may still wish to withdraw their asylum claim and be removed immediately. The officer handling the case must ensure that there is no misunderstanding and that the alien is voluntarily making that decision. The officer may wish to consult the Asylum Office to determine whether the case should still be referred. Before allowing the withdrawal, the officer must be sure that the alien has both the intent and the means to depart immediately from the United States. When processing an asylum-seeker who wants to dissolve or withdraw his asylum claim, the officer should take a second sworn statement from the alien, using the Form I-867A&B. Ensure that all the facts of the case and the alien's willingness to withdraw are recorded. See Chapter 17.2 for procedural guidance relating to withdrawal of application for admission.

(8) Aliens applying for admission under the Visa Waiver Program (VWP) are not subject to expedited removal, regardless of their true and correct nationality. If an alien applying under the VWP indicates an intention to apply for asylum or a fear of persecution, the alien will be referred to an asylum officer using the supplemental notice, Information about Threshold Screening Interview, to determine whether an exception to the Agreement applies. If the alien does not qualify for an exception, he or she will be refused entry under the VWP and returned to Canada. If an exception applies, the asylum officer will refer the alien to an immigration judge for an asylum-only hearing using Form I-863.

    a.    Search for existing records in CIS and other appropriate automated data systems. If an A file exists, create a temporary work folder. If a file does not exist, follow local procedures for creating an A file. Track the work folder in the National File Tracking System (NFTS).

    b.    Complete the sworn statement using Form I-877.

### Inspector's Field Manual

c.    Partially complete the Form I-275 with the identifying information, noting the facts of the case and the inadmissibility in the narrative.  Indicate that the alien was referred for a Safe Third Country Agreement threshold screening.

d.    Fill out both portions of the Form I-94W, but do not endorse the form. Include it in the A file.

e.    Give the alien the supplemental notice, Information about Threshold Screening Interview.

f.    Arrange for detention in accordance with local procedures and fax the sworn statement, Form I-275 and the threshold screening notice to the appropriate Asylum Office.

g.    If the alien does not qualify for an exception, he or she will be returned to Canada.  ICE DRO will normally transport the alien to the port of entry. The CBP Officer will complete the Form I-275, checking the box for VWP refusal.  Forward a copy of the I-275 to the appropriate Consulate.

h.    Endorse both portions of the Form I-94W "refused in accordance with INA section 217"; line stamp or enter the date, POE and the officer's stamp number.  Also note the reason for refusal (ground(s) of inadmissibility) in block 13 of the form.

**Returnees - Aliens who entered the United States either legally or illegally and are returned from Canada pursuant to the Safe Third Country Agreement.**

The courts have long held that aliens who entered the United States, either legally or illegally, then traveled to a foreign country, who were refused entry and are returned, are deemed not to have departed the United States. Matter of T, 6 I&N Dec. 638 (BIA 1955).  [see also GenCo Opinion 89-17]. Thus, aliens who apply for admission to Canada but are returned to the United States after having been returned by Canada pursuant to the Agreement are not arriving aliens and therefore not subject to expedited removal.  These aliens will be processed as if apprehended or encountered within the United States.  Depending on their status, they may or may not be placed in removal proceedings.  These aliens may be processed either by port of entry personnel, or turned over to Border Patrol or ICE for processing in accordance with existing local practice.

For persons traveling from the United States and seeking refugee status in Canada, Citizenship and Immigration Canada (CIC) will make the determination of whether the

## Inspector's Field Manual

exceptions to the Agreement apply directly at the port of entry at the time of the refugee claimant's application for admission to Canada. Those who qualify for an exception to the Agreement will be permitted to file their refugee application in Canada. Those who do not qualify for an exception will be returned to the United States the same day in most cases. CIC officials will fax an IMM 5569 to the designated U.S. official at the receiving U.S. port of entry and will normally contact the U.S. port of entry by telephone to confirm that the alien is returning. CIC will provide the alien with a copy of the IMM 5569, the negative eligibility decision, and a copy of the removal order. CIC will seize all fraudulent documents and fax copies to U.S. officials. They will return legitimate documents to the alien. Most ineligible applicants will be returned unescorted from Canada in their own vehicles, although uncooperative or dangerous persons may be escorted. Ineligible claimants will usually be returned to the United States through the same port of entry.

Port Directors should coordinate with their local Canadian counterparts to determine the most effective and efficient means of notification or return in accordance with each country's procedures.

Aliens being returned from Canada will be processed according to their status in the United States.

(1) Aliens who are in status upon being returned from Canada after applying for asylum there.

Aliens who are in status upon their return from Canada may be released and given a Form I-589, Application for Asylum and for Withholding of Removal, if they wish to file their claim with an Asylum Office in the United States. Asylum claims made at an Asylum Office are "affirmative" applications filed voluntarily by aliens.

(2) Aliens who entered the United States illegally or are out of status upon return from Canada after applying for asylum there.

Aliens who have not been admitted or paroled into the United States are amenable to removal proceedings before an immigration judge based on inadmissibility under section 212(a) of the Act. Aliens who were admitted to the United States but who are out of status are subject to removal proceedings before an immigration judge based on deportability under section 237(a) of the Act. Upon their return from Canada, these aliens may be placed in removal proceedings pursuant to section 240 of the Act and may be detained in accordance with current ICE detention priorities if they are subject to mandatory detention, are of national security interest or their release would represent a danger to the public, or meet other established detention criteria.

## Inspector's Field Manual

a. Removal hearings under section 240of the Act

(i) General. Upon an alien's return from Canada, a determination must be made as to what section of the Act that alien will be charged with. Regardless of whether the alien is being charged under section 212(a) or section 237(a) of the Act, the officer will institute removal proceedings under section 240 of the Act by issuance of a Form I-862, Notice to Appear. However, since these are not arriving aliens, other aspects of processing may differ from those used for arriving aliens. If the alien indicates a fear of persecution or return, advise the alien that he or she may present his or her asylum claim during removal proceedings before the immigration judge. If the alien does not understand the English language, an interpreter must be used to ensure that the alien is appropriately advised of the process and rights.

(ii) Search for existing records in CIS and other appropriate automated data systems. If an A file exists, create a temporary work folder. If a file does not exist, follow local procedures for creating an A file. Track the work folder in the National File Tracking System (NFTS).

(iii) Process the alien in IDENT/ENFORCE, using the NTA module. DO NOT use the Inspections/NSEERS module for these cases, as they are not arriving aliens/applicants for admission. The modules designed for non-POE cases automatically record the disposition according to the module selected, and include the appropriate forms, which may not be included in the Inspections/NSEERS module. Select Detained (WA/NTA) with I-217 or Released OR (NTA) with I-217, as appropriate. Complete the biographical information on the initial screens.

(iv) Complete IDENT processing. Notate "Safe Third Country Returnee" in the comments field, followed by any other appropriate notations. This will assist in tracking and verifying that the alien was returned by Canada pursuant to the Agreement.

(v) Complete Form I-213, Record of Deportable/Inadmissible Alien.

(vi) Take a sworn statement, giving the administrative warning of rights. Although ENFORCE contains Form I-215B, Record of Sworn Statement in Affidavit Form, it is preferable to take a sworn statement in question and answer format to fully establish inadmissibility or deportability. Use Form I-263A as the jurat.

(vii)      Complete a Form I-265, Notice to Appear, Bond, and Custody

I-LINK

### Inspector's Field Manual

Processing Sheet, to provide a record that uniform criteria were applied in making the custody determination. Current detention priorities must also be considered in making custody decisions.

(viii)     Complete Form I-826, Notice of Rights and Request for Disposition. Every alien apprehended within the United States and charged with inadmissibility or deportability must be given a Form I-826. Provide the alien with a copy of the form.

(ix) When a minor (a person under the age of 18) is returned from Canada, he or she must be given a Form I-770, Notice of Rights and Disposition. If the minor is less than 14 years of age or unable to understand the notice, the notice shall be read and explained to the minor in a language he or she understands. Minors should be treated in accordance with the *Flores v. Reno* Settlement Agreement. The terms of that agreement were incorporated in an INS memorandum dated July 19, 1997, entitled Settlement of Jenny Lisette Flores, et al., v. Janet Reno.

(x) Prepare an original and two copies of Form I-826, Notice to Appear. An NTA for a non-arriving alien may be issued only by those officers specified in 8 CFR 239.1(a). This includes Directors of Field Operations, Port Directors, and Deputy Port Directors. The Commissioner has also delegated this authority to Assistant Port Directors. The Form I-826 shall be prepared in the name of and signed by the authorizing official. If the alien is being held in DHS custody, indicate that fact and the location of the facility where the alien is detained in the address block. If the alien is not being held in DHS custody, enter the complete address and phone number where the alien can be reached and provide the alien with Form EOIR-33, Change of Address Form, to report any change of address. If the alien's mailing address is different from the physical address, include both. Check the appropriate block to indicate whether the alien is present without inspection, overstay or status violator. If the alien had been granted voluntary departure previously and failed to depart within the time specified, the NTA should contain a factual allegation stating when the voluntary departure was granted and for what period of time, and that the alien did not depart within that time frame.

Check any other appropriate boxes on the form immediately following the "provisions of law" section. The NTA must ordinarily include the time and place of the hearing. Obtain a date and time for the hearing, following established local procedures. In situations where a hearing date and time cannot be obtained, indicate " to be set" in the appropriate data field. No hearing date may be scheduled earlier than 10 days from the date of service of the NTA (to allow sufficient time to obtain counsel and prepare for the

## Inspector's Field Manual

hearing), but the form includes a waiver that the alien may execute in order to obtain an earlier hearing date. Fill in the appropriate address and room number for the Immigration Court where the alien is to appear. On the reverse of the Form I-862 is critical information concerning representation, conduct of removal proceedings and the consequences of failure to appear at the scheduled hearing. These should be specifically explained to the alien in a language the alien understands.

The NTA must be served on the alien within 24 hours of issuance where DHS proposes to set bond or detain the alien. Have the alien sign the original, place the original and a copy in the A file, and serve the alien a copy. If the file contains a Form G-28, Notice of Entry of Appearance as Attorney or Representative, the alien's counsel must also be sent a copy of the Form I-862. The officer serving the NTA must execute the Certificate of Service block.

(xi) Provide the alien with a current list of organizations and programs prescribed in 8 CFR 292 that provides free legal services.

(xii)      If the alien is to be detained, prepare a Form I-200, Warrant for Arrest of Alien, for the authorizing official to sign. A Warrant for Arrest of Alien may be issued only by those officers listed in 8 CFR 287.5(e)(2) (limited to Port Directors and Area Port Directors) and may be served only by those officers listed in 8 CFR 287.5(e)(3) (includes CBP Officers). A Warrant for Arrest of Alien shall be prepared in the name of and signed by the authorizing official. Follow the local procedures for authorization and arranging of detention.

(xiii)      Consult 8 CFR 236.1(e) to ensure that the appropriate consular official is immediately notified of the alien's detention, even if the alien requests that this not be done. Notify the alien that he or she may communicate with a consular official.

(xiv)      If qualified, the alien may be released on his or her own recognizance from custody or under bond, as a matter of discretion, pending a removal hearing. Such discretion should be applied only if the alien does not pose a danger to the public and is likely to comply with the terms of the exercise of discretion, or in accordance with detention priorities. Prepare a Form I-286, Notice of Custody Determination, with such conditions as the Director or the Director's designated representative may establish. If releasing the alien on his or her own recognizance, complete Form I-220A. If a bond is required, the amount can be no less than $1500.00. Consult local ICE DRO for bond procedures. Provide alien with a copy of Form I-830,

I-LINK

**Inspector's Field Manual**

Notice to EOIR: Alien Address.

(xv)　　　Photograph and fingerprint the alien on FD-249 fingerprint cards (two sets) either manually or through IAFIS, if available.  Note the FINS number under Miscellaneous Numbers on back of FD-249.  Code the fingerprint cards with the proper United States Code citation.  A third copy may be kept at the port.

(xvi)　　　Complete Form R-84.

(xvii)　　　Complete Form I-217, Information for Travel Document or Passport and place in the A file.

(xviii)　　　Coordinate with ICE/DRO, ICE Counsel, and Records for disposition of the A file.

b. Voluntary departure

DHS may permit an alien to voluntarily depart the United States at the alien's own expense in lieu of being subject to section 240 proceedings or before initiation of such proceedings, if the alien is not deportable under section 237(a)(2)(A)(iii) or section 237(a)(4)(B) of the Act.  If the alien is granted voluntary departure with safeguards, he or she must depart immediately and under the direct observation of DHS and is not permitted to be out of DHS custody.  Since an alien being returned from Canada pursuant to the Agreement may not be granted voluntary departure to Canada and has indicated an intention to seek asylum, voluntary departure will not normally be considered in these situations, except in extraordinary circumstances.

In accordance with 8 CFR 240.25, only district director (CBP Directors of Field Operations) are authorized to grant voluntary departure as a matter of discretion. The processing officer must weigh favorable and unfavorable factors before deciding to offer the option of voluntary departure in each case.  Among the factors to be considered include previous immigration violations, age, infirmity, and indications for stricter enforcement policies at a particular location or during a particular time period.  The processing officer must be satisfied that the alien has the means to immediately depart the United States at his or her own expense. See Chapter 13 of the Detention and Deportation Officer's Manual for information on voluntary departure.

(i)  Once having decided to permit voluntary departure, the processing officer must make sure the alien understands his or her rights contained in the Form I-826. Have the alien initial the block indicating his or her wish to depart the

I-LINK

### Inspector's Field Manual

United States voluntarily. The officer serving the Form I-826 must execute the Certificate of Service block. Give a copy of the form to the alien.

(ii) If the alien elects to waive his or her right to a hearing before an immigration judge, complete the Form I-213 in ENFORCE, using the Full VR module.

(iii) If applicable, cancel the alien's nonimmigrant visa pursuant to 22 CFR 41.122(h)(5) which provides that the nonimmigrant visa should be canceled if an alien is in violation of his or her status.

c. Aliens not entitled to a removal hearing upon being returned from Canada.

Certain aliens are not entitled to formal removal proceedings under section 240 of the Act. The procedures for processing these aliens are described below.

(i) Previously Admitted Crewmember/Violator Returned From Canada.

Crewmembers are not entitled to a hearing before an immigration judge, except for the purpose of resolving an asylum claim. In the case where a crewmember does not wish to apply for asylum in the United States and his vessel or aircraft remains in the United States, he or she may be issued a Form I-99, Notice of Revocation, and returned to the vessel or aircraft for removal. If the vessel or aircraft has departed the United States, the crewmember may be ordered removed by issuing a Form I-259, Notice to Detain, Remove or Present Alien, to the transportation line or agency representing the transportation line on which the alien served. Procedures for removal of crewmembers are described in Chapter 23.10.

If removal occurs within 5 years of the crewmember's landing in the United States, the carrier is liable for the costs of removal. When carrier liability exists, complete and serve a Notice to Transportation Line Regarding Alien Removal Expenses, Form I-288. Expenses billable to a carrier may be tracked and recorded on a Record of Expenses Billable to Transportation Company, Form I-380. Coordinate removal and service upon carrier with ICE/DRO.

If such crewmember wishes to apply for asylum, use the Form I-863, check Box #3 and the appropriate box indicating the status of the crewmember before serving, and forward the form to the appropriate Immigration Court. Crewmembers may be detained if they present a danger to the public or a risk of absconding. In the absence of these adverse factors, they may be released on bond as a matter of discretion. Crewmembers who were present

**Inspector's Field Manual**

in the United States before April 1, 1997, are an exception and must be placed into removal proceedings under section 240 of the Act.

(ii) Visa Waiver Program (VWP) Violators Returned From Canada.

Aliens who were admitted under the VWP pursuant to section 217 of the Act and who violated their status or stayed beyond the 90-day admission period permitted by statute are not eligible for a hearing, except in cases involving an asylum claim. In the case where there is no asylum claim or the asylum claim is denied, such alien may be ordered removed by means of a letter from the Port Director. This letter should advise the alien of the determination that he or she violated the conditions of admission under the VWP and that he or she is being removed from the United States without a hearing before an immigration judge. Sample language to be used may be found in Appendix 14-2 of the Detention and Deportation Officer's Field Manual.

Coordinate with local ICE/DRO concerning detention or release of the VWP violator and the service of the Form I-288, Notice to Transportation Line Regarding Alien Removal Expenses, and the Form I-259 on the carrier that brought the alien into the United States, if the alien originally arrived by air. See IFM Chapter 15.7 (g)(6), VWP Removal Procedures, for detailed instructions on processing procedures.

In the case where an alien wishes to apply for asylum, complete Forms I-863, check Box #3 and the appropriate category within that paragraph, and refer the alien to the Immigration Court for the asylum hearing in accordance with IFM Chapter 15.7(g)(4), VWP Asylum Requests and Procedures.

In situations where a removal order under section 217 has been issued and there is limited detention availability, Form I-220B, Order of Supervision may be issued by ICE/DRO to allow the alien to voluntarily report to a DRO office for verification of departure.

d. Aliens previously ordered removed, who reentered the United States and are not admitted to Canada after applying for asylum there.

Section 241(a)(5) of the Act provides that the Attorney General [now the Secretary of Homeland Security] shall reinstate, without referral to an Immigration Court, a prior order against an alien who illegally reentered the United States after having been deported, excluded or removed, regardless of the date that the previous order was entered. An alien who voluntarily departed the United States while under a final order of exclusion, deportation or removal,

### Inspector's Field Manual

and then illegally reentered the United States is also subject to this provision.

Reinstatement is not applicable to an alien who was granted voluntary departure by an immigration judge and left the United States in compliance with the terms of that grant. These aliens are subject to the removal provisions under section 240 of the Act. If, however, the alien stayed beyond the period authorized for voluntary departure, or left of his or her own volition while a final order was outstanding (i.e., the alien "self-deported"), the alien is subject to reinstatement.

Before processing the alien for reinstatement, you must verify the facts relevant to reinstatement of a previous order. Regulations at 8 CFR 241.8 require that the officer must establish: whether the alien was subject to a prior order; the identity of the alien, that is, whether the alien is in fact an alien who was previously removed; and whether the alien unlawfully reentered the United States. You must obtain evidence of the prior removal order, which may be faxed from the National Records Center or the office currently holding the file. In cases of disputed identity, verify identity through fingerprint comparison. Consider all relevant evidence, including alien's statements, other evidence in alien's possession, and database checks to determine whether last entry was lawful. In any case in which you are not able to satisfactorily establish the facts, the previous order cannot be reinstated, and the alien must be processed for removal through other applicable procedures, such as removal proceedings under section 240 of the Act.

On November 18, 2004, the 9th Circuit Court of Appeals ruled in Morales-Izquierdo v. Ashcroft that the reinstatement provisions in 8 CFR 241.8 violate the statutory requirement that removal determinations may be made only by immigration judges. Therefore, in processing aliens returned pursuant to the Agreement at Canadian land border ports of entry, the reinstatement provisions may not be applied in the states of Washington, Idaho, Montana, and Alaska.

In preparing cases for aliens who are subject to reinstatement, officers should use the following procedure. See Chapter 14.8 of the Detention and Deportation Officers Field Manual for additional information.

(i)  Create a work folder and obtain database printouts containing the previous order. Track the work folder in NFTS.

(ii) Complete the Form I-213 through the Reinstate Deport with I-217 module in ENFORCE. If the alien admits to being previously ordered removed or granted voluntary departure, the Form I-213 must so indicate. If a fingerprint hit verifies such previous adverse action, include that information on the Form I-213. If the alien disputes the fact that he or she was previously removed,

### Inspector's Field Manual

the alien's fingerprints must be compared with those in the A file documenting the previous removal to affirm positively the alien's identity. The fingerprint comparison must be completed by a locally available expert or by the Forensic Document Laboratory via electronic means.

(iii) Take a complete sworn statement from the alien using Form I-877, concerning all pertinent facts. Use Form I-263A, Record of Sworn Statement, as a jurat to close the statement. The record of sworn statement must document admissions, if any, relevant to determining whether the alien is subject to reinstatement, and whether the alien expressed a fear of persecution or torture if returned on the reinstated order. The sworn statement must include the following question and the alien's response thereto: "Do you have any fear of persecution or torture should you be removed from the United States?" If the alien expresses a fear of persecution or torture, once detained, ICE Office of Detention and Removal Operations will refer him or her to an asylum officer who will determine whether he or she has a reasonable fear of persecution or torture. Provide a copy of the statement to the alien and retain copies for the file.

(iv) Complete the Form I-871, Notice of Intent/Decision to Reinstate Prior Order. Sign the top portion of the form, provide a copy to the alien, and retain the original for the file. You must read, or have read, the notice to the alien in a language the alien understands. The alien signs the second box of the file copy and indicates whether he or she intends to rebut the officer's determination. In the event that the alien declines to sign the form, note the block that a copy of the form was provided and the alien declined to acknowledge receipt or provide any response.

(v) Execute Form I-205, Warrant of Removal/Deportation.

(vi) All reinstatement cases must be detained. Follow the local procedures for authorization and arranging of detention of the alien so that ICE/DRO may complete the reinstatement of a final order.

e. Aliens who have been ordered removed from Canada, are transiting the United States pursuant to that removal, and claim asylum.

CBP may parole an alien deportee from Canada through the United States, in accordance with section 212(d)(5)(A) of the Act. These aliens will be escorted by Canadian officials. Pursuant to the Agreement, if the alien deportee claims asylum while transiting the United States, he or she shall be returned to Canada for consideration of the claim.

I-LINK

### Inspector's Field Manual

In practice, most of these cases would have been paroled by CBP through a preclearance airport in Canada. As these flights normally arrive at domestic gates of an airport in the interior of the United States, CBP will not have direct contact with the alien. However, the alien may make his asylum claim to the escorting Canadian officers, airline employees, or other officials and may be brought to the CBP offices in the airport. In these cases, parole status will be terminated and the alien deportee will be placed in expedited removal proceedings and referred to an asylum officer for a credible fear interview, where the alien will first receive a threshold screening determination. The alien should be given the Information About Threshold Screening Interview along with the Form M-444. After processing, DHS will return the alien to Canada. This process should be coordinated with ICE DRO as it will require detention.

### (e) Dispute Resolution Under the Safe Third Country Agreement

The Agreement provides that procedures must include mechanisms for resolving differences in interpretation and implementation of the terms of the Agreement. There may be situations where the alien, upon return to the United States, claims that there is new material evidence that was not reasonably available to Canadian officials, or the alien alleges that Canadian officials did not consider all evidence, or the alien's true identity is discovered upon return to the United States. While CBP Officers should not attempt to act as advocates for the alien, they may request a reconsideration of the decision if warranted.

(1) The CBP Port Director may contact the CIC manager in writing, providing the name and FOSS ID number of the alien and a summary of the new material evidence to be considered along with any supporting documentation.

(2) A CIC officer will review the case and determine if the evidence was considered at the time of the interview. If the evidence was already considered, the information will be provided to the CBP Port Director with confirmation that the case will not be redetermined. If the CIC officer requires clarification from the claimant, contact will be by telephone. If it is determined that the applicant is eligible to make a refugee claim in Canada, the CIC manager will request the return of the applicant.

(3) Any further disputes that cannot be resolved at the local level should be referred through the DFO to CBP HQ Immigration Policy and Programs (IPP). IPP will forward the information to the USCIS Asylum Division Director for resolution.

(4) If Canadian officers have similar concerns about an alien returned to Canada under the Agreement, they must contact the Deputy Director of Asylum at USCIS Headquarters.

I-LINK

## 17.12  Bonds.

Whenever an alien for whom a bond has been posted is admitted, endorse the reverse of the arrival portion of the I-94 with the "A" number, FCO code and the word "Bond".  When a bond has been pre-posted as a condition of visa issuance, the nonimmigrant visa will be so noted by the consular officer.

## 17.13  Visa Waiver Program Cases. (Revised IN01-04)

See discussion in Chapter 15.7 concerning VWP refusals and limitations on removal hearings. A VWP applicant who claims asylum may be accorded a limited removal hearing , but such a hearing is limited **solely** to the issue of asylum or withholding of removal, in accordance with 8 CFR 208.2(b).  In such a situation, process the applicant using Form I-863, Notice of Referral to Immigration Judge.

## 17.14  Lookout Intercepts.

See Chapter 31.6.

## 17.15  Expedited Removal.

(a) Inadmissibility.   Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) amended section 235(b) of the Immigration and Nationality Act (Act) to authorize the Attorney General (now the Secretary of the Department of Homeland Security (DHS)) to remove without a hearing before an immigration judge aliens arriving in the United States who are inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act.  Under these expedited removal provisions, aliens who indicate an intention to apply for asylum or who assert a fear of persecution or torture are referred to an asylum officer for a credible fear interview.   Those who are found to have a credible fear by the asylum officer are referred to an immigration judge for a full removal hearing on the merits of their claim or claims.

The expedited removal provisions became effective April 1, 1997.   Under section 235(b)(1) of the Act, expedited removal proceedings may be applied to two categories of aliens.

First, section 235(b)(1)(A)(i) of the Act permits expedited removal proceedings for aliens who are arriving in the United States.  8 CFR 1.1(q) defines the term "arriving alien." Refer to section (a)(1) of this chapter for the meaning of "arriving alien."   Pursuant to section 235(b)(1)(F) of the Act, Cuban nationals who arrive at U.S. ports-of-entry

**Inspector's Field Manual**

(POEs) by aircraft are exempt from expedited removal proceedings.

Second, section 235(b)(1)(A)(iii) of the Act provides the Attorney General (now the Secretary of DHS) the discretion to designate certain other aliens to whom the expedited removal proceedings may be applied, even though they are not arriving in the United States. This provision permits application of the expedited removal proceedings to any or all aliens who have not been admitted or paroled into the United States and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by an immigration officer. The Attorney General delegated this authority to designate classes of aliens to the Commissioner of the Immigration and Naturalization Service, and this has since been delegated to the Commissioner of CBP and the Under Secretary of Immigration and Customs Enforcement (ICE). Pursuant to 8 CFR 235.3(b)(1)(ii), the designation may become effective upon publication of a notice in the Federal Register.

On November 13, 2002, the INS published in the Federal Register a notice designating an additional class of aliens who may be placed in expedited removal proceedings - aliens who arrive in the United States by sea, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period immediately preceding the determination of inadmissibility. Aliens falling within this newly designated class will be detained at the discretion of the government during the course of immigration proceedings. This newly designated class does not include Cuban nationals, crewmen, or stowaways.

(1) Arriving Aliens. For an alien to be subject to the expedited removal provisions at a POE, the alien must first meet the definition of "arriving alien." The term "arriving alien" as defined in 8 CFR 1.1(q) means an applicant for admission coming or attempting to come into the United States at a POE, or an alien seeking transit through the United States at a POE, or an alien interdicted in international or U.S. waters and brought into the United States by any means, whether or not to a designated POE, and regardless of the means of transportation. An arriving alien remains such even if paroled pursuant to section 212(d)(5) of the Act, except that an alien who was paroled before April 1, 1999, or an alien granted parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States shall not be considered an arriving alien for purposes of section 235(b)(1)(A)(i) the Act.

Aliens who entered the United States without inspection; aliens apprehended in the United States without legal status; and aliens who have departed the United States, are refused admission into another country and are thereafter returned back to the United States do not fall within the definition of arriving aliens. Alien stowaways on arriving vessels, lawful permanent resident aliens of the United States, or applicants under the Visa Waiver Program may be considered arriving aliens for other

### Inspector's Field Manual

purposes under the Act, but are not subject to the expedited removal provisions.

It is the responsibility of the officer to determine whether the alien is an arriving alien subject to being placed in expedited removal proceedings. Also see Chapter 17.11 for processing alien applicants for admission who claim asylum at ports-of-entry.

(2) Applicability. In general, arriving aliens who are inadmissible under section 212(a)(6)(C) and/or (7) are subject to expedited removal under section 235(b)(1) of the Act. Officers should only charge those grounds of inadmissibility that can be fully supported by the evidence and that will withstand any further scrutiny. Officers may, but need not, charge more than one ground of inadmissibility. If 212(a)(6)(C) and/or 212(a)(7) are the only charges lodged, the alien must be processed under expedited removal and may not be referred for an immigration hearing under section 240. If additional charges are lodged, the alien may be referred for a section 240 hearing, but this should only occur in extraordinary circumstances. Generally speaking, if an alien is inadmissible under 212(a)(6)(C) and/or (7), additional charges should not be brought and the alien should be placed in expedited removal. There will be very few instances where it will be advantageous to the government to lodge additional charges and institute section 240 removal proceedings if a solid expedited removal proceeding can be concluded. Even in criminal cases, an expedited removal proceeding will normally be the preferred option.



DHS retains the discretion to permit withdrawal of application for admission in lieu of issuing an expedited removal order (see Chapter 17.2). Provisions for withdrawal are contained in both statute and regulation, with specific guidance in the IFM, and should be followed by all officers with authority to permit withdrawals. As an example, in cases where a lack of proper documents is the result of inadvertent error, misinformation, or where no fraud was intended (e.g. an expired nonimmigrant visa), officers may consider, on a case-by-case basis and at the discretion of the government, any appropriate waivers, withdrawal of application for admission, or deferred inspection to resolve the ground of inadmissibility rather than issue an expedited removal order.

The authority to formally order an alien removed from the United States without a hearing or review, carries with it the responsibility to accurately and properly apply the grounds of inadmissibility.

(3) Grounds of Inadmissibility. All officers should be aware of precedent decisions

### Inspector's Field Manual

and policies relating to the relevant grounds of inadmissibility. Section 212(a)(6)(C) is an especially difficult charge to sustain unless the case involves obviously fraudulent or counterfeit documents. Misrepresentation is even more difficult to determine. Also keep in mind that an alien who is determined to be inadmissible for fraud or misrepresentation is barred forever from the United States, with few waivers available. Any one or several of the following points should be considered in determining if an alien has committed fraud or misrepresentation.

- To support a charge of having procured a document by fraud or misrepresentation, the procuring must have been done from a government official, not from a counterfeiter, and any misrepresentation must have been practiced on a U.S. Government official.

- The procurement by fraud must relate to a person who has done so to obtain his or her own admission, not someone else's.

- The fraud or misrepresentation must be material, i.e., the alien is inadmissible on the true facts, or the misrepresentation tends to shut off a relevant line of inquiry that might have resulted in a determination of inadmissibility.

- In general, an alien should not be charged with misrepresentation if he or she makes a timely retraction of the misrepresentation, in most cases at the first opportunity.

- Silence or failure to volunteer information does not in itself constitute a misrepresentation.

- Aliens who are determined to be mentally incompetent and small children judged to be incapable of independently forming an intent to defraud should not be ordered removed using section 212(a)(6)(C)(i) as the inadmissibility charge. The preferred charge in such cases would be section 212(a)(7)(A).

- Section 344 of IIRIRA did not create any waiver for immigrants found inadmissible under section 212(a)(6)(C)(ii) relating to false claims to U.S. citizenship. Therefore, immigrants found inadmissible under section 212(a)(6)(C)(ii) are permanently barred from the United States.

(4) Supervisory approval of removal orders. All expedited removal orders require supervisory approval before service upon the alien. By regulation, this approval authority is not to be delegated below the level of a second-line supervisor. Each field office may determine at what level (second-line supervisor or above) this review authority should be delegated.

I-LINK

### Inspector's Field Manual

The expedited removal provisions are not applicable in pre-clearance or pre-inspection operations. If DHS wishes to proceed with expedited removal of an alien inspected during an en route inspection of a vessel, action on the case will be deferred until the vessel has arrived in the United States. The alien may then be processed as an expedited removal case.

Port directors are responsible for ensuring that all officers conducting expedited removal proceedings, and supervisors approving expedited removal orders, are properly trained in the expedited removal provisions.

See Appendix 17-3 for a flow chart mapping the entire expedited removal process.

(Paragraph (a) amended 8/21/97; IN97-05)

(5)Aliens seeking asylum at land border ports of entry. Section 235(b) of the INA does not provide for an affirmative asylum application process at a port of entry. Therefore, an officer should consider an alien who arrives at a land border port-of-entry and seeks asylum to be an applicant for admission by operation of law. The alien will most likely be inadmissible under section 212(a)(7)(A)(i) of the INA as an intending immigrant without proper documentation or under section 212(a)(6)(C) of the INA as an immigration violator with fraudulent documents. As a result, he or she will be subject to expedited removal proceedings.

Except as noted below, the alien, if otherwise subject, should be placed in expedited removal proceedings, referred for a credible fear interview, and detained pending a final determination of a credible fear of persecution or torture. See INA § 235(b)(1)(B)(iii)(IV); 8 CFR § 235.3(b)(4)(ii). Once it has been determined that an alien has a credible fear of persecution or torture, DHS may continue to detain the alien or parole the alien from custody, as appropriate.
(Paragraph (a)(5) added 11-1-05; CBP 12-06)

(6) Cuban asylum seekers at land border ports-of-entry. Natives or citizens of Cuba arriving at land border ports of entry, whose immediate removal from the United States is highly unlikely, should be placed directly into section 240 proceedings in lieu of expedited removal, without lodging additional charges. These aliens may be paroled directly from the port of entry while awaiting removal proceedings if identity is firmly established, all available background checks are conducted, and the alien does not pose any terrorist or criminal threat. Pursuant to section 235(b)(2)(C) of the INA, they may also be returned to contiguous territory pending removal proceedings under section 240 of the INA. This option should only be considered if the alien is not eligible for the exercise of parole discretion, the alien has valid status in Canada or Mexico, Canadian or Mexican border officials are willing to accept the alien back, and the claim of fear of persecution is

I-LINK

## Inspector's Field Manual

unrelated to Canada or Mexico.

An officer should not parole a native or citizen of Cuba from a land border port of entry for the sole purpose of allowing the alien to apply for adjustment under the Cuban Adjustment Act of 1966, Pub. L. 89-732, 80 Stat. 1161 (1966), without initiating section 240 proceedings. The Cuban Adjustment Act (CAA) provides that any native or citizen of Cuba who has been admitted or paroled into the United States, *and who is otherwise admissible as an immigrant*, may adjust status to that of a lawful permanent resident after being physically present in the United States for at least one year. It does not, however, require an officer to parole a native or citizen of Cuba at a port of entry without regard to public safety. Therefore, an officer should grant parole to a native or citizen of Cuba only if the alien does not pose a criminal or terrorist threat to the United States. (Paragraph (a)(6) added 11-1-05; CBP 12-06)

(b) Preparing a case. The expedited removal proceedings give officers a great deal of authority over removal of aliens and will remain subject to serious scrutiny by the public, advocate groups, and Congress. All officers should be especially careful to exercise objectivity and professionalism when processing aliens under this provision. Because of the sensitivity of the program and the potential consequences of a summary removal, you must take special care to ensure that the basic rights of all aliens are preserved, and that aliens who fear removal from the United States are given every opportunity to express any concerns at any point during the process. This includes conducting interviews in an area that affords sufficient privacy, whenever feasible. Since a removal order under this process is subject to very limited review, you must be absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her.

The steps to be taken in the expedited removal proceedings differ somewhat from those in which an alien is referred for a removal hearing before an immigration judge. It is important that a complete, accurate record of removal be created, and that any expedited removal be justifiable and non-arbitrary. The following steps must be taken in each case in which an order of expedited removal is contemplated or entered against an alien:

(1) Use of Form I-867A&B. Clearly explain to the alien, in a language he or she understands, the serious nature and impact of the expedited removal process, as noted on the Form I-867A&B. Officers must use an interpreter, when needed, to assist in the expedited removal process. Refer to Chapter 17.18 for Guidance on the Use of Interpreters and Interpreter Services.

Read the statement of rights and consequences contained on the first page of Form I-867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, to the alien. Explain that you will be taking a statement from him or her, and

### Inspector's Field Manual

that any information given or discovered will be used in making a decision on the case and may result in his or her prompt removal. Advise the alien that if he or she is found to be inadmissible and a decision is made to order the alien removed, he or she will be immediately removed from the United States. Explain that there is no appeal to this decision and explain that this will be his or her only opportunity to provide any information or state any fear of return or removal that he or she may have.

In every expedited removal case, you must use the Form I-867A&B to take a complete sworn statement from the alien concerning all pertinent facts. If the case did not initially appear to involve inadmissibility and removal under the expedited removal proceedings, and the sworn statement was begun using other forms, you must immediately advise the alien of the rights and warnings on Form I-867A once you determine that the expedited removal proceedings will apply. The officer shall note either on the Forms I-867A&B or in a memorandum, explaining why those other forms are included.

The sworn statement will be done in question and answer format. Form I-831, Continuation Sheet, or a blank page may be used for the body of the statement. The sworn statement must cover several general areas of inquiry:

- Identity - include true name, aliases, date and place of birth and other biographical data.

- Alienage - determine citizenship, nationality, and residence. Cover any possible claim to U.S. citizenship through parents.

- Inadmissibility - questions should cover the alien's reason for coming to the United States, information about the specific facts of the case and the specific suspected grounds of inadmissibility.

- Fear of persecution or torture - if the alien indicates in any fashion or at any time during the inspections process, that he or she has a fear of persecution, or that he or she has suffered or may suffer torture, you are required to refer the alien to an asylum officer for a credible fear determination. One of the significant differences between expedited removal proceedings and regular removal proceedings is that the inspecting officer has a responsibility to ensure that anyone who indicates a fear of persecution or intent to apply for asylum in the United States is referred to an asylum officer for a credible fear determination. Inspectors should consider verbal as well as non-verbal cues given by the alien. The obligatory questions on the Form I-867B are designed to help in determining whether the alien has such fear. Ask the questions as they appear on the Form I-867B at the end of the sworn statement. If the alien indicates an intention to

I-LINK

**Inspector's Field Manual**

apply for asylum or a fear of harm or concern about returning home, or makes any such statements or comments at any time during the inspections process, the inspector may ask a few additional follow-up questions to ascertain the general nature of the fear or concern. Any comments of concern made by the applicant must be recorded in the sworn statement, including any indications made by the alien prior to the secondary interview.

Do **not** ask detailed questions on the nature of the alien's fear of persecution or torture: leave that for the asylum officer. In determining whether to refer the alien, inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements. The inspector should err on the side of caution, apply the criteria generously, and refer to the asylum officer any questionable cases, including cases that might raise a question about whether the alien faces persecution or torture. Do not make any evaluation as to the merits of such fear; that is the responsibility of the asylum officer. Officers processing aliens for expedited removal may contact the Asylum office point(s) of contact when necessary to obtain guidance on whether to refer questionable cases involving an expression of fear or a potential asylum claim. See paragraph (d) of this chapter for more detailed information regarding credible fear referrals.

• Impact of decision - once you have gathered all the facts, you will decide, in consultation with a supervisor, the best course of action. Depending on the circumstances, you may admit the alien, allow the alien to apply for any applicable waivers, defer the inspection or otherwise parole the alien, permit the alien to withdraw his or her application for admission, issue an expedited removal order, or refer the alien for a credible fear determination. Whatever decision is made, clearly advise the alien of the impact and consequences of the determination and record this in the sworn statement.

You must use the Form I-867B as the final page of the sworn statement and jurat. Be sure to obtain responses from the alien regarding the mandatory closing questions contained on the form. If the alien in any way indicates a fear of removal or return, follow the procedures in paragraph (d) of this section. Collect any additional evidence relevant to the case that is discovered during the inspections process.

After the sworn statement is completed, have the alien read the statement, or have it read to him or her in a language the alien understands. Use an interpreter if necessary. Make any necessary corrections or additions. Have the alien initial each page and each correction. Provide a copy of the completed statement, upon signature, to the alien. Retain a copy for the A file and a copy for the port file, if one is created

I-LINK

### Inspector's Field Manual

If at any time you feel that an amendment to the initial sworn statement is needed, you may complete a second sworn statement during the inspections process. An incident may also take place after you have completed the initial sworn statement, but before the alien is removed from the United States, where a second sworn statement may be helpful. Ask the alien enough questions under oath to address all concerns that may have arisen during the process.

The statement must be signed by the alien and by the officer taking the statement, as well as by a witness. An alien cannot avoid expedited removal by refusing to sign the statement or answer the questions. If the alien will not sign, write "Subject refused to sign" on the signature line. If the alien will not answer any questions, take a skeleton sworn statement, listing all pertinent questions, and writing after each "Subject refused to answer". An expedited removal order may still be issued, provided the removal is otherwise substantiated (e.g., if the alien presented a fraudulent document), and is not dependent solely on the alien's statements.

(2) Form I-860, Notice and Order of Expedited Removal. Prepare three copies of Form I-860. Check the appropriate ground(s) of inadmissibility under which the alien is being charged (e.g. 212(a)(6)(C)(i)), and insert a narrative description of each charge and the violation committed. Read and explain the charges to the alien in the alien's native language or in a language the alien can understand. An interpreter may be required to ensure that the alien understands the allegations and the removal order. Interpreters may not be used if they are employees of the government of the alien's home country, such as an employee of a government-owned airline, except for the most routine questioning. Never use an employee of a foreign government if there is any possibility of sensitive areas (e.g., persecution or torture) being discussed. The alien should be given an opportunity to respond to the charges, and any response must be recorded in either the sworn statement or an addendum to the statement. Expedited removal forms exist in other languages. If a form in the alien's native language or in a language the alien understands is used, place only the English version in the file and give the translated version to the alien.

After all statements are taken and other paperwork is complete, present it through your chain of command to the appropriate supervisor (not to be delegated below the second-line supervisor) or a person officially acting in that capacity for review and approval. If the appropriate supervisor is not present at the port, the supervisory review and approval may be obtained telephonically, by fax, or by other means. The approving authority must be properly advised of all facts in the case in order to make an informed decision. Print the name and title of the supervisor approving the order, and check the box on the form indicating that concurrence was obtained telephonically or by other means. The Form I-860 must be signed legibly by the

statements.

(2) Form **I-860**, Notice and Order of Expedited Removal. Prepare three copies of Form I-860. Check the appropriate ground(s) of inadmissibility under which the alien is being charged (e.g. **212(a)(6)(C)(i)**), and insert a narrative description of each charge and the violation committed. Read and explain the charges to the alien in the alien's native language or in a language the alien can understand. An interpreter may be required to ensure that the alien understands the allegations and the removal order. Interpreters may not be used if they are employees of the government of the alien's home country, such as an employee of a government-owned airline, except for the most routine questioning. Never use an employee of a foreign government if there is any possibility of sensitive areas (e.g., persecution or torture) being discussed. The alien should be given an opportunity to respond to the charges, and any response must be recorded in either the sworn statement or an addendum to the statement. Expedited removal forms exist in other languages. If a form in the alien's native language or in a language the alien understands is used, place only the English version in the file and give the translated version to the alien.

After all statements are taken and other paperwork is complete, present it through your chain of command to the appropriate supervisor (not to be delegated below the second-line supervisor) or a person officially acting in that capacity for review and approval. If the appropriate supervisor is not present at the port, the supervisory review and approval may be obtained telephonically, by fax, or by other means. The approving authority must be properly advised of all facts in the case in order to make an informed decision. Print the name and title of the supervisor approving the order, and check the box on the form indicating that concurrence was obtained telephonically or by other means. The Form **I-860** must be signed legibly by the preparing officer.

(3) Photographing and fingerprinting. Enroll the alien in ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ake the alien's photograph and fingerprint the alien on FD-249 fingerprint cards (three sets—see **chapter 18.9(c)** for distribution), or electronically, if ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ re available at the port. Be sure to complete the entire form and properly code the the fingerprint cards with the proper U.S. Code citation, since the FBI will not clear cards without such codes. Following are examples of codes that may be used:

- 18 U.S.C. 1544    Photo substitutions
- 18 U.S.C. 1546    Counterfeit immigrant visa
- 8 U.S.C. 1306     Counterfeit immigration documents, such as alien registration
- 18 U.S.C. 911     False claims to U.S. citizenship (imposters, photo substitution of U.S. passport)
- 18 U.S.C. 1001    Other (fraudulent documents, false statements, imposter, etc.)

(4) Forensic Document Lab (FDL) analysis. Obtain forensic analysis, if appropriate. In cases involving fraudulent documents, if the sworn statement includes an admission of the fraud, no forensic analysis may be required. For the expedited removal proceedings, actual forensic examination of the document by the FDL may not be feasible. This does not mean that it is permissible to "rush to judgement", or that it is permissible to expeditiously remove an alien based on incomplete evidence. If forensic analysis is required to establish that the alien is inadmissible, such analysis must be obtained before the Form **I-860** is executed. If necessary, the alien should be detained until the analysis is performed, and then the Form I-860 can be executed. (On the other hand, if the alien's inadmissibility under section **212(a)(7)** has been established, there is little or no reason to delay the expedited removal process in order to also establish the **212(a)(6)(C)** charge.) Offices with electronic devices for transmitting quality images should use those technologies whenever possible or necessary. [See **Chapter 32** for details on using FDL services and for contributing documents or intelligence information concerning the fraud.]

(5) Tracking of ER cases. Unless an A number already exists for an alien placed into expedited removal, an A number must be

assigned to every expedited removal case at the POE in order to ensure proper tracking of the case from the onset.

Codes have been created for entry of expedited removal cases into the Central Index System (CIS). Those codes are:

- ERF   **E**xpedited **R**emoval case has been initiated under section **235(b)(1)** of the INA and a final decision is pending a credible **F**ear determination by an asylum officer or immigration judge.

- ERP   **E**xpedited **R**emoval case has been initiated under section **235(b)(1)** INA and a final decision is **P**ending for reasons other than referral for credible fear interview before an asylum officer.

- ERR   **E**xpedited **R**emoval case has been initiated and alien has been **R**emoved from the United States under that program.

Entry of cases into CIS should be accomplished as quickly as possible in accordance with local policy. To ensure prompt data entry, A files for expedited removal cases should be separated from other files and flagged as expedited removal cases.

Codes have also being created to designate expedited removal cases in the National Automated Immigration Lookout System (NAILS) and the Interagency Border Inspection System (IBIS).

Search for existing records in CIS and other appropriate automated systems. If an A file exists, create a temporary file and request the permanent file. After the file is received, update it with all relevant documents completed or collected during the expedited removal process, and forward it to the proper files control office. If no previous file exists, create a new A file relating to the alien.



INS

6) Consular notification of alien detention. Consult **8 CFR 236.1(e)** to ensure that, if required, the appropriate consular official is immediately notified of the alien's detention, even if the alien **requests** that this **not** be done. Notify the alien that he or she may communicate with a consular official. These steps normally will only be necessary when removal of the alien cannot be accomplished immediately and the alien must be placed in detention for longer than 24 hours. When you contact a consular official, never mention any asylum claim which may have been filed, or give any indication that the alien has expressed a fear of persecution or torture.

(7) Criminal prosecution. Aliens arriving at the POEs who are subject to the expedited removal provisions may also be subject to criminal prosecution. If criminal prosecution of the alien is contemplated in addition to expedited removal, the criminal action must be completed before the alien is ordered removed. [See **Chapter 18** for procedures for criminal prosecution]. Officers must give the alien his/her Miranda warning and once the warning of rights has been given to the alien, questioning of the alien can only occur with the alien's consent. If the alien refuses to provide a sworn statement, or if the U.S. Attorney's Office prohibits the officer from taking any sworn statements or completing removal processing prior to the completion of the criminal proceedings, the administrative process must be completed after the alien's criminal proceeding is concluded.

If the alien permits questioning and the U.S. Attorney's Office does not prohibit questioning and processing of the alien, complete the sworn statement and the Form I-860. Do not serve the Form **I-860** on the alien, but place it in the A file pending the criminal processing. If the alien is to be turned over to another law enforcement agency, serve a Form **I-247**, Immigration Detainer - Notice of Action, on the other agency. Once the alien is returned to DHS custody, the Form I-860 may be served and the alien removed under the expedited removal order.

(8) Service of the Form I-860. Serve the original Form I-860 on the alien, unless the alien is to be deferred to an onward office, in which case the service is accomplished by the onward office. If the alien is being prosecuted criminally, the Form I-860 will be served after the criminal conviction. Place a copy of the Form I-860 in the A file. The third copy may be retained at the port.

(9) Form **I-296**, Notice to Alien Ordered Removed/Departure Verification. Check the appropriate box to indicate the period during which the alien must obtain permission to reenter: 5 years for the first removal; 20 years in the case of a second or subsequent removal; at any time if the alien has been **convicted** of an aggravated felony (even though the alien is not being charged as an aggravated felon in this proceeding). Do not check the 10-year box; that is for aliens removed under other provisions of the Act. At the time of actual removal, a photograph and a pressed print of the alien's right index finger should be placed on a copy of the Form I-296, the alien should sign the form, and the particulars of the departure should be entered on the form for retention in the file. Serve the alien with a copy of the Form I-296 before removal. The original form should remain in the A file.

(10) Form **I-275**, Consular Notification. Cancel the alien's visa or border crossing card, if appropriate. Complete and distribute the Form **I-275** as described in **Chapter 17.2**. Check all the boxes that apply, with a brief description of the denial and removal of the alien. Note the passport with the file number and action taken, for example: "Ordered Removed 6/1/04 NYC/Section 212(a)(6)(C) (i)". Forward a copy of the Form I-860 with the Form I-275 to the Department of State.

(11) Form I-94, Arrival/Departure Document. Prepare a new Form I-94. If the alien applied for admission at a land border, annotate the Form I-94 to read: "Form I-860 Removal Order issued pursuant to section **235(b)(1)** of the Act. (Date), (Place), (Officer)". If the alien applied for admission at an airport or seaport, use the parole stamp and endorse the I-94 to read: "For removal from the United States by (carrier name). Form I-860 Removal Order issued pursuant to section **235(b)(1)** of the Act. (Date), (Place), (Officer)".

(12) Detention. Detain the alien as appropriate. Follow local procedures to obtain detention authorization and arrange for detention. Aliens placed into expedited removal proceedings must be detained until removed from the United States. Parole may be permitted only if there is a medical emergency or if it is necessary for legitimate law enforcement purposes, such as for criminal prosecution or to testify in court. Refer to **Chapter 17.8** for the CBP policy on the detention of aliens at POEs. Aliens subject to expedited removal who claim a fear of persecution or torture must be detained pending a credible fear determination. Once an alien has established a credible fear of persecution or is otherwise referred (as provided by regulation) for a full removal proceeding under section **240**,



release of the alien may be considered under normal parole criteria. Aliens who make false claims to U.S. citizenship, or unverified claims to lawful permanent resident, asylee, or refugee status, must be detained pending review of the removal order by the immigration judge. Aliens arriving at a land border port-of-entry who do not claim lawful status in the United States or a fear of persecution should normally be processed immediately and either returned to Canada or Mexico or detained until removed.

(13) Credible fear interview referral. See paragraph (d) of this chapter for detailed information on credible fear referrals. Credible fear interviews will normally take place at DHS or contract detention facilities. Each POE and detention facility will be provided with a point or points of contact at the Asylum office having responsibility for that geographical area. It is the responsibility of the referring (Inspections) officer to provide the alien being referred for a credible fear interview with both a Form **M-444**, Information about Credible Fear Interview, and a list of free legal services, as provided in **8 CFR part 292**. It is generally the responsibility of the detention and removal personnel to notify the appropriate Asylum office point of contact when an alien subject to the expedited removal process is being detained in DHS custody pending this interview. That officer should also provide any additional information or concerns of the alien, such as whether the alien requires an interpreter or other special requests and considerations. However, in locations where the credible fear interview requires travel by the asylum officer, the referring officer should notify the Asylum office when referring the alien in order to provide as much advance notice as possible. When aliens are detained in non-DHS facilities or at remote locations, the referring officer must notify the appropriate Asylum office. If the alien is subsequently transferred to another detention site, the detention or deportation officer must ensure that the appropriate Asylum office has been notified.

Normally the credible fear interview will not take place sooner than 48 hours after the alien arrives at the detention facility. If the alien requests that the interview be conducted sooner, the referring officer, or any other officer to whom the alien makes the request, should immediately convey that information to the appropriate Asylum office.

(14) Removal from the United States. Most aliens removed under the expedited removal provisions will be promptly removed; however, some aliens, such as those who claim asylum or LPR status, may be detained pending a decision on their claim. At the land border, the alien's departure to the contiguous foreign territory. At air and seaports, serve the carrier of arrival with the Form I-259, Notice to Detain, Remove, or Present Aliens, and check the appropriate boxes to order the carrier to remove the alien when the removal process is finished. If the case cannot be timely completed, advise the carrier of potential liability.

(15) Database entries. The expedited removal process continues to be the subject of extensive inquiry and requires appropriate tracking of specific case data. Expedited removal cases will normally be processed through ▓▓▓▓▓▓. In addition, every case in which an expedited removal order is issued must be entered into the Deportable Alien Control System (DACS) until that system is replaced with the ▓▓▓▓▓▓▓▓▓▓▓▓▓ Entry of data for those aliens detained by DHS will be handled by the Detention and Removal personnel responsible for the detention facility. Entry of data for aliens who do not require detention and are removed directly from the POEs is the responsibility of CBP. Cases initiated at the POEs and referred for removal proceedings under section 240 will continue to be entered into DACS by Detention and Removal. Complete appropriate closeouts in ▓▓▓▓▓

(16) Form G-22.1, Inspections Summary Report. Consult G-23 Report of Field Operations Procedures for reporting guidelines.



(c) Withdrawal of application for admission in lieu of an expedited removal order.
DHS has the discretion to allow an inadmissible alien to voluntarily withdraw his or her application for admission and to depart the United States in accordance with section **235(a)(4)** of the INA. This discretion applies to aliens subject to expedited removal, and should be applied carefully and consistently, since an officer's decision to allow withdrawal or issue a removal order is final. Officers should keep in mind that an order of expedited removal carries with it all the penalties of an order of removal issued by an immigration judge (including a bar to reentry of at least 5 years following removal pursuant to section **212(a)(9)(A)(i).**

Follow the guidelines contained in **Chapter 17.2** to determine whether an alien's withdrawal of an application for admission or asylum claim best serves the interest of justice. An officer's decision to permit withdrawal of an application for admission must be properly documented by means of a Form **I-275**, Withdrawal of Application for Admission/Consular Notification, to include the facts surrounding the voluntary withdrawal and the withdrawal of the asylum claim. In addition, an officer should prepare a new sworn statement, or an

addendum to the original sworn statement on Form I-867A&B, covering the facts pertaining to the alien's withdrawal of the asylum claim.

An alien may not be pressured into withdrawing his or her application for admission or asylum claim under any circumstances. An officer must provide adequate interpretation to ensure that the alien understands the expedited removal process and the effects of withdrawing an application for admission or an asylum claim. Furthermore, an asylum officer must be consulted before an alien who has expressed a fear of return to his or her home country may be permitted to withdraw an asylum claim.

If an officer permits an alien to withdraw his or her application for admission and elects to return the alien to Canada or Mexico, the Form I-275 should indicate the alien's status in Canada or Mexico and the basis for determination of that status. This determination may be based on contacts with Canadian or Mexican authorities, stamps in the alien's passport, or other available documentation. The narrative on Form I-275 should also indicate that the alien has not expressed concern about returning to Canada or Mexico.

If the alien expresses any concern or reluctance about returning to Canada or Mexico and wishes to pursue the asylum claim in the United States, the officer should advise the alien that he or she will be placed in the expedited removal process, unless subject to section 240 proceedings by statute, regulation, or policy, and will be detained pending the credible fear determination. The alien should not be given the Form I-589, Application for Asylum and for Withholding of Removal, nor should an affirmative asylum interview be scheduled at the port of entry.
(Paragraph (c) revised 11-1-05; CBP 12-06)

(d) Fear of persecution or request for asylum. Aliens who indicate an intention to apply for asylum or a fear of persecution or torture may not be ordered removed until an asylum officer has interviewed the alien to determine whether the alien has a credible fear of persecution or torture and warrants a full asylum hearing before an immigration judge.

When questioning or taking a sworn statement from any alien subject to the expedited removal provisions, you need not directly solicit an asylum claim. However, to ensure that an alien who may have a genuine fear of return to his or her country is not summarily ordered removed without the opportunity to express his or her concerns, you should determine, in each case, whether the alien has any concern about being returned to his or her country. Further, you should explore any statement or indications, verbal or non-verbal, that the alien actually may have a fear of persecution or torture or return to his or her country. You must fully advise the alien of the process, as indicated on the Form **I-867A**, and of the opportunity to express any fears.

Keep in mind that the alien need not use the specific terms "asylum" or "persecution" to qualify for referral to an asylum officer, nor does the fear of return have to relate specifically to one of the five grounds contained within the definition of refugee. The United States is bound by both the Protocol on Refugees and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and, except under extraordinary circumstances, may not return an alien to a country where he or she may face torture or persecution.

The alien may convey a fear of violence or harm, a need for protection, an indication of harm to, or disappearance of, relatives or associates, or dangerous conditions in his or her country. Even disputes of a personal nature sometimes may relate to asylum, such as domestic violence, sexual or child abuse, child custody problems, coercive marriage or family planning practices, or forced female genital mutilation. All officers should recognize that sometimes unusual cases have been found eligible for asylum that may not have initially appeared to relate to the five grounds contained in the definition of refugee, such as AIDS victims who face government persecution, land or money disputes with wealthy persons or persons in power, whistle blowers, witnesses to crimes and even organized crime connections. Harm sufficient for a credible fear referral can include ███████████████████████████████



Do not make judgement decisions concerning any fear of persecution, torture, or return. Any alien who by any means indicates a fear of persecution or return **may not** be removed from the United States unless the alien has been interviewed and a credible fear determination been made by an asylum officer. An alien who does not indicate a fear of return but responds to one of the protection-

related questions by stating that he or she has applied for refugee or asylum status in the United States or elsewhere in the past, or mentions a relative, friend or associate who has done so (even if such claims are still pending or were denied), should be asked further questions to determine whether or not the alien is expressing a fear of return or an intention to apply for asylum indirectly. If, on more detailed questioning, the alien states that he or she has no fear of return and no interest in applying for asylum, the case need not be referred for a credible fear interview.

If the alien answers affirmatively to one the protection-related questions or requests asylum, and later changes the answer or asks to be sent home, the officer should consult with the local Asylum office or refer the case. If an attorney, friend, or relative notifies any officer that an individual in the expedited removal process is planning to apply for asylum or has a fear of return, that officer should notify the port of entry. The officer responsible for the case should either consult with an asylum supervisor or refer the alien for a credible fear interview, even if the alien does not express a fear directly. In the expedited removal process, an attorney, friend, or relative who acts as a consultant to the alien need not file a Form G-28.

Any alien who exhibits any ████████████████████████ – that alert the office to possible fear of harm should be referred. If an officer notices signs of ████████████████████████████████████ the officer should consult an asylum supervisor, or the applicant should be referred. ████████████ should be noted in parentheses or brackets in the sworn statement or memo to file.

████████████████████████████████████████ It is important to be aware of these possible reactions. Do not dismiss t███████ ██tomatically as signs of uncooperative behavior.

Considerations that should NOT affect the officer's decision to refer an alien for a credible fear interview include:

- ████████████████. The asylum officer will review the sworn statement and documents and ask the alien about any inconsistencies and discrepancies. Only an asylum officer can make a credibility determination for purposes of deciding whether the alien has a credible fear of persecution.

- ████████████████████████████████████████████████

- ████████████ Aliens should be referred, for example, if they claim ████████████, or if for example, that they claim ████████████

- Country of origin: No country should be considered safe – or dangerous- for all residents. However, knowledge of conditions in the alien's home country may help alert an officer to non-verbal cues or confused or vague expressions of fear.

- Whether harm is on account of the alien's race, religion, political opinion, nationality or social group: Officers should not make a determination on whether the harm feared is on account of the alien's race, religion, nationality, membership in a particular social group or political opinion. Asylum law, and particularly the definition of a "social group" is evolving – cases involving domestic violence, spousal abuse, sexual abuse of children, female genital mutilation, coercive family planning practices, organized crime, whistleblowers on government corruption, homosexuality, and AIDS, and other unresolved legal areas should be referred. An alien may also be offered protection from return under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, when it is more likely than not that the alien would be tortured, even if the motivation for the torture is not on account of the applicant's race, religion, nationality, social group or political opinion.
- Mandatory Bars: The presence of a mandatory bar to asylum should not prevent referral. Referrals should occur even in cases where, for example, the alien appears to be firmly resettled in a third country, transited through a third country, or when there is information that appears to indicate that the alien is a criminal or a danger to national security.
- Stated Preference to Apply for Asylum Elsewhere: If an alien expresses a fear of return, but states that he or she does not want to apply for asylum in the United States because he or she plans to apply for asylum elsewhere, the alien should be referred. Some applicants may not be aware that certain countries will not accept an asylum application from them if they have transited through the United States.

The International Religious Freedom Act of 1998 (IRFA) was passed by Congress out of a growing concern about violations of religious freedom in countries around the world. IRFA requires training for certain government employees on the nature of religious persecution abroad. Violations of religious freedom can include prohibitions on, restrictions of, or punishment for:

- Assembling for peaceful religious activities
- Speaking freely about religious beliefs
- Changing religious beliefs or affiliation
- Possessing and distributing religious literature
- Raising children in the religious practices and teachings of one's choice.

Any of the following acts are violations of religious freedom if committed on account of an individual's religious belief or practice:

- Detention
- Interrogation
- Imposition of onerous financial penalties
- Forced labor
- Forced mass resettlement
- Imprisonment
- Forced religious conversion
- Beating, torture, mutilation, rape, murder, enslavement, and execution

IRFA defines "particularly severe violations of religious freedom" as systematic, ongoing, egregious violations of religious freedom, including violations such as:

- Torture or cruel, inhuman, or degrading treatment or punishment;
- Prolonged detention without charges;
- Causing the disappearance of persons by the abduction or clandestine detention of those persons; or
- Other flagrant denial of the right to a person's life, liberty, or security.

Applicants who are questioned by officers in expedited removal proceedings may not understand that religious persecution is an issue they should reveal in their interview. Sometimes an applicant will not indicate any past incidents of religious persecution, but you might become aware of it incidentally. Perhaps you learn that the applicant is a Jehovah's Witness and realize he or she is from a country in which Jehovah's Witnesses are persecuted.



You might also come across customs and behavior that are new to you, for example, the wearing of scarves for religious reasons. In talking with that person, you might learn that there is a fear of return, but the person did not realize that religion was a protected ground for asylum at the time of inspection. Therefore, it is important to adhere to the procedural safeguards built into the expedited removal process.

IRFA requires that the State Department annually publish a report on the condition of religious freedom in the world. Specifically, the report describes the status of religious freedom in every foreign country. It also cites any violations of religious freedom or trends toward improvement or deterioration in the respect and protection of religious freedom. There is an Executive Summary at the beginning of the report, which highlights the report's findings. Each Asylum Office has bound copies of the report for reference. The report is also posted every year on the State Department's web site.

IRFA does not change the legal standard for determining refugee or asylum eligibility. It also does not give preference to religious persecution. It does require refugee and asylum officers to receive specialized training concerning religious persecution. When religious issues are involved, adjudicators must become informed about conditions in the applicant's home country by referring to the annual report on religious freedom published by the Department of State. However, a claim cannot be denied solely because an officer cannot find information in the report. As with every case, officers should consult a variety of current and reliable sources for an accurate representation of country conditions. In certain unconventional cases, determining whether an applicant's unique set of beliefs is a religion may require careful consideration and research, and when appropriate, consultation with proper DHS personnel.

While IRFA mandates that certain new processes be implemented, it does not change the basic job requirements.

- IRFA does not authorize individuals housed in DHS facilities to do anything they wish under the guise of religious practice.
- IRFA does not require officers to determine what a religion is or what constitutes religious persecution.
- And while IRFA emphasizes issues of religious persecution, it does not imply that other types of persecution are any less important.

All officers must disregard their own religious convictions and beliefs evaluating an asylum or refugee claim. For example, you may be a Muslim officer interviewing a non-Muslim asylum applicant who claims to be persecuted by Muslims on account of his religion. Upon hearing such claims, you may be surprised, offended, disbelieving, or have other adverse personal reactions because of your own religious convictions and opinions. While it may be difficult, you must evaluate such claims objectively and without personal bias.

If the alien indicates an intention to apply for asylum or asserts a fear of persecution or torture, and is being referred for a credible fear interview with an asylum officer:

(1) Create an A file, if one does not already exist.

(2) Fully process the alien as an expedited removal case. Establishing inadmissibility cannot be left to the asylum officer. Record a description of the particulars of the interview and the alien's initial claim to asylum or fear of return by means of a sworn statement using Form **I-867A&B**. Follow the instructions in paragraph (b)(1) above to ensure that the alien understands the proceedings. Although you should not pursue the asylum claim in detail, enough information should be obtained to inform the asylum officer of the alien's initial claim to asylum or fear of persecution or return. If the alien answers the closing questions on Form I-867B in the affirmative, several other questions may be necessary to determine the general nature of the fear or concern.

(3) Complete the Determination of Inadmissibility portion of the Form **I-860**, including sufficient information to support the charges of inadmissibility should the asylum officer find that alien does not have a credible fear of persecution. Sign **only** the Determination portion of the form. The removal part of the order will be signed by the asylum officer only after it is determined that the alien does not have a credible fear of persecution. Refer also to **Chapter 43.3** for documenting any potential fines issues.

(4) Advise the alien of the purpose of the referral and that the alien may consult with a person or persons of his or her choosing, at no expense to the government and without delaying the process, prior to the interview. The Form **M-444**, Information about Credible Fear Interview, must be given to the alien and explained in a language the alien understands. The alien should sign two



copies, acknowledging receipt of the information. One copy should be placed in the A file, and the other retained by the alien.  Give the alien a current list of organizations and programs prescribed in **8 CFR 292** which provides free legal services.

(5) Arrange for detention of the alien according to local procedures. Although it is normally the responsibility of the detention and removal personnel officer to notify the Asylum office, in some circumstances, you must advise the appropriate Asylum office that an alien being detained requires a credible fear interview. The Asylum office should also be advised whether the alien requires an interpreter and of any other special considerations. It may be helpful for the officer to provide the asylum officer with information on the alien's gender, the language(s) the alien speaks, whether the alien is traveling with a spouse or children, and any special medical needs or unusual behavior. Forward the A file to the location where the credible fear interview will take place. Prepare Form **I-259** and serve it on the affected carrier. Complete Form I-94 for NIIS entry notated "Detained at _____ pending credible fear interview pursuant to section **235(b)(1)(B)** of the Act. (Date), (Place), (Officer)".

An asylum officer will conduct an interview to determine if the alien has a credible fear of persecution, either at the detention facility or at a location arranged through the Asylum office having jurisdiction over the place of apprehension, depending on location. If the alien is determined to have a credible fear of persecution or torture, the asylum officer will refer the alien before an immigration judge for full consideration of the asylum and withholding of removal claim in proceedings under section **240** of the Act. If the alien is found not to have a credible fear of persecution or torture, following review by a supervisory asylum officer, the asylum officer will order the alien removed pursuant to section **235(b)(1)**, unless the alien requests that the determination of no credible fear be reviewed by an immigration judge. If the alien makes such a request, the asylum officer will use Form **I-863**, Notice of Referral to Immigration Judge, checking box #1, to refer the alien to the immigration judge for review of the credible fear determination. If the immigration judge determines that the alien does not have a credible fear of persecution, DHS will present the alien for removal to the carrier on which he or she arrived. There may be some situations where the actual carrier of arrival and port of embarkation cannot be ascertained. Such cases may require additional processing, including detention, in order to arrange for travel documents and transportation at government expense (User Fee).

If an alien claims a fear or concern about possible harm, and later asks to be sent home, the officer should review the sworn statement carefully with the alien to determine if there was a misunderstanding. If there was no misunderstanding, the officer should prepare a second Form **I-867A**&**B** and note that the alien has changed his or her mind. The officer must consult with an asylum supervisor before executing the decision. If the asylum supervisor concurs that it is appropriate to remove the applicant without a credible fear interview, the name of the supervisor, and the date and time of concurrence should be noted in the A file. Both the original and final Form I-867A&B must remain in the file.

If the alien maintains throughout the sworn statement that he or she has no fear of return and later claims a fear or a desire to apply for asylum, the applicant should be referred for a credible fear interview. The officer should reinterview the alien and complete an addendum to the statement, re-asking the fear questions. The officer should void the original Form **I-860** and complete an new Determination of Inadmissibility. The Form **I-296** should be voided if the verification of removal section has already been completed, and the officer should complete a memo to file, explaining the circumstances of the case.

(e) Claim to lawful permanent resident, asylee, or refugee status, or U.S. citizenship.

(1) An expedited removal case involving an alien who claims to be a U.S. citizen, to have been lawfully admitted for permanent residence, to have been admitted as a refugee under section **207**, or to have been granted asylum under section **208**, should be handled very cautiously to ensure that the rights of the individual are fully protected. The expedited removal authority provided by IIRIRA is a powerful tool and there are grave consequences involved in incorrectly processing a bona fide citizen, LPR, refugee or asylee for removal. You should be extremely aware of those consequences when you are using this tool. Although the statute and regulations provide certain procedural protections to minimize the risk of such consequences, you should never process a case for expedited removal which you would not feel satisfied processing for a hearing before an immigration judge.

If the alien falsely (or apparently falsely) claims to be a U.S. citizen, LPR, refugee, or asylee, and is not in possession of documents



to prove the claim, make every effort to verify the alien's claim prior to proceeding with the case. This can be accomplished through a thorough check of the data systems, manual request to the Records Division, careful questioning of the alien, or prudent examination of documents presented. Use whatever means at your disposal to verify or refute a claim to U.S. citizenship, including verification of birth records with state authorities, etc.

(2) Verifiable claim. When inspecting an alien whose claim to LPR status has been verified, determine whether the alien is considered to be making an application for admission within the meaning of section **101(a)(13)(C)**. [See discussion in **Chapter 13.4**.] Although the LPR may not be considered to be seeking admission, he or she is nonetheless required to present proper documents to establish his or her status as an LPR. If the claim is verified and the alien appears to be admissible except for lack of the required documents, consider a waiver under section **211(b)** for an LPR. When inspecting an alien who had previously been admitted as a refugee or granted asylum status and who had departed the United States without having applied for a refugee travel document, consider accepting an application for a refugee travel document in accordance with **8 CFR 223.2(b)(2)(ii)** for a refugee or asylee. Refer to **Chapters 13.2** and **17.5** for a discussion of this and other options for admitting returning residents.

If the claim is verified, but a waiver is not available or is not clearly warranted, such as when fraud was committed in obtaining status or upon entry, or in cases where the alien appears to have abandoned his or her residence, you may initiate removal proceedings under section **240** of the Act. Procedures for preparing for removal hearings and processing inadmissible LPRs are discussed in **Chapters 17.6** and **17.10**. Although the charging document, Form **I-862**, Notice to Appear, is the same for both inadmissible and deportable aliens, immigration officers performing inspections at a POE are authorized to issue a Notice to Appear only to arriving aliens, as defined in **8 CFR 1.1(q)**. If an LPR is not considered to be seeking admission, he or she is not an arriving alien. If a Notice to Appear is to be issued charging the returning resident as a deportable alien, the Notice to Appear must be issued by one of the authorizing officers listed in **8 CFR 239.1**, including port directors.

(3) Unverifiable Claim. If no record of the alien's lawful admission for permanent residence, grant of refugee status, admission as an asylee, or citizenship can be found after a reasonably diligent search, advise the alien that you are placing him or her under oath, or take a declaration as permitted in 28 U.S.C. 1746, and warn the alien of the penalties for perjury. Section 1746 of the Title 28 U.S. Code reads as follows:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him as true under penalty of perjury, and dated, in substantially the following form:

> - If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".

> - If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

The penalties for perjury contained in 18 U.S.C. 1621 (perjury generally) provide for fine and imprisonment of not more than 5 years, or both. The penalties for perjury contained in 18 U.S.C. 1546 (fraud and misuse of visas, permits, and other documents) provide for fine and imprisonment of not more than 10 years, or both.

If the alien declares under oath, pursuant to the advice above, that he or she is a citizen, LPR, refugee, or asylee, order the alien removed under section **235(b)(1)(A)** and refer to the immigration judge for review of the order. Complete Form **I-860** after completing all procedures in this chapter. Serve the Form I-860 on the alien. Serve Form **I-259** on the affected carrier, if



appropriate. Use Form **I-863**, checking Box #4, to refer the removal order to the immigration judge for review. The alien should be detained pending review of the order by the immigration judge. In the event an alien who has made a verbal claim to citizenship or to LPR, refugee, or asylee status declines to make a sworn statement, conclude the expedited removal process in the same manner as any other nonimmigrant in the same situation.

If the immigration judge determines that the individual is not a citizen or is an alien who has never been admitted as an LPR, refugee, or asylee, the expedited removal order will be affirmed and the alien removed. There is no appeal from the decision of the immigration judge. If the judge determines that the individual is a citizen, the process is terminated and the citizen is released. If the judge determines that the alien was once admitted as an LPR, refugee, or asylee, and that status has not been terminated, the judge will vacate the expedited removal order and the government may initiate removal proceedings under section **240**.

(f) Special Treatment of Unaccompanied minors. When a minor (a person under the age of eighteen) who is unaccompanied and appears to be inadmissible under section **212(a)(6)(C)** or **(7)** of the Act, officers should first try to resolve the case under existing guidelines. Existing guidelines permit granting a waiver, deferring the inspection, or employing other discretionary means, if applicable, including withdrawal of an application for admission.

(1) Withdrawal of application for admission by minors. Whenever appropriate, officers should permit unaccompanied minors to withdraw their application for admission rather than placing them in formal removal proceedings. In deciding whether to permit an unaccompanied minor to withdraw his or her application for admission, every precaution should be taken to ensure the minor's safety and well-being. Factors to be considered include the seriousness of the offense in seeking admission, previous findings of inadmissibility against the minor, and any intent by the minor to knowingly violate the law.

Before permitting a minor to withdraw his or her application for admission, the officer must be satisfied either that the minor is capable of understanding the withdrawal process, or that a responsible adult (relative, guardian, or in cases where a relative or guardian is not available, a consular officer) is aware of the actions taken and the minor's impending return. Officers must attempt to contact a relative or guardian either in the United States or in another country regarding the minor's inadmissibility whenever possible. A minor brought to the United States by a smuggler is to be considered an unaccompanied minor, unless the smuggler is an adult relative (parent, brother, sister, aunt, uncle, or grandparent) or legal guardian. If the smuggler is not a relative or guardian, he or she should not be consulted concerning the disposition of the minor's case.

The true nationality of the minor must be ascertained before permitting the minor to withdraw. Another factor to consider is whether the port of embarkation to which the minor will be returned is the country of citizenship of the minor. A minor may not be returned to or be required to transit through a country which may not be willing or obligated to accept him or her. If the minor is being returned to a third country through a transit point, officers must ensure that an immediate and continuous transit will be permitted.

When deciding whether to permit the minor to withdraw his or her application for admission, officers must also make every effort to determine whether the minor has a fear of persecution or return to his or her country. If the minor indicates a fear of persecution or intention to apply for asylum, or if there is any doubt, especially in the case of countries with known human rights abuses or where turmoil exists, the minor should be placed in removal proceedings under section **240** of the Act. If there is no possibility of a fear of persecution or return and the INS permits the minor to withdraw his or her application for admission, the consular or diplomatic officials of the country to which the minor is being returned must be notified. Safe passage can then be arranged, and after all notifications to family members and government officials have been made, the minor may be permitted to withdraw.

(2) Minors referred for section **240** proceedings. Except as noted below, if a decision is made to pursue formal removal charges against the unaccompanied minor, the minor will normally be placed in removal proceedings under section **240** of the Act rather than expedited removal. The unaccompanied minor will be charged under both section **212(a)(7)(A)(i)(I)** of the Act as an alien not in possession of proper entry documents and section **212(a)(4)** of the Act as an alien likely to become a public charge. This additional charge renders the minor subject to removal proceedings under section **240** of the Act. Other charges may also be lodged, as appropriate. As a general rule, minors should not be charged with section **212(a)(6)(C)** of the Act, unless circumstances indicate that the alien clearly understood that he or she was committing fraud or that the minor is knowingly involved in criminal activity



relating to fraud.

Minors who are placed in section **240** proceedings and who are not in expedited removal may either be released in accordance with the parole provisions, or placed in a DHS-approved juvenile facility, shelter, or foster care in accordance with existing juvenile detention policies and the Flores v. Reno settlement. At all stages of the inspections and removal process, officers should take every precaution to ensure that the minor's rights are protected and that he or she is treated with respect and concern. [See **Appendix 17-4**, policy memorandum discussing the Flores settlement.]

(3) Expedited removal of minors. Under limited circumstances, an unaccompanied minor may be placed in expedited removal proceedings. The minor may be removed under the expedited removal provisions only if the minor:

- has, in the presence of a DHS officer, engaged in criminal activity that would qualify as an aggravated felony if committed by an adult; or

- has been convicted or adjudicated delinquent of an aggravated felony within the United States or another country, and the inspecting officer has confirmation of that order; or

- has previously been formally removed, excluded, or deported from the United States.

If an unaccompanied minor is placed in expedited removal proceedings, the removal order must be reviewed and approved by the director of field operations, or person officially acting in that capacity, before the minor is removed from the United States. This is in addition to the normal supervisory approval required of all expedited removal cases.

(4)   Treatment of Minors during Processing. Officers should treat all minors with dignity and sensitivity to their age and vulnerability. Processing of minors should be accomplished as quickly as possible. Like all persons being detained at POEs, officers must provide the minors access to toilets, sinks, drinking water, food, and medical assistance if needed. Minors may not be placed in short-term hold rooms, nor may they be restrained, unless they have shown or threatened violent behavior, they have a history of criminal activity, or there is a likelihood the juvenile may attempt to escape. Unaccompanied minors should not be held with unrelated adults. Any detention following processing at the POE must be in accordance with the Flores v. Reno settlement.

(Paragraph (f) added 8/21/97; IN97-05)

(g) Minors accompanied by relatives or guardians. If formal proceedings are initiated against an accompanying adult relative or legal guardian, the minor should be placed in the same type of proceeding (i.e. expedited removal or **240** proceedings) as the adult. However, withdrawal of application for admission by the minor should be considered whenever appropriate, even though the relative or guardian may remain subject to formal removal proceedings.

(h) United Nations High Commissioner for Refugees monitoring guidelines. The United States has signed various international agreements accepting an obligation to protect refugees and asylum-seekers from return to persecution or torture, and to follow certain international standards in processing those needing protection. The organization that monitors compliance with these agreements and provides guidance on their implementation is the United Nations High Commissioner for Refugees (UNHCR). As such, the United States has a responsibility to cooperate with UNHCR's requests for access to processes involving those needing protection. Therefore, DHS believes it is appropriate for the UNHCR to observe, to the extent within the resources available to the UNHCR, the expedited removal process to make a fair and impartial assessment of the process.

For these reasons, full cooperation with visiting UNHCR delegations is essential. Below are general guidelines and procedures to follow regarding a visit from the UNHCR. While the guidelines concentrate on the limits of the UNHCR's access and potential problem areas, in our experience the UNHCR has approached site visits professionally and responsibly, providing us with positive comments and useful feedback, and problems are unlikely to arise during its site visits.



(1) <u>UNHCR requests.</u> The UNHCR has agreed to make all requests to observe the expedited removal process at POEs or the credible fear interview at detention facilities in writing to the Office of Field Operations. If any field office receives a request for access to the expedited removal process from a representative of the UNHCR, the field office should advise the representative to make the request to the Office of Field Operations.

Written requests from UNHCR to conduct a site visit must be received a minimum of two weeks in advance. CBP will consider written requests submitted less than two weeks in advance for only exceptional circumstances. The request will include the purpose and site (s) of the visit, the duration of the visit, the complete list of names of the UNHCR staff on the delegation, the title and official responsibilities of everyone on the delegation, the information about the person leading the delegation, and any special needs or requests. The Office of Field Operations will evaluate the request in consultation with the field and make a decision as quickly as possible.

Should there be a need to clarify or confirm the identities of visiting team members, local CBP staff will call the Office of Field Operations.

(2) <u>Scope of UNHCR's access to secondary inspection processing.</u> The UNHCR has agreed to maintain the confidentiality of any information to which it has access such as training materials and procedures manuals. Therefore, it can be given full access to tour the primary and secondary inspection areas, holding cells, food storage facilities, and other areas related to processing of expedited removal cases. While at the port, UNHCR representatives should be accompanied by a CBP officer, unless CBP has arranged for the representatives to talk confidentially with an alien. For safety reasons, the representatives will not be allowed to participate or be used as witnesses in baggage and personal effects search or body-pat-down search. Viewing of the baggage search may be allowed if there is no safety concern or threat to the representatives. The representatives should not be given access to computer databases or programs containing sensitive law enforcement information, but may be given a demonstration of certain programs in relation to the expedited removal process. The representatives may ask questions about the process, so long as their movements and the timing of their questions do not impede the processing of cases.

The port will designate a supervisor on the shift to whom the UNHCR team may direct questions about the processing. As time permits, the supervisor may arrange for the representatives to talk directly with line officers. During a secondary inspection, when possible, the representatives should be allowed to view the secondary inspection from an area (seated or standing) that would enable them to hear and see all participants.

The port will designate one or more secondary and primary officers on the shift to whom the UNHCR representatives may direct questions. Designation of these officers should be initially on a voluntary basis.

(3) <u>Interactions between UNHCR and aliens in secondary inspection.</u> If UNHCR representatives ask to sit in on interviews of either specific aliens or a random sample of aliens in secondary, the CBP officer should explain to the alien that the UNHCR representatives do not work for the U.S. Government, but work for the United Nations, and have asked to observe some interviews to understand the U.S. process. No more than two representatives may be present during the interview, and business cards will be provided to the alien after the interview is completed. The officer should explain that it is the alien's decision whether the UNHCR representatives are allowed to observe the interview or not, and that CBP will ask the same questions and follow the same procedures either way. If the alien does not want the UNHCR representatives to sit in on the interview, his or her wish should be respected. If the applicant requests to talk briefly and confidentially with the UNHCR representatives, he or she may do so after the officer finishes the secondary interview and process.

If the alien indicates that he or she does not want the presence of the representatives, and the representatives appear to be questioning that decision, a supervisor should be notified immediately and should support the alien's decision to be interviewed without UNHCR observers with no further discussion. The CBP supervisor will provide an explanation to the UNHCR delegation lead official that the interview will not continue with their participation. Additionally, the supervisor reserves the right to terminate the entire site visit, any part of an interview, or a particular portion of the site visit. A reason must be provided to the lead UNHCR official at the time of the termination. Prior to a decision to terminate the entire site visit, the supervisor must immediately advise the



Headquarters Field Operations point-of-contact through appropriate channels. The alien's agreement or refusal to have a UNHCR presence at the interview should not be factored into the officer's decision to refer a case for a credible fear interview.

If an alien agrees to be interviewed with the UNHCR representatives present, the UNHCR representatives may observe the interview, and will be given a few minutes at the end of the interview to communicate directly with the applicant. In general, the UNHCR representatives should not ask questions or make comments during the interview. The CBP officer may, however, at his or her discretion, allow the representatives to make a comment or ask a question if the officer believes that it is facilitating the progress of the interview. Any interruptions of the interview will be recorded in the sworn statement.

CBP is not responsible for interpreting the interview verbatim or locating an interpreter to provide a verbatim interpretation in such circumstances. If the CBP officer and the alien are communicating in a language other than English without the assistance of an interpreter, and the representatives do not understand the language, the officer should explain what is being stated or asked.

When the interview is concluded, the UNHCR representatives should be invited to communicate briefly with the applicant. Any questions or statements asked by the representatives or the applicant, and any responses, will be recorded in the sworn statement.

If the UNHCR team or the alien requests a brief private discussion, the request should be accommodated within the constraints of the facility. Normally the issues aliens bring up with the UNHCR are the same like those they bring up during secondary inspections, e.g.: when can they call a relative, how long does the process take, and so forth. This request should be noted on the sworn statement. Generally, the meeting should take place out of hearing, but not out of sight, of CBP staff. If the UNHCR team requires translation and is not able to locate its own telephonic interpreter quickly, an interpreter should be provided when feasible. The local Asylum office will have been notified that the UNHCR is conducting a site visit and can cover the cost of interpretation using a commercial interpreter service if necessary. However, if an interpreter cannot be located quickly and there are time constraints (such as finishing in time to put an applicant on a scheduled plane), the officer should consult with his or her supervisor to decide whether there are compelling reasons for delaying the process to provide the representatives time to obtain an interpreter.

If the UNHCR team reports back to the CBP officer, after a private conference, that the alien alleged abusive treatment, either by CBP, an airline employee, or a smuggler, a supervisor should be notified immediately and the alien should be asked further questions in the representatives' presence. If the UNHCR team indicates that the alien has expressed a fear during the private conference which was not expressed during the interview with the CBP officer, the officer should ask the alien, in the representatives' presence, whether the alien is afraid of or concerned about return and would like to discuss his or her situation privately with an asylum officer. The alien's answer to the above questions should be recorded in the sworn statement or in a memo to file.

If the alien appears unwilling to discuss the alleged claim of fear with the CBP officer, states that the UNHCR representatives misunderstood, or does not want to be detained for a credible fear interview, the officer should call the local Asylum office for guidance on whether to refer the alien for a credible fear interview.

(4) Follow-up. If serious problems or misunderstandings arise during the UNHCR site visit, a CBP supervisor should immediately contact the Headquarters Field Operations representative who set up the meeting. After the UNHCR visit is completed, the field office will provide the Office of Field Operations feedback on how the visit went and alert it to any issues which the UNHCR representative (s) might raise.

(Added IN 00-22.)

(h) Non-governmental organizations secondary inspection access guidelines.
Since the implementation of expedited removal, many non-governmental organizations (NGOs) have requested access to observe and monitor this process at POEs. It is the DHS policy to promote a fair and open process by granting such requests for access to the extent that the visits do not compromise fundamental law enforcement interests and confidentiality as well as privacy rights. The aim of this policy is to achieve a reasonable balance between providing access to government information and protecting fundamental law

b2

enforcement obligations and the individual interests of arriving aliens. The following guidelines provide the procedures and practices to be followed by field offices and POEs receiving requests for visits or tours of CBP inspection facilities and operations by NGOs. An NGO may be generally defined as a group of individuals outside of the public and for-profit sectors, usually established to serve the interests of their communities, of a particular target group, or the common good. This definition should be interpreted broadly, and may include local and international organizations, business and professional associations, chambers of commerce, and policy development and research institutes. It is not intended to include the media or persons or organizations whose intent is to provide legal representation to individuals during secondary inspection processing at the time of their visit.

(1) Requests for visits.

* Any request to visit an inspection facility or observe secondary immigration inspection processing must be made in writing to the director of field operations having jurisdiction over the POE to be visited. The request must be made sufficiently in advance of the proposed visit, normally at least two weeks, to allow coordination with all affected parties, including facility operators and other agencies as appropriate. Special tours by visiting dignitaries or other special interest groups may be arranged at the discretion of the director of field operations, or at the request of headquarters offices.

* The request will include the proposed purpose and site(s) of the visit, the duration of the visit, the full names of the organization and the proposed visitors, whether they will have any special needs or requests, and point of contact. The field office receiving the request, in consultation with the site to be visited, will make a prompt decision and notify the interested party either in writing or telephonically of that decision. Whenever possible, visitors should be provided with a copy of these guidelines prior to their arrival at the POE.

* The size of the group and the number and duration of visits permitted are to be determined by the director of field operations, based on operational and resource considerations. If the director of field operations, port director, or other official determines that the visit will have an adverse effect on port operations, staffing resources, or the confidentiality or integrity of the inspection process, the request may be denied, the visit postponed, or the terms of the visit limited in a way appropriate to the potential adverse effects. If the director of field operations feels that an excessive number of requests would have an adverse impact on operations, he or she may ask the NGOs to consolidate their requests for visits. The director of field operations may also deny, limit, or terminate a visit based on particular law enforcement or security concerns, but should not deny such requests as a routine matter.

* If the director of field operations denies the request, the requesting party will be notified, in writing, of the specific reasons for the denial.

* The field office will retain a record of all POE visit requests. The record will include, at a minimum, the number of requests made, the disposition of each request, the name of the organization and the number of participants in each visit, and the date on which each visit occurred. Field offices may include comments on significant incidents, impact on operations, or other relevant information.

(2) Scope of access.

* Visitors will be escorted through the facility at all times. They may be present only in parts of the inspection area that are authorized by the official escorting them. For safety concerns, they will not be allowed to participate in baggage searches or be used as witnesses in baggage or body searches. They may be permitted to view a baggage search, with the consent of the alien, unless the officer determines there may be a safety concern or threat.

* Visitors may be permitted to observe the overall immigration inspections process, both primary and secondary, in such a way that it does not interfere with port operations. The port director may designate a supervisor or officer to whom the visitor may direct questions about the processing. As time and circumstances permit, the port official may arrange for visitors to talk directly



to officers.

- Visitors may observe individual immigration secondary inspections of applicants for admission only with the consent of the applicant and the port officials. The port official will explain to the alien who the visitor is and what he or she wishes to observe. The alien's consent must be entirely voluntary, and should be noted in the sworn statement, if taken, or otherwise in the file. Visitors may not interfere with or interrupt the inspection or question applicants for admission. They may ask the inspector questions about the case being processed only when the alien is not present. Inspectors must not divulge any information about any secondary case that may compromise law enforcement confidentiality or the privacy of any alien. Visitors may not speak confidentially to an alien during the inspection process or while the alien is in CBP custody at the POE.

- CBP is not responsible for interpreting the interview verbatim for visitors or locating an interpreter to provide a verbatim interpretation in cases where the CBP officer and the alien are communicating without the assistance of an interpreter in a language other than English.

- Visitors may not have access to computer databases or programs containing sensitive law enforcement nature of the information, but may be given a demonstration of programs that are not law enforcement sensitive. They may not observe video display monitor outputs of systems data on screen or in print relating to specific applicants for admission.

- Visitors may not film, photograph, videotape, or audiotape POE operations, inspectors, or applicants for admission.

- CBP reserves the right to terminate the entire site visit, a particular portion of the site visit, or access to any part of an interview, if it determines that the visit has become disruptive to port operations or may in any way compromise the integrity of the inspection process. For safety reasons, port officials may remove visitors from the inspection area or terminate the visit if any visitor or applicant for admission becomes unruly or violent, or if any other safety hazard becomes apparent.

- Any violations of this policy by visitors to POEs will be documented in writing, and any significant incidents or interruptions will be reported to Headquarters Office of Field Operations through the chain of command.

b2

## 17.16 Members and Representatives of Terrorist Organizations. (Added IN98-04)

(a) General. Section **212(a)(3)(B)** of the INA, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996, Pub. L.**104-132** and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, added new grounds of inadmissibility applicable to members and representatives of terrorist organizations. Section **219** of the Act provides authority for the Secretary of State to compile and publish an official list of organizations whose members and representatives are subject to this ground of inadmissibility. The official list was published in the Federal Register on October 8, 1997. [See Appendix **17-5** of this manual.]

These new procedures are extremely important enforcement tools designed to keep such aliens out of the U.S. and prevent domestic terrorism. Some members and representatives of designated terrorist organizations may possess a visa issued prior to publication of the list of terrorist organizations. Such aliens are nonetheless inadmissible if they fall within the descriptions discussed above.

(b) Definitions.

(1) Representatives. Under Section **212(a)(3)(B)(i)(IV)** of the Act, an alien who is a "representative" of a designated terrorist organization is inadmissible. Section 212(a)(3)(B)(iv) of the Act states that the term"representative" includes: an officer, official or spokesman of an organization, and any person who directs, counsels, commands or induces an organization or its members to engage in terrorist activity.

If an alien falls within this definition, he or she is inadmissible. Evidence of past representative status is a highly probative, although not dispositive, factor which should be considered when determining if current representative status exists.

(2) Members. Under Section 212(a)(3)(B)(i)(V) of the Act, an alien who is a member of a designated terrorist organization is inadmissible if the alien "knows or should have known" the organization is a terrorist organization. The statute does not define "member." However, membership does not require actual participation in terrorist activities. Some organizations require that an individual take an oath or perform an act that is a prerequisite of membership, but some do not. The Service must determine whether an alien is member of a designated organization on a case-by-case basis. Factor relevant to determining membership include but are not limited to the following:

- Past membership without evidence that the alien terminated membership

- Acknowledgment of membership by the organization, by other members, or by the alien

- Actively working to further the organization's aims and methods

- Occupying a position of trust in the organization, either past or present



- Receiving financial support from the organization, such as a scholarship, salary or pensions

- Contributing money or other items of value to the organization

- Frequent association with other members

- Participation in the organization's activities, even if lawful

- Voluntarily displaying symbols of the group

- Receiving honors and awards given by the group

- Determination of membership by a competent court

These factors must be considered in their entirety, and some may not be sufficient in isolation to support a finding of membership. For example, while contributing money to an organization in itself does not necessarily indicate membership, it may indicate membership in certain situations, depending on the nature of the organization.

To make a finding of inadmissibility, the Service must determine that an alien is not only a "member" of a designated organization, but additionally, that the alien "knows or should have known" that the organization is a terrorist organization. This "mens rea" or "state of mind" determination should also be made on a case-by-case basis. Factors relevant to this determination are: the specific organization involved; classified or unclassified information regarding the alien's participation in the organization, including the alien's statement; and any other relevant information.

(c) Procedures. In order to implement these provisions, the following procedures must be strictly followed:

(1) The list of terrorist organizations will be distributed to all ports-of-entry and included in the Inspector's Field Manual. Port directors will ensure that all inspectors and other officers are familiar with and have ready access to the list at both primary and secondary inspection booths.

(2) Immigration inspectors who have reason to believe an applicant for admission may be a member or representative of an organization on the list must refer the applicant for secondary inspection. Inspectors may develop a suspicion concerning such membership as a result of questioning during primary inspection or as a result of lookout information or other intelligence. In any case where the secondary officer establishes inadmissibility under this provision, he or she must take a sworn statement addressing the factors described in paragraph (b).

(3) If the inspecting officer concludes that the alien is inadmissible, the officer must inform the alien that he or



she is inadmissible to the United States and complete processing for a removal hearing, withdrawal, or temporary removal, as appropriate and in accordance with outstanding instructions. [See Chapters 17.2, 16.6 and 17.7 of this manual.] The type of removal proceeding will depend on the alien's status and whether the evidence is classified or unclassified.

(4) Forward copies of all sworn statements and other relevant documentation to Headquarters, Office of Field Operations, attention: Counterterrorism Coordinator.

(5) The Counterterrorism Coordinator will take appropriate action, which may include consultation with other agencies, such as the Federal Bureau of Investigation and the Department of State.

## 17.17 Technical Notes. (Redesignated as 17.17, previously 17.16; IN98-04)

(a) [Reserved] (Removed by CBP 3-04)

(b) Inadmissibility after Alien Leaves Primary but Remains in Inspectional Area. There are occasions when an alien, after completing primary inspection, is intercepted by another CBP officer and is found to be inadmissible. Such alien may be held for removal proceedings if he or she has not left the confines of the federal inspection area, regardless of the fact that the passport may have been stamped "Admitted" and an I-94 issued. Case law has made it clear that an alien does not effect an "entry" into the United States for immigration purposes unless all of the following elements are present: (1) the alien is physically present in the territory of the United States; (2) the alien has been inspected and admitted for immigration purposes or the alien has actually and intentionally evaded inspection; and (3) the alien is free from official restraint. Correa v. Thornburgh, 901 F.2d 1166 (2d Cir. 1990); In re Dubbiosi, 191 F. Supp. 65 (E.D. Va. 1961); Matter of Pierre, 14 I & N Dec. 467 (BIA 1973) [See also **General Counsel Opinion 91-37**.]. Although the definition of "entry" is no longer defined in the INA, and has been replaced by the definition of "admission" and "admitted" in section **101(a)(13)**, the general provisions still apply in this context. (Revised by CBP 3-04)

## 17.18 Use of Interpreters and Interpreter Services.

(a) General. In the inspections process, an interpreter may be required to ensure that an alien being interviewed understands the process. The alien needs to be given an opportunity to respond to questions during a sworn statement and to be able to understand and respond to any charges and allegations brought against him or her. It is the responsibility of the officer to read and explain to the alien, in the alien's native language or in a language the alien understands, any determination regarding admissibility and/or removal from the United States. In an interview requiring an interpreter, the role of the interpreter is crucial and any misinterpretation can lead to an incorrect determination of an alien's admissibility.

During the expedited removal process, an interpreter may be required to ensure that the alien understands the allegations and the removal order. As part of the process, the applicant for admission is questioned and a sworn statement taken to establish inadmissibility and to ascertain that the alien has no fears or concerns about being returned to his or her home country or country of last residence. The officer needs to be aware of whether the alien requires an interpreter to convey any concerns or fears he or she may have. Any alien who indicates an intention to apply for asylum or a fear of persecution or torture may not be removed until an asylum officer interviews the alien to determine whether he or she has a credible fear of persecution or torture and warrants a full asylum hearing before an immigration judge.

The International Religious Freedom Act of 1998 (IRFA), PL 105-292, 112 Stat. 2787, section 603, seeks to safeguard aliens against the inadvertent use of interpreters who may have hostile biases. In particular, when interviewing possible asylum applicants, inspectors are



prohibited from using airline personnel or other interpreters provided by the airline if the airline is owned by a government that is "known to be involved in practices which would meet the definition of persecution under international refugee law." Since an inspector may not actually know which foreign carriers are privately owned and which are state owned, inspectors should use other officers or commercial interpreters whenever possible.

(b) Interpretations and Translations. Ports of entry (POEs) should accommodate, whenever possible, special requests from an alien, such as a request for a male or female interpreter or request for an interpreter with a specific dialect or from a specific part of the country. Officers are to monitor the quality of interpretation the alien and the translation. If a problem with the interpretation/translation persists, a new interpreter shall be obtained.

Officers are also responsible for informing the interpreter of their role in the process. Below are some guidelines to be aware of when using interpreters.

(1) Interpreters and Translators. If the alien being inspected cannot speak English well enough to fully understand the questions and answer them without difficulty, the alien must be provided with an interpreter. While some aliens can speak and understand English well enough to be interviewed without an interpreter, many aliens may feel more comfortable with an interpreter during the interview.

It is important to know who is qualified to serve as an interpreter and who is not. Officers may use another officer who is fluent in the alien's language, a commercial interpreter services company, a family member, another passenger, an employee or representative from an airline that is not foreign-owned, or on a limited basis, the legacy Immigration and Naturalization Service (INS) New York Interpreters Unit. In sensitive cases, particularly those involving expedited removal, officers should use professionally trained and certified interpreters, rather than family members, other passengers, or airline employees.

(2) Beginning the Interview. Before an interview with an alien, the officer shall emphasize to the interpreter (whether it be another officer, contract interpreter, family member, airline employee, or other individual) the importance of interpreting verbatim, without adding or omitting any information. If a translation of a form(s) in the alien's language is needed, the officer will provide the interpreter with a copy of the form(s), either by physically handing the form to the interpreter, or by faxing a copy of the form(s) to the interpreter before the interview takes place, if the interpretation is being conducted telephonically.

Officers should stress to interpreters the confidentiality of all information discussed, and that the interpreter must remain neutral and objective throughout the interview. The interpreter should also be told that the interviewer or alien may ask for clarification whenever necessary.

(3) Interpreter's Certification. Currently there is no standardized interpreter's certification form. Therefore, a statement must be added at the bottom of the sworn statement. With an expedited removal case, an interpreter's certification may be added at the bottom of the Form I-867B (i.e.; " I _____ certify that I have literally and fully translated the questions asked by the officer into the _____ language and that I truthfully, literally and fully translated the answers to such questions into English.").

(4) Role of the Interpreter. The role of the interpreter is an important one. Interpreters allow the two parties to communicate with each other. Any misinterpretation may result in the applicant for admission being admitted, detained or removed in error. The fundamental role of the interpreter is to faithfully translate everything that is said, and nothing else. The interpreter guidelines specified below do not constitute an exhaustive list but are considered basic interpreter requirements.

•   The interpreter must be fluent in both English and a language the alien fully understands



- The interpreter is to remain neutral and impartial.
- The interpreter must not engage in conversation with the alien during the interview.

b2

## Inspector's Field Manual

interview.

- The interpreter must interpret verbatim using the officer and alien's choice of words, rather than the interpreter's choice of words.
- The interpreter should advise the officer if certain terminology cannot be interpreted verbatim and that an interpretation that will accurately convey the meaning of what is being said will be used instead.
- The interpreter should not to try to resolve ambiguities or to paraphrase or summarize the exchange with the alien.
- The interpreter should use the same grammatical voice as the speaker (e.g., "I came to visit my family" rather than "He says he came to visit his family").
- The interpreter is not to adopt the role of inspector or take on a primary questioning role, or to indicate in any way his or her opinion of what the alien is saying.

(5) Competency of the Interpreter. Competency of the interpreter is not always easy to determine. There are a number of signs that indicate that there may be miscommunication or that the interpreter is having difficulty interpreting. The alien may indicate non-verbally that he or she is confused or does not understand. It is important that the officer look for signs of miscommunication between the alien and the interpreter. Below are some indications that misinterpretation exists:

- Response to the officer's question does not answer the question or only partially answers the question.
- Officer recognizes words not being interpreted.
- Interpreter uses many more words to interpret the question than the question appears to have.
- Lengthy response from the alien is interpreted from the interpreter as a very brief response.
- There is back-and-forth dialogue between the interpreter and the alien.
- The alien indicates non-verbally that he or she is confused, concerned, or does not understand.

If the officer notices any indication that the alien and/or interpreter do not fully understand each other, or if the officer and interpreter do not fully understand each other, the officer must stop the interview and contact another interpreter as soon as possible. The officer will note on the sworn statement or in a memo to the file that a second interpreter was obtained and include the reason. The officer, in consultation with the supervisor, has the discretion to obtain another interpreter for the interview. A statement/question should be added to the sworn statement to verify that the alien fully understands and feels comfortable with the interpreter (i.e., "Do you understand and are you satisfied with the translation provided to you?")

(6) Factors Affecting the Accuracy of the Interpretation.

## Inspector's Field Manual

- The interpreter may not be sufficiently competent in English or the other language.
- The interpreter may have biases.
- The interpreter may have difficulties interpreting from one language to another.
- The alien and interpreter may be communicating through a second language.
- The alien and interpreter may speak different versions of a language.
- Either the interpreter or the alien may exhibit unprofessional behavior.
- The alien may not know how to best communicate through an interpreter.
- There may be cultural differences between interpreter and alien.
- The disposition of the interpreter may not foster good communication.

(7) Ways to Facilitate the Interpretation Through an Interpreter.
- Address the alien directly, not the interpreter.
- Avoid conversations with the interpreter in front of the alien that are not interpreted to the alien.
- Be conscious of your speech patterns.
- Choose your words carefully and avoid idioms.
- Be conscious of the use of certain pronouns and avoid them if possible (i.e.; he, she, they). It is better to use words that denote relationship or refer specifically to an individual (by using name, position, etc.) rather than certain pronouns.
- Speak clearly, and when necessary, speak slowly.
- Ask straightforward questions and avoid making statements disguised as questions.
- Keep questions clear and simple, asking specific questions one at a time.
- Break down what is to be said into reasonable amounts of information.
- Ask the alien to break his or her statements into short segments so the interpreter can interpret accurately.
- Repeat the question/statement slowly or rephrase it if the interpreter does not appear to understand.
- Check with the interpreter to be sure that he or she understands what is being said, particularly at the beginning of the interview.
- Speak with both the interpreter and alien as soon as it appears that there is a problem in interpretation.
- Remind the interpreter of his or her role when necessary during the interview.

(8) Ending the interview. Before ending the interview with the alien and the interpreter, the officer shall stress to the alien the need for any information relevant to the case and address the alien's questions and concerns. With an expedited removal case, the mandatory closing questions on the Form I-867B must be asked. An interpreter's certification statement should be added at the bottom of the Form I- 867B (see subsection "(c)" above, "Interpreter's Certification"). The sworn statement must be read back to the alien, and a copy of the statement given to the alien after the alien and the officer(s) sign it. If the alien is being referred for a credible fear interview, the officer

I-LINK

**Inspector's Field Manual**

must provide the alien with the Form M-444, Information About Credible Fear Interview. This information should be provided while the interpreter is available, in order to ensure that the alien understands the information and to address any questions the alien may have. The 3/22/99 revision of Form M-444 has been translated into Mandarin, Arabic, Haitian Creole, French, and Albanian. If available, the officer should provide the alien with a Form M-444 in the language the alien understands. The officer must make sure that all needed interpretations and translations are completed before dismissing the interpreter/translator.

(c) Interpretation/Translation Services. When the officer cannot find an interpreter / translator at the POE, he or she should use an interpreter service. Each field office should have arrangements with one or more commercial interpreter services for telephonic interpretations 24 hours a day, 7 days a week. These services either have a contract with the agency or accept payment with a government credit card. Certified interpreters may also be available on a limited basis through the legacy INS's New York Interpreters Unit.

Following is a list of available commercial interpreter services. Others companies may also be available.

| | | |
|---|---|---|
| AT&T Language Line Services | (800) 419-9206 | |
| CyraCom International | (800) 713-4950 | (520) 745-9447 |
| Language Learning Enterprises | (800) 234-0780 | |
| Language Line Services | (800) 874-9426 | (800) 523-1786 |
| Language Services Associates | (800) 305- 9673 | |
| TransPerfect Translations: | (212) 689-5555 | |

## Chapter 18:  Criminal Prosecution (Added INS - TM2)

18.1   General
18.2   Criminal Offenses Under the INA
18.3   Types of Arrest
18.4   Arrest Authority
18.5   Arrests Based on IBIS or National Crime Information Center (NCIC)   Information
18.6   Warrantless Searches and Seizures
18.7   Degrees of Suspicion
18.8   Criminal Action Procedures

I-LINK

# EXHIBIT K

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Ali Khoshbakhti Vayeghan,     )   Case No. CV 17-0702

       Petitioner, )

     v.      )

Kelly, et al.,        )

       Respondents. )

_____ )

  On January 28, 2017, Petitioner Vayeghan filed a Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, an Order to Show Cause re Preliminary Injunction, and an *Ex Parte* Application for Temporary Restraining Order ("TRO") staying his removal from the United States, and ordering his release from the custody of the Department of Homeland Security. [Doc. ##1, 2.] Before the Court could rule on the TRO, he was placed on a flight to Dubai to be removed to Iran. On January 29, 2017, he filed an Amended *Ex Parte* Application for Temporary Restraining Order ("Amended TRO"), which is currently before the Court. [Doc. # 4.]

Federal Rule of Civil Procedure 65 governs the issuance of TROs and preliminary injunctions, and courts apply the same standard to both. *See Credit Bureau Connection, Inc. v. Pardini*, __ F. Supp. 2d __, 2010 WL 2737128, at *5 (E.D. Cal. July 12, 2010) (citing *Ne. Ohio Coal. for the Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The purpose of such injunctive relief is to preserve the rights and relative positions of the parties, *i.e.*, the *status quo*, until a final judgment issues. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).

Having reviewed and considered Petitioner's written submissions, the Court finds that:

1. Petitioner has demonstrated a strong likelihood of success in establishing that removal violates the Establishment Clause, the Immigration and Nationality Act, and his rights to Equal Protection guaranteed by the United States Constitution. *See* 8 U.S.C. §§ 1151, 1152(a)(1)(A) ("[N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."); *Johnson v. California*, 543 U.S. 499, 506–508 (2005); *Board of Educ. Of Kiryas Joel Vill. Sch. Dist. V. Grumet*, 512 U.S. 687, 696, 702–703 (1994); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–67 (1977).

2. There is a strong likelihood that Petitioner is likely to suffer irreparable harm in the absence of interim injunctive relief.

3. The balance of equities weighs sharply in favor of Petitioner and granting interim injunctive relief.

4. The Court must consider the public interest in upholding constitutional rights. *Preminger v. Pincipi*, 422 F.3d 815, 826 (9th Cir. 2005). Given the constitutional rights at issue in this case, interim injunctive relief is in the public interest.

In light of the foregoing, **IT IS HEREBY ORDERED THAT**:

1. Respondents are enjoined and restrained from barring Petitioner's return to the United States.

2. Respondents shall transport Petitioner back to the United States and admit him under the terms of his previously approved visa.

3. Respondents shall communicate the terms of this Court's order immediately to officers in Dubai, and to authorities in the airport in Dubai holding Petitioner on Respondents' orders.

4. Respondents shall file their opposition to Petitioners' *Ex Part*e Application by February 3, 2017. Petitioner shall file her reply by February 7, 2017.

5. Respondents shall appear before the assigned judge on February 10, 2017 at 9:30 a.m. to show cause why the preliminary injunctive relief sought in the *Ex Parte*

6. Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction should not be granted.

**IT IS SO ORDERED.**

DATED:  January 29, 2017

*Dolly M. Gee*

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

DATED:  January 29, 2017

_____

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE