## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

HAMEED KHALID DARWEESH and
HAIDER SAMEER ABDULKHALEQ
ALSHAWI,

        Petitioners,

v.

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"); JOHN KELLY, Secretary of DHS;
KEVIN K. MCALEENAN, Acting
Commissioner of DBP; and JAMES T.
MADDEN, New York Field Director, CBP,

        Respondents.

Case No. 17 Civ. 480 (AMD)

Date: February 15, 2017

## BRIEF OF *AMICI CURIAE* NONGOVERNMENTAL ORGANIZATIONS AND INTERNATIONAL LAW SCHOLARS IN SUPPORT OF THE PLAINTIFFS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................iii

INTEREST STATEMENT OF *AMICI CURIAE* .................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 1

ARGUMENT ........................................................................................................................... 3

    I.  International Treaties and Customary International Law Are Relevant to the Interpretation of the Constitutional Provisions and Legislation Applicable in This Case.................................................................................................................... 3

    II.  The Executive Order Discriminates on the Basis of Religion in Violation of the Fifth Amendment Equal Protection Right and the Religious Freedom Restoration Act of 1993 .................................................................................................. 6

        A.  Applicable Treaties and Customary International Law .................................................6

        B.  The Executive Order Is Inconsistent with U.S. Nondiscrimination Obligations on the Basis of Religion Under International Law..................................10

        C.  The Fifth Amendment and Religious Freedom Restoration Act of 1993 Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law ........................................................................................................11

    III.  The Executive Order Discriminates on the Basis of National Origin in Violation of the Fifth Amendment Equal Protection Clause and the Immigration and Nationality Act................................................................................................................ 13

        A.  Applicable Treaties and Customary International Law ...............................................13

        B.  The Executive Order Is Inconsistent with U.S. Nondiscrimination Obligations on the Basis of National Origin Under International Law ......................14

        C.  The Fifth Amendment Equal Protection Duty and Immigration and Nationality Act Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law..............................................................................16

    IV.  The Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act, the Administrative Procedures Act, and the Foreign Affairs Reform and Restructuring Act of 1998 Should Be Interpreted to Prohibit the Arbitrary Detention of Visa Holders and Exclusion of Refugees.................................... 17

        A.  Applicable Treaties and Customary International Law ...............................................17

        B.  The Executive Order Is Inconsistent with U.S. Obligations Under International Law Relating to Arbitrary Detention and Exclusion of Refugees.....................................................................................................................20

        C.  The Due Process Clause and Relevant Statutes Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law ...........................22

CONCLUSION....................................................................................................................... 25

APPENDIX............................................................................................................................. 27

# TABLE OF AUTHORITIES

**U.S. Cases**                                                                         **Page**

*Boumediene v. Bush*, 553 U.S. 723 (2008) ................................................................12
*F. Hoffmann-La Roche Ltd. v Empagran S.A.*, 542 U.S. 155 (2004) ...........................5
*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)..............................................5, 19
*Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) .........................................................23
*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ...........................................................12
*Lawrence v. Texas*, 539 U.S. 558 (2003) ..................................................................12
*Matthews v. Diaz*, 426 U.S. 67 (1976)......................................................................23
*Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)......................................5
*Paquete Habana*, 175 U.S. 677 (1900).......................................................................5
*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................23
*Sale v. Haitian Centers Council*, 509 U.S. 155 (1994)................................................5
*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................................22
*Talbot v. Seeman*, 5 U.S. (1 Cranch) 1 (1801) ...........................................................5
*United States v. Salerno*, 481 U.S. 739 (1987) .........................................................22
*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801) .................................5
*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1994)...........................................12
*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..................................................................22

**Constitution and Statutes**

U.S. Constitution, art. II...............................................................................................5
U.S. Constitution, art. VI.........................................................................................3, 6
U.S. Constitution, amend. V .............................................................................. *passim*

Title 5, U.S. Code:
        Section 706.............................................................................................24

Title 8, U.S. Code:
        Section 1101....................................................................................16, 70
        Section 1152..............................................................................................16
        Section 1158..............................................................................................23
        Section 1182..............................................................................................16
        Section 1187..............................................................................................14
        Section 1229..............................................................................................23
        Section 1231..............................................................................................23

Title 42, U.S. Code:
        Section 2000bb-1 ......................................................................................13

Title 50, U.S. Code:
    Sections 21-24.................................................................................................14

**Legislative History**

Congressional Record, Volume 138:
    S4781-01 ...................................................................................................3, 6
Congressional Record, Volume 140:
    S7634-02 ........................................................................................................13

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or
    Punishment, 1990, Hearing Before the Comm. on Foreign Relations, U.S. Senate,
    101st Cong. (1990), at 8...................................................................................4

Senate Comm. on Foreign Relations, Report on International Convention on the
    Elimination of All Forms of Racial Discrimination, S. Exec. Rep. No. 103-29, at
    25 (1994).........................................................................................................4

Sen. Exec. Rpt. 101-30 (1990)........................................................................................3

**Executive Orders**

Executive Order 13,769: Protecting the Nation from Foreign Terrorist Entry into the
    United States (Jan. 27, 2017), *at* https://www.whitehouse.gov/the-press-
    office/2017/01/27/executive-order-protecting-nation-foreign-terrorist-entry-
    united-states .......................................................................................... *passim*

**Treaties**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, June 26, 1987, 1465 U.N.T.S. 113....................................................8
Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 ....... 3, 18, 22-23
Protocol relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606
    U.N.T.S. 267 ...................................................................................................3
International Convention on the Elimination of All Forms of Racial Discrimination,
    Dec. 21, 1965, G.A. Res. 2106 (XX), Annex, 660 U.N.T.S. 195.......................7, 14
International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171
    (1976)..................................................................................................... *passim*

**International Decisions, Awards, and Communications**

*A v. Australia*, U.N. Hum. Rts. Comm., Comm. No. 560/1993 (Apr. 30, 1997), U.N.
    Doc. CCPR/C/59/D/560/1993................................................................................18
*Ahmadou Sadio Diallo Case (Rep. of Guin. v. Dem. Rep. of Congo)*, 2010 I.C.J. Rep.
    639..................................................................................................................17

*Haitian Center for Human Rights v. United States*, Case 10.675, Inter-Am. Comm'n
    H.R., Rep. No. 51/96, para. 157, OEA/Ser.L/V/II.95, doc. 7 rev. at 550 (1997) ..................20
Report on Immigration in the United States: Detention and Due Process, Inter-Am.
    Comm'n. on Hum. Rts., OEA/Ser.L/V/II., Doc. 78/10 (Dec. 30, 2010) ................................19
*Torres v. Fin*, U.N. Hum. Rts. Comm, Comm. No. 291/1988 (Apr. 2, 1990), U.N. Doc.
    CCPR/C/38/D/291/1988 ................................................................................................................18

## International Declarations

American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX (1948),
    Basic Documents Pertaining to Human Rights in the Inter-American System,
    OEA/Ser.L/V/I.4 rev. 13, at 13 (2010) .......................................................................................9
Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 at 71
    (1948)..........................................................................................................................................9

## Other International Materials

Committee Against Torture
    Gen. Comment No. 2, U.N. Doc. CAT/C/GC/2 (2008)..........................................................19
Human Rights Committee
    Gen. Comment No. 15 (1986), U.N. Doc. HRI/GEN/1/Rev.1, at 18 (1994)...........................9
    Gen. Comment No. 18, U.N. Doc. HRI/GEN/1Rev.1 at 26 (1994) ...............................7, 9, 15
    Gen. Comment No. 35, U.N. Doc. CCPR/C/GC/35 (2014) .................................................. 7-8
State Reports—Convention Against Torture—United States of America, U.N. Doc.
    CAT/C/28/Add.5 (Feb. 9, 2000) ..................................................................................................5
U.N. Econ. & Soc. Council, Report of the Working Group to the Economic and Social
    Council, Dec. 19, 1997, U.N. Doc. E/CN.4/1998/44...............................................................18
U.N. Human Rights Council, Report of the Working Group on Arbitrary Detention
    Dec. 24, 2012, U.N. Doc. A/HRC/22/44 ...................................................................................18
U.N. Special Rapporteur on Torture, Interim Report of the Special Rapporteur on
    Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, at 14-
    16, paras. 38-43, Aug. 7, 2015, U.N. Doc. A/70/303 ..............................................................20

## News Reports

David Brody, *President Trump Says Persecuted Christians Will Be Given Priority as
    Refugees*, CBN N., Jan. 27, 2017, *at* http://www1.cbn.com/content/brody-file-
    exclusive-president-trump-says-persecuted-christians-will-be-given-priority ........................11
Glenn Kessler, *The Number of People Affected by Trump's Travel Ban: About 90,000*,
    Wash. Post, Jan. 30, 2017, at https://www.washingtonpost.com/news/fact-
    checker/wp/2017/01/30/the-number-of-people-affected-by-trumps-travel-ban-
    about-90000/?utm_term= .8c582fca9542 .................................................................................10
Evan Perez, Pamela Brown & Kevin Liptak, *Inside the Confusion of the Trump
    Executive Order and Travel Ban*, CNN, Jan. 28, 2017, *at*
    http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/ ........................................21

Maquita Peters & Colin Dwyer, *Federal Judge Stays Deportations, Blocking Part of Trump's Immigration Order*, NPR, Jan. 28, 2017, *at* http://www.npr.org/sections/thetwo-way/2017/01/28/512158238/arrivals-to-u-s-blocked-and-detained-as-trumps-immigration-freeze-sets-in ...................................................21

Rebecca Savransky, *Giuliani: Trump asked me how to do a Muslim ban 'legally,'* THE HILL, Jan. 29, 2017, *at* http://thehill.com/homenews/administration/ 316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally ....................................11

Betsy Woodruff, *White House Lowballs Impact of Trump Ban*, THE DAILY BEAST, Jan. 30, 2017, *at* http://www.thedailybeast.com/articles/2017/01/30/white-house-lowballs-impact-of-trump-ban.html...........................................................................21

**Other Sources**

Central Intelligence Agency, World Factbook, *at* https://www.cia.gov/library/publications/the-world-factbook/geos/xx.html ..........................................10

Aoife Duffy, *Expulsion to Face Torture?* Non-refoulement *in International Law*, 20 INT'L J. REFUGEE L. 373 (2008) .............................................................................19

Joan Fitzpatrick, *The International Dimension of U.S. Refugee Law*, 15 BERK. J. INT'L L. 1 (1997) ..................................................................................................................20

Bill Frelick, *"Abundantly Clear": Refoulement*, 19 GEO. IMMIGR. L.J. 245 (2004) .....................20

Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 THE PAPERS OF ALEXANDER HAMILTON 33 (Harold C. Syrett ed. 1969)...........................................6

Hurst Hannum, The Status of the Universal Declaration of Human Rights in National and International Law, 25 GA. J. INT'L & COM. L. 287 (1995/96) ......................................9, 19

Joint Declaration of National Security Officials, *Washington v. Trump*, No. 17-35105 (9th Cir. 2017), *available at* https://www.aclu.org/legal-document/state-washington-v-trump-declaration-national-security-officials ....................................22

Thomas David Jones, *International Decision: Sale v. Haitian Centers Council, Inc.*, 88 AM. J. INT'L L. 114 (1994)...................................................................................20

Statement by NSC Spokesperson Bernadette Meehan on the U.S. Presentation to the Committee Against Torture, Nov. 12, 2014, *at* https://obamawhitehouse.archives.gov/the-press-office/2014/11/12/statement-nsc-spokesperson-bernadette-meehan-us-presentation-committee-a. ..................................20

Theodor Meron, *Extraterritoriality of Human Rights Treaties*, 89 AM. J. INT'L L. 78 (1995)....................................................................................................................20

Alex Nowrasteh, Cato Institute, *Terrorism and Immigration: A Risk Analysis*, No. 798, Sept. 13, 2016, *at* https://object.cato.org/sites/cato.org/files/pubs/ pdf/pa798_2.pdf ....................................................................................................................14, 22

Alex Nowrasteh, Cato Institute, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Jan. 26, 2017, *at* https://www.cato.org/blog guide-trumps-executive-order-limit-migration-national-security-reasons. ..........................15

Open Letter from International Lawyers to the peoples of Europe, the European Union, EU Member States and their representatives on the Justice and Home Affairs Council (Sept. 28, 2015), *at* http://ohrh.law.ox.ac.uk/wordpress/wp-content/uploads/here.pdf...............................................................................................20

Jordan J. Paust, *In Their Own Words: Affirmations of the Founders, Framers, and Early Judiciary Concerning the Binding Nature of the Customary Law of Nations*, 14 U.C. DAVIS L. REV. 205, 240-45 (2008).............................................................6

Edward J. Ramotowski, Dep'y Assist. Sec'y of State, U.S. Dep't of State, Memorandum of Jan. 27, 2017, *available at* http://www.politico.com/ f/?id=00000159-f6bd-d173-a959-ffff671a0001 ...................................................20

*Restatement (Third) of the Foreign Relations Law of the United States* .......................................5

Donald J. Trump Statement on Preventing Muslim Immigration, Dec. 7, 2015, *at* https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration....................................................................................11

Donald J. Trump, *Politico: Trump Is Doing 'Exactly' What He Promised on the Campaign Trail*, Jan. 28, 2017, *at* https://www.donaldjtrump.com/ media/politico-trump-is-doing-exactly-what-he-promised-on-the-campaign-trail ...........................................11

# INTEREST STATEMENT OF *AMICI CURIAE*

The international law scholars specializing in public international law and international human rights law whose views are represented in this *amicus* brief are members of the International Human Rights Committee of the International Law Association, American Branch and the Human Rights Interest Group of the American Society of International Law,[1] as well as university professors and practicing lawyers with expertise in these subjects. The nongovernmental organizations whose views are represented in this brief have expertise in civil rights law, immigration law, or international human rights law. They submit this brief to vindicate the public interest in ensuring a proper understanding and application of the international human rights law relevant to this case. A list of the nongovernmental organizations and individual scholars is set out in the Appendix.

The undersigned are the sole authors, are not parties in this case, and have received no compensation from any party to this case. Plaintiffs have consented to the filing of this brief, and defendants have stated that they "neither consent to, nor oppose" it.[2]

# SUMMARY OF ARGUMENT

International law is part of U.S. law and must be faithfully executed by the President and enforced by U.S. courts except when clearly inconsistent with the U.S. Constitution or legislation adopted by Congress. The United States is a party to and bound by several international human rights treaties relevant to the legality of Executive Order 13,769 of January 27, 2017 ("EO"). Sections 3 and 5 of the EO violates the duties of (1) nondiscrimination on the basis of religion and (2) national origin, (3) observing due process of law and protecting from arbitrary detention all

---

[1] This brief represents the opinion of the Committee and Interest Group members, but not necessarily that of the American Society of International Law, the International Law Association ("ILA"), or the ILA American Branch.

[2] Email from Steven A. Platt, Trial Attorney, U.S. Dep't of Just., to Aaron X. Fellmeth (Feb. 6, 2017).

persons within U.S. jurisdiction, and (4) refraining from excluding or expelling refugees without due consideration of their circumstances, their status, or the potentially dire consequences to them. U.S. obligations under international human rights law reinforce constructions of the Fifth Amendment to the U.S. Constitution that prohibit discrimination based on religion or national origin against U.S. visa holders, U.S. visa applicants, and refugees. Moreover, the Fifth Amendment prohibits the arbitrary detention and arbitrary exclusion of these same groups without due process of law once under U.S. jurisdiction, particularly when that provision is read consistently with U.S. obligations under international law. The Religious Freedom Restoration Act, the Immigration and Nationality Act, the Administrative Procedure Act, and the Foreign Affairs Reform and Restructuring Act of 1998 should likewise be read in harmony with these obligations, which reinforce the conclusion that the statutes also forbid discrimination and denials of due process of the type mandated by sections 3 and 5 of the EO.

**ARGUMENT**

**I.**     **International Treaties and Customary International Law Are Relevant to the Interpretation of the Constitutional Provisions and Legislation Applicable in This Case**

This brief will explain the relevant provisions of international human rights law binding on the United States and applicable to the facts and claims before the Court regarding Executive Order 13,769: Protecting the Nation from Foreign Terrorist Entry Into the United States of January 27, 2017 (hereinafter, the "EO").  International law is relevant to this case because the Supremacy Clause of the U.S. Constitution makes treaties part of U.S. law.  Customary international law is also part of U.S. law under Supreme Court precedent and enforceable by U.S. courts.

Under the Supremacy Clause of the Constitution, "treaties made . . . under the authority of the United States, shall be the supreme law of the land, and judges of every state shall be bound thereby."[3]  Although the Constitution does not require legislation prior to treaties taking legal effect, the Supreme Court distinguishes between self-executing and non-self-executing treaties. The Senate or the President have declared that all major human rights treaties to which the United States is a party are non-self-executing,[4] except the applicable provisions of the Refugee Convention, which are self-executing.[5]  Regardless of the accuracy of this interpretation of the treaties, by ratifying them, the United States bound itself by the treaties' own terms to provide judicial or other remedies for violations of treaty obligations.[6]  Thus, even if the treaty provisions

_____

[3] U.S. Const. art. VI, cl. 2.

[4] *See, e.g.*, 138 Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992) (International Covenant on Civil and Political Rights); Sen. Exec. Rpt. 101-30, Resolution of Advice and Consent to Ratification (1990), at II(2) (Convention Against Torture).

[5] Convention Relating to the Status of Refugees art. 33, July 28, 1951, 189 U.N.T.S. 137 [hereinafter "1951 Refugee Convention"]. Although the United States did not ratify the Convention itself, it acceded to the 1967 Protocol, by which it became bound by articles 2 through 34 of the 1951 Convention. Protocol relating to the Status of Refugees art. 1, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

[6] *See, e.g.*, International Covenant on Civil and Political Rights art. 2(2), Dec. 19, 1966, 999 U.N.T.S. 171 (1976) [hereinafter "CCPR"].

themselves are interpreted as not directly enforceable in U.S. courts, the rights they grant must be reflected in any interpretation of the Constitution, existing law, or implementing legislation.

The human rights treaties applicable in this case contain rules binding on U.S. courts for another reason. In those cases in which Congress has not enacted implementing legislation, the U.S. government has uniformly taken the position that the U.S. Constitution and legislation already put the United States in compliance with the human rights treaties to which it is a party.[7] For example, when submitting human rights treaties to the Senate for its advice and consent, both Presidents George W. Bush and William Clinton assured the Senate that the United States could and would fulfill its treaty commitments by applying federal constitutional and statutory law. During Senate hearings on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"),[8] the State Department Legal Advisor told the Senate: "Any public official in the United States, at any level of government, who inflicts torture . . . would be subject to an effective system of control and punishment in the U.S. legal system."[9] Similarly, with respect to the International Convention on the Elimination of All Forms of Racial Discrimination ("CERD"),[10] the Clinton Administration told the Senate: "As was the case with the prior treaties, existing U.S. law provides extensive protections and remedies sufficient to satisfy the requirements of the present Convention."[11] The Senate relied on these assurances as a basis for its consent to ratification. Courts construe federal constitutional and statutory law to be consistent with the requirements of human rights treaties because the Senate consented to ratification on the basis of executive branch assurances that the United States would fulfill its treaty commitments in the application of existing federal constitutional and statutory law.

---

[7] *See, e.g.*, U.N. Doc. CAT/C/28/Add.5, paras. 58-60 ("Where domestic law already makes adequate provision for the requirements of the treaty and is sufficient to enable the United States to meet its international obligations, the United States does not generally believe it necessary to adopt implementing legislation.").

[8] June 26, 1987, 1465 U.N.T.S. 113.

[9] Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, 1990, Hearing Before the Comm. on Foreign Relations, U.S. Senate, 101st Cong. (1990), at 8.

[10] Dec. 21, 1965, G.A. Res. 2106 (XX), Annex, 660 U.N.T.S. 195.

[11] Senate Comm. on Foreign Relations, Report on International Convention on the Elimination of All Forms of Racial Discrimination, S. Exec. Rep. No. 103-29, at 25-26 (1994).

This conclusion comports with a core principle of statutory construction announced by the Supreme Court in *Murray* v. *The Schooner Charming Betsy*: "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."[12] That doctrine has been consistently and recently reaffirmed by the Supreme Court,[13] and, in *Filartiga v. Pena-Irala*, the U.S. Court of Appeals for the Second Circuit confirmed that merely because a treaty is not self-executing does not imply that the rule it establishes is irrelevant, if the rule is embodied in customary international law.[14] As the U.S. government acknowledged to the United Nations Committee Against Torture: "Even where a treaty is 'non-self-executing,' courts may nonetheless take notice of the obligations of the United States thereunder in an appropriate case and may refer to the principles and objectives thereof, as well as to the stated policy reasons for ratification."[15] This is particularly important because both the Executive and Legislative Branches rely on the courts to uphold their interpretations of U.S. law as consistent with U.S. obligations under treaties and customary international law.

Customary international law is directly enforceable in U.S. courts without implementing legislation.[16] In *The Paquete Habana*, the Supreme Court held that customary international law "is part of our law" and directly enforceable in courts when no conflicting treaty, legislative act, or judicial decision controls.[17] As discussed below, several of the human rights treaty rules applicable in this case are also rules of customary international law.

Moreover, it is not only U.S. courts that must apply treaties and customary international law as law of the United States. The President is bound faithfully to execute the law under Article II, Section 3 of the Constitution.[18] Because Article VI of the Constitution makes treaties the supreme law of the land, the President is constitutionally obligated to comply with U.S. treaty obligations as well as with customary international law. This was apparently the intent of the

---

[12] 6 U.S. (2 Cranch) 64, 118 (1804); *accord* Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 43 (1801).

[13] *See, e.g.*, F. Hoffmann-La Roche Ltd. v Empagran S.A., 542 U.S. 155, 164 (2004).

[14] 630 F.2d 876, 881-85 (2d Cir. 1980).

[15] State Reports—Convention Against Torture—U.S.A., U.N. Doc. CAT/C/28/Add.5, para. 57 (Feb. 9, 2000), *citing* Sale v. Haitian Ctrs. Council, 509 U.S. 155 (1994).

[16] RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(3).

[17] 175 U.S. 677, 700 (1900).

[18] U.S. CONST. art. II, sec. 3.

Framers.[19]  Courts therefore have a duty to restrain federal executive action that conflicts with a duly ratified treaty.  As the Supreme Court wrote in ordering the President to restore a French merchant ship to its owner pursuant to a treaty obligation: "The constitution of the United States declares a treaty to be the supreme law of the land.  Of consequence its obligation on the courts of the United States must be admitted."[20]

Even if the President were not directly bound by international law, however, he is still obligated to comply with the requirements of the Constitution itself and all applicable legislation enacted by Congress within its authority.  Because these statutes must be interpreted in a manner consistent with international law whenever possible, the President must comply with any international law that is consistent with applicable legislation.

In the following sections, we will explain the international law treaties and customary rules relevant to interpreting U.S. law in evaluating the constitutionality and legality of the EO.

## II.     The Executive Order Discriminates on the Basis of Religion in Violation of the Fifth Amendment Equal Protection Right and the Religious Freedom Restoration Act of 1993

### A.     Applicable Treaties and Customary International Law

The United States has been bound by the International Covenant on Civil and Political Rights ("CCPR") since U.S. ratification of the treaty in 1992.[21]  Article 2 of the CCPR states in relevant part:

> 1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, *religion*, political or other opinion, *national or social origin*, property, birth or other status.

---

[19] Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 THE PAPERS OF ALEXANDER HAMILTON 33, 33-43 (Harold C. Syrett ed. 1969). *See generally* Jordan J. Paust, *In Their Own Words: Affirmations of the Founders, Framers, and Early Judiciary Concerning the Binding Nature of the Customary Law of Nations*, 14 U.C. DAVIS L. REV. 205, 240-45 (2008).
[20] United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 109 (1801).
[21] 138 Cong. Rec. S4781-01 (daily ed., Apr. 2, 1992).

> . . .
>
> 3. Each State Party to the present Covenant undertakes:
>
> (*a*) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;
>
> (*b*) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;
>
> (*c*) To ensure that the competent authorities shall enforce such remedies when granted.[22]

The United Nations Human Rights Committee ("HRC") is charged by the CCPR with monitoring implementation by state parties to the covenant and issuing guidance on its proper interpretation. The HRC interprets article 2 to prohibit "any distinction, exclusion, restriction or preference which is based on" a prohibited ground, and which has "the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing."[23]

The substantive rights guaranteed by the CCPR, which must be protected without discrimination based on religion or national origin under article 2, bear directly on the conformity of the EO with U.S. obligations under international law. CCPR article 9 guarantees the right to freedom from arrest or detention except "on such grounds and in accordance with such procedure as are established by law." Furthermore, anyone deprived of liberty by arrest or detention "shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."[24] The HRC has clarified that these provisions of article 9 encompass detention of all persons, not excluding non-citizen refugees and asylum seekers,[25] for reasons of immigration control.

The HRC has also clarified that detentions may be "arbitrary" within the meaning of article 9 despite statutory authorization:

---

[22] CCPR, *supra* note 6, art. 2 (emphasis added).

[23] Human Rights Committee, General Comment No. 18, para. 6, U.N. Doc. HRI/GEN/1Rev.1 at 26 (1994).

[24] CCPR, *supra* note 6, art. 9.

[25] Human Rights Committee, General Comment No. 35, para. 3, U.N. Doc. CCPR/C/GC/35 (2014).

An arrest or detention may be authorized by domestic law and nonetheless be arbitrary. The notion of "arbitrariness" is not to be equated with "against the law," but must be interpreted more broadly to include elements of inappropriateness, injustice, lack of predictability and due process of law, as well as elements of reasonableness, necessity and proportionality.[26]

In the context of immigration detention, the HRC has noted specifically that detention regulations must be reasonable, necessary, and proportionate to the legitimate goals of the state's immigration policies:

Asylum seekers who unlawfully enter a State party's territory may be detained for a brief initial period in order to document their entry, record their claims and determine their identity if it is in doubt. To detain them further while their claims are being resolved would be arbitrary *in the absence of particular reasons specific to the individual*, such as an individualized likelihood of absconding, a danger of crimes against others or a risk of acts against national security. The decision must consider relevant factors case by case and *not be based on a mandatory rule for a broad category*; must take into account less invasive means of achieving the same ends, such as reporting obligations, sureties or other conditions to prevent absconding; and must be subject to periodic re-evaluation and judicial review. . . .[27]

The CCPR establishes in article 13 that a non-citizen lawfully in a state's territory may be expelled "only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority."[28]

Finally, article 26 of the CCPR prohibits discrimination in any government measure, regardless of whether the measure violates a Covenant right:

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against

---

[26] *Id.* para. 12.

[27] *Id.* para. 18 (emphasis added) (citations omitted).

[28] CCPR, *supra* note 6, art. 13.

discrimination on any ground such as race, colour, sex, language, *religion*, political
or other opinion, *national or social origin*, property, birth or other status.[29]

As interpreted by the HRC and consistent with its wording, this provision "prohibits discrimination in law or fact in any field regulated" by the government.[30]

The nondiscrimination provisions of the CCPR are also reflected in customary international law binding on the United States, forming part of U.S. law unless contrary to the Constitution or a statute. The Universal Declaration of Human Rights, which the United States approved in 1948, mandates nondiscrimination in religion and national origin, as well as equal protection of the law, and it categorically prohibits arbitrary detention.[31] The American Declaration of the Rights and Duties of Man, which the United States approved when it signed and ratified the Charter of the Organization of American States the same year, has similar provisions.[32] These nondiscrimination principles and the prohibition on arbitrary detention have become sufficiently widespread and accepted by the international community that they have entered into customary international law in the present day.[33]

CCPR article 2, taken in combination with articles 9 and 13, forbids the state to discriminate based on religion in detaining any visa holder, immigration applicant or refugee within the state's jurisdiction; in determining their status; and in expelling them from the country. These provisions apply to non-citizens and citizens alike,[34] and they specifically forbid wholesale arbitrary expulsion of refugees based on religion.[35] In addition, CCPR article 26 provides an independent basis for prohibiting discrimination in immigration policies based on religion. Notably, unlike CCPR article 2, the equal protection provisions of CCPR article 26 apply to

---

[29] CCPR, *supra* note 6, art. 26 (emphasis added).

[30] Human Rights Committee, General Comment No. 18, *supra* note 23, para. 12.

[31] Universal Declaration of Human Rights, arts. 2, 7, 9, G.A. Res. 217A(III), U.N. Doc. A/810 at 71 (1948).

[32] *Id.* arts. 17, 25, 27, O.A.S. Res. XXX (1948), Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L/V/I.4 rev. 13, at 13 (2010).

[33] *See* Hurst Hannum, *The Status of the Universal Declaration of Human Rights in National and International Law*, 25 Ga. J. Int'l & Comp. L. 287, 342, 345-46 (1995/96).

[34] Human Rights Committee, General Comment No. 15, paras. 1-2, 5 (1986), U.N. Doc. HRI/GEN/1/Rev.1, at 18 (1994).

[35] *Id.* para. 10.

nonresident aliens as well as citizens and residents.  Article 26 lacks article 2's limitation to "all individuals within its territory and subject to its jurisdiction."

### B.    The Executive Order Is Inconsistent with U.S. Nondiscrimination Obligations on the Basis of Religion Under International Law

The EO ostensibly pursues the legitimate purpose of preventing the immigration of persons with an intention to commit acts of terrorism in U.S. territory.  Some provisions of the EO appear to be designed with this end in view and are consonant with international human rights law. However, sections 3 and 5 of the EO are not reasonable and proportionate measures for protecting national security, and they constitute arbitrary discrimination in violation of the CCPR.

Nowhere in the EO does the President exclude all Muslims from the United States. However, both the intent and effect of the EO are to discriminate against Muslims in U.S. immigration policy.  Section 3(c) of the EO categorically suspends immigration from seven specified countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.  Every one of these countries has a population that is overwhelmingly Muslim,[36] and the EO does not suspend immigration from any country with non-Muslim majorities.  Moreover, Section 5(b) of the EO states that, when and if refugee resettlement is resumed, individuals who are members of a "religious minority" in their country of origin will be given preference, and section 5(e) prioritizes "national interest" exceptions from the ban based on religious minority status.  Approximately 90,000 visa holders will be affected by the EO's suspension.[37]

Although discrimination "in effect" violates U.S. human rights obligations under international law, religious discrimination is not merely an incidental effect of the EO.  Religious discrimination is also its plain intent.  During his presidential campaign, Donald J. Trump called

---

[36] The following are the percentages of the populations of each country that are Muslim: Iran 99.4%; Iraq 99%; Libya 96.6%; Somalia unknown (but the Transitional Federal Charter proclaims Islam as the state religion); Sudan unknown (but a large majority is Muslim); Syria 87%; and Yemen 99.1%. *See* Central Intelligence Agency, World Factbook, *at* https://www.cia.gov/library/publications/the-world-factbook/geos/xx.html.

[37] Glenn Kessler, *The Number of People Affected by Trump's Travel Ban: About 90,000*, WASH. POST, Jan. 30, 2017, *at* https://www.washingtonpost.com/news/fact-checker/wp/2017/01/30/the-number-of-people-affected-by-trumps-travel-ban-about-90000/?utm_term=.8c582fca9542.

repeatedly for discrimination against Muslims *ipsis verbis*.  For example, on December 7, 2015, the Trump campaign released an announcement on "preventing Muslim immigration" that called for "a total and complete shutdown of Muslims entering the United States."[38]  Trump's own campaign staff confirmed that a ban specifically directed at Muslims was his intent.[39]  That campaign position was still posted on his Web site when this brief was filed.  On January 28, 2017, Trump's Web site posted a summary of an editorial stating that he is doing "'exactly' what he promised" during his campaign.[40]  On the same day he signed the EO, Trump told an interviewer that he will be treating Christian refugees from Syria as a "priority."[41]  The EO's intent to discriminate against Muslims is plain.

## C.     The Fifth Amendment and Religious Freedom Restoration Act of 1993 Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law

Even if the President were not directly constrained by treaties binding on the United States under international law, under the *Charming Betsy* doctrine, the court should interpret the applicable provisions of U.S. law in a manner consistent with international human rights law.  This is not only easy to do, it is inevitable, as the applicable domestic laws—the Fifth Amendment to the U.S. Constitution and the Religious Freedom Restoration Act—both reflect similar human rights concerns as the CCPR.

The Fifth Amendment to the U.S. Constitution uses the same words as the CCPR; both forbid government discrimination using the term "no person" as the subject.  Neither uses the

---

[38] Donald J. Trump Statement on Preventing Muslim Immigration, Dec. 7, 2015, *at* https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration (visited Feb. 15, 2017).

[39] *See* Rebecca Savransky, *Giuliani: Trump asked me how to do a Muslim ban 'legally,'* THE HILL, Jan. 29, 2017, *at* http://thehill.com/homenews/administration/316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally.

[40] Donald J. Trump, *Politico: Trump Is Doing 'Exactly' What He Promised on the Campaign Trail*, Jan. 28, 2017, *at* https://www.donaldjtrump.com/media/politico-trump-is-doing-exactly-what-he-promised-on-the-campaign-trail.

[41] David Brody, *President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBN N., Jan. 27, 2017, *at* http://www1.cbn.com/content/brody-file-exclusive-president-trump-says-persecuted-christians-will-be-given-priority (visited Feb. 15, 2017).

words "no citizen" or "no resident." "No person" is the broadest possible language.[42] Non-citizen refugees and immigration applicants are legal persons within the meaning of the Constitution, as well as under international law as implemented in the United States.[43] Therefore, the plain reading of the Fifth Amendment grants them due process rights while, at a minimum, they are within the jurisdiction or authority of the U.S. government. The same applies to equal protection rights.[44] This is the interpretation most consistent with the CCPR's nondiscrimination provisions.

It would also be inconsistent with international human rights law and a plain reading of the Fifth Amendment to allow religious discrimination in immigration policy against nonresident aliens *outside* the territory or jurisdiction of the United States. The Court need not resolve now whether the Fifth Amendment accords the full range of due process rights to nonresident aliens who do not currently hold a valid U.S. visa. However, *amici* interpret the Fifth Amendment equal protection right to prohibit arbitrary discrimination against such persons on the basis of religion. The U.S. government has no more power to proclaim arbitrarily that it will henceforth give priority to immigration applications from Christians or Zoroastrians than it does to discriminate against non-Christian U.S. resident aliens. Although the Supreme Court has questioned due process protection of nonresident aliens outside the United States,[45] it has never squarely confronted the issue of whether Congress or the President may freely discriminate based on religion in its immigration policy in this context. Further, more recent Supreme Court precedent supports the notion that the Due Process Clause reaches farther than its previous decisions might otherwise seem to suggest.[46] In light of U.S. obligations under international human rights law and the plain wording of the Fifth Amendment, *amici* believe that such discrimination is unconstitutional.

---

[42] *Cf.* United States v. Verdugo-Urquidez, 494 U.S. 259, 265-66 (1994) (The Fourth Amendment, "by contrast with the Fifth . . . Amendment[], extends its reach only to 'the people'; . . . [it] contrasts with the word 'person' . . . used in the Fifth . . . Amendment.").

[43] *See* CCPR, *supra* note 6, art. 16.

[44] *See* Lawrence v. Texas, 539 U.S. 558, 575 (2003) ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests.").

[45] *See, e.g.*, Johnson v. Eisentrager, 339 U.S. 763 (1950).

[46] *See* Boumediene v. Bush, 553 U.S. 723, 758-63 (2008) (rejecting formalistic and categorical limits on the extraterritorial application of constitutional rights; stating that whether a particular right applies extraterritorially depends on a functional determination whether its application would be impracticable or anomalous under the circumstances).

Such discrimination also violates the Religious Freedom Restoration Act of 1993 ("RFRA").[47] That statute prohibits the "Government" from substantially burdening "a person's" exercise of religion unless the government measure furthers a "compelling government interest" using "the least restrictive means of furthering" that interest.[48] The RFRA does not define "person," but in light of U.S. obligations under international human rights law and their applicability to statutory interpretation under *The Charming Betsy* doctrine, that term should be construed as broadly as possible to encompass U.S. citizens, resident aliens, and nonresident alien visa applicants as well. Moreover, by focusing on the obligations of the government rather than the rights of individuals, the RFRA appears more concerned with the nature of governmental action than the persons affected by it. Consequently, to the extent that a discriminatory immigration policy burdens the exercise of religion in the United States, it violates the RFRA.

## III.    The Executive Order Discriminates on the Basis of National Origin in Violation of the Fifth Amendment Equal Protection Clause and the Immigration and Nationality Act

### A.    Applicable Treaties and Customary International Law

The analysis in the preceding section, relating to the religious nondiscrimination provisions of the CCPR binding on the United States, applies *mutatis mutandis* in the case of discrimination based on national origin. As in the preceding analysis, the EO violates U.S. obligations under CCPR articles 2, 9, 13, and 26 to the extent that it discriminates based on religion, in either intent or effect, in immigration and detention policy and decisions.

In addition, the United States has been a party to the CERD since 1994.[49] Under CERD, each state party commits to refraining from and prohibiting all forms of racial discrimination, and each undertakes "to engage in no act or practice of racial discrimination . . . and to ensure that all public authorities and public institutions, national or local, shall act in conformity with this obligation."[50] CERD specifically defines "racial discrimination" to include distinctions and

---

[47] Pub. L. 103-141, 107 Stat. 1488 (1993) (codified as amended at 42 U.S.C. ch. 21B).
[48] 42 U.S.C. § 2000bb-1.
[49] *See* 140 Cong. Rec. S7634-02 (daily ed., June 24, 1994).
[50] *Id.* art. 2(1)(a).

restrictions based on national origin.[51]  With regard to immigration practices, CERD makes clear that states are free to adopt only such "nationality, citizenship or naturalization" policies that "do not discriminate against any particular nationality."[52]  Like the nondiscrimination provisions of CCPR article 26, CERD article 2 does not limit its application to citizens or resident non-citizens; it applies to state immigration policies and practices generally.

Collectively, these treaties prohibit states from discriminating based on national origin against citizens, resident aliens, and nonresident aliens alike.

### B.    The Executive Order Is Inconsistent with U.S. Nondiscrimination Obligations on the Basis of National Origin Under International Law

Unlike religious discrimination, which is implicit in the EO, national origin discrimination is explicit in the EO.  The ostensible basis for this discrimination is that the suspended countries are known to sponsor terrorism or are areas in which heightened terrorist activity is occurring.[53] There may be circumstances under which human rights obligations would permit distinctions on the basis of national origin, such as during a state of war.[54]  However, no such circumstances exist today.  Instead, the EO adopts irrational and greatly disproportionate means to achieve its stated goal.

The EO presents no evidence that refugees, visa holders, and visa applicants from the listed seven countries carry a significantly higher risk of engaging in terrorist acts than those from any other country.  In fact, the available evidence is contrary.  Nationals of the seven banned countries have killed zero persons in terrorist attacks in the United States since 1975.[55]  Indeed, according to a thorough Cato Institute study, the annual chance of being murdered in the United States by someone *other than* a foreign-born terrorist is 252.9 times greater than the chance of being

---

[51] *Id.* art 1(1).

[52] *Id.* art. 1(3).

[53] *Cf.* 8 U.S.C. § 1187(a)(12) .

[54] U.S. law dating to the nation's founding, for example, provides for such a limited exception in authorizing the detention and removal of enemy aliens, defined specifically as citizens, residents, or subjects of nations or governments with which the United States is at war. *See* 50 U.S.C. §§ 21-24.  That exception is inapplicable here.

[55] Alex Nowrasteh, Cato Institute, *Terrorism and Immigration: A Risk Analysis*, No. 798, Sept. 13, 2016, at 7-15, *at* https://object.cato.org/sites/cato.org/files/pubs/pdf/pa798_2.pdf.

murdered by a foreign-born terrorist.[56]  A ban on entry of citizens from countries without any history of disproportionate U.S. terrorism could hardly be less reasonable.  Moreover, the U.S. government has imposed no ban on visas from countries such as Saudi Arabia, the United Arab Emirates, and Egypt, whose immigrants (albeit exceedingly few) have actually committed terrorist acts on U.S. territory resulting in the deaths of U.S. citizens.[57]  Differentiating visa holders, visa applicants, and refugees from these states is therefore not a "reasonable and objective" means of achieving national security.[58]  There is no possible rational basis for discriminating against visa applicants or holders based on country of origin in general, and of the countries chosen in the EO in particular.

Moreover, even if (counterfactually) the rate of terrorism by refugees and visa holders were statistically higher in the seven countries, the government has presented no evidence that the risk of terrorist acts from non-citizens from those countries presents such a threat that immediate and drastically discriminatory action is necessary or proportionate.  In effect, the EO presumes that every visa applicant or holder from the seven countries is a terrorist, based on their country of origin.  By the same logic, if adult men have a much higher chance than adult women of engaging in terrorist plots, it would be rational to presume men to be terrorists and issue a blanket denial of visas to males.

In short, the EO is irrational and unreasonable in using country of origin as a proxy for unfitness to visit or reside in the United States.  Contrary to the requirements of the CCPR and CERD, the EO gives no consideration to the individual circumstances of the visa holder, applicant, or refugee.  The order was so rushed, and its implementation so chaotic, that arbitrariness was virtually guaranteed.  By its terms, the EO applies equally to infants; to non-citizens who have rendered loyal service to the U.S. government; and to lawful permanent residents who have lived in the United States for thirty years, know no other life, and have already been carefully vetted by the U.S. government.  Although the EO authorizes the Secretary of State and Secretary of Homeland Security to issue exceptions on a case-by-case basis in article 3(g), it gives no guidance

---

[56] *Id.* at 2.

[57] *Id.* at 7-15; Alex Nowrasteh, Cato Institute, *Guide to Trump's Executive Order to Limit Migration for "National Security" Reasons*, Jan. 26, 2017, *at* https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons.

[58] Human Rights Committee, General Comment No. 18, *supra* note 23, para. 13.

on the factors to be used in assessing the "national interest." Wholesale discrimination cannot be excused by authorizing individual, discretionary exceptions to the rule on vague grounds.

C.       **The Fifth Amendment Equal Protection Duty and Immigration and Nationality Act Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law**

As discussed above, the equal protection duty of the Fifth Amendment to the Constitution is best interpreted in a manner consistent with U.S. obligations under international human rights law to protect all individuals within U.S. territory or under U.S. jurisdiction, as well as nonresident alien visa applicants. Consequently, the Fifth Amendment's equal protection guarantee should be construed to prohibit the EO's discrimination against both resident and nonresident aliens based on national origin.

For similar reasons, the Immigration and Nationality Act ("INA")[59] should be construed to invalidate the EO. The INA provides that, with exceptions not relevant here, "no person shall . . . be discriminated against in the issuance of an immigrant visa because of the person's . . . nationality, place of birth, or place of residence."[60] The language could hardly be clearer. The President is forbidden to order immigration authorities to use nationality as a factor in issuing immigrant visas, which is precisely what the EO directs. The plain language of the INA is not limited to applicants who are current immigrant visa holders, resident in the United States, or currently within U.S. territory or jurisdiction.

Although section 212(f) of the INA authorizes the President to proclaim a suspension of entry of a class of aliens whose entry "would be detrimental to the interests of the United States,"[61] that provision should not be read to authorize discrimination based on religion or national origin unless necessary to achieve a compelling purpose. First, no congressional delegation of discretion to the President should be construed as *carte blanche* to violate binding U.S. treaty obligations. Second, the nondiscrimination provisions of the INA were added after section 212(f), and were

---

[59] Pub. L. 82-414, § 101, 66 Stat. 163, 167 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.*).
[60] 8 U.S.C. § 1152(a)(1).
[61] 8 U.S.C. § 1182(f).

evidently intended to limit the President's discretion to discriminate. The INA should therefore be interpreted in a manner consistent with U.S. obligations under international human rights law, which forbids national origin discrimination regardless of whether the applicant is a resident alien, a current immigrant visa holder, or has never set foot within the United States.[62]

IV.     **The Due Process Clause of the Fifth Amendment, the Immigration and Nationality Act, the Administrative Procedures Act, and the Foreign Affairs Reform and Restructuring Act of 1998 Should Be Interpreted to Prohibit the Arbitrary Detention of Visa Holders and Exclusion of Refugees**

A.      **Applicable Treaties and Customary International Law**

Article 9 of the CCPR prohibits arbitrary arrest and detention of any person. It specifically requires that "[a]nyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that the court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful."[63] In order to be effective, this review must be independent, provide a real inquiry into the necessity of the detention, and include the possibility for a reviewing court to order release if the detention is found unlawful. An individual's specific circumstances must be taken into account, making the creation of a blanket detention program for all migrants unlawful, as noted above. In addition, CCPR article 13 prohibits the arbitrary expulsion of non-citizens lawfully in a state's territory.

In 2010, the International Court of Justice held in the *Diallo* case that article 9 of the CCPR is applicable in principle to any form of detention, "whatever its legal basis and the objective being pursued."[64] The HRC has further clarified in its recommendations that the CCPR is applicable to "all deprivations of liberty," including cases concerning immigration control and even when the

---

[62] To be clear, the INA forbids discrimination based on country of origin, not distinctions based on country of origin. Not every distinction is discrimination. Only arbitrary distinctions violate the INA. Therefore, if the President were to suspend immigration from a specific country based on an actual, imminent threat, the distinction would not qualify as discrimination *ab initio*.

[63] CCPR, *supra* note 6, art. 9(4).

[64] Ahmadou Sadio Diallo (Rep. of Guin. v. Dem. Rep. of Congo), Judgment on the Merits, 2010 I.C.J. Rep. 639, para. 77.

detention period is of a short duration.[65]  Restricting personal movement of individuals at airports while under constant surveillance deprives them of liberty.[66]  Under international law binding on the United States, individuals arriving at United States ports of entry must be afforded an opportunity to apply for asylum or other humanitarian protection, be promptly received and properly processed by U.S. authorities, and be allowed freedom of movement absent a compelling justification.

Furthermore, the arbitrary detention of asylum seekers specifically violates U.S. treaty obligations under article 31 of the 1951 Refugee Convention, which the United States is legally bound to uphold through the 1967 Protocol.  That article provides that a country may restrict the movement of refugees only when absolutely necessary.[67]  Indefinite detention may drive asylum seekers to return to a country in which they face the danger of persecution.  Detention pending a reasonably prompt examination of the credibility of their fear of persecution qualifies as necessary; further detention does not, unless no credible fear is shown.

Most notably, the Refugee Convention also prohibits the expulsion of non-citizens and refugees lawfully in the territory of the United States except in pursuance of a decision reached by due process of law (a prohibition also included in the CCPR).[68]  Article 33 prohibits states from expelling or returning "any refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  Article 3 requires states to apply this *non-refoulement* obligation "without discrimination as to race, religion, or country of origin."  The Refugee Convention is self-executing and, therefore, directly enforceable by U.S. courts.

---

[65] *Torres v. Fin*, U.N. Hum. Rts. Comm., Comm. No. 291/1988 (Apr. 2, 1990), U.N. Doc. CCPR/C/38/D/291/1988; *A v. Australia*, U.N. Hum. Rts. Comm., Comm. No. 560/1993 (Apr. 30, 1997), U.N. Doc. CCPR/C/59/D/560/1993; *see also*, U.N. Hum. Rts. Council, Report of the Working Group on Arbitrary Detention, at 20, para. 55, Dec. 24, 2012, U.N. Doc. A/HRC/22/44 ("Any confinement or retention of an individual accompanied by restriction on his or her freedom movement, even if of relatively short duration, may amount to *de facto* deprivation of liberty.") [hereinafter "U.N. Human Rights Council Report"].

[66] U.N. Human Rights Council Report *supra* note 65, at 21, para. 59; *see* U.N. Econ. & Soc. Council, Report of the Working Group to the Economic and Social Council at 13, para. 41, Dec. 19, 1997, U.N. Doc. E/CN.4/1998/44.

[67] 1951 Refugee Convention, *supra* note 5, art. 31(2).

[68] *Id.* art. 32; CCPR, *supra* note 6, art. 13.

Moreover, the article 33 *non-refoulement* obligation is part of customary international law.[69] The Refugee Act of 1980 expressly incorporated the definition of "refugee" from the Convention to ensure U.S. compliance with U.S. treaty obligations.[70]

The jurisprudence of the Inter-American Commission on Human Rights ("IACHR") is helpful in interpreting these obligations. The IACHR is a principal organ of the Organization of American States, of which the United States is a member. In its 2015 report on the human rights of refugees, migrant families, and unaccompanied children in the United States, the IACHR established that in order to comply with each person's right "to seek and receive asylum in foreign territory" the domestic procedures must be adequate and effective.[71] This requires, at minimum, that an asylum seeker be provided a hearing that complies with the basic due process standards.[72]

As noted in Section I, the United States is also a party to the CAT, article 3 of which provides: "No State shall expel, return or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." CAT's *non-refoulement* obligation requires that the United States examine the risks of torture or persecution in the state of return. The prohibition on torture in particular has long been customary international law, as recognized in the Second Circuit.[73]

The Committee Against Torture, the international body assigned by the CAT to monitor state implementation of the Convention and offer guidance on its provisions, has clarified that these obligations apply "not only in [the state's] sovereign territory but also . . . [in] . . . all areas where the State partly exercises, directly or indirectly, in whole or in part, *de jure* or *de facto* effective control," and that "States parties are obligated to adopt effective measures to prevent public authorities and other persons acting in an official capacity" from violating the rights provided for in the CAT.[74] Furthermore, the IACHR has interpreted state obligations under

---

[69] *See* Aoife Duffy, *Expulsion to Face Torture?* Non-refoulement *in International Law*, 20 INT'L J. REFUGEE L. 373 (2008).

[70] Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102 (codified at 8 U.S.C. § 1101(a)(42)).

[71] Inter-Am. Comm'n. H.R., Report on Immigration in the United States: Detention and Due Process, para. 63, OEA/Ser.L/V/II., doc. 78/10 (Dec. 30, 2010).

[72] *Id.* para. 96.

[73] Filartiga v. Pena-Irala, 630 F.2d 876, 881-85 (2d Cir. 1980); *see* Hannum, *supra* note 10, at 344-45.

[74] Committee Against Torture, General Comment No. 2, paras. 16-17, U.N. Doc. CAT/C/GC/2 (2008).

international human rights law, and U.S. obligations in particular, as prohibiting the forcible return of asylum seekers to another country without an examination of the risks of torture or other persecution, even though they may not then be in U.S. territory or under U.S. jurisdiction.[75]  The *non-refoulement* obligation under international law consequently has no geographic limitation.[76]

### B. The Executive Order Is Inconsistent with U.S. Obligations Under International Law Relating to Arbitrary Detention and Exclusion of Refugees

The text of the EO does not specifically call for a detention program for individuals entering the United States, but arbitrary detention was a foreseeable consequence of the order.  On January 27, 2017, pursuant to the EO, the Department of State ordered the revocation of nearly all valid immigrant and non-immigrant visas already issued to nationals of the seven countries, subject

---

[75] The Haitian Center for Human Rights v. United States, Case 10.675, Inter-Am. Comm'n H.R., Rep. No. 51/96, para. 157, OEA/Ser.L./V/II.95, doc. 7 rev. at 550 (1997).

[76] Although the Supreme Court in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), held the interdiction and return of Haitian refugees on the high seas to be consistent with U.S. obligations under international law, it is the position of *amici*, as it is the position of the IACHR, the U.N. Special Rapporteur on Torture, and indeed of virtually every other expert in international law to comment on the case since, that the Court's decision erred and put the United States in violation of international human rights law. *See, e.g.*, Special Rapporteur on Torture, Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, at 14-16, paras. 38-43, Aug. 7, 2015, U.N. Doc. A/70/303; Open Letter from International Lawyers to the peoples of Europe, the European Union, EU Member States and their representatives on the Justice and Home Affairs Council (Sept. 28, 2015), *at* http://ohrh.law.ox.ac.uk/wordpress/wp-content/uploads/here.pdf; Bill Frelick, *"Abundantly Clear": Refoulement*, 19 GEO. IMMIGR. L.J. 245, 266-67 (2005); Joan Fitzpatrick, *The International Dimension of U.S. Refugee Law*, 15 BERK. J. INT'L L. 1 (1997); Theodor Meron, *Extraterritoriality of Human Rights Treaties*, 89 AM. J. INT'L L. 78 (1995); Thomas David Jones, *International Decision: Sale v. Haitian Centers Council, Inc.*, 88 AM. J. INT'L L. 114 (1994). The examples could easily be multiplied.

Even the U.S. government has now accepted that its obligations under article 16 of the CAT apply at a minimum "in places outside the United States that the U.S. government controls as a governmental authority."  *See* Statement by NSC Spokesperson Bernadette Meehan on the U.S. Presentation to the Committee Against Torture, Nov. 12, 2014, *at* https://obamawhitehouse.archives.gov/the-press-office/2014/11/12/statement-nsc-spokesperson-bernadette-meehan-us-presentation-committee-a.

to a case-by-case review[77] that has not yet occurred. Due to the government's lack of preparation for the EO, that review could not take place without the extended detention of visa-holders, applicants, and refugees already arrived in the United States. The order was issued without providing for the exigencies of large numbers of U.S. visa holders and refugees continuously arriving at U.S. airports, seaports, and borders from the designated states. The haphazard implementation of the order denied individuals the opportunity for individualized review and resulted in due process violations pertaining to detention, denial of counsel, and the removal of those with valid visas to enter and remain in the United States. Over one hundred individuals, migrants, permanent residents, and asylum seekers were detained at U.S. ports in the days immediately after the EO was issued,[78] and more than two hundred individuals were denied entry to the U.S. despite having valid visas.[79] Individuals with valid immigration documents have been reportedly expelled from the United States.[80] Many were immediately sent back, without any individual assessment of their situation or risk of persecution, in violation of international law.[81]

More generally, a valid visa holder who arrives in the United States is "lawfully in the territory" of the United States; consequently, expulsion purely on grounds of religion or national origin, especially without individual assessment of risk, is not "in pursuance of a decision reached in accordance with law" and therefore violates article 13 of the CCPR.

In short, exclusion of a refugee without examining whether the refugee will thereby be subjected to a risk of torture in the country of return violates U.S. obligations under the Refugee Convention and CAT, and violates due process under the CCPR. U.S. obligations under these

---

[77] Memorandum from Edward J. Ramotowski, Dep'y Assist. Sec'y of State, U.S. Dep't of State (Jan. 27, 2017), *available at* http://www.politico.com/f/?id=00000159-f6bd-d173-a959-ffff671a0001.

[78] Maquita Peters & Colin Dwyer, *Federal Judge Stays Deportations, Blocking Part of Trump's Immigration Order*, NPR, Jan. 28, 2017, *at* http://www.npr.org/sections/thetwo-way/2017/01/28/512158238/arrivals-to-u-s-blocked-and-detained-as-trumps-immigration-freeze-sets-in.

[79] Betsy Woodruff, *White House Lowballs Impact of Trump Ban*, THE DAILY BEAST, Jan. 30, 2017, *at* http://www.thedailybeast.com/articles/2017/01/30/white-house-lowballs-impact-of-trump-ban.html.

[80] Evan Perez, Pamela Brown & Kevin Liptak, *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN, Jan. 28, 2017, *at* http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/.

[81] *Id.*.

treaties extend to individuals barred under the EO, including all individuals detained within or expelled from U.S. territory, or repelled in transit or from areas of foreign airports under U.S. control without assessment of their risk of torture or persecution. By renouncing the President's constitutional obligation to comply with U.S. treaties ratified by the Senate, the EO puts thousands of individuals at potential risk of torture or other persecution in violation of U.S. obligations under international law. The EO's asserted national security rationale for depriving refugees of this right cannot satisfy even rational basis scrutiny. In fact, from 1975 to 2015, the overall chance that an American would be killed in a terror attack by a refugee was one in 3.64 *billion* each year.[82] The reason for this statistic is that the normal vetting process has proven entirely adequate to ensure that refugees seek asylum in good faith, as former high-ranking national security officials have testified.[83] The President cannot justify putting refugees at risk of torture and persecution in violation of international law to mitigate a nearly nonexistent danger.

### C.    The Due Process Clause and Relevant Statutes Should Be Interpreted in Light of U.S. Obligations Under International Human Rights Law

The Fifth Amendment to the Constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property without due process of law . . . ." Holding an individual in detention violates the Due Process Clause if it is without cause, because detention without cause cannot possibly serve a legitimate government purpose. The Supreme Court has established a presumption against such detention: "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[84] Detention that is "excessive in relation to the regulatory goal" violates substantive due process.[85] This aspect of the Court's interpretation of the Due Process Clause aligns the United States with international human rights law.[86]

---

[82] Nowrasteh, *Terrorism and Immigration*, *supra* note 55, at 18.

[83] *See* Joint Declaration of National Security Officials para. 6, *Washington v. Trump*, No. 17-35105 (9th Cir. 2017), *available at* https://www.aclu.org/legal-document/state-washington-v-trump-declaration-national-security-officials.

[84] United States v. Salerno, 481 U.S. 739, 755 (1987); *accord* Zadvydas v. Davis, 533 U.S. 678, 690-92 (2001) (applying the same due process principle to immigration detention).

[85] *Salerno*, 481 U.S. at 755.

[86] The Supreme Court stated in *Sosa v. Alvarez-Machain* that detention must be "prolonged" to violate customary international law in the context of the arrest and extradition of

Although national security may be a valid government purpose, as the preceding sections discuss, using religion or country of origin as a simplistic proxy for terrorism has no basis in fact; violates U.S. nondiscrimination obligations; and is not only excessive in relation to the goal of national security, but also bears no meaningful empirical relation to it. Consequently, the EO violates the substantive due process rights of detained visa holders, applicants, and refugees by forcing the government to detain such persons arbitrarily.

The Fifth Amendment Due Process Clause also guarantees procedural due process by mandating that "no person" will be denied notice and a meaningful opportunity to be heard before a neutral decisionmaker.[87] "It is well established that the Fifth Amendment entitles non-citizens to due process of law in deportation proceedings."[88] The Supreme Court has held that a non-citizen in the United States unlawfully, involuntarily, or transitorily is still entitled to the Fifth Amendment's due process protections.[89] Refugees, who are a category of non-citizens seeking protection from persecution and entitled to special consideration under international law, are *a fortiori* entitled to the due process of law, including individualized consideration of their respective situation and the risks associated with exclusion or return.

In addition, the INA and Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA")[90] both implement international obligations of due process with respect to refugees. The INA provides: "Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum."[91] It further provides applicants with the opportunity to take part in removal proceedings before an immigration judge.[92] Under the Refugee Convention, an asylum seeker who not been convicted of a serious crime can only be returned when there are "reasonable grounds for regarding" the individual as "a danger to the security of the country."[93] The EO excludes refugees based on religion and country of origin

---

an accused criminal. 542 U.S. 692, 737 (2004). That reasoning does not apply when the detention is *not* part of normal criminal procedures but pursuant to an arbitrary and discriminatory policy.

[87] U.S. CONST. amend. V; *see* Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004).

[88] Reno v. Flores, 507 U.S. 292, 306 (1993).

[89] Matthews v. Diaz, 426 U.S. 67, 77 (1976).

[90] Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified as amended at 8 U.S.C. § 1231).

[91] 8 U.S.C. § 1158(a).

[92] 8 U.S.C. § 1229(a)(1).

[93] 1951 Refugee Convention, *supra* note 5, art. 33(2).

without the required individualized assessment. The INA nowhere authorizes the President to abrogate these rights with respect to refugees in violation of U.S. obligations under international treaties based on discriminatory motives.

The FARRA implements U.S. obligations under CAT by incorporating the CAT's *non-refoulement* obligation whenever the return of individuals places them at risk of torture or persecution. It also requires procedural safeguards necessary to determine their claims of risk of such torture or persecution. The FARRA states the United States shall not "expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."[94] This provision was adopted to codify article 33 of the Refugee Convention, which uses very similar words, and should be construed consistently with U.S. obligations under international law  The FARRA should, therefore, be interpreted to prohibit the President from ordering immigration officials to deny refugees in U.S. territory or under U.S. control a reasonable opportunity to present their case against exclusion or expulsion.

Finally, the Administrative Procedure Act ("APA")[95] requires courts to hold unlawful any federal agency action performed "without observance of procedure required by law."[96] Like the other statutes discussed here, the APA should be interpreted to uphold U.S. obligations under the CCPR and CAT. These treaties require the government to observe due process of law by not imposing arbitrary conditions on the exercise of a right or acting inconsistently with the valid legislation or the government's own published procedures. Pursuant to the EO, the Department of Homeland Security has refused to honor valid immigration and nonimmigration visas issued by the government. Nor did it comply with FARRA requirements to examine the risks of torture and persecution to asylum seekers. Arbitrarily denying non-citizens the benefit of a valid visa without good cause, and failing to provide an individualized assessment of the risks associated with return by asylum seekers, both violate international human rights law and should be held to violate the APA as well.

---

[94] 8 U.S.C. § 1231.
[95] Pub. L. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551-59).
[96] 5 U.S.C. § 706(2)(D).

# CONCLUSION

For the foregoing reasons, *amici* respectfully request that Court issue a permanent injunction prohibiting enforcement of Sections 3 and 5 of the Executive Order.

DATED: February 15, 2017

Phoenix, Arizona

Respectfully submitted,

AARON FELLMETH[*] (admission *pro hac vice* pend.)
    Jordan Brunner, Law Student Intern
    Amanda Ghannam, Law Student Intern
    Jennifer Hancock, Law Student Intern
    Madeline Mahugh, Law Student Intern
Arizona State University, Sandra Day
O'Connor College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

JONATHAN HAFETZ[*] (JLH-0843)
Seton Hall University School of Law
One Newark Center
Newark, NJ  07102
(917) 355-6896
jonathan.hafetz@shu.edu

---

\*  Address is for correspondence and identification only. This brief does not purport to state the views of Arizona State University or Seton Hall University, or their respective law schools, if any.

*Of Counsel:*

Shifa Alkhatib
620 W. Jackson St., Ste. 4105
Phoenix, AZ  85003
(602) 349-5524
shifa.alkhatib@gmail.com

Meghan Waters
2565 S. Milwaukee St.
Denver, CO  80210
(303) 641-1531
megwat@gmail.com

Catherine Moore
University of Baltimore School of Law
1420 N. Charles St.
Baltimore, MD  21201
(410) 837-6784
cmoore@ubalt.edu

# APPENDIX

The *amici* are nongovernmental organizations and legal scholars specializing in public international law and international human rights law. They have substantial expertise in issues directly affecting the outcome of this case. These *amici* are identified below.

## Organizations

| | |
|---|---|
| Human Rights Advocates | Legal Aid Society (New York) |
| Human Rights & Gender Justice Clinic, City University of New York School of Law | MADRE |
| | National Center on Homelessness & Poverty |
| International Association of Democratic Lawyers | National Lawyers Guild |
| International Center for Advocates Against Discrimination | Secular Communities of Arizona |
| | T'ruah: The Rabbinic Call for Human Rights |
| International Justice Project | |

## Individuals

**Institutional affiliations are listed for identification purposes only; opinions in this brief do not reflect those of any affiliated organization.**

1. William Aceves, Dean Steven R. Smith Professor of Law, California Western School of Law

2. Dr. Johannes van Aggelen, former senior human rights official, United Nations, Office of the High Commissioner for Human Rights

3. Wanda M. Akin, Esq., Co-Founder, International Justice Project

4. Don Anton, Professor of International Law & Director, Law Future Centre, Griffith University Law School, Australia

5. Paige Berges, Esq., London, United Kingdom

6. Wendi Warren H. Binford, Associate Professor of Law; Director, Clinical Law Program, Willamette University

7. Carolyn Patty Blum, Interim Director, Benjamin B. Ferencz Human Rights and Atrocity Prevention Clinic, Benjamin N. Cardozo Law School

8. Anthony P.X. Bothwell, Esq., Law Offices of Anthony P.X. Bothwell

9. Bill Bowring, Professor & Director of the LLM/MA in Human Rights, University of London, Birkbeck College School of Law, U.K.

10. Raymond M. Brown, Co-Founder, International Justice Project

11. Gráinne de Búrca, Florence Ellinwood Allen Professor of Law, New York University Law School

12. Elizabeth Burleson, Esq., Greenwich, CT

13. Roderick P. Bushnell, Esq., Law Offices of Roderick P. Bushnell, San Francisco, CA

14. Linda Carter, Professor of Law Emerita, University of the Pacific, McGeorge School of Law

15. Dr. Grace Cheng, Associate Professor of Political Science, Hawai'i Pacific University

16. Marjorie Cohn, Professor Emerita, Thomas Jefferson School of Law

17. Jorge Contesse, Assistant Professor, Rutgers (Newark) Law School

18. Omar Dajani, Professor, University of the Pacific, McGeorge School of Law

19. Thomas A. Dallal, Esq., Deputy Director, Diakonia International Humanitarian Law Resource Center, Jerusalem

20. Margaret M. deGuzman, Associate Professor, Temple University, Beasley School of Law

21. Daniel H. Derby, Professor, Touro Law Center

22. Margaret Drew, Associate Professor & Director, Human Rights at Home Clinic, University of Massachusetts Law School

23. Ariel Dulitzky, Clinical Professor of Law, University of Texas School of Law

24. Monica Feltz, Esq., Executive Director, International Justice Project

25. Martin S. Flaherty, Leitner Family Professor of International Human Rights Law, Co-Director, Leitner Center for International Law & Justice, Fordham Law School

26. Daniel Fullerton, Counsel, Public International Law & Policy Group

27. Hannah Garry, Clinical Professor of Law & Director, International Human Rights Clinic, University of Southern California, Gould School of Law

28. Peter Halewood, Professor of Law, Albany Law School

29. Alexandra Harrington, Adjunct Professor, Albany Law School

30. Deena Hurwitz, Esq., Charlottesville, VA

31. Dr. Alice de Jonge, Senior Lecturer, Monash University, Australia

32. Christine Keller, Esq., Legal Officer, International Criminal Tribunal for the Former Yugoslavia

33. Jocelyn Getgen Kestenbaum, Telford Taylor Visiting Clinical Professor of Law, Benjamin N. Cardozo School of Law

34. Robert Lutz, Paul E. Treusch Professor of Law, Southwestern Law School

35. Daniel Barstow Magraw, Senior Fellow, Foreign Policy Institute and Professorial Lecturer, Johns Hopkins University School of Advanced International Studies

36. Kathleen Maloney, Adjunct Professor, Lewis & Clark School of Law

37. Annette M. Martínez-Orabona, Adjunct Professor, Inter-American University of Puerto Rico, School of Law

38. Jeanne Mirer, Esq., President, International Association of Democratic Lawyers

39. Steven S. Nam, Distinguished Practitioner, Center for East Asian Studies, Stanford University

40. Dr. Andrew Novak, Term Assistant Professor of Criminology, Law & Society, George Mason University

41. Nigel N.T. Li, President, International Law Association, Chinese (Taiwan) Branch; Chinese (Taiwan) Society of International Law

42. Anna R. Maitland, Schuette Clinical Fellow, Center for International Human Rights, Northwestern University, Pritzker School of Law

43. Kathleen M. Maloney, Adjunct Professor, Lewis and Clark School of Law

44. Thomas M. McDonnell, Professor of Law, Pace University, Elisabeth Haub School of Law

45. Natasha Lycia Ora Bannan, President, National Lawyers Guild

46. Aparna Polavarapu, Assistant Professor, University of South Carolina School of Law

47. Dianne Post, Esq., Central Arizona National Lawyers Guild

48. William Quigley, Professor of Law, Loyola University New Orleans, Loyola College of Law

49. Balakrishnan Rajagopal, Professor of Law & Development, Massachusetts Institute of Technology

50. Jaya Ramji-Nogales, I. Herman Stern Professor of Law, Temple University, Beasley School of Law

51. Nicole Rangel, Esq., Associate Legal Officer, International Criminal Tribunal for the Former Yugoslavia

52. Marny Requa, Associate Professor, Georgian Court University (Lakewood, NJ)

53. Nani Jansen Reventlow, Associate Tenant, Doughty Street Chambers, U.K.

54. Francisco J. Rivera Juaristi, Director, International Human Rights Clinic, Santa Clara University School of Law

55. Gabor Rona, Visiting Professor of Law, Cardozo Law School

56. Lt. Joshua Root, Esq., Instructor of Human Rights and International Law, Newport, RI

57. Leila Sadat, Henry H. Oberschelp Professor of Law; Director, Whitney R. Harris World Law Institute, Washington University School of Law

58. Margaret L. Satterthwaite, Professor of Clinical Law, New York University School of Law

59. Beth Van Schaack, Leah Kaplan Visiting Professor in Human Rights, Stanford Law School

60. Mortimer Sellers, Regents Professor and Director, Center for International and Comparative Law, University of Baltimore School of Law

61. Corey Shenkman, Esq., Principal Investigator, Institute for Social Policy and Understanding

62. Dr. Anette Sikka, Asisstant Professor of Legal Studies, University of Illinois, Springfield

63. Matiangai Sirleaf, Assistant Professor, University of Pittsburgh Law School

64. David L. Sloss, Professor of Law, Santa Clara University Law School

65. Rachel A. Smith, International Law Association, American Branch, Program Director

66. Juliet S. Sorensen, Harry R. Horrow Professor of International Law, Northwestern University, Pritzker School of Law

67. Dr. Michael Stein, Executive Director & Visiting Professor, Harvard Law School Project on Disability

68. Milena Sterio, Professor of Law & Associate Dean, Cleveland State University, Cleveland-Marshall College of Law

69. Jessica Stern, Executive Director, OutRight Action International

70. Anastasia Sarantos Taskin, Esq., Taskin Law & Mediation

71. Juliet S. Sorensen, Harry R. Horrow Professor of International Law, Northwestern University, Pritzker School of Law

72. Beth Stephens, Distinguished Professor, Rutgers (Camden) Law School

73. Dr. Tara Van Ho, Assistant Professor, Aarhus University Department of Law

74. Constance de la Vega, Professor of Law, University of San Francisco

75. Dr. Ralph Wilde, Reader, University College of London Faculty of Laws, U.K.

76. Matthew Zagor, Associate Professor, Australia National University College of Law

77. Katja Ziegler, Sir Robert Jennings Professor International Law, Director, Centre of European Law and Internationalisation, University of Leicester School of Law, U.K.