# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMEED KHALID DARWEESH, et al., ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> DONALD TRUMP, et al., ) <br> Defendants. ) | Civil Case No. <br> 17-CV-00480 (AMD) |

SECOND TODD A. HOFFMAN DECLARATION

In accordance with the provisions of 28 U.S.C. § 1746, I, Todd A. Hoffman, declare the following to be true and correct:

1. I am the Executive Director of Admissibility and Passenger Programs ("APP"), within the Office of Field Operations, U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security ("DHS"). As Executive Director of Admissibility and Passenger Programs, I am responsible for overseeing and coordinating all CBP programs related to the admission and processing of international visitors and travelers to the United States.

2. I make this declaration based on my own personal knowledge and information provided to me in the course of my official duties. In preparing this declaration, I, as well as others on my staff who work under my supervision, have reviewed CBP data and other information related to the inspection and processing of international visitors to the United States who arrived and applied for admission at United States ports of entry, and at CBP preclearance locations, since January 27, 2017.

3. I am familiar with the President's Executive Order 13769, "Protecting the Nation from Foreign Terrorist Entry into the United States" issued on January 27, 2017 ("Executive Order"), and the steps that CBP took to implement it.

4. I am familiar with the letter issued by the Department of State on January 27, 2017, provisionally revoking all nonimmigrant and immigrant visas of nationals of Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen, subject to limited exceptions, pursuant to the Executive Order (the "State Revocation Letter"), and with the letter issued by the Department of State on February 3, 2017, reversing the aforementioned provisional revocations ("State Reinstatement Letter").

5. I am also familiar with the Decision and Order issued by this Court in the above-styled action on January 28, 2017 (the "E.D. N.Y. Order"), and the Temporary Restraining Order issued by the District Court, Western District of Washington, on February 3, 2017 (the "W.D. Wash. TRO"), enjoining and restraining enforcement of certain provisions within the Executive Order.

### CBP Efforts to Identify Individuals with Physically "Revoked" Visas

6. Upon issuance of the W.D. Wash. TRO, individuals holding passports from Iraq, Syria, Iran, Sudan, Libya, Somalia, and Yemen, containing valid United States visas, may apply for admission to the United States to the same extent as before the Executive Order. However, CBP understands that there is a subset of individuals originally affected by the Executive Order who may experience difficulties traveling to the United States in order to apply for admission.

7. When CBP encounters an applicant for admission with a visa that has been revoked by the Department of State, it is CBP's normal practice to physically mark the visa as "revoked." Between January 27, 2017 (the date of the Executive Order and the State Revocation

Letter) and February 3, 2017 (the date of the W.D. Wash. TRO and the State Reinstatement Letter), CBP encountered individuals subject to the Executive Order with visas revoked by the Department of State, and CBP marked many of those visas as "revoked." Because these individuals possess visas physically marked as "revoked," air carriers may deny these individuals boarding of flights bound for the United States.

8. To identify affected individuals with visas physically marked "revoked," CBP searched its records to identify those individuals holding passports from Iraq, Syria, Iran, Sudan, Libya, Somalia, or Yemen, who, between January 27, 2017 and February 3, 2017, were inspected by CBP and deemed inadmissible to the United States on the basis of the Executive Order. CBP identified 141 such individuals – forty-four that were encountered at United States airports, and another ninety-seven that were encountered at land border ports of entry or preclearance locations abroad.

9. The forty-four individuals encountered by CBP at airports were all encountered on January 27 or 28, 2017. Upon being determined inadmissible, each of these forty-four individuals voluntarily withdrew their applications for admission to the United States and returned to a foreign destination on an outbound flight. According to CBP records, twenty-four of the forty-four individuals have since traveled back to, and been admitted to, the United States, many with the assistance by CBP described below.

10. For those individuals encountered at land border ports of entry or preclearance locations, upon being determined inadmissible, each of the ninety-seven individuals voluntarily withdrew their applications for admission to the United States. According to CBP records, fourteen of the ninety-seven individuals have since returned to and been admitted to the United States.

## CBP Efforts to Facilitate Return Travel for Affected Individuals

11. In an effort to fully comply with all court orders, including the E.D. N.Y. Order and the W.D. Wash. TRO, CBP, in partnership with the Department of State, has taken, and continues to take, reasonable steps to facilitate travel to the United States for those individuals whose visas were physically marked as "revoked" on the basis of the Executive Order.

12. CBP personnel routinely communicate with air carriers. To facilitate close cooperation between CBP and air carriers, CBP developed the Carrier Liaison Program, through which CBP maintains a 24/7 Regional Carrier Liaison Group (RCLG) phone center to provide real-time entry requirements and document validity advice to carriers worldwide.

13. Since January 28, 2017, CBP has worked through its RCLG to facilitate the boarding of flights to the United States of affected individuals, on a case-by-case basis. Once CBP receives a request from an affected individual and determines that facilitation of travel is appropriate, CBP informs the air carrier, through the RCLG, that the particular individual may be permitted to board an aircraft bound for the United States without the carrier fearing it will be fined under 8 U.S.C. § 1323. While CBP cannot require an air carrier to board and transport any individual, CBP advises the carrier that although the individual possesses a United States visa that is marked as revoked, the individual's visa has been reinstated and is deemed by CBP to be valid for travel.

14. CBP has utilized this process to successfully facilitate the return travel for approximately twenty-four individuals. For example, S.A. (name withheld to protect the privacy of the individual) was initially inspected by CBP at JFK International Airport on January 28, 2017. Based on the Executive Order and the State Revocation Letter, Ms. A. was determined to be inadmissible to the United States, and her United States visa was physically marked by CBP

as revoked. She withdrew her application for admission to the United States and departed for a foreign destination. On February 3, 2017, CBP received notice that Ms. A. wished to travel back to the United States. CBP utilized its RCLG to contact the air carrier, and Ms. A. was cleared to board her aircraft. Ms. A. was admitted to the United States on February 6, 2017.

15. CBP is currently utilizing this same process to facilitate the return travel of H.E., who was initially encountered by CBP on January 28, 2017, at Orlando International Airport. H.E. was determined to be inadmissible, withdrew her application for admission, and her visa was marked "revoked." On February 13, 2017, CBP received notice that H.E. wished to travel back to the United States. CBP utilized its RCLG to contact the air carrier, and H.E. was cleared to board her aircraft. H.E. is currently on board an aircraft and in transit to the United States as of the signing of this Declaration.

16. CBP will continue to utilize this process, on a case-by-case basis, as CBP becomes aware of affected individuals with physically revoked visas as described above who wish to return to the United States where such facilitation is appropriate. Of course, CBP cannot commit to the return of any particular individual, or to ensuring admission of any individual, as CBP lacks capacity or authority to engage with individuals who are not currently presenting themselves for admission and CBP is unable to make a final admissibility determination as to any traveler until the traveler is inspected by a CBP officer. In addition, and regardless of whether CBP may offer input or a recommendation, carriers ultimately decide whether to permit each passenger to board their aircraft. Nevertheless, CBP is taking the facilitation steps possible within the practical and legal limitations imposed on it.

### Coordination with the Department of State to Notify Affected Individuals

17. In an effort to more proactively facilitate return travel for individuals with revoked visas, CBP has provided the Department of State with a list of all 141 individuals described above. Even though preclearance locations in foreign countries do not affect "removals" of travelers, CBP nevertheless included those individuals who were encountered at preclearance locations in the materials it has provided to the Department of State. It is my understanding that the Department of State has been using, and will continue to use, the information provided by CBP to facilitate the issuance of transportation foils (which enable individuals to board aircraft), or the reissuance of revoked visas, to affected individuals.

18. To the extent any of these individuals wish to travel on their previously issued visa, CBP remains willing to consider coordinating with the airlines to facilitate such travel on a case-by-case basis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *February 16, 2017* at *Washington, DC*

       (Date)                (City/State)

Signature: _____

Todd A. Hoffman