UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMEED KHALID DARWEESH, et al., | 17-cv-480-CBA |
| Petitioners, | |
| and | |
| PEOPLE OF THE STATE OF NEW YORK, by ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF THE STATE OF NEW YORK, | |
| Intervenor-Plaintiff, | |
| - against - | |
| DONALD J. TRUMP, President of the United States, et al., | |
| Respondents. | |

**BRIEF FOR 167 MEMBERS OF CONGRESS AS *AMICI CURIAE*
IN SUPPORT OF PETITIONERS AND INTERVENOR-PLAINTIFF**

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
CONSTITUTIONAL ACCOUNTABILITY
CENTER
1200 18th Street, NW, Suite 501
Washington, D.C. 20036
Tel.: (202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
david@theusconstitution.org

Raymond H. Brescia
Associate Professor of Law*
Albany Law School
80 New Scotland Avenue
Albany, New York 12208
Tel.: (518) 445-3247
rbres@albanylaw.edu
*For affiliation purposes only

Peter Karanjia
Jason Harrow
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499
peterkaranjia@dwt.com
jasonharrow@dwt.com

Victor A. Kovner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel.: (212) 489-8230
Fax: (212) 489-8340
victorkovner@dwt.com

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ................................................................ 1

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ................................................................ 5

I.    BECAUSE THE EXECUTIVE ORDER DISCRIMINATES ON THE BASIS OF RELIGION, IT CANNOT BE SQUARED WITH THE CONSTITUTION'S TEXT AND HISTORY. ...................................... 6

II.    BECAUSE THE EXECUTIVE ORDER DISCRIMINATES ON THE BASIS OF NATIONALITY, IT CANNOT BE SQUARED WITH THE CONSTITUTION'S TEXT AND HISTORY OR THE IMMIGRATION AND NATIONALITY ACT. ............................................... 12

    A.    The Order Violates The Fifth Amendment's Due Process Clause Because The Order's Broad Restrictions Based On Nationality Are Not Rationally Related To Any Legitimate Government Interests. ......... 12

    B.    By Discriminating On The Basis Of Nationality, The Order Also Runs Afoul Of The Immigration And Nationality Act. ........................... 17

        1.    The INA Categorically Prohibits Discrimination Based On, Among Other Things, Nationality, Place Of Birth, Or Place Of Residence. ............................................................. 18

        2.    The Provision On Which The Order Relies Cannot Override The Act's Explicit Prohibition On Discrimination. ...................... 21

CONCLUSION ................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
    512 U.S. 687 (1994)................................................................................6, 10, 11

*Boumediene v. Bush,*
    553 U.S. 723 (2008)........................................................................................5, 6

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)......................................................................................10, 11

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)............................................................................................15

*Fiallo v. Bell,*
    430 U.S. 787 (1977)..............................................................................................5

*Haitian Refugee Ctr. v. Civiletti,*
    503 F. Supp. 442 (S.D. Fla. 1980)................................................................18, 19

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006)............................................................................................22

*Hampton v. Mow Sun Wong,*
    426 U.S. 88 (1976)..............................................................................................12

*Hirayabashi v. United States,*
    320 U.S. 81 (1943)..............................................................................................12

*In re Griffiths,*
    413 U.S. 717 (1973)..............................................................................................1

*INS v. Chadha,*
    462 U.S. 919 (1983)........................................................................................5, 6

*King v. Burwell,*
    135 S. Ct. 2480 (2015)..........................................................................................5

*Korematsu v. United States,*
    323 U.S. 214 (1944)............................................................................................12

*Larson v. Valente,*
    456 U.S. 228 (1982)............................................................................................10

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    45 F.3d 469 (D.C. Cir. 1995) .................................................................................4, 18, 22, 25

*McCreary Cty. v. ACLU of Ky.*,
    545 U.S. 844 (2005) ...........................................................................................................7, 11

*Narenji v. Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979) .................................................................................................13

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ............................................................................................. 12-13

*Romer v. Evans*,
    517 U.S. 620 (1996) ...................................................................................................4, 13, 15

*United States v. Windsor*,
    133 S. Ct. 2675 (2013) ..............................................................................................8, 9, 12

*Wallace v. Jaffree*,
    472 U.S. 38 (1985) ...................................................................................................................10

*Walz v. Tax Comm'n of N.Y. City*,
    397 U.S. 664 (1970) .................................................................................................................10

*Washington v. Trump*,
    --- F.3d ---, 2017 WL 526497 (9th Cir. Feb. 9, 2017) ...................................................2, 6, 14

*Wong Wing Hang v. INS*,
    360 F.2d 715 (2d Cir. 1966) ....................................................................................................21

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................................................22

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...........................................................................................................1, 5

*Zivotofsky v. Kerry*,
    135 S. Ct. 2076 (2015) ............................................................................................................22

**Constitutional Provisions**

U.S. Const.
    amend. I .................................................................................................................3, 7, 8
    amend. V .............................................................................................................3, 8, 9, 12
    amend. XIV ...............................................................................................................9, 12
    art. III ..............................................................................................................................5
    art. VI, § 3 ...................................................................................................................3, 6

**Statutes**

8 U.S.C.
§ 1101(a)(42)(A) ................................................................................................22
§ 1151(b)(2)(A)(i) .............................................................................................23
§ 1152(a)(1)(A) ...............................................................................4, 18, 19, 22
§ 1152(a)(1)(B) .................................................................................................25
§ 1152(a) ....................................................................................................22, 25
§ 1153.................................................................................................................23
§ 1182(f)............................................................................................5, 18, 21
§ 1187(a)(12)(A) ...............................................................................................23
§ 1187(a)(12)(B) ...............................................................................................23

Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015,
Pub. L. No. 114-113, Div. O, Title II, § 203 (2015)................................14

**Regulations**

50 Fed. Reg. 41329 (1985) ........................................................................24

51 Fed. Reg. 30470 (1986) ....................................................................24, 25

71 Fed. Reg. 28541 (2006) ........................................................................24

**Legislative Materials**

Annals of Cong.,
5th Cong., 2d Sess. (1798) ................................................................3, 8, 9

Cong. Globe,
37th Cong., 2d Sess. (1862) ....................................................................9
39th Cong., 1st Sess. (1866) ...............................................................9, 10

H.R. Rep. No. 89-745 (1965)........................................................................18

*Immigration: Hearings on H.R. 2580 Before the Subcomm. on Amending the
Immigration and Nationality Act, and for other purposes of the H. Comm. on
the Judiciary*, 89th Cong. 418 (1965) (statement of Rep. Benjamin S.
Rosenthal) ................................................................................................19

*Immigration: Hearings on H.R. 2580 Before the Subcomm. on Immigration and
Nationality of H. Comm. on the Judiciary*, 89th Cong. 2 (1965) (statement of
Attorney General Nicholas Katzenbach) ...............................................20

*Immigration: Hearings on H.R. 7700 and 55 and Identical Bills Before the
Subcomm. No. 1 of the H. Comm. on the Judiciary*, 88th Cong. 391 (1964)
(statement of Secretary of State Dean Rusk) ........................................20

*Immigration: Hearings on H.R. 7700 and 55 Identical Bills Before the Subcomm. on Amending the Immigration and Nationality Act, and for other purposes of the H. Comm. on the Judiciary*, 88th Cong. 208 (1964) (statement of Rep. Harold Ryan) .................................................................................................... 19

*Immigration: Hearings on S. 500 Before the Subcomm. on Immigration and Naturalization of the S. Comm. on the Judiciary*, 89th Cong. 547 (1965) (statement of Sen. Maurine B. Neuberger) ............................................................ 19

Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill (Oct. 3, 1965) ............................................................................................................ 19

**Treaties**

1951 Convention Relating to the Status of Refugees, opened for signature July 28,1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (entered into force Apr. 22, 1954) ................... 22

1967 Protocol Relating to the Status of Refugees, opened for signature Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967) ........................... 22

**Other Authorities**

2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 196 (Jonathan Elliot ed. 1836) ("*Elliot's Debates*") ........................................ 5, 7

Alex Nowrasteh, *Guide to Trump's Executive Order To Limit Migration for "National Security" Reasons*, Cato Inst.: Cato at Liberty (Jan. 26, 2017), https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons ..................................................................................... 14

Amy B. Wang, *Trump asked for a "Muslim ban," Guiliani says—and ordered a commission to do it legally*, Wash. Post (Jan. 29, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.aa581a145c57 ..................................................................... 2, 6

Associated Press, *State Dept: Fewer Than 60,000 Visas Canceled by Trump Order* (Feb. 3, 2017), https://www.nytimes.com/aponline/ 2017/02/03/us/politics/ap-us-travel-ban-visas-revoked.html?_r=0 ........................................ 21

Carla Marinucci, *Rice, Albright Criticize Trump's Executive Order*, Politico, Feb. 1, 2017, http://www.politico.com/states/california/story/2017/02/condi-rice-and-madeline-albright-deliver-blistering-joint-rebuke-of-trump-immigration-policy-109285 ........................................................................ 16

Daniel Burke, *Trump says US will prioritize Christian refugees*, CNN.com (Jan. 30, 2017), http://www.cnn.com/2017/01/27/politics/trump-christian-refugees/ ........................................................................................................... 3, 6

Dara Lind, *Donald Trump proposes "total and complete shutdown of Muslims entering the United States*, Vox.com (Dec. 7, 2015), http://www.vox.com/2015/12/7/9867900/donald-trump-muslims .......................................2, 6

Department of State, *2 FAM 070 DISSENT CHANNEL*, Department of State (2011), https://fam.state.gov/fam/02fam/02fam0070.html .......................................................16

*Dissent Channel: Alternatives to Closing Doors in Order to Secure Our Borders*, Dissent Channel (2017), https://assets.documentcloud.org/documents/3438487/Dissent-Memo.pdf ...........................16

DHS Press Release, DHS, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016) ...................................................................................14

Elise Labott, *Over 900 US career diplomats protest Trump order*, CNN.com (Jan. 31, 2017), http://www.cnn.com/2017/01/30/politics/ career-diplomats-dissent-memo .................................................................................................................16

Evan Perez et al., *Inside the Confusion of the Trump Executive Order and Travel Ban*, CNN.com (Jan. 30, 2017), http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/ .......................................17

Gerald M. Boyd, *Reagan Acts To Tighten Trade Embargo of Cuba*, N.Y. Times (Aug. 23, 1986), http://www.nytimes.com/1986/08/23/ world/reagan-acts-to-tighten-trade-embargo-of-cuba.html ...................................24

James Madison, *Memorial and Remonstrance Against Religious Assessments, in 2 The Writings of James Madison* 183 (G. Hunt ed. 1901) .......................................7

Jim Endrizzi et al., *Visas Mantis Security Advisory Opinions*, NAFSA.com, https://www.nafsa.org/findresources/Default.aspx?id=8645 (last visited Feb. 15, 2017) ......................................................................................................15

Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies*, Reuters.com, Jan. 29, 2017, http://www.reuters.com/article/us-usa-trump-immigration-confusion-idUSKBN15D07S?il=0 ....................................................................................17

2 Joseph Story, *Commentaries on the Constitution*, § 1293 (3d ed. 1858).................................3, 8

Kate M. Manuel, Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* (Jan. 23, 2017), https://fas.org/sgp/crs/homesec/R44743.pdf.........................................24

Kentucky Resolutions of 1798, 4 *Elliot's Debates* at 543 ..............................................8

Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), https://founders.archives.gov/documents/Washington/05-06-02-0135 ....................................8

Madison's Report on the Virginia Resolutions, 4 *Elliot's Debates* at 556 .....................................9

Michael D. Shear & Ron Nixon, *How Trump's Rush To Enact an Immigration
    Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017),
    https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-
    immigration-order-chaos.html ...............................................................................................17

Thomas Jefferson, Virginia Act for Establishing Religious Freedom
    (Oct. 31, 1785) ........................................................................................................................7

U.S. Customs & Border Protection, Visa Waiver Program Improvement and
    Terrorist Travel Prevention Act Frequently Asked Questions,
    https://www.cbp.gov/travel/international-visitors/visa-waiver-program/visa-
    waiver-program-improvement-and-terrorist-travel-prevention-act-faq (last
    visited Feb. 15, 2017)............................................................................................................14

U.S. Department of State, Alert Feb. 4, 2017 'Important Announcement:
    Executive Order On Visas,'
    https://travel.state.gov/content/travel/en/news/important-announcement.html ......................21

U.S. Department of State, "Presidential Proclamations" (current as of Feb. 6,
    2017), https://travel.state.gov/content/visas/en/fees/presidential-
    proclamations.html; archived version, https://perma.cc/M2RL-6775 ...................................23

U.S. Refugee Admissions Program, U.S. Department of State,
    https://www.state.gov/j/prm/ra/admissions/ (last visited Feb. 15, 2017)...............................15

Virginia Resolutions of 1798, Address to the People, 4 *Elliot's Debates* .......................................8

## INTEREST OF *AMICI CURIAE*

*Amici* are 167 members of Congress who are familiar with the Immigration and Nationality Act and other laws passed by Congress related to immigration and national security concerns, as well as the interplay between those laws and constitutional guarantees. Many *amici* have participated in the drafting of immigration and national security legislation and serve or have served on key committees with jurisdiction over these issues. *Amici* are also committed to ensuring that our immigration laws and policies both help protect the nation from foreign and domestic attacks and comport with fundamental constitutional principles, such as religious freedom and equal protection under the law. *Amici* are thus particularly well-situated to provide the Court with insight into the limitations that both the Constitution and federal immigration laws impose on the Executive Branch's discretion to restrict admission into the country, and have a strong interest in seeing those limitations respected.

A full listing of *amici* appears in the Appendix.

## SUMMARY OF ARGUMENT

The United States is a nation built on immigration: "From its inception, our Nation welcomed and drew strength from the immigration of aliens." *In re Griffiths*, 413 U.S. 717, 719 (1973). It is also a nation built on the rule of law. As members of Congress, *amici* recognize that the President has broad authority over immigration and national security matters, but that "power is subject to important constitutional limitations," *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001), as well as statutory limitations reflected in the Immigration and Nationality Act ("INA"). The President's January 27, 2017 Executive Order (the "Order") transgresses those constitutional and statutory limitations, and this Court has both the authority and duty to say so. *Id.* at 695. As the Ninth Circuit recently explained in rejecting the Administration's claim that the Order is "unreviewable," "[t]here is no precedent to support this claimed unreviewability, which runs

contrary to the fundamental structure of our constitutional democracy." *Washington v. Trump*, ---F.3d ---, 2017 WL 526497, at \*5 (9th Cir. Feb. 9, 2017).

Even during the short period while the Order remained fully in effect—before courts across the country intervened to restrain ongoing violations of constitutional and statutory rights, pending further review—the Order unleashed chaos and abridged the rights of countless individuals with ties to the seven Muslim-majority countries that it targets. Within hours of being signed, the Order barred from entry to the United States thousands of visa holders who had already undergone months of rigorous vetting, led to the unjustified detention at domestic airports of numerous others lawfully entering the country, and left many more stranded while en route to the United States. Making matters worse, the Order's effects are not limited to those seeking to enter the country using duly issued visas. The Order prevents U.S. citizens, lawful permanent residents, refugees, and asylees *within the United States* from sponsoring and reuniting with their children, spouses, and other relatives who are nationals of the targeted countries. It also prevents lawful permanent residents and nonimmigrant-visa holders from leaving the United States for fear of being refused entry upon their return.

On top of all this, the Order—in both practical effect and design—targets Muslims, consistent with President Trump's repeated promises (while still a candidate) that he would limit entry of Muslims into the country.[1] Indeed, the President's public statements have made clear that the preference the Order explicitly creates for members of a "minority religion," Order § 5(b), is designed to "help" only "Christians," and not adherents of other faiths who are

---

[1] *See, e.g.*, Dara Lind, *Donald Trump proposes "total and complete shutdown of Muslims entering the United States*, Vox.com (Dec. 7, 2015), http://www.vox.com/2015/12/7/9867900/donald-trump-muslims; Amy B. Wang, *Trump asked for a "Muslim ban," Guiliani says—and ordered a commission to do it legally*, Wash. Post (Jan. 29, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.aa581a145c57.

persecuted.[2] It is small wonder, then, that the Order has been widely perceived across the globe as an affront to Muslims.

The Order flies in the face of one of our most deeply rooted constitutional values: that the government must not favor (or disfavor) any particular religion. As the Constitution's text and history make clear, the Religion Clauses—both Article VI's prohibition on the use of religious tests, and the First Amendment's promise of "free exercise of religion" and prohibition on "laws respecting an establishment of religion"—prohibit a religious test that singles out a religion for discriminatory treatment under our immigration laws.

The Order's religious discrimination also runs afoul of the Fifth Amendment's requirement of due process, which includes the guarantee of the equal protection of the laws. The original meaning of the Constitution confirms that those core principles of equality protect both citizen and noncitizen alike. Indeed, during debates over the Alien Act of 1798—which authorized the President to remove aliens he deemed harmful to the public peace and safety— opponents of the Act time and again emphasized the breadth of the Fifth Amendment's guarantee of due process, which "speaks of persons, not of citizens." Annals of Cong., 5th Cong., 2d Sess. 1956 (1798). Those views ultimately carried the day, as the Act was widely viewed as unconstitutional, leaving "no permanent traces in the constitutional jurisprudence of the country." 2 Joseph Story, *Commentaries on the Constitution*, § 1293, at 173 (3d ed. 1858).

Even apart from the fatal flaws of government-sponsored religious discrimination, the Order's facial classification on the basis of nationality runs into additional obstacles—both constitutional and statutory. As a constitutional matter, the Order contravenes settled principles of equal protection. As the Supreme Court has long recognized, "even in the ordinary equal

---

[2] Daniel Burke, *Trump says US will prioritize Christian refugees*, CNN.com (Jan. 30, 2017), http://www.cnn.com/2017/01/27/politics/trump-christian-refugees/.

protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). This Order does not survive even rational-basis review. To begin with, it is vastly overbroad—targeting both individuals and countries in a way that does nothing to further the Order's stated purpose of "protect[ing] the American people from terrorist attacks by foreign nationals admitted to the United States," Order, Preamble. At least since 1975, not a single American has been killed as a result of terrorist attacks on U.S. soil carried out by individuals born in the seven countries targeted. *See infra* at 14. Further, because the Order denies immigration benefits based on where that person is "from," Order § 3(c), it inexplicably sweeps in tens of thousands of individuals who plainly pose no terrorist threat, including long-time residents with homes, jobs, and families in the United States, as well as U.S. citizens seeking to reunite with immediate family members from those countries. The upshot is that the Order does exactly the opposite of what it intends—undermining, rather than enhancing, the nation's security.

As a statutory matter, the Order cannot be squared with Congress's clearly expressed intent in the INA. The INA categorically prohibits discrimination in the issuance of immigrant visas based on, among other things, "nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). In enacting that provision, Congress abolished a prior, widely condemned system of quotas based on national origin and "unambiguously directed that no nationality-based discrimination shall occur," *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). While the Administration relies on Section 212(f) of the INA, which allows the President, under certain circumstances, to "suspend the entry of all aliens or any class of aliens as immigrants or

4

nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f), that provision cannot be read—and has never been read—to authorize the sort of wholesale discrimination involved here. Indeed, interpreting the INA to allow sweeping bans based on nationality would render the later-enacted nondiscrimination provision a dead letter.

The best way to protect the security of the nation, to uphold foundational American values, and to safeguard our democracy is to respect the Constitution's fundamental protections and the laws passed by Congress. "Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

## ARGUMENT

The Supreme Court has never given any President in history what this Administration now seeks—a blank check to control entry into the country, irrespective of constitutional and statutory limitations. *See Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977). As the Court has long recognized, the President's authority over immigration does not change the fundamental principle that "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, so long as the exercise of that authority does not offend some other constitutional restriction." *INS v. Chadha*, 462 U.S. 919, 941 (1983) (citation omitted). Nor does it eliminate the Framers' design that when other branches of government transgress constitutional boundaries, "the judicial department is a constitutional check," 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 196 (Jonathan Elliot ed. 1836) ("*Elliot's Debates*"). Consistent with the fundamental role of Article III courts "to say what the law is," *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)), this Court must ensure that the President's actions comport with "important constitutional limitations," *Zadvydas*, 533 U.S. at 695, and that the President has used a

"constitutionally permissible means of implementing" the authority he claims. *Chadha*, 462 U.S. at 941-42; *see Boumediene*, 553 U.S. at 765 ("Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'" (citation omitted)). As the Ninth Circuit recognized, "courts can and do review constitutional challenges to the substance and implementation of immigration policy." *Washington*, 2017 WL 526497, at *6.

## I.    BECAUSE THE EXECUTIVE ORDER DISCRIMINATES ON THE BASIS OF RELIGION, IT CANNOT BE SQUARED WITH THE CONSTITUTION'S TEXT AND HISTORY.

Although drafted to appear facially neutral with respect to religion, the Order, by its design, practical operation, and widespread perception, targets Muslims. It singles out nationals only from majority-Muslim countries. Moreover, President Trump has repeatedly said that he wanted to limit Muslim entry into the country, *see, e.g.*, Lind, *supra*, and he has made clear that the Order's preferential treatment for "minorities" is designed to "help" Christians in majority-Muslim countries, Burke, *supra*. That is not all. At least one close adviser to the President has publicly stated that this focus on nationality was designed to implement a "Muslim ban." *See* Wang, *supra*. In this context, the Order's discrimination on the basis of religion, which creates a "danger of stigma and stirred animosities" toward Muslims, *see Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 703 (1994) (Kennedy, J., concurring), violates the Constitution.

Our Constitution promises religious freedom to people of *all* religions and nationalities. The Constitution prohibits all religious tests for federal office, providing that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. Const. art. VI, cl. 3. This ban on the use of religious tests reflects the Framers' belief that "as all have an equal claim to the blessings of the government under which they live, and which

6

they support, so none should be excluded from them for being of any particular denomination in religion." 2 *Elliot's Debates* at 119. The United States was conceived as a "great and extensive empire," where "there is, and will be, a great variety of sentiments in religion among its inhabitants." *Id.* at 118-19. As Reverend Daniel Shute observed during the debates in the Massachusetts ratifying convention: "[W]ho shall be excluded from national trusts? Whatever answer bigotry may suggest, the dictates of candor and equity, I conceive, will be, *None*." *Id.* at 119 (emphasis in original).

Article VI's ban on religious tests, however, was not alone sufficient to ensure religious freedom to all. In 1791, the Framers added the First Amendment to the Constitution, broadly guaranteeing the "free exercise of religion" and prohibiting the making of any "law respecting an establishment of religion." U.S. Const. amend I. That Amendment "expresses our Nation's fundamental commitment to religious liberty": the Religion Clauses were "written by the descendants of people who had come to this land precisely so that they could practice their religion freely. . . . [T]he Religion Clauses were designed to safeguard the freedom of conscience and belief that those immigrants had sought." *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 881 (2005) (O'Connor, J., concurring).

As our nation's Framers noted at the time, the guarantee of free exercise and the structural prohibition on establishment together ensure that "[t]he Religion . . . of every man must be left to the conviction and conscience of every man," James Madison, *Memorial and Remonstrance Against Religious Assessments*, in 2 *The Writings of James Madison* 183, 184 (G. Hunt ed. 1901), and that "opinion[s] in matters of religion . . . shall in no wise diminish, enlarge, or affect [our] civil capacities," Thomas Jefferson, Virginia Act for Establishing Religious Freedom (Oct. 31, 1785). These twin guarantees ensure that "[a]ll possess alike liberty of

conscience . . . . It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights. [H]appily the Government of the United States . . . gives to bigotry no sanction, to persecution no assistance." Letter from George Washington to the Hebrew Congregation in Newport, Rhode Island (Aug. 18, 1790), https://founders.archives.gov/documents/Washington/05-06-02-0135.

At the same time they added the First Amendment to the Constitution, the Framers also added the Fifth Amendment, including its Due Process Clause. That Clause—which states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law"—"contains within it the prohibition against denying to any person the equal protection of the laws," thereby "withdraw[ing] from Government the power to degrade or demean." *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013). Significantly, when the Framers adopted this Amendment, they made clear that its protections extend to both citizens and noncitizens alike. During debates over the Alien Act of 1798, which authorized the President to remove aliens he considered harmful to the public peace and safety, the Act was broadly denounced as "bestow[ing] upon the President despotic power over a numerous class of men," *see* Virginia Resolutions of 1798, Address to the People, 4 *Elliot's Debates* at 531, and reducing noncitizens to the status of "outlaws" subject to the "absolute dominion of one man," Kentucky Resolutions of 1798, 4 *Elliot's Debates* at 543. Although it was enacted into law, the Act was widely viewed as unconstitutional, leaving "no permanent traces in the constitutional jurisprudence of the country." 2 Joseph Story, *Commentaries on the Constitution*, § 1293, at 173.[3]

_____

[3] Opponents of the Alien Act time and again emphasized that the Fifth Amendment's guarantee of due process "speaks of persons, not citizens; so far as it relates to personal liberty, the Constitution and the common law includes aliens as well as citizens; and if Congress have the power to take it from one, they may also take it from the other." Annals of Cong., 5th Cong., 2d Sess. 1956. Answering those who thought the government had a free hand when regulating

More than seventy years after the Founding, the Fourteenth Amendment was added to the Constitution, including its express prohibition on any state efforts to "deny to any person . . . the equal protection of the laws." U.S. Const. amend XIV, § 1. The Fourteenth Amendment's equal protection guarantee has been incorporated into the Fifth Amendment's Due Process Clause, and thus requires the federal government to respect the same principles of equality that bind the States. *See Windsor*, 133 S. Ct. at 2695 (observing that "the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved"). That equal protection guarantee reflected the enduring constitutional value of protecting all persons, regardless of whether they were citizens or immigrants coming to the United States for the first time: "[T]he patriots of America proclaimed the security and protection of law for all. . . . No matter what spot of the earth's surface, they were born; no matter whether an Asiatic or African, a European or an American sun first burned upon them; no matter citizens or strangers; no matter whether rich or poor . . . , this new Magna Carta to mankind declares the rights of all to life and liberty and property to be equal before the law." Cong. Globe, 37th Cong., 2d Sess. 1638 (1862).

The original meaning of the equal protection guarantee "establishes equality before the law," Cong. Globe, 39th Cong., 1st Sess. 2766 (1866), "abolishes all class legislation in the States[,] and does away with the injustice of subjecting one caste of persons to a code not applicable to another." *Id.* Indeed, from the very beginning, the Fourteenth Amendment's guarantee of equality was particularly important to prevent state-sponsored discrimination

---

the status of noncitizens, Edward Livingston argued that "the Constitution expressly excludes any idea of this distinction." Annals of Cong., 5th Cong., 2d Sess. at 2012. As Madison pointed out, "[i]f aliens had no rights under the Constitution, they might not only be banished, but even capitally punished, without a jury or other incidents to a fair trial." Madison's Report on the Virginia Resolutions, *in* 4 *Elliot's Debates* at 556.

against immigrants. *See infra* at 12-13 (discussing the reach of the equal protection guarantee).

Exemplifying that view, Congressman John Bingham—one of the drafters of the Fourteenth

Amendment—demanded that "all persons, whether citizens or strangers, within this land . . .

have equal protection in every State in this Union in the rights of life and liberty and property[.]"

Cong. Globe, 39th Cong., 1st Sess. at 1090.

 Consistent with this text and history, precedent confirms that the Constitution's

prohibition on religious discrimination applies to all persons. As the Supreme Court has

repeatedly made plain, the rule that "one religious denomination cannot be officially preferred

over another" is the "clearest command of the Establishment Clause." *Larson v. Valente*, 456

U.S. 228, 244 (1982). Indeed, that command lies at the "heart of the Establishment Clause."

*Kiryas Joel*, 512 U.S. at 703; *see id.* at 714 (O'Connor, J., concurring) ("[T]he government

generally may not treat people differently based on the God or gods they worship, or do not

worship."); *id.* at 728-29 (Kennedy, J., concurring) ("[T]he Establishment Clause forbids the

government to use religion as a line-drawing criterion."); *id.* at 728-29 (Kennedy, J., concurring)

(the Religion Clauses forbid "religious gerrymandering"). In short, "the Establishment Clause is

infringed when the government makes adherence to religion relevant to a person's standing in

the political community." *Id.* at 715 (O'Connor, J., concurring) (quoting *Wallace v. Jaffree*, 472

U.S. 38, 69 (1985) (O'Connor, J., concurring)).

 Free exercise principles, too, proscribe "[o]fficial action that targets religious conduct"

for adverse treatment, and require courts to "'survey meticulously the circumstances of

governmental categories to eliminate . . . religious gerrymanders.'" *Church of Lukumi Babalu*

*Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 534 (1993) (quoting *Walz v. Tax Comm'n of N.Y.*

*City*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)). In sum, "the Religion Clauses . . . all

speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits." *Kiryas Joel*, 512 U.S. at 715 (O'Connor, J., concurring). Similarly, discrimination by the government on the basis of religion has long been viewed as manifestly inconsistent with the basic equality guarantee that our Constitution promises to all. *See id.* at 728 (Kennedy, J., concurring) ("[T]he Establishment Clause mirrors the Equal Protection Clause. Just as the government may not segregate people on account of their race, so too it may not segregate on the basis of religion. The danger of stigma and stirred animosities is no less acute for religious line-drawing than for racial.").

It is irrelevant that the Executive Order here does not mention Muslims by name. "Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination." *Church of Lukumi Babalu*, 508 U.S. at 534; *Kiryas Joel*, 512 U.S. at 699 ("[O]ur analysis does not end with the text of the statute at issue."). Context matters, *see McCreary*, 545 U.S. at 861-62; *Kiryas Joel*, 512 U.S. at 699, and the contextual evidence that the Order singles out and stigmatizes Muslims is overwhelming. *See supra* at 6. Nor does it matter that the Order does not apply to all Muslims. In *Kiryas Joel*, for instance, the Supreme Court struck down a gerrymandered school district drawn to favor a single Jewish sect. *See id*. at 705 ("Here the benefit only flows to a single sect, but aiding this single, small religious group causes no less a constitutional problem than would follow from aiding a sect with more members or religion as a whole."). Singling out seven Muslim-majority nations (particularly after repeatedly stating the intent to ban all Muslims from the United States), while providing better treatment for religious minorities with the intent of prioritizing Christians, establishes both a religious test and constitutes discrimination on the basis of religion. Such action is plainly inconsistent with the principles of religious freedom and anti-discrimination enshrined in our Constitution.

11

II.   **BECAUSE THE EXECUTIVE ORDER DISCRIMINATES ON THE BASIS OF NATIONALITY, IT CANNOT BE SQUARED WITH THE CONSTITUTION'S TEXT AND HISTORY OR THE IMMIGRATION AND NATIONALITY ACT.**

A.   **The Order Violates The Fifth Amendment's Due Process Clause Because The Order's Broad Restrictions Based On Nationality Are Not Rationally Related To Any Legitimate Government Interests.**

As noted above, the Due Process Clause of the Fifth Amendment, which provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law," U.S. Const. amend V, "contains within it the prohibition against denying to any person the equal protection of the laws," and "withdraws from Government the power to degrade or demean." *Windsor*, 133 S. Ct. at 2695. Like the States, the federal government "must govern impartially," and "equal justice under law" for all persons is therefore "served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Just as these guarantees prohibit discrimination on the basis of religion, they also prohibit discrimination on the basis of nationality.

Indeed, discrimination by the government on the basis of national origin has long been viewed as manifestly inconsistent with the basic guarantee our Constitution promises to all. *See Hirayabashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."); *Korematsu v. United States*, 323 U.S. 214, 234-35 (1944) (Murphy, J., dissenting) ("Being an obvious racial discrimination, the order deprives all those within its scope of the equal protection of the laws as guaranteed by the Fifth Amendment."). To be sure, the federal government has greater latitude in the immigration context to regulate on the basis of nationality than it does on the basis of religion, and reasonable actions in response to demonstrable security threats will be upheld. *See, e.g.*, *Rajah v. Mukasey*,

12

544 F.3d 427 (2d Cir. 2008) (9/11 attacks); *Narenji v. Civiletti*, 617 F.2d 745 (D.C. Cir. 1979)

(Iran hostage crisis). That does not mean, however, that the government has a blank check to

discriminate against individuals based on their ancestry. *See Rajah*, 544 F.3d at 438 (recognizing

that actions based on "animus . . . would call for some remedy").

Even if viewed only as a regulation of nationality, the Order still fails because its

discrimination on that basis cannot survive even the most limited judicial review. As the

Supreme Court has long recognized, even in equal protection cases applying "the most

deferential of standards," courts "insist on knowing the relation between the classification

adopted and the object to be attained." *Romer*, 517 U.S. at 632. Thus, at a minimum, the

government's classification must "bear a rational relationship to an independent and legitimate

legislative end." *Id.* at 633. Here, the Order cannot withstand even the most minimal scrutiny

because it is vastly over-inclusive, targeting both individuals and countries in a way that does not

further the Order's stated purpose of "protect[ing] the American people from terrorist attacks by

foreign nationals admitted to the United States," Order, Preamble. *See Romer*, 517 U.S. at 633

(law fails rational basis review where it is "at once too narrow and too broad"); *id.* at 635 ("The

breadth of the [law] is so far removed from these particular justifications that we find it

impossible to credit them.").

Among other things, the Order imposes a blanket ban on entry into the United States by

virtually all noncitizens from seven countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and

Yemen. Order § 3(c) (suspending entry of "aliens from countries referred to in section

217(a)(12) of the INA," with very limited exceptions). There is no evidence, however, to suggest

that such an expansive and categorical exclusion bears any rational relationship to protecting

Americans from terrorist attacks. As the Ninth Circuit has observed, "[t]he Government has

pointed to no evidence that any alien from any of the countries named in the Order has perpetrated a terrorist attack in the United States." *Washington*, 2017 WL 526497, at *10. Indeed, not a single American has been killed as a result of terrorist attacks on U.S. soil carried out by individuals born in those countries since at least 1975. Alex Nowrasteh, *Guide to Trump's Executive Order To Limit Migration for "National Security" Reasons*, Cato Inst.: Cato at Liberty (Jan. 26, 2017), https://www.cato.org/blog/guide-trumps-executive-order-limit-migration-national-security-reasons; *see id.* ("[T]he countries that Trump chose to temporarily ban are not serious terrorism risks."). *Id.*[4] In fact, "[v]ery few attacks on U.S. soil since September 11, 2001 have been traced to foreign nationals at all." Washington Response to Emergency Motion, Ex. A ¶ 4 (joint declaration of former Secretaries of State and national security officials ("National Security Officials Joint Declaration")), *Washington v. Trump*, No. 17-35105 (9th Cir. filed Feb. 6, 2017). In other words, the Order replaces our previous system, which subjected all applicants to appropriate levels of scrutiny, with a broad and categorical ban—undergirded by religious-based tests—that has no basis in the facts on the ground.

---

[4] To be sure, a 2015 law and its implementing regulations provided that nationals of countries participating in the Visa Waiver Program, which "permits citizens of 38 countries to travel to the United States for business or tourism for stays of up to 90 days without a visa," U.S. Customs & Border Protection, Visa Waiver Program Improvement and Terrorist Travel Prevention Act Frequently Asked Questions, https://www.cbp.gov/travel/international-visitors/visa-waiver-program/visa-waiver-program-improvement-and-terrorist-travel-prevention-act-faq (last visited Feb. 15, 2017), would no longer be admitted to the United States without a visa if they had traveled to the countries identified in the Order or were dual-nationals of those countries and were not subject to a specified exception, *see* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, Div. O, Title II, § 203 (2015); DHS Press Release, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016) (designating additional countries subject to the Act's restrictions). In stark contrast with the Order here, however, that 2015 law did not categorically "bar [individuals subject to it from] travel[ling] to the United States," Visa Waiver Program FAQ, *supra*; it simply prohibited such individuals from entering the country without a visa. That law thus provides no precedent for this Order's draconian, nationality-based ban on admission. *See Washington*, 2017 WL 526497, at *10 n.7.

Furthermore, because the Order denies entry based solely on a person's nationality, it inexplicably sweeps in large categories of individuals who plainly pose no terrorist threat. *See Romer*, 517 U.S. at 633 (law fails rational basis review when "[i]t identifies persons by a single trait and then denies them protection across the board"). Infants and young children, for example, are barred under the Order's terms. So, too, are noncitizens who have provided critical support to U.S. military efforts abroad, including Petitioner Hameed Khalid Darweesh, who served as an interpreter for the U.S. Army for over a year, and then worked in other capacities for the U.S. government and for U.S. government contractors. Pet. ¶ 19. Finally, the Order also denies entry to and subjects to other immigration-related restrictions (such as restricting visa renewal and the ability to travel) even individuals who have already been subject to careful vetting and who may already be in the United States, such as refugees—one of the most rigorously scrutinized groups—and certain nonimmigrant visa holders who have cleared consular screening.[5]

Finally, the evidence that the President intended to favor Christian (and not Muslim) refugees—rather than pursuing a neutral policy of aiding adherents of *any* persecuted religion— further demonstrates that the Order is motivated not by legitimate national security interests. Mere "fear, unsubstantiated by factors which are properly cognizable," is not a "permissible" basis for treating one group differently from another. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

That the Order is not rationally related to any legitimate government interest is underscored by its counterproductive effects. Rather than enhancing our national security interests, the Order undermines them, threatening critical international relationships and

---

[5] *See, e.g.*, U.S. Refugee Admissions Program, U.S. Department of State, https://www.state.gov/j/prm/ra/admissions/ (last visited Feb. 15, 2017); Jim Endrizzi et al., *Visas Mantis Security Advisory Opinions*, NAFSA.com, https://www.nafsa.org/findresources/ Default.aspx?id=8645 (last visited Feb. 15, 2017).

alienating those whose cooperation is acutely needed in the fight against violent extremism.

Former Secretaries of State and other former officials who have devoted their careers to

defending the nation have expressed concern that the Order "has alienated U.S. allies" and "will

strain our relationships with partner countries . . . on whom we rely for vital counterterrorism

cooperation." National Security Officials Joint Declaration ¶ 5(b). Former Secretary of State

Condoleezza Rice has publicly stated that the Order was "ill-considered."[6] Roughly 1,000 State

Department diplomats have further predicted that the Order will "sour relations" with "much of

the Muslim world," thereby harming our ability to access the critical "intelligence and resources

[we] need to fight the root causes of terror abroad, before an attack occurs within our borders."[7]

The Order may also help fuel the dangerous narrative—advanced by ISIS and other terrorist

groups—that the United States is engaged in a war against Islam. *See* National Security Officials

Joint Declaration ¶ 3 (the Order "will aid ISIL's propaganda effort and serve its recruitment

message").

　　　The development of national security policy requires delicate judgments that take account

of the often complicated intersection of myriad factors. Accordingly, when the Executive Branch

formulates far-reaching national security policies, it generally engages in careful consideration

and consultation with Congress and the relevant federal agencies. Here, however, federal

---

[6] Carla Marinucci, *Rice, Albright Criticize Trump's Executive Order*, Politico (Feb. 1, 2017), http://www.politico.com/states/california/story/2017/02/condi-rice-and-madeline-albright-deliver-blistering-joint-rebuke-of-trump-immigration-policy-109285.

[7] *Dissent Channel: Alternatives to Closing Doors in Order to Secure Our Borders*, at 2, Dissent Channel (2017) ("Dissent Channel"), https://assets.documentcloud.org/documents/3438487/Dissent-Memo.pdf; Elise Labott, *Over 900 US career diplomats protest Trump order*, CNN (Jan. 31, 2017), http://www.cnn.com/2017/01/30/politics/career-diplomats-dissent-memo; *see also* Department of State, *2 FAM 070 DISSENT CHANNEL* (2011), https://fam.state.gov/fam/02fam/02fam0070.html (explaining that the Dissent Channel enables Department of State officials to "express dissenting or alternative views on substantive issues of policy, in a manner which ensures serious, high-level review and response").

16

agencies with relevant expertise reportedly were not adequately consulted during the deliberations about, and drafting of, the Order. According to one report, "[t]he policy team at the White House developed the executive order . . . and largely avoided the traditional interagency process that would have allowed the Justice Department and homeland security agencies to provide operational guidance . . . ."[8] As a result, Homeland Security Secretary John Kelly and Department of Homeland Security leadership did not see the "final details" until "shortly before the order was finalized." Perez et al., *supra*; Shear & Nixon, *supra* ("the secretary of homeland security was on a White House conference call getting his first full briefing on the global shift in policy" as the President was signing it); *id.* ("the new secretary of defense[] did not see a final version of the order until . . . hours before" it was signed).

In sum, the Order, which was the product of insufficient consultation with the career professionals best positioned to determine how to protect the American people, does not bear any rational relationship to the Order's purported interest in national security. It therefore cannot survive even the most deferential level of review.

### B.     By Discriminating On The Basis Of Nationality, The Order Also Runs Afoul Of The Immigration And Nationality Act.

The INA—consistent with the fundamental constitutional principles discussed above— limits the discretion of the Executive Branch, categorically prohibiting "discriminat[ion]" against prospective entrants in the issuance of immigrant visas based on their "nationality, place of birth,

---

[8] Evan Perez et al., *Inside the confusion of the Trump executive order and travel ban*, CNN.com (Jan. 30, 2017), http://www.cnn.com/2017/01/28/politics/donald-trump-travel-ban/; *see* Michael D. Shear & Ron Nixon, *How Trump's Rush To Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017), https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html; Jonathan Allen & Brendan O'Brien, *How Trump's abrupt immigration ban sowed confusion at airports, agencies*, Reuters.com (Jan. 29, 2017), http://www.reuters.com/article/us-usa-trump-immigration-confusion-idUSKBN15D07S?il=0.

or place of residence," 8 U.S.C. § 1152(a)(1)(A). While the INA also provides the President with the power to suspend the entry of any "*class* of aliens," 8 U.S.C. § 1182(f), that provision does not override the categorical prohibition on nationality-based discrimination. Indeed, no President has ever invoked the limited discretion granted by 8 U.S.C. § 1182(f) in an attempt to completely bar entry of *all* nationals of a particular country—much less, as here, millions of individuals from multiple countries. The Order runs headlong into the INA's prohibition on discrimination.

1. **The INA Categorically Prohibits Discrimination Based On, Among Other Things, Nationality, Place Of Birth, Or Place Of Residence.**

The INA provides that, with certain exceptions not relevant here, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). In adopting this prohibition, "Congress could hardly have chosen more explicit language," "*unambiguously direct[ing]* that no nationality-based discrimination shall occur." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) ("*LAVAS*") (emphasis added), *vacated on other grounds*, 519 U.S. 1 (1996). The adoption of this 1965 provision was a sharp rebuke to what had come before: as one court has explained, "[f]or many years, the immigration laws explicitly discriminated against persons of various races and nationalities." *Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 453 (S.D. Fla. 1980), *aff'd as modified*, 676 F.2d 1023 (5th Cir. 1982). Congress's 1965 amendment abandoned the prior "national quota system of immigration," *id.*, according to which "the selection of immigrants was based upon race and place of birth," H.R. Rep. No. 89-745, at 8–10 (1965). By flatly "prohibiting discrimination in the granting of visas on the basis of 'race, sex, nationality, place of birth, or place of residence,'" the 1965 amendments "manifested Congressional recognition that

the maturing attitudes of our nation made discrimination on these bases improper." *Civiletti*, 503

F. Supp. at 453 (quoting 8 U.S.C. § 1152(a)(1)(A)).

Numerous members of Congress decried the prior quota system as fundamentally un-

American. As one put it, the system stood "in conflict with our principles of human brotherhood

and equality," and was contrary to "our basic American tradition." *Immigration: Hearings on S.*

*500 Before the Subcomm. on Immigration and Naturalization of the S. Comm. on the Judiciary*,

89th Cong. 547 (1965) (statement of Sen. Maurine B. Neuberger); *see Immigration: Hearings on*

*H.R. 2580 Before the Subcomm. on Amending the Immigration and Nationality Act, and for other*

*purposes of the H. Comm. on the Judiciary*, 89th Cong. 418 (1965) (statement of Rep. Benjamin

S. Rosenthal) ("For all too long, America's immigration and naturalization laws have been in

conflict with our national history and ideals."); *Immigration: Hearings on H.R. 7700 and 55*

*Identical Bills Before the Subcomm. on Amending the Immigration and Nationality Act, and for*

*other purposes of the H. Comm. on the Judiciary*, 88th Cong. 208 (1964) (statement of Rep.

Harold Ryan) ("The United States must not support a doctrine of favoritism. We cannot preach

the ideals of democracy, and, at the same time, judge the qualifications of men because of their

race or national ancestry.").

Similarly, when President Johnson signed the 1965 amendments to the INA, he

recognized that the prior immigration system was "a cruel and enduring wrong in the conduct of

the American Nation." Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill

(Oct. 3, 1965). As he explained, such a system "violate[s] the basic principle of American

democracy—the principle that values and rewards each man on the basis of his merit as a man."

*Id.* Testifying in support of the amendments, Attorney General Katzenbach likewise stated that

the prior quota system not only "ought to be intolerable on principle alone," but also "creat[ed]

incalculable harm to our Nation and to our citizens." *Immigration: Hearings on H.R. 2580 Before the Subcomm. on Immigration and Nationality of H. Comm. on the Judiciary*, 89th Cong. 2 (1965) (statement of Attorney General Nicholas Katzenbach). Among other things, it "prevented or delayed" "brilliant and skilled residents of other countries . . . from coming to this country," thereby harming our "domestic self-interest" and "self-interest abroad." *Id.* at 1. And it inflicted countless "cruelties," including "requiring the separation of families." *Id.* at 1, 3. "This is neither good government nor good sense." *Id.* at 1 (quoting President Johnson).

Others who supported the abolition of the quota system recognized the practical reality that discrimination on the basis of nationality could put American lives at risk. Secretary of State Dean Rusk testified in support of the amendments that many countries "resent the fact that the quotas are there as a discriminatory measure." *Immigration: Hearings on H.R. 7700 and 55 and Identical Bills Before the Subcomm. No. 1 of the H. Comm. on the Judiciary*, 88th Cong. 391 (1964) (statement of Secretary of State Dean Rusk).

Based on this testimony, Congress made the considered judgment that we are a nation built on immigration and that immigration of worthy individuals from all corners of the globe increases our domestic tranquility. In other words, "our system of freedom is superior to the rival system of fear." Katzenbach Statement at 1. The 1965 ban on discrimination in immigrant visa issuance was thus designed to prohibit the Executive from practicing wholesale discrimination against people coming from certain countries.

Despite this clear prohibition in the INA, that is precisely what the Order here commands. It directs the "Suspension of Issuance of Visas . . . to Nationals of [the specified] Countries," Order § 3(a), "suspend[s] entry into the United States" of such persons, *id.* § 3(c), and makes clear that any visas for such persons are "otherwise blocked," *id.* § 3(g). Moreover, that is

20

exactly how the Order has been implemented—at least until the courts enjoined its application pending further judicial review. Immediately upon issuance of the Order, government officials stopped issuing new visas to nationals of the seven targeted countries, and even undertook the wholesale revocation of visas already issued to those persons—which, by the Executive's own count, affected as many as 60,000 individuals.[9] By its plain terms and in its actual operation, the Order runs afoul of both the text and purpose of the INA's nondiscrimination provision. Indeed, the Administration's desired interpretation of the statute presumably would empower the President to restore the discriminatory quota system that Congress abolished. That cannot be within the Executive's authority.

### 2.   The Provision On Which The Order Relies Cannot Override The Act's Explicit Prohibition On Discrimination.

As Judge Friendly explained shortly after passage of the 1965 amendments discussed above, even in the area of immigration, an executive officer's "invidious discrimination against a particular race or group" is a classic "abuse of discretion," and thus "impermissible." *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966). Section 212(f) of the INA—which states that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate," 8 U.S.C. § 1182(f)—does not nullify that basic principle, nor does it override the more specific and later-enacted nondiscrimination mandate discussed above. While

---

[9] *See* U.S. Department of State, Alert Feb. 4, 2017, "Important Announcement: Executive Order On Visas," https://travel.state.gov/content/travel/en/news/important-announcement.html; Associated Press, *State Dept: Fewer Than 60,000 Visas Canceled by Trump Order*, N.Y. Times (Feb. 3, 2017), https://www.nytimes.com/aponline/2017/02/03/us/politics/ap-us-travel-ban-visas-revoked.html?_r=0.

§ 212(f) undoubtedly grants the President broad discretion, the President "may not disregard limitations that Congress has, in proper exercise of its own . . . powers, placed on his powers." *Hamdan v. Rumsfeld*, 548 U.S. 557, 593 n.23 (2006); *see Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) ("[I]t is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."). Indeed, reading § 212(f) to allow the sort of discrimination that the Order commands would render the later nondiscrimination provision a dead letter. *See LAVAS*, 45 F.3d at 473 ("The appellees' proffered statutory interpretation, leaving it fully possessed of all its constitutional power to make nationality-based distinctions, would render 8 U.S.C. § 1152(a) a virtual nullity.").[10]

Significantly, to the extent Congress wanted to make exceptions to this categorical nondiscrimination rule, it did so with specificity. For instance, 8 U.S.C. § 1152(a)(1)(A) provides that the nondiscrimination provision should be applied "[e]xcept as specifically provided in . . .

---

[10] The Order also conflicts with other aspects of the INA. That statute—which codifies our international treaty obligations concerning refugees, *see* 1967 Protocol Relating to the Status of Refugees, opened for signature Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967); 1951 Convention Relating to the Status of Refugees, opened for signature July 28,1951, 19 U.S.T. 6259, 189 U.N.T.S. 137 (entered into force Apr. 22, 1954)—defines a refugee as a person "who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of" her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Notably, these overarching protections for refugees are neutral as to any *particular* religion or nationality; they do not contemplate that the United States will grant preferential treatment only to a single religion or nationality—or, conversely, disfavor a particular religion or nationality. At a given time and place, adherents of a particular religious faith may be targeted for persecution; in those circumstances, the INA protects them not because of their faith *per se*, but because their faith has given rise to persecution in their home country—which, in turn, entitles them to refugee status.

sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title." Those provisions, in turn, permit certain preferences for, among others, immediate relatives of U.S. citizens in specified circumstances, *id.* §§ 1151(b)(2)(A)(i), 1153. In carving out those express exceptions, Congress determined that the forms of "discrimination" permitted by those programs and preferences were acceptable. Similarly, in other provisions of the Code, Congress expressly carved out exceptions to the Visa Waiver Program, *see id.* § 1187(a)(12)(A); *see also supra* note 4, thereby requiring persons from certain countries (e.g., Iraq and Syria) to undergo more rigorous screening.[11] Congress did not carve out a similar exception for § 212(f), and this Court lacks the power to rewrite the INA to create an exception that the statutory text does not contain.

Nor has § 212(f) ever been used to enact a categorical bar on entry to all aliens from a particular nation—much less millions of individuals from seven nations, like those covered by the Order here. Rather, as the current Administration has recognized, § 212(f) orders "arise from a foreign policy decision to keep *certain elements* in a given country from getting a visa." U.S. Department of State, "Presidential Proclamations" (current as of February 14, 2017) (emphasis added), https://travel.state.gov/content/visas/en/fees/presidential-proclamations.html (last visited Feb. 14, 2017); archived version (as it appeared on February 6, 2017) available at https://perma.cc/M2RL-6775. The power may not be used to create a blanket exclusion order; setting aside the constitutional problems raised by any such order, it would run afoul of the nondiscrimination rule that Congress added to the INA in 1965—after § 212(f) was enacted. *See supra* at 18-20.

---

[11] This provision includes an exception for persons present in Iraq or Syria "in order to perform military service in the armed forces of a program country" or "to carry out official duties as a full time employee of the government of a program country." 8 U.S.C. § 1187(a)(12)(B). Here, however, the Order by its terms bars the entry of already extensively vetted foreign nationals, such as Mr. Darweesh, who have substantially assisted U.S. military efforts. *See* Pet. ¶¶ 4, 18-19.

The § 212(f) proclamations that were in effect when President Trump took office are a case in point. Proclamation 5377—issued by President Reagan in 1985 and still in effect—suspends the entry of "officers or employees of the Government of Cuba or the Communist Party of Cuba" as nonimmigrants. 50 Fed. Reg. 41329 (1985). Similarly, a 2006 Proclamation suspended the entry of "Persons Responsible for Policies or Actions That Threaten the Transition to Democracy in Belarus." 71 Fed. Reg. 28541 (2006). These uses of § 212(f), and others like them, are consistent with the INA's nondiscrimination provision because they apply to classes of aliens not defined purely by their "nationality, place of birth, or place of residence." The Executive did not stray from this targeted use of § 212(f) even in the wake of the devastating attacks of September 11, 2001.[12]

Even the 1986 Proclamation by President Reagan concerning Cuban nationals—which the federal government has cited in defending the Order, *see* Gov't 9th Circuit Stay Mot. at 4 (citing Pres. Proc. 5517, 51 Fed. Reg. 30470 (1986))—was not an attempt to invoke § 212(f) in order to discriminate on the basis of nationality. Rather, according to official statements issued at the time, that Proclamation was adopted "to tighten enforcement of the [Cuban] embargo" by denying to Cuban nationals the ability to move money and goods into the United States and to come to the United States via third countries. *See* Gerald M. Boyd, *Reagan Acts To Tighten Trade Embargo of Cuba*, N.Y. Times (Aug. 23, 1986), http://www.nytimes.com/1986/08/23/world/reagan-acts-to-tighten-trade-embargo-of-cuba.html. Because it was intended to be an adjunct to the enforcement of the embargo—and not an outright ban on the entry of Cubans—the Proclamation permitted Cuban citizens to enter the United States as nonimmigrants, to the extent permissible, or as immigrants if they were immediate relatives of U.S. citizens, were entitled to

---

[12] *See* Kate M. Manuel, Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* 6-10 & tbl. 1 (Jan. 23, 2017), https://fas.org/sgp/crs/homesec/R44743.pdf.

other special immigrant status, or met other criteria. 51 Fed. Reg. 30470 (1986). By contrast, the Order here is unprecedented because it indiscriminately sweeps in virtually everyone "from" seven separate nations and denies them entry no matter their status.

Finally, other efforts to square the Order with the statutory prohibition on discrimination likewise fail. For example, 8 U.S.C. § 1152(a)(1)(B), which states that nothing in the nondiscrimination provision "shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed," is not to the contrary. That provision simply allows otherwise neutral and nondiscriminatory *procedures* for processing visas, and may not be read in a way that "would render 8 U.S.C. § 1152(a) a virtual nullity," *LAVAS*, 45 F.3d at 473.

* * *

The Order violates both fundamental constitutional norms and the INA. Fortunately, national security and protection of our most deeply cherished liberties are not a zero-sum game. This Court should hold unlawful the ill-conceived Executive Order, allowing the President— after proper consultation with Congress, law enforcement, and national security officials—to protect the nation's security in ways that comply with the Constitution and our nation's laws.

## CONCLUSION

The Court should grant the injunctive relief requested by petitioners and intervenor-plaintiff.

25

Respectfully submitted,

/s/ David H. Gans

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
CONSTITUTIONAL ACCOUNTABILITY
CENTER
1200 18th Street, NW, Suite 501
Washington, D.C. 20036
Tel.: (202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
david@theusconstition.org

Raymond H. Brescia
Associate Professor of Law*
Albany Law School
80 New Scotland Avenue
Albany, New York 12208
Tel.: (518) 445-3247
rbres@albanylaw.edu
*For affiliation purposes only[13]

/s/ Peter Karanjia

Peter Karanjia
Jason Harrow
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
Tel.: (202) 973-4200
Fax: (202) 973-4499
peterkaranjia@dwt.com
jasonharrow@dwt.com

Victor A. Kovner
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel.: (212) 489-8230
Fax: (212) 489-8340
victorkovner@dwt.com[14]

---

[13] Counsel for *amici* are grateful for the valuable contributions to this brief of Professor Brescia's students: Andrew Carpenter, Elyssa Klein, Mary Ann Krisa, Martha Mahoney, Graham Molho, and Gloria Sprague.

[14] *Amici* certify that (a) no party's counsel authored any part of this brief, (b) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief, and (c) no person other than *Amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief. All counsel represent Members of the House of Representatives listed in the Appendix. The Constitutional Accountability Center and Professor Brescia additionally represent Members of the Senate listed in the Appendix.

**APPENDIX:**

LIST OF *AMICI* MEMBERS OF CONGRESS

**U.S. Senate**

Dianne Feinstein,
        Senator of California

Patrick J. Leahy,
        Senator of Vermont

Richard J. Durbin,
        Senator of Illinois

Sheldon Whitehouse,
        Senator of Rhode Island

Amy Klobuchar,
        Senator of Minnesota

Al Franken,
        Senator of Minnesota

Christopher A. Coons,
        Senator of Delaware

Richard Blumenthal,
        Senator of Connecticut

Mazie K. Hirono,
        Senator of Hawaii

Tammy Baldwin,
        Senator of Wisconsin

Michael F. Bennet,
        Senator of Colorado

Cory A. Booker,
        Senator of New Jersey

LIST OF *AMICI* – cont'd

Sherrod Brown,
    Senator of Ohio

Thomas R. Carper,
    Senator of Delaware

Tammy Duckworth,
    Senator of Illinois

Kirsten E. Gillibrand,
    Senator of New York

Kamala D. Harris,
    Senator of California

Edward J. Markey,
    Senator of Massachusetts

Robert Menendez,
    Senator of New Jersey

Jeff Merkley,
    Senator of Oregon

Jack Reed,
    Senator of Rhode Island

Bernard Sanders,
    Senator of Vermont

Brian Schatz,
    Senator of Hawaii

Jeanne Shaheen,
    Senator of New Hampshire

Chris Van Hollen,
    Senator of Maryland

LIST OF *AMICI* – cont'd

Elizabeth Warren,
    Senator of Massachusetts

Ron Wyden,
    Senator of Oregon


**U.S. House of Representatives**

John Conyers, Jr.,
    Representative of Michigan

Jerrold Nadler,
    Representative of New York

Zoe Lofgren,
    Representative of California

Sheila Jackson Lee,
    Representative of Texas

Steve Cohen,
    Representative of Tennessee

Henry C. "Hank" Johnson,
    Representative of Georgia

Theodore E. Deutch,
    Representative of Florida

Luis V. Gutierrez,
    Representative of Illinois

Karen Bass,
    Representative of California

Cedric L. Richmond,
    Representative of Louisiana

3A

LIST OF *AMICI* – cont'd

Hakeem Jeffries,
> Representative of New York

David N. Cicilline,
> Representative of Rhode Island

Eric Swalwell,
> Representative of California

Ted W. Lieu,
> Representative of California

Jamie Raskin,
> Representative of Maryland

Pramila Jayapal,
> Representative of Washington

Brad Schneider,
> Representative of Illinois

Alma S. Adams,
> Representative of North Carolina

Nanette Barragán,
> Representative of California

Ami Bera,
> Representative of California

Donald S. Beyer, Jr.,
> Representative of Virginia

Sanford D. Bishop,
> Representative of Georgia

LIST OF *AMICI* – cont'd

Earl Blumenauer,
    Representative of Oregon

Suzanne Bonamici,
    Representative of Oregon

Brendan F. Boyle,
    Representative of Pennsylvania

Robert A. Brady,
    Representative of Pennsylvania

Julia Brownley,
    Representative of California

G.K. Butterfield,
    Representative of North Carolina

Michael Capuano,
    Representative of Massachusetts

Salud Carbajal,
    Representative of California

Tony Cárdenas,
    Representative of California

André Carson,
    Representative of Indiana

Kathy Castor,
    Representative of Florida

Joaquin Castro,
    Representative of Texas

Judy Chu,
    Representative of California

LIST OF *AMICI* – cont'd

Katherine M. Clark,
    Representative of Massachusetts

Yvette Clarke,
    Representative of New York

W.M. Lacy Clay,
    Representative of Missouri

Jim Cooper,
    Representative of Tennessee

J. Luis Correa,
    Representative of California

Joseph Crowley,
    Representative of New York

Elijah E. Cummings,
    Representative of Maryland

Danny K. Davis,
    Representative of Illinois

Susan Davis,
    Representative of California

Diana L. DeGette,
    Representative of Colorado

Valdez Butler Demings,
    Representative of Florida

Rosa L. DeLauro,
    Representative of Connecticut

Suzan K. DelBene,
    Representative of Washington

6A

LIST OF *AMICI* – cont'd

Mark DeSaulnier,
    Representative of California

Debbie Dingell,
    Representative of Michigan

Lloyd Doggett,
    Representative of Texas

Keith Ellison,
    Representative of Minnesota

Eliot Engel,
    Representative of New York

Anna Eshoo,
    Representative of California

Adriano Espaillat,
    Representative of New York

Elizabeth Etsy,
    Representative of Connecticut

Bill Foster,
    Representative of Illinois

Lois Frankel,
    Representative of Florida

Marcia Fudge,
    Representative of Ohio

Tulsi Gabbard,
    Representative of Hawaii

Ruben Gallego,
    Representative of Arizona

LIST OF *AMICI* – cont'd

Vicente González,
	Representative of Texas

Al Green,
	Representative of Texas

Gene Green,
	Representative of Texas

Raúl Grijalva,
	Representative of Arizona

Colleen Hanabusa,
	Representative of Hawaii

Alcee L. Hastings,
	Representative of Florida

Brian Higgins,
	Representative of New York

Steny H. Hoyer,
	Representative of Maryland

Jared Huffman,
	Representative of California

Eddie Bernice Johnson,
	Representative of Texas

William R. Keating,
	Representative of Massachusetts

Robin L. Kelly,
	Representative of Illinois

Joseph P. Kennedy, III,
	Representative of Massachusetts

LIST OF *AMICI* – cont'd

Ro Khanna,
      Representative of California

Ruben Kihuen,
      Representative of Nevada

Ron Kind,
      Representative of Wisconsin

Brenda L. Lawrence,
      Representative of Michigan

Barbara Lee,
      Representative of California

Sander Levin,
      Representative of Michigan

John Lewis,
      Representative of Georgia

Alan Lowenthal,
      Representative of California

Nita Lowey,
      Representative of New York

Ben Ray Luján,
      Representative of New Mexico

Michelle Lujan Grisham,
      Representative of New Mexico

Stephen F. Lynch,
      Representative of Massachusetts

Carolyn B. Maloney,
      Representative of New York

LIST OF *AMICI* – cont'd

Doris Matsui,
    Representative of California

Betty McCollum,
    Representative of Minnesota

James P. McGovern,
    Representative of Massachusetts

Grace Meng,
    Representative of New York

Gwen Moore,
    Representative of Wisconsin

Grace F. Napolitano,
    Representative of California

Richard M. Nolan,
    Representative of Minnesota

Donald Norcross,
    Representative of New Jersey

Eleanor Holmes Norton,
    Representative of District of Columbia

Beto O'Rourke,
    Representative of Texas

Jimmy Panetta,
    Representative of California

Bill Pascrell, Jr.,
    Representative of New Jersey

Donald M. Payne, Jr.,
    Representative of New Jersey

LIST OF *AMICI* – cont'd

Nancy Pelosi,
    Representative of California

Ed Perlmutter,
    Representative of Colorado

Scott H. Peters,
    Representative of California

Chellie Pingree,
    Representative of Maine

Mark Pocan,
    Representative of Wisconsin

Jared Polis,
    Representative of Colorado

David Price,
    Representative of North Carolina

Mike Quigley,
    Representative of Illinois

Kathleen M. Rice,
    Representative of New York

Lucille Roybal-Allard,
    Representative of California

Bobby L. Rush,
    Representative of Illinois

Gregorio Kilili Camacho Sablan,
    Representative of Northern Mariana Islands

Linda T. Sánchez,
    Representative of California

LIST OF *AMICI* – cont'd

John P. Sarbanes,
    Representative of Maryland

Janice D. Schakowsky,
    Representative of Illinois

Adam B. Schiff,
    Representative of California

Robert C. "Bobby" Scott,
    Representative of Virginia

José E. Serrano,
    Representative of New York

Carol Shea-Porter,
    Representative of New Hampshire

Brad Sherman,
    Representative of California

Albio Sires,
    Representative of New Jersey

Louise Slaughter,
    Representative of New York

Adam Smith,
    Representative of Washington

Darren Soto,
    Representative of Florida

Jackie Speier,
    Representative of California

Mark Takano,
    Representative of California

LIST OF *AMICI* – cont'd

Bennie Thompson,
    Representative of Mississippi

Mike Thompson,
    Representative of California

Dina Titus,
    Representative of Nevada

Paul D. Tonko,
    Representative of New York

Norma Torres,
    Representative of California

Juan Vargas,
    Representative of California

Marc Veasey,
    Representative of Texas

Filemon Vela, Jr.,
    Representative of Texas

Nydia Velázquez,
    Representative of New York

Debbie Wasserman Schultz,
    Representative of Florida

Bonnie Watson Coleman,
    Representative of New Jersey

Peter Welch,
    Representative of Vermont

Frederica S. Wilson,
    Representative of Florida

LIST OF *AMICI* – cont'd

John Yarmuth,
    Representative of Kentucky

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2017, I caused to be electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record in this proceeding.


Dated:  Washington, D.C.     DAVIS WRIGHT TREMAINE LLP
   February 16, 2017

           By: _____s/ Peter Karanjia_____
            Peter Karanjia

           1919 Pennsylvania Avenue, N.W., Suite 800
           Washington, D.C. 20006
           Tel: (202) 973-4200
           Fax: (202) 973-4499
           Email: peterkaranjia@dwt.com