UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAMEED KHALID DARWEESH, et al., <br><br> on behalf of themselves and others similarly situated, <br> *Petitioners*, <br><br> v. <br><br> DONALD TRUMP, President of the United States, et al., <br><br> *Respondents*. | Case No. 1:17-cv-00480 (CBA) |

## PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS AND REPLY REGARDING PRELIMINARY INJUNCTION

Michael J. Wishnie (MW 1952)
Muneer I. Ahmad†
Elora Mukherjee (EM 4011)
Marisol Orihuela†
JEROME N. FRANK LEGAL SERVICES
ORGANIZATION*
YALE LAW SCHOOL‡
P.O. Box 209090
New Haven, CT 06520-9090
Phone: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@yale.edu

Lee Gelernt (LG-8511)
Omar C. Jadwat (OJ-7025)
Cecillia D. Wang (CW-8359)
Andre I. Segura†
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
lgelernt@aclu.org
ojadwat@aclu.org
cwang@aclu.org
asegura@aclu.org


*Counsel for Petitioners*
*Additional Counsel Appear on next page*

Mark Doss
Rebecca Heller
Julie Kornfeld
Stephen Poellot
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
URBAN JUSTICE CENTER
40 Rector St, 9th Floor
New York, NY 10006
Tel. (646)-602-5600
mdoss@refugeerights.org
bheller@refugeerights.org
jkornfeld@refugeerights.org
spoellot@refugeerights.org

Karen C. Tumlin[††]
Nicholas Espíritu[††]
Melissa S. Keaney[†]
Esther Sung[†]
NATIONAL IMMIGRATION
LAW CENTER
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
Phone: (213) 639-3900
tumlin@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

Jennifer Chang Newell[††]
Cody H. Wofsy[††]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 343-0770
jnewell@aclu.org
cwofsy@aclu.org

Jonathan Polonsky
KILPATRICK TOWNSEND & STOCKTON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel. (212) 775 8703
jpolonsky@kilpatricktownsend.com

Justin B. Cox[†]
NATIONAL IMMIGRATION
LAW CENTER
1989 College Ave. NE
Atlanta, GA 30317
Phone: (678) 404-9119
cox@nilc.org

[**]Application for admission forthcoming.
[††] Appearing *pro hac vice*.
[‡] For identification purposes only.

**TABLE OF CONTENTS**

**INTRODUCTION**……………………………………………………………….....1

**STATEMENT OF THE CASE**……………………………………………………...3

**LEGAL STANDARDS**……………………………………………………………....5

**ARGUMENT**

I.      The Case Is Not Moot…………………………………………………..6

II.     The Executive Order Discriminates on the Basis of Religion and Is Therefore Unconstitutional………………………………………………………14

III.    The Executive Order Unlawfully Deprives Class Members of Their Right to Apply for Asylum and Withholding of Removal……………………………25

IV.     The Executive Order's Discrimination on the Basis of Nationality Violates Section 202 of the Immigration and Nationality Act…………………………28

V.      The Executive Order Violates Due Process……………………………...30

VI.     The Executive Order Violates the Administrative Procedure Act………………33

VII.    Other Preliminary Injunction Factors……………………………………34

**CONCLUSION**………………………………………………………………40

# TABLE OF AUTHORITIES

## Cases

*Ali v. Trump,* No. 17-0135 (W.D. Wash. Feb. 6, 2017) ................................................... 36

*Am. Acad. of Religion v. Napolitano,* 573 F.3d 115, 126 (2d Cir. 2009) ...................................... 21

*Amador v. Andrews,* 655 F.3d 89, 99-101 (2d Cir. 2011) ............................................. 11

*Ambrose v. Malcolm,* 414 F. Supp. 485, 493 (S.D.N.Y. 1976) ..................................... 35

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ....................................................... 6

*Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir. 1984) .......................................... 31

*Azizi v. Thornburgh,* 908 F.2d 1130, 1134 (2d Cir. 1990), ............................................. 33

*Aziz v. Trump,* No. 17-0116 (E.D. Va. Feb. 13, 2017) ........................................ 2, 11,37

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 715 (1994) ...................... 15

*Campos v. Nail* 43 F.3d 1285, 1288 (9th Cir. 1994) ........................................... 27

*Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 57 (2d Cir. 2016) ...................................6

*City of Boerne v. Flores,* 521 U.S. 507, 516 (1997) ........................................ 26

*City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) .......................................... 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
 508 U.S. 520, 532, 534, 540 (1993) ...................................................... 15

*Comer v. Cisneros,* 37 F.3d 775, 800 (2d Cir. 1994) .............................................. 8,10

*County of Riverside v. McLaughlin,* 500 U.S. 44, 51-52 (1991) ................................. 10

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ................................. 30

*Department of Agriculture v. Moreno,* 413 U.S. 528, 534 (1973) ................................. 21

*Dia v. Ashcroft,* 353 F.3d 228, 239 (3d Cir. 2003), ..................................... 32

*Dolan v. Connolly,* 794 F.3d 290, 293 (2d Cir. 2015) ................................... 6

*Etuk v. Slattery,* 936 F. 2d 1433, 1441-43 (2d Cir. 1991) ................................. 8

*Ezeagwuna v. Ashcroft,* 325 F.3d 396, 400, 405 (3d Cir. 2003) .....................................31

*F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ............................................... 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
528 U.S. 167, 189 (2000)......................................................................................................... 8

*Gerstein v. Pugh,* 420 U.S. 103, 110-11 (1975) ........................................................................ 35

*Haitian Refugee Ctr. v. Smith,* 676 F.2d 1023, 1038 (5th Cir. 1982) ......................................... 31

*Hassan v. City of New York,* 804 F.3d 277, 290 n.2 (3d Cir. 2015) ........................................... 15

*Holder v. Humanitarian Law Project,* 561 U.S. 1, 34 (2010) .......................................................22

*Hunter v. Underwood,* 471 U.S. 222, 227-28 (1985) ................................................................. 15

*Ibrahim v. Dep't of Homeland Sec.,* 669 F.3d 983, 997 (9th Cir. 2012), .................................... 32

*INS v. Cardoza-Fonseca,* 480 U.S. 421, 444 (1987) ................................................................. 27

*INS v. Chadha,* 462 U.S. 919, 940-41 (1983) ........................................................................... 24

*Jankowski-Burczyk v. INS,* 291 F.3d 172, 178 (2d Cir. 2002) .................................................. 24

*Judulang v. Holder,* 565 U.S. 42, 53 (2011) ............................................................................. 34

*Kerry v. Din,* 135 S. Ct. 2128, 2141 (2015) ............................................................................. 21

*Kone v. Holder,* 596 F.3d 141, 147 (2d Cir. 2010) ................................................................... 27

*Kowalczyk v. INS,* 245 F.3d 1143, 1146-49 (10th Cir. 2001) ...................................................... 31

*Lamont v. Woods,* 948 F.2d 825, 835 (2d Cir. 1991)................................................................. 24

*Landon v. Plascencia,* 459 U.S. 21, 33-34 (1982) .................................................................... 32

*Larson v. Valente,* 456 U.S. 228, 246 (1982), .......................................................................... 14

*Loughalam v. Trump,* No. 17-10154 (D. Mass. Feb. 3, 2017).............................................. 36, 38

*Manwani v. U.S. Dep't of Justice,* 736 F. Supp. 1367, 1381 (W.D.N.Ca. 1990) ........................ 32

*Mitchell v. Cuomo,* 748 F. 2d 804, 806 (2d Cir. 1984),............................................................. 35

*Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F. 3d 506 (2d Cir. 2005) ................. 35

*Orantes-Hernandez v. Thornburgh,* 919 F.2d 549, 553 (9th Cir. 1990)..................................... 27

*Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 487 (1997)....................................................... 18

*Robidoux v. Celani,* 235 F.3d 115, 125 (2d Cir. 2000)............................................................... 24

*Rojas-Reyes v. INS,* 135 S. Ct. 2128, 2141 (2015) ...................................................... 21

*Romero v. INS,* 399 F.3d 109, 112 (2d Cir. 2005) ....................................................... 30

*Romer v. Evans,* 517 U.S. 620, 634-35 (1996) .............................................................. 21

*Salazar v. King,* 822 F.3d 61, 73 (2d Cir. 2016) ........................................................... 10

*Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155 (1993).......................................... 28

*Texas Monthly v. Bullock,* 489 U.S. 1, 20 (1989), ....................................................... 17

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 648 (2d Cir. 2011) ..................6

*United States v. Brown,* 352 F.3d 654, 668 (2d Cir. 2003) (same)............................... 14

*United States v. Lue,* 134 F.3d 79, 86 (2d Cir. 1998) .................................................... 24

*United States v. Robel,* 389 U.S. 258, 264 (1967) ........................................................ 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266-68 (1977). ............... 15

*Washington v. Trump,* F.3d, 2017 WL 526497 (9th Cir. 2017)............................................. passim

*White v. Mathews,*559 F.2d 852, 857 (2d Cir. 1977) ..................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) ....................................... 6

*Yiu Sing Chun v. Sava,* 708 F.2d 869, 876 (2d Cir. 1983)............................................. 27

*Yuen Jin v. Mukasey,* 538 F.3d 143, 158-60 (2d Cir. 2008) ......................................... 24

*Zadvydas v. Davis,* 533 U.S. 678,695 (2001) ............................................................... 24

**Statutes and Regulations**

5 U.S.C. § 706(2)(A)…………………………………………………………………3, 30, 33

5 U.S.C. § 706(2)(B)…………………………………………………………………...3, 34

5 U.S.C. § 706(2)(C)……………………………………………………………………....3

5 U.S.C. § 706(2)(D)……………………………………………………………………...3

8 U.S.C. § 1101(a)(13)(A)………………………………………………………………...7

8 U.S.C.§1227(a)(1)(B)……………………………………………………………..…....14

8 U.S.C. § 1182(f)……………………………………………………….......................*passim*

42 U.S.C. §2000bb *et seq*……………………………………………………………………………...26

42 U.S.C. § 2000cc *et seq*……………………………………………………………………………...26

8 U.S.C. 1158(a)………………………………………………………………………………………26

8 U.S.C. § 1231(b)(3)………………………………………………………………………………26, 36

8 U.S.C. § 1231(b)(3)(A)……………………………………………………………………………...26

8 U.S.C. § 1158(a)(1)…………………………………………………………………………………27

8 U.S.C. § 1225(b)(1)(A)(ii)…………………………………………………………………………27

8 C.F.R. § 235.3(b)(4)………………………………………………………………………………27

INA § 202(a)(1)(A), 8 U.S.C. § 1152(a)(1)(A)……………………………………………………...28, 29

8 U.S.C. § 1152(a)(1)(B)…………………………………………………………………………...29

8 U.S.C. § 1158……………………………………………………………………………………36

Plaintiffs hereby oppose the government's motion to dismiss and reply to the government's memorandum in opposition to a preliminary injunction.

## INTRODUCTION

This case involves a challenge to Executive Order No. 13769 by individuals who have reached or will reach <u>United States soil</u>. As such, it is far narrower and more straightforward than virtually every other case around the country challenging the Executive Order, including the State of Washington's case, in which the Ninth Circuit issued a preliminary injunction barring enforcement of the Executive Order as to individuals on U.S. soil <u>and</u> those abroad who have never traveled to the United States. *Washington v. Trump*, __F.3d __, 2017 WL 526497 (9th Cir. 2017).

The Executive Order bars certain noncitizens from entering the country for varying lengths of time. Specifically, it bars refugees from entering for 120 days; immigrant (i.e., green card) and nonimmigrant (i.e., temporary visitor) visa holders from seven Muslim-majority countries for 90 days; and Syrian refugees indefinitely. In addition, the Order is designed to disfavor Muslim refugees and to favor Christian refugees. In its short period of operation, before being enjoined by this and other courts, the ban placed people at risk of persecution and torture, separated families, disrupted workplaces, and interfered with courses of study. By design, the ban has disproportionately impaired the rights of Muslims; although ostensibly justified on the basis of national security, the Executive Order seeks to fulfill the President's campaign promise to ban Muslim entry to the country, and that repeatedly expressed intention is evident on the face of the Order.

There is no question that the plaintiffs in this case, individuals who are or will be on U.S. soil, are entitled to statutory rights, including, most importantly, the right to apply for persecution-related relief.  There is likewise no question that plaintiffs have constitutional rights, including the right to be free from religious discrimination and the right to due process.  And as both the Ninth Circuit and a Virginia district court recently held, these rights cannot simply be discarded by the President, regardless of what authority he invokes.  *Washington*, 2017 WL 526497 at *9 ("[T]he government has failed to establish that it will likely succeed on its due process argument in this appeal."); *Aziz v. Trump*, No. 17-0116 at *20 n.11 (E.D. Va. Feb. 13, 2017) (order granting preliminary injunction) attached as Ex. A to Decl. of Nicholas Espíritu ("Espíritu Decl.").

That is particularly so where, as here, the President has offered <u>no</u> evidence that the ban is necessary to protect national security; indeed the only evidence in the record regarding national security is the uncontradicted declaration of 10 national security professionals, including two former Secretaries of State, who explain that this unprecedented ban is not only unnecessary to protect national security, but is actually counterproductive.  *See* Espíritu Decl. Ex. B (Joint Declaration of Madeleine K. Albright, et al. in *Washington v. Trump*, No. 17-35105 (9th Cir., filed Feb. 6, 2017)); *see also* Dkt. No. 137 (Amicus Brief of Former National Security Officials). As the Ninth Circuit stated: "Rather than present evidence to explain the need for the Executive Order, the Government has taken the position that we must not review its decision at all." *Washington*, 2017 WL 526497 at *10; *see also Aziz*, No. 17-0116 at 17 ("Defendants have not . . . produced any evidence, beyond the text of the EO itself, to support their contention that the EO was primarily motivated by national security concerns.").

2

Given that this case concerns only those individuals who have reached or will reach U.S. soil, the government understandably devotes comparatively little space to the merits, and instead argues that the case is moot.  But the case is not moot under well-established Second Circuit law, because this is a putative class action involving highly transitory claims in which the two named plaintiffs received (incomplete) relief only *after* the class certification motion was filed.  The Second Circuit has stressed repeatedly that the government should not be permitted to moot a case by granting relief to the named plaintiffs after a class certification motion is filed, especially where, as here, the claims are inherently transitory and the putative class includes future members as well as those already affected by the challenged policy.

The Court should deny the government's motion to dismiss.  It should also grant a preliminary injunction in light of the heavy vetting of individuals who have reached or will reach the United States, the inevitable chaos that will ensue if the ban is allowed to take effect again, and the irreparable harm that many plaintiffs would face.

## STATEMENT OF THE CASE

Approximately twelve hours after the Executive Order was signed, plaintiffs Darweesh and Alshawi brought this action on behalf of themselves and those similarly situated, seeking to enjoin the operation of the Order against those who had reached or would reach U.S. soil.  Dkt. No. 1.  Plaintiffs assert statutory and constitutional claims, including the denial of the statutory right to apply for asylum and similar forms of relief from persecution; the denial of due process; the denial of equal protection; and the violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D) (prohibiting, *inter alia*, action that is arbitrary, capricious, an abuse of discretion, or contrary to constitutional right).  *Id*.  Plaintiffs simultaneously filed for class certification.  Dkt. No. 4.

3

As alleged in the complaint, President Trump signed the Executive Order on January 27, 2017, one week after assuming office.  Dkt. No. 1 ¶¶ 12, 13.  The Order, *inter alia*, invokes Immigration and Nationality Act ("INA") Section 212(f), 8 U.S.C. § 1182(f), as authority to suspend the entry into the United States of refugees, including Syrian refugees indefinitely, as well as of noncitizens from seven designated countries: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.  Dkt. No. 1 ¶¶ 14-16; *see also* Executive Order, Dkt. No. 2 Ex. A ("Order").  Within hours of the Order being signed, there were numerous individuals—to whom the United States had already granted visas, permanent residency, or refugee status after extensive vetting— detained and questioned by immigration officers, denied entry to the United States, and subjected to the threat of removal because of the Executive Order.  Dkt. No. 1 ¶ 55.

Mr. Darweesh, for example, held an Iraqi Special Immigrant Visa, granted to him based on his ten years of service to the U.S. government (including the U.S. military) and the threats to his life and well-being that he suffered as a result.  *Id*. ¶¶ 17-22.  The process for obtaining that visa involved securing a statement from the U.S. government that he had provided "faithful and valuable service" to the government and waiting over two additional years for his and his family's visas to be processed.  *Id*. ¶¶ 23-30.  Despite holding a valid visa, Mr. Darweesh was detained by the government on his arrival in the United States and remained detained at the time the complaint was filed.  *Id*. ¶ 31.  He was denied access to his attorneys and was at risk of being returned to Iraq against his will despite the serious danger to his life in that country.  *Id*. ¶¶ 32- 38.

Similarly, Mr. Alshawi arrived in the United States carrying a valid immigrant visa, granted by the U.S. government to reunite him with his wife and seven-year-old son, both of whom are lawful permanent residents.  *Id*. ¶¶ 39-42, 45.  Ms. Alshawi, Mr. Alshawi's wife,

worked for a U.S. contractor in Iraq, and her family was targeted because of that association.  *Id*. ¶¶ 43-44.  She and their son were granted refugee status, and Mr. Alshawi was approved to enter the United States to join them.  *Id*. ¶¶ 45-46.  Like Mr. Darweesh, however, Mr. Alshawi was detained upon arrival, refused access to his attorneys, and was at risk of removal at the time the complaint was filed.  *Id*. ¶¶ 48-53.  When Mr. Alshawi's attorneys sought to speak with their client, a government agent told them that the person to talk to was "Mr. President.  Call Mr. Trump."  *Id*. ¶ 51.  Other class members were similarly detained and at risk of removal.  *Id.* ¶ 55.

Shortly after filing their complaint and motion for class certification, plaintiffs filed a motion seeking a stay of removal.  Dkt. No. 6.  After a hearing held on the evening of January 28, 2017, Judge Donnelly enjoined removals of individuals designated in the Order but otherwise entitled to enter the United States, concluding that plaintiffs had a "strong likelihood of success" on the merits, that there was "imminent danger" of "substantial and irreparable injury to refugees, visa-holders, and other individuals" subject to the Order, and that a stay of removal would not "injure the other parties interested in the proceeding."  Dkt. No. 8.  Judge Donnelly also found a likelihood of success that class certification would be granted.  Conference Tr. Jan. 28, 2017, at 13.  The government has opposed the maintenance of this order, and has moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## LEGAL STANDARDS

In considering a motion to dismiss, the Court must construe the complaint liberally, accept all non-conclusory factual allegations as true, and draw all reasonable inferences in the plaintiffs' favor.  *Dolan v. Connolly*, 794 F.3d 290, 293 (2d Cir. 2015).  The complaint need allege only enough facts to "state a claim to relief that is plausible on its face," meaning "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As shown below, plaintiffs' allegations state both constitutional and statutory claims. Similarly, in considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1), "plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial" to the question of subject matter jurisdiction. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

The familiar four-part test governs the issuance of a preliminary injunction: the plaintiff must show (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Alternatively, the Court may award an injunction if the plaintiff demonstrates irreparable harm and "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.,* 660 F.3d 643, 648 (2d Cir. 2011) (internal quotation marks omitted). Because the merits questions under this analysis substantially overlap with the merits questions presented by the motion to dismiss, plaintiffs will address them together.

## ARGUMENT

## I.     THE CASE IS NOT MOOT.

The government contends that the case is moot and the Court therefore lacks jurisdiction under Fed. R. Civ. P. 12(b)(1) because the two named plaintiffs have now been admitted to the United States. Resp'ts' Mem. of Law in Supp. of Mot. to Dismiss, Dkt. No. 66-1 ("Gov't Br.") at 5. That contention is wrong under well-settled law, for two reasons. First, the claims of the named plaintiffs themselves are not moot because the relief they have received represents only a

6

voluntary cessation of the challenged policy.  Second, the government cannot moot a class action by granting relief to the named plaintiffs after the complaint and class certification motion have been filed, where, as here, the claims are inherently transitory.

The government argues in the alternative that even if the circumstances of putative class members should be considered, the case should still be deemed moot because no class member is currently *detained*.  That alternative argument is likewise wrong, for two independent reasons. First, this case challenges the Executive Order's ban on class members' *entry or admission* to the United States,[1] not simply their detention incident to the denial of admission—a point the government implicitly recognizes by repeatedly stating that the named plaintiffs' cases are moot because they have been "admitted."  Gov't Br. 1, 6, 7-8.  The government has not suggested that all those subjected to the Executive Order have been admitted to the United States, and contends only that the putative class members are no longer detained.  Second, the class is defined as all those who are or "will be" subjected to the Executive Order.  Dkt. No. 4 ¶ 7.  Consequently, even if the case concerned only detention, and not admission, the case would not be moot because, absent an injunction, individuals traveling to the United States in the future will be detained and removed—a point the government does not, and could not, dispute.

## A.  Named Plaintiffs' Claims Are Not Moot Under The Voluntary Cessation Doctrine.

The Supreme Court has explained that it is "well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation and internal quotation marks omitted).  As the Court has emphasized,

---

[1] The Executive Order mentions both "entry" and "admission."  *See, e.g.,* Order §§ 1, 3.  The INA defines admission as the lawful entry of a noncitizen into the United States after inspection and authorization by an immigration officer.  8 U.S.C. § 1101(a)(13)(A).

"the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent," and a case may only become moot if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (citation and internal quotation marks omitted). Notably, "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness*." Id.* (citation omitted); s*ee also id.* at 190 (describing "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"); *Comer v. Cisneros*, 37 F.3d 775, 800 (2d Cir. 1994) (discussing defendants' "very heavy burden"); *Etuk v. Slattery*, 936 F. 2d 1433, 1441-43 (2d Cir. 1991) (holding that it is the defendants' burden to show there is no reasonable expectation that they would re-impose the challenged practice and that absent an "unambiguous assurance that [defendants] will not revert to its old policies, plaintiffs plainly have a continuing stake in the outcome of this litigation"); *Aziz*, No. 17-0116 at 3; *Washington v. Trump*, 2017 WL 526497 at *8.

The government has not met its "formidable" burden here. Notably, although the government has admitted the named plaintiffs, the Executive Order has not been rescinded, and the government continues to claim the unreviewable authority to deny entry to the noncitizens specified in Section 3(c), including the named plaintiffs.[2] It is only by virtue of the stay issued in this case and the preliminary injunctions in *Washington* and other cases that the government has currently ceased to apply the Executive Order. As a result, plaintiffs are unable to leave the

---

[2] The Executive Order on its face covers lawful permanent residents and was originally applied to them. As other courts have noted, the Order has not been revised and the statement from White House counsel that the Order no longer covers lawful permanent residents is not binding. *See Washington*, 2017 WL 526497 at *8; *Aziz*, No. 17-0116 at 3-4 (citing *Washington*, 2017 WL 526497 at *8).

United States without the risk that they will be denied boarding onto a flight back to the United States on the basis of the Executive Order, or, should they be able to return to a U.S. port of entry, the risk that they will be detained and removed pursuant to the Executive Order.  The named plaintiffs' activities thus continue to be constrained by the challenged policy.[3]

> **B.   Because Plaintiffs' Claims Are Inherently Transitory, The Government Cannot Moot The Case By Granting Relief To The Named Plaintiffs After The Complaint And Class Certification Motion Were Filed.**

Even assuming the named plaintiffs' claims were moot, the Second Circuit has repeatedly made clear that the government should not automatically be able to moot a case by granting relief to named class members after the filing of a complaint and class certification motion, even if a class certification motion has not yet been granted.  As the Second Circuit has held, the government's mooting of a class representative's claims will not moot a class action where the claims are inherently transitory.  Any other rule would mean that the government's actions in such cases could effectively be insulated from review.  *See, e.g.*, *White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977) (explaining that otherwise, the government "could avoid judicial scrutiny of its procedures by the simple expedient of granting [relief] to plaintiffs who seek, but have not yet obtained, class certification").

The well-established rule is that "[w]here class claims are inherently transitory, the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  *Robidoux v. Celani*, 987 F.2d 931, 938-39 (2d Cir. 1993) (citation and internal quotation marks omitted).  Thus, "[e]ven where the class is not certified until after the claims of the individual class representatives have become moot, certification may be deemed to relate

---

[3] Currently, the district court's preliminary injunction in the *Washington* case, which the Ninth Circuit refused to stay, would likely permit plaintiffs' return if they traveled abroad, but the Administration is challenging that ruling.

back to the filing of the complaint in order to avoid mooting the entire controversy."  *Id.* at 939

(citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991)); *see also Salazar v. King*,

822 F.3d 61, 73 (2d Cir. 2016) ("The exception to the mootness doctrine for 'inherently

transitory' claims asserted by the named plaintiff(s) in a class action allows such claims to 'relate

back' to the time of the filing of the complaint with class allegations.").  Not only does this

doctrine prevent defendants from defeating judicial review, but it ensures that "a district court

[will] have enough time to consider these important issues of class status carefully . . . ."  *White*,

559 F.2d at 857.  Notably, the government ignores this rule, Gov't Br. 8, even though the main

case on which it relies, *Comer v. Cisneros*, 37 F.3d 775, 799 (2d Cir. 1994), makes clear that

"[w]here the claims of the named plaintiffs become moot prior to class certification, there are

several ways in which mootness is not had," including if the claims are inherently transitory.

Under the "inherently transitory" exception, "a case will not be moot, even if the

controversy as to the named plaintiffs has been resolved, if: '(1) it is uncertain that a claim will

remain live for any individual who could be named as a plaintiff long enough for a court to

certify the class; and (2) there will be a constant class of persons suffering the deprivation

complained of in the complaint.'"  *Salazar*, 822 F.3d at 73 (citations omitted).

Here, there is no dispute that the named plaintiffs had standing to bring their claims at the

time the complaint was filed.  The class claims are inherently transitory because the government

could detain, exclude, and remove countless noncitizens before this Court has an opportunity to

rule on class certification.  Alternatively, as it has done with the named plaintiffs, the

government could choose to admit noncitizens covered by the Executive Order.  In either event,

the period is likely to be too short to allow for adjudication of the class certification motion.  *See*

*Salazar*, 822 F.3d at 74 (holding that the inherently transitory exception applied because the

defendant federal agency "processes . . . applications . . . relatively quickly," such that the named plaintiffs received relief after filing of the complaint and before class certification could be decided); *Robidoux*, 987 F.2d at 939; *Amador v. Andrews*, 655 F.3d 89, 99-101 (2d Cir. 2011) (applying "inherently transitory" exception to prison policy challenge, even though class representatives had been released after filing of complaint).

The "inherently transitory" exception applies with special force here because of the practical constraints on identifying affected class members before their claims become moot. The government does not allow lawyers and family members into the area of the airport where "secondary inspection" occurs.  *See* Temporary Restraining Order, *Aziz v. Trump*, No. 1:17-cv-116 (E.D. Va. Jan. 28, 2017) (ordering respondents to allow attorneys access to petitioners detained at Dulles International Airport).  Indeed, the only individuals likely to be able to effectively seek relief are those who, like the named plaintiffs, had preexisting attorney-client relationships and could have their attorneys file immediately, before they were removed.

Further, as shown below, there is no question that, in the absence of an injunction, "there will be a constant class of persons" subject to the challenged provisions of the Executive Order. *Salazar*, 822 F.3d at 74.  Regardless of whether the government is *currently* detaining anyone under the Executive Order, if the injunctions were lifted, the government could continue to detain, deny admission to, and remove noncitizens who reach American soil in the future.

Thus, under settled Second Circuit law, the government is incorrect that this case is moot because the two named plaintiffs were granted partial relief after the filing of the complaint.

**C.    The Putative Class Members' Claims Are Not Moot.**

11

The government argues, in the alternative, that even if the circumstances of putative class members should be considered, the case should still be deemed moot because no class member is currently *detained*.  Gov't Br. 9.  That is wrong for three reasons.

1.  The government's affidavit states only that no individual is currently "detained."  *See* Gov't Br., Exhibit A.  But even assuming that there is no one currently detained, that does not moot the case, because this case challenges the denial of *entry or admission* under the Executive Order, including those who were detained and excluded under the Executive Order and have not been subsequently admitted.  *See, e.g.,* Complaint, Dkt. No. 1 ¶ 56 ("Each of these similarly situated individuals is entitled to bring a petition for a writ of habeas corpus or, in the alternative a complaint for declaratory and injunctive relief, to prohibit the policy, pattern, and practice of Respondents detaining class members and prohibiting class members from entering the United States . . . .").  Indeed, the government appears to recognize that the case is about detention *and* admission in that the government repeatedly notes that the named plaintiffs have been "admitted."  Gov't Br. 1, 6, 7-8.  Any other understanding of the case would make little sense, since plaintiffs then would be agreeing that they could be stripped of their visas and/or removed. The government, which has yet to produce the list of those detained under the Executive Order, as ordered by Judge Donnelly, Dkt. No. 8, does not claim that every individual subjected to the Executive Order in the past has been *admitted*.[4]

2.  The government's argument is also wrong because the class includes individuals who in the future will be subjected to the Executive Order.  *See* Complaint, Dkt. No. 1 ¶ 56 (defining class to include specified individuals who "*will be* denied entry to the United States on the basis

---

[4] The government has worked with plaintiffs' counsel to facilitate the return of individuals plaintiffs' counsel have brought to their attention, but in the absence of the list, there is an indeterminate number of individuals who have not been able to return.

of the January 27, 2017 Executive Order") (emphasis added); Class Cert. Mot., Dkt. No. 4 ¶ 7 (same).  The government has conspicuously not stated that if the injunction is lifted, it will refrain from applying the Executive Order to individuals who in the future reach United States soil.  As noted in plaintiffs' motion for class certification, based on statistics compiled by the Department of State from Fiscal Year 2015, about 25,317 individuals from Iraq, Syria, Sudan, Yemen, Iran, Libya, and Somalia typically enter the United States on non-immigrant, special immigrant, and refugee visas within a given 90 days (the duration of the ban on entry of noncitizens from these countries)—a figure which does not account for the large number of other immigrant visas holders.  *See* Class Cert. Mot., Dkt. No. 4 ¶ 26 & n.2.  Indeed, plaintiffs would welcome a binding statement from the government that the Executive Order will not be applied in the future to any individual who reaches United States soil.

3. Finally, the government's argument fails to account for the continuing effects of the Executive Order on class members who have been admitted.  As noted above with respect to the named plaintiffs, noncitizens in the United States and subject to the Executive Order are precluded from traveling abroad.  Moreover, under the Executive Order, the government revoked the visas of at least 60,000 people.[5]  The visa revocation not only would preclude plaintiffs from traveling abroad, but could also subject them to deportation.[6]

---

[5] *See* Espíritu Decl. Ex. C (Justin Jouvenal, Rachel Weiner & Ann E. Marimow, *Justice Dept. Lawyer Says 100,000 Visas Revoked Under Travel ban; State Dept. says About 60,000*, Wash. Post (Feb. 3, 2017)).  The government has temporarily lifted that visa revocation, following the injunction issued by the district court in Washington.  Dkt. No. 50, Attachment 1.

[6] Section 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C.§ 1227(a)(1)(B), provides: "Any alien . . . whose nonimmigrant visa (or other documentation authorizing admission into the United States as a nonimmigrant) has been revoked under section 221(i), is deportable."  The visa revocation ordered pursuant to the Executive Order invoked §221(i).  *See* Dkt. No. 20-1.

In short, under settled law, the government cannot moot this case by providing relief to the named plaintiffs after the filing of the class certification motion.  Any other rule would allow the government to effectively insulate its actions from review, especially in cases, like this one, where the claims are inherently transitory and the government controls access to the affected individuals.

## II.    THE EXECUTIVE ORDER DISCRIMINATES ON THE BASIS OF RELIGION AND IS THEREFORE UNCONSTITUTIONAL.

Government conduct that prefers one religion over another strikes at one of the founding principles of this country and violates the guarantee of equal protection provided by the Due Process Clause.  The Constitution "mandates governmental neutrality between religion and religion" and the government "may not adopt programs or practices . . . which . . . oppose any religion," a prohibition which is "absolute."  *Larson v. Valente*, 456 U.S. 228, 246 (1982) (Establishment Clause) (internal quotation marks omitted); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam) (equal protection); *United States v. Brown*, 352 F.3d 654, 668 (2d Cir. 2003) (same); *Aziz*, No. 17-0116 at 13-14 (in discussing Establishment Clause claim, noting the "message of exclusion" when the government acts to disfavor a religion).  "[T]he Religion Clauses . . . and the Equal Protection Clause as applied to religion . . . all speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."  *Hassan v. City of New York*, 804 F.3d 277, 290 n.2 (3d Cir. 2015) (quoting *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring in the judgment) (alterations in original, internal

quotation marks omitted)); *see also Washington*, 2017 WL 526497 at *10; *Brown*, 352 F.3d at 669 n. 18.[7]

The Executive Order violates the Constitution because it discriminates on the basis of religion by disfavoring Muslims, favoring Christian refugees, and drawing an arbitrary line between majority and minority religions.  This discrimination is clear whether one looks at the voluminous evidence prior to the signing of the Order or at the Order itself.  *See Hunter v. Underwood,* 471 U.S. 222, 227-28 (1985); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).

In seeking to dismiss plaintiffs' religious discrimination claim, the government incorrectly suggests that the Court may apply only a deferential standard of review.  Gov't Br. 11.  Assuming, *arguendo*, a deferential standard applies, the Order would not survive because it is arbitrary and designed to discriminate.  The proffered national security rationale is not "bona fide" and does not hold up to even rational basis scrutiny, and there is overwhelming evidence to establish discriminatory intent behind the Executive Order.   Moreover, the government's assertion that the "subjective motivations for enacting the Executive Order" are "irrelevant," and that therefore the Court cannot go beyond the four corners of the Order to evaluate its constitutionality, Gov't. Br. 13, is wrong as a matter of law, as two courts have already held. *Washington v. Trump*, 2017 WL 526497 at *10 ("It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims."); *Aziz*, No. 17-0116 at 14 (similarly rejecting the argument "that the Court may not go beyond the text of the EO in assessing its purpose").

_____

[7] Courts rely on the shared principles of these constitutional provisions in adjudicating claims. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 534, 540 (1993) (discussing common thread in equal protection and the Religion Clauses).

15

## A.     The Order Is Arbitrary And Discriminatory On Its Face.

The plain language of the Executive Order evinces religious discrimination.  The Order repeatedly employs barely veiled references to stereotypes regarding Islam.  The Order invokes terms singling out and disparaging Muslims, such as references to "honor killings," Order §§ 1, 10(a)(iii); "violent ideologies," Order § 1; "persecution of those who practice religions different from their own," Order § 1; and "foreign nationals" being "radicalized," Order § 10(a)(ii).  These terms should be recognized for what they are: statements that this Order is directed at individuals of a particular, disfavored faith.  *See Lukumi*, 508 U.S. at 534 (statute's use of the purportedly neutral terms "sacrifice" and "ritual" was evidence of singling out a particular religion).  The derogatory reference to Islam was even clearer in a prior draft of the Order, which was publicly leaked days before the final Order was signed.  That draft—the effective equivalent of the legislative history of this Order—included the phrase "violent religious edicts."  Espíritu Decl. Ex. D § 1.  While these references are clear enough on their own terms, their meaning becomes undeniable when read against the backdrop of the President's prior statements regarding Islam, discussed below, which invoke the same false and dangerous stereotypes about Muslims.  *Infra* Section B; *cf. Lukumi*, 508 U.S. at 534-35 (examining statements made leading up to enactment of purportedly neutral law in concluding that object was to target a particular religion).

The Order also establishes explicit preferences based on religion, arbitrarily favoring "minority" religions over "majority" religions in determining who will be admitted to this country as a refugee.  *See* Order § 5(b) (directing officials to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality"); *id.* § 5(e) (similar).  This ranking of religions is further intrinsic evidence of intent to target Muslims.  But it is also

16

an independent violation.  The government may not make "explicit and deliberate distinctions between different religious organizations," as the Order does between minority and majority religions.  *Larson*, 456 U.S. at 245-46 & n.23 (striking down statutory discrimination between religions based on the source of their contributions, observing that political leaders "are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations").

Any government determination of what constitutes "majority" and "minority" religions in a given country will also lead to impermissible government entanglement with religion.  *See Texas Monthly v. Bullock*, 489 U.S. 1, 20 (1989) (plurality opinion).  Government agents might need to determine, for example, whether various combinations of Catholics, Orthodox Christians, Protestants, Methodists, Anglicans, Baptists, Mormons, Jehovah's Witnesses, and dozens or hundreds of other groups professing belief in Jesus are adherents to the "same" or "different" religions in order to determine whether an individual's religion is the majority or the minority in a particular country.  Similar lines would need to be drawn with regard to Muslim denominations, and those of other faiths.  To make such decisions, the government would be required to consider the beliefs and practices of a sect in comparison to those of other sects to decide whether an individual is of a "majority" or "minority" religion.  The Constitution does not tolerate this level of government entanglement with the nuance of religious belief.  *Id.*

> **B.    There Is Overwhelming Evidence Of Intent To Discriminate On The Basis Of Religion.**

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266; *see also Lukumi*, 508 U.S. at 540 (same).  Case law identifies a variety of factors that can be probative of a discriminatory purpose, including the nature and

degree of the disparate impact produced by the challenged law; the historical background and specific series of events leading to the law's enactment; the legislative or administrative history, including contemporaneous statements made by the decisionmaker(s); and any departures from normal processes or substantive considerations. *Lukumi*, 508 U.S. at 540; *Arlington Heights*, 429 U.S. at 266-68; *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 861-66 (2005). This list of factors is nonexhaustive. *Arlington Heights*, 429 U.S. at 268. As the Court found in the Virginia case, the task here is "determining whether the proffered reason for the EO is the real reason." *Aziz*, No. 17-0116 at 16.

Here, the Order has an overwhelmingly disparate impact on Muslims, and in ways that are probative of intent. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997). The seven countries whose nationals are banned from entering the United States are each over 90% Muslim. *See* Espíritu Decl. Ex. E (Central Intelligence Agency's World Listing Factbook website providing countries' population percentage by religious affiliation). Section 5's suspension of the refugee resettlement program and its indefinite prohibition on the entry of Syrians as refugees has a similarly disparate impact on Muslims. Moreover, the special carve-outs for religious minorities in Section 5(b) and (e) indicate a preference to lessen the adverse impact on Christians, which has been confirmed by President Trump himself.[8]

As a candidate, now-President Trump expressly stated numerous times that he intended, if elected, to ban Muslim immigrants from entering the United States[9]—a commitment that he

---

[8] Espíritu Decl. Ex. F (David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017)) (President Trump confirming that Christians would be given priority when applying for refugee status, stating, "[W]e are going to help them."); *see also id.* at Ex. G (Sarah Pulliam Bailey, *Trump signs order limiting refugee entry, says he will prioritize Christian refugees*, Wash. Post (Jan 31, 2017)).
[9] Espíritu Decl. Ex. H (Statement by Donald J. Trump on Preventing Muslim Immigration (Dec. 7, 2015) [hereinafter Trump Statement on Preventing Muslim Immigration]) (stating that

18

never repudiated and that, in fact, remains on his campaign website today.[10]  President Trump conceded that he was using territory as a proxy for religion.[11]  When asked after his election victory whether he still intended to ban Muslim immigrants from the United States, President-elect Trump confirmed that his plans had not changed.[12]  And one week after being inaugurated he signed the Executive Order at issue here, banning entry of all non-citizens from seven overwhelmingly Muslim countries.  Two days after the Order was issued, Rudolph Giuliani, an advisor to President Trump, stated that then-candidate Trump had asked Mr. Giuliani for help in "legally" creating a "Muslim ban"; that, in response, Mr. Giuliani and others decided to use territory as a proxy; and that this idea is reflected in the signed Order.[13]  Even without other

---

"Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on," and asserting that "there is great hatred towards Americans by large segments of the Muslim population," and "it is obvious to anybody the hatred is beyond comprehension."); *see also id.* at Ex. I (Donald J. Trump (@realDonaldTrump), Twitter (December 7, 2015, 1:47 PM)); *id.* at Ex. J (Jenna Johnson, *Trump calls for 'total and complete shutdown of Muslims entering the United States'*, Wash. Post (Dec. 7, 2015)) (noting that in addition to the call for the complete shutdown of Muslims entering the United States, President Trump had signaled his support for "heavy surveillance of mosques" and that he "would consider establishing a database to track all Muslims in the country").

[10] Espíritu Decl. Ex. H (Trump Statement on Preventing Muslim Immigration).

[11] Espíritu Decl. Ex. K (*Meet the Press* (NBC television broadcast July 24, 2016)) (in response to being asked if a plan similar to the now-enacted Executive Order was a "rollback" from "[t]he Muslim Ban," then-candidate Trump stated: "I actually don't think it's a rollback.  In fact, you could say it's an expansion. . . . I'm looking now at territory.  People were so upset when I used the word Muslim.  Oh, you can't use the word Muslim.  Remember this.  And I'm OK with that, because I'm talking territory instead of Muslim.").

[12] Espíritu Decl. Ex. L (Katie Reilly, *Donald Trump on Proposed Muslim Ban: 'You Know My Plans,'* Time (Dec. 21, 2016)).

[13] Espíritu Decl. Ex. M (Amy B. Wang, "*Trump asked for a 'Muslim ban,' Guiliani says – and ordered a commission to do it 'legally'*", Wash. Post (Jan. 29, 2017)) (Mr. Giuliani explaining that "when [then-candidate Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together. Show me the right way to do it legally.'").

evidence, or the benefit of any discovery, there is voluminous evidence that the Order was intended, at least in part, to discriminate against Muslims.[14]

### C.   The Order Would Fail Even Under Deferential Review.

The government contends that the Executive Order should be reviewed under a rational basis standard.  In other cases challenging the Executive Order, the government has argued for application of the "facially legitimate and bona fide" standard.  *See Washington*, 2017 WL 526497 at *6; *Aziz*, No. 17-0116 at 16.  But, as discussed below, such deferential review is not the proper standard where religious discrimination is at issue.  In any event, the Executive Order cannot survive even a deferential standard of review.

As an initial matter, the government is incorrect that "subjective motivations" are "simply irrelevant" under deferential review.  Gov't Br. 13.  As Judge Brinkema explained in the Virginia case, if the government's proffered reason "has been given in 'bad faith,' it is not 'bona fide,'" meaning the Court must determine "whether the proffered reason . . . is the real reason."  *Aziz*, No. 17-0116 at 16 (citing, *inter alia*, *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 126 (2d Cir. 2009); *accord Kerry v. Din*, 135 S. Ct. 2128, 2141 (2015) (Kennedy, J., concurring in the

---

[14] Espíritu Decl. Ex. N (Jenna Johnson, *Donald Trump says he is not bothered by comparisons to Hitler*, Wash. Post (Dec. 8, 2015) (comparing his proposed Muslim ban to former President Franklin Roosevelt's decision to intern Japanese Americans during World War II, and suggesting that internment camps for Muslims would be considered as "a temporary measure until our representatives, many of whom are grossly incompetent, until our representatives can figure out what's going on."); *id.* at Ex. O (Theodore Schleifer, *Donald Trump: 'I think Islam hates us'*, CNN (Mar. 10, 2016)) (stating "I think Islam hates us"); *id.* at Ex. P Alex Griswold, *Trump Responds to Brussels Attacks: 'We're Having Problems With the Muslims*, Mediate (Mar. 22, 2016)) (stating that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," adding, "You need surveillance, you have to deal with the mosques whether you like it or not . . . These attacks aren't done by Swedish people, that I can tell you"); *compare with Hunter*, 471 U.S. at 229 ("The delegates to the all-white [Alabama Constitutional Convention of 1901] were not secretive about their purpose. John B. Knox, president of the convention, stated in his opening address: 'And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.'") (citation omitted).

20

judgment).  Here, as set forth above, there is ample evidence that the purported distinction drawn

on the basis of nationality is pretext for religious discrimination, and is therefore not bona fide.[15]

Discriminatory policy cannot survive even deferential review because the government

has no legitimate interest in such discrimination.  *Romer v. Evans,* 517 U.S. 620, 634-35 (1996)

("[L]aws of the kind now before us raise the inevitable inference that the disadvantage imposed

is born of animosity toward the class of persons affected.  '[I]f the constitutional conception of

'equal protection of the laws' means anything, it must at the very least mean that a bare . . .

desire to harm a politically unpopular group cannot constitute a *legitimate* governmental

interest.'") (quoting *Department of Agriculture v. Moreno,* 413 U.S. 528, 534 (1973)).  Here,

anti-Muslim animus is evident on the face of the Order and in the abundant evidence of intent,

not least of which is a statement by the President on the same day that the Order was issued.[16]

Further, in litigation before this court, the Ninth Circuit, and the Eastern District of

Virginia, "the Government has done little more than reiterate" its interest in combatting terrorism

without explaining how the Order is necessary or even useful for that purpose.  *Washington*,

2017 WL 526497 at *10; *accord Aziz*, No. 17-0116 at 6 (the government has not "offered any

evidence to identify the national security concerns that allegedly prompted this [Order], or even

described the process by which the [P]resident concluded that this action was necessary").  That

is insufficient.  The government's national security powers do not "'automatically trump the

---

[15] The government cites *Louhghalam v. Trump*, No. 17-10154-NMG, 2017 WL 479779 (D.
Mass. Feb. 3, 2017), which applied deferential review and upheld the Order.  *Louhghalam*
notably recognized that the Second Circuit requires examination of whether the government's
decision was in fact "bona fide," but concluded First Circuit precedent was to the contrary.  The
Court's decision was also issued without the benefit of full merits briefing or the evidence from
senior former national security experts submitted here (and on which the Ninth Circuit and
Eastern District of Virginia heavily relied).

[16] Espíritu Decl. Ex. F (David Brody, *Brody File Exclusive: President Trump Says Persecuted
Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017)).

Court's own obligation to secure the protection that the Constitution grants to individuals,' even in times of war," *Washington*, 2017 WL 526497 at \*6 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)), and "[n]ational defense cannot be deemed an end in itself, justifying any exercise of . . . power," no matter how weak the rationale may be, *id*. (quoting *United States v. Robel*, 389 U.S. 258, 264 (1967) (internal quotation marks omitted)).

By contrast, former senior national security, foreign policy, and intelligence officials have submitted evidence that the Order in fact "ultimately undermines the national security of the United States, rather than making us safer" and "cannot be justified on national security or foreign policy grounds." Espíritu Decl. Ex. B (Joint Declaration of Madeleine K. Albright, et al.). Moreover, four of the signatories to that declaration "were current on active intelligence regarding all credible terrorist threat streams directed against the U.S. as recently as one week before the issuance of the" Order, and yet know of no "specific threat that would justify the travel ban." *Id*. That fact should not be particularly surprising: "The Administration has identified no information or basis for believing there is now a heightened or particularized future threat from the seven named countries." *Id*. Instead, the Order "will aid ISIL's propaganda effort and serve its recruitment message by feeding into the narrative that the United States is at war with Islam," and will harm troops deployed abroad, the ability to gather intelligence, and law enforcement operations. *Id*.; *see also Aziz*, No. 17-0116 at 6, 21 (extensively citing similar declaration); Dkt. No. 137 (Amicus Brief of Former National Security Officials).

Likewise, there is no justification for the Order's arbitrary and discriminatory distinction between majority and minority religions sufficient to survive even deferential scrutiny. As already explained, the preference for minority religions will require government officials to delve into the fine points of religious doctrine to determine what counts as separate religions and

22

what does not. Even apart from the constitutional violation inherent in such entanglement with religion, there is simply no reason to do so apart from an illegitimate desire to preference Christian refugees from majority-Muslim countries.[17] The desire to harm Muslim refugees from majority-Muslim countries would of course be likewise illegitimate. *See Romer,* 517 U.S. at 634-35. Thus, even if the Court were to apply a deferential standard of review, the Executive Order could not survive.

**D.     Neither The Plenary Power Doctrine Nor INA Section 212(f) Justifies This Unprecedented Religious Discrimination.**

The government has effectively pursued the same course here as was rejected by the Ninth Circuit: "Rather than present evidence to explain the need for the Executive Order, the Government has taken the position that we must not review its decision at all." *Washington*, 2017 WL 526497 at *10. But, as that court explained, "it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Id*. at *7; *see also Aziz*, No. 17-0116 at 10 ("This is a familiar judicial exercise.") (internal quotation marks omitted). The government has pointed to nothing that would justify rubber-stamping this Order.

1. The government alludes to the doctrine of plenary power over immigration. Gov't Br. 11 n.2. But "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches have unreviewable authority over immigration or are not subject to the Constitution when policymaking in that context." *Washington*, 2017 WL 526497 at *5 (citing *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001); *INS v. Chadha*, 462 U.S. 919, 940-41 (1983)); *accord Aziz*, No. 17-0116 at 11-12 ("Every presidential action must still comply with the limits

---

[17] Espíritu Decl. Ex. F (David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*, CBN News (Jan. 27, 2017)).

set by Congress' delegation of power and the constraints of the Constitution, including the Bill of Rights."). Moreover, the Supreme Court has *never* applied the plenary power doctrine to uphold religious discrimination. *Cf. Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir. 1991) (noting that the Supreme Court "itself has suggested that the constitutional prohibition against establishments of religion targets the competency of Congress to enact legislation of that description—irrespective of time or place").

Likewise, the circuit precedent the government cites regarding discrimination generally has nothing at all to do with *religious* discrimination. Gov't Br. 11-13.[18] The one case the government cites addressing a religious discrimination claim actually supports plaintiffs' argument: The Second Circuit rejected a claim against a registry established shortly after the September 11 attacks because the plaintiffs had offered no *evidence* of "improper animus toward Muslims" beyond the fact that the countries at issue were predominantly Muslim. *Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008). Here, as already explained, plaintiffs have provided ample evidence of intent to discriminate against Muslims. *See Aziz*, No. 17-0116 at 18 ("Absent the direct evidence of animus presented by the Commonwealth, singling out these countries for additional scrutiny might not raise Establishment Clause concerns; however, with that direct evidence, a different picture emerges.").

2. The Order invokes INA § 212(f), 8 U.S.C. § 1182(f), but that provision says nothing of religion, has never been invoked to justify religiously discriminatory exclusion, and should

---

[18] *See Yuen Jin v. Mukasey*, 538 F.3d 143, 158-60 (2d Cir. 2008) (distinction between those who comply with a removal order and those who do not); *Romero v. INS*, 399 F.3d 109, 111-12 (2d Cir. 2005) (statutory distinction by nationality); *Jankowski-Burczyk v. INS*, 291 F.3d 172, 178 (2d Cir. 2002) (distinction between permanent residents and other noncitizens); *Rojas-Reyes v. INS*, 235 F.3d 115, 125 (2d Cir. 2000) (distinction between those with final and non-final deportation orders); *United States v. Lue*, 134 F.3d 79, 86 (2d Cir. 1998) (distinction between citizens and noncitizens).

not be read to authorize exclusion of a "class" of noncitizens on the basis of religion.[19]  Indeed, Section 212(f)'s text simply does not allow the President to impose a restriction on entry that is religiously discriminatory.  Section 212(f) emphatically does not allow entry restrictions to be imposed on Presidential fiat.  Rather, in addition to the clear limitations on 212(f) authority imposed by other statutes and the Constitution, Section 212(f) itself requires that it be in "the interests of the United States" to impose the restriction at issue.  The United States has no "interest" in denying entry on a religiously discriminatory basis, *cf. Romer,* 517 U.S. at 634-35, and Section 212(f) therefore does not authorize the President to impose the ban at issue here.  Moreover, Section 212(f) should be understood against the backdrop of our Constitution's unique emphasis on religious nondiscrimination and thus should be read to avoid the serious constitutional questions that would be presented by an immigration statute authorizing discrimination on the basis of religion.

Indeed, Congress has shown particular concern for religious freedom, further undercutting an interpretation of 212(f) that would authorize exclusion of members of a particular faith.  *See, e.g.*, Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §2000bb *et seq.*; *City of Boerne v. Flores*, 521 U.S. 507, 516 (1997) (explaining that RFRA's application is "universal" across the federal government, including all federal statutes, whether adopted before or after its enactment); *see also* Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq*.

---

[19] INA § 212(f), 8 U.S.C. § 1182(f), provides in relevant part: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

In light of these considerations, any suggestion that Congress has authorized the President to order a ban disfavoring Muslims, or favoring Christians, is simply wrong. But if Congress did, *sub silentio*, authorize religious discrimination in § 212(f), that application of the provision is unconstitutional. Neither Congress nor the President can override the Constitution. *See Washington*, 2017 WL 526497 at *5-7; *Aziz*, No. 17-0116 at 10-12.

## III.   THE EXECUTIVE ORDER UNLAWFULLY DEPRIVES CLASS MEMBERS OF THEIR RIGHT TO APPLY FOR ASYLUM AND WITHHOLDING OF REMOVAL.

The Order also unlawfully seeks to eliminate the statutory rights, guaranteed to all noncitizens on U.S. soil, to apply for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). *See* 8 U.S.C. 1158(a) (asylum); 8 U.S.C. § 1231(b)(3) (withholding); Pub. L. No. 105-277, § 2242, 112 Stat. 2681-822 (1998) (reprinted in 8 U.S.C. § 1231, Notes (2012)) (CAT).

Under the withholding statute, "the Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country" on enumerated grounds. 8 U.S.C. § 1231(b)(3)(A) (emphasis added). The government, including the President, has no discretion to violate this command. Noncitizens who satisfy the statutory standard "are *entitled* to mandatory suspension of deportation." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987) (emphasis in original); *Yiu Sing Chun v. Sava*, 708 F.2d 869, 876 (2d Cir. 1983). The same principle applies for the CAT: "Protection under the CAT, like withholding of removal, is a mandatory form of relief." *Kone v. Holder*, 596 F.3d 141, 147 (2d Cir. 2010).

The President also cannot deprive noncitizens of the right to apply for asylum within the United States. The asylum statute provides that "[a]ny alien who is physically present in the

United States or who arrives in the United States … irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1).  The statute expressly prohibits the government from denying arriving noncitizens the right to apply for asylum.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii) (providing that "the officer *shall* refer the alien for an interview by an asylum officer" if the alien claims fear or the desire to apply for asylum) (emphasis added); 8 C.F.R. § 235.3(b)(4) ("[T]he inspecting officer *shall not proceed further* with removal of the alien until the alien has been referred for an interview by an asylum officer.") (emphasis added).

These provisions "confer[] upon *all aliens* a statutory right to apply for asylum." *Campos v. Nail*, 43 F.3d 1285, 1288 (9th Cir. 1994) (emphasis added); *see also Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 553 (9th Cir. 1990) (discussing "the right of aliens to apply for asylum" and stating that "[i]t is undisputed that all aliens possess such a right under the Act").  The Second Circuit has thus held that "asylum seekers at our border" are "entitled to nothing less" than an opportunity to apply for asylum.  *Chun*, 708 F.2d at 876.  As a result, "a total denial of opportunity to apply for asylum justifies injunctive relief."  *Campos*, 43 F.3d at 1288.

The Supreme Court has thus recognized that these statutory requirements limit the President's authority to exclude noncitizens under 8 U.S.C. § 1182(f).  In *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), the Court considered a challenge to a Presidential proclamation, issued under 8 U.S.C. § 1182(f), ordering the interdiction and return of Haitian nationals at sea, without any asylum or withholding procedures.  Although the Court rejected the challenge, holding that the Refugee Act of 1980 did not apply *extraterritorially*, the Court recognized that asylum and withholding procedures prevent the President from eliminating access to those procedures for individuals *on U.S. soil*.  Indeed, the Court explicitly noted that

27

withholding requirements applied to noncitizens "on the threshold of initial entry." *Id.* at 170, 180, 187 (citation and internal quotation marks omitted).  This case concerns *only* individuals who reach U.S. soil.  The plaintiffs are therefore entitled to a hearing to determine whether they are eligible for asylum, withholding, and CAT relief.

## IV.    THE EXECUTIVE ORDER'S DISCRIMINATION ON THE BASIS OF NATIONALITY VIOLATES SECTION 202 OF THE IMMIGRATION AND NATIONALITY ACT.

By suspending entry of refugees from Syria indefinitely, and immigrants from Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen for 90 days, the Executive Order contravenes the INA's prohibition on nationality discrimination and therefore exceeds the President's statutory authority to exclude noncitizens.  Section 202(a)(1)(A) of the INA, 8 U.S.C. § 1152(a)(1)(A), provides, with limited and immaterial exceptions, that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of," among other things, the person's "nationality."  Passed in 1965, at the height of the civil rights movement, Section 202 was explicitly framed as a repudiation of nationality discrimination in immigration policy.  President Johnson, in his signing statement, declared that "for over four decades the immigration policy of the United States has been twisted and has been distorted by the harsh injustice of the national origins quota system."  Lyndon B. Johnson, Remarks at the Signing of the Immigration Bill (October 3, 1965).

The Executive Order violates Section 202's anti-discrimination command by relying on nationality to suspend the issuance of visas and to ban entry.  Section 3 of the Executive Order explicitly "Suspen[ds] *Issuance* of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern" (emphasis added), directly contravening Section 202(a)(1)(A)'s prohibition on "discriminat[ion] . . . in the issuance of an immigrant visa."  The ban on entry in

28

Section 3(c) of the Executive Order also violates this prohibition: for 202(a)(1)(A) to have any meaning, the anti-discrimination principle necessarily applies not only to issuance, but also to maintenance, revocation, and entry into the country.

The government relies on 8 U.S.C. § 1152(a)(1)(B), which provides that the nondiscrimination provision may not "limit the authority of the Secretary of State to determine the *procedures* for the processing of immigrant visa applications." *See* Gov't Br. 13 (emphasis added). Yet the Executive Order does not merely change procedures for the processing of visas, but rather expressly suspends issuance of those visas, as well as entry into the country. Moreover, the State Department implemented the Executive Order by categorically revoking the visas of nationals of the seven banned countries. *See* Dkt. No. 20-1. That the Order *also* alters processing procedures does not render lawful its discrimination in issuance, revocation, and entry.

Nor can Section 212(f) override Section 202's nondiscrimination requirement. Section 202 was enacted in 1965, thirteen years after Section 212(f). Moreover, Section 212(f) is limited not only by Congress' express disfavor of nationality restrictions, but also by the asylum and withholding provisions described above. *See Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). It is therefore unsurprising that Section 212(f) has never been invoked to justify so broad a nationality-based restriction on entry. Indeed, in the narrow circumstances in which Congress has found nationality classifications necessary, it has passed specific legislation. *See, e.g.*, *Romero v. INS*, 399 F.3d 109, 112 (2d Cir. 2005) (rejecting challenge to legislation implementing immigration preferences for nationals of Nicaragua and Cuba). The immigration

29

laws do not authorize the President's nationality-based visa and entry restrictions, and those restrictions are therefore invalid.  *See* 5 U.S.C. § 706(2)(A).

## V.     THE EXECUTIVE ORDER VIOLATES DUE PROCESS.

The Executive Order deprives lawful permanent residents and visa holders of their right to enter the country and does not provide any process whatsoever.  As the Ninth Circuit concluded, the government cannot show "that the Executive Order provides what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." *Washington*, 2017 WL 526497 at *7.  Indeed here, as in the Ninth Circuit, "the Government does not contend that the Executive Order provides for such process."  *Id.*  Instead, the government contends that the due process claims are not viable because plaintiffs' claims are moot and they have therefore not suffered prejudice by the lack of process. Gov't Br. 10.  But, as discussed above, the case is not moot and the government has not and cannot justify, on the merits, its deprivation of all process.

The statutory rights to apply for asylum, withholding, and CAT give rise to interests protected by the Due Process Clause.  "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens," regardless of "whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  The Executive Order deprives class members of their protected interests, including the right to apply for asylum and withholding, without any hearing or opportunity to show eligibility for such relief from removal.

For instance, the asylum, withholding, and CAT statutes give rise to interests protected by the Due Process Clause.  *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984) ("[T]he protected right to avoid deportation or return to a country where the alien will be persecuted warrants a

hearing where the likelihood of persecution can be fairly evaluated."); *see also Ezeagwuna v. Ashcroft*, 325 F.3d 396, 400, 405 (3d Cir. 2003) (finding due process violation in case of asylum seeker detained "[u]pon her arrival at Newark International Airport," and confirming that "[d]ue process protections are afforded to aliens facing removal"); *Kowalczyk v. INS*, 245 F.3d 1143, 1146-49 (10th Cir. 2001) (holding that noncitizen, who applied for asylum upon arrival in the United States, suffered a due process violation when he was denied an opportunity to respond to administratively noticed facts); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1038 (5th Cir. 1982) ("Congress and the executive have created, at a minimum, a constitutionally protected right to petition our government for political asylum.").

The Executive Order deprives prospective class members of these protected interests without offering any opportunity whatsoever to contest that determination.  For example, when Customs and Border Protection detained and sought to remove Mr. Darweesh, it offered him no opportunity to explain that he had worked for the U.S. government in Iraq for nearly ten years, and that, as a result, two of his colleagues had been murdered and he had been targeted by the Baghdad Police, who are known to work with anti-American militias.  Compl. ¶ 20.  Such summary, irrational removal violates the due process rights of class members who fear persecution upon return to their home countries.

The Executive Order also violates due process by banning the entry or reentry of lawful permanent residents and visa holders without any process at all.  These individuals have a substantial interest in being able to travel to their homes, their studies, their jobs, and their loved ones in the United States, an interest that cannot be deprived without process.  Individuals granted fiancé visas traveling to the United States to marry their intended marital partner; noncitizens granted employment visas who are traveling to jobs they have been offered and

accepted; those granted student visas who have paid tuition and committed to a course of study at an institution of higher learning here in the United States, and many others who have been granted visas after submitting extensive applications and undergoing painstaking vetting, cannot have their interests summarily extinguished. *See, e.g.*, *Landon v. Plascencia*, 459 U.S. 21, 33-34 (1982) (recognizing due process rights of lawful permanent resident returning from abroad); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) (allowing noncitizen whose student visa was revoked while she was traveling outside the United States to proceed with due process claim); *Manwani v. U.S. Dep't of Justice*, 736 F. Supp. 1367, 1381 (W.D.N.Ca. 1990) (holding that U.S. citizen "has a protected property interest, codified in the INA, to petition the INS to obtain immediate relative status for a bona fide spouse"). Indeed, and at a very minimum, these noncitizens have a right to have their applications for admission determined under the lawful procedures enacted by Congress, and free from the restrictions imposed by the Executive Order, which is unlawful for the multiple reasons discussed herein. *See, e.g.*, *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (en banc) (explaining that noncitizen denied entry enjoyed due process rights stemming "from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights'") (citation omitted).

Thus, the Ninth Circuit properly concluded that the government was unlikely to establish that the Executive Order satisfies due process. The Court concluded that it was "obvious" that there were "viable claims based on the due process rights of persons who will suffer injuries to protected interests due to the Executive Order." *Washington*, 2017 WL 526497 at *9 (recognizing that the Executive Order may violate, *inter alia*, the due process of rights of returning lawful permanent residents, non-immigrant visaholders "who have been in the United

32

States but temporarily departed," and noncitizens "who have a relationship with a U.S. resident or an institution that might have rights of its own to assert") (citations omitted).  The Ninth Circuit's decision reflects the well-established principle that persons with substantial connections to the United States have significant interests that may not be deprived without due process.  *See, e.g.*, *Plascencia*, 459 U.S. at 33-34.[20]

## VI.  THE EXECUTIVE ORDER VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

The Executive Order also violates the Administrative Procedure Act, which authorizes judicial review of administrative action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B).   Under the APA's arbitrary or capricious standard, "courts retain a role, and an important one, in ensuring" that the agency has "engaged in reasoned decisionmaking," a "task [that] involves examining the reasons" the agency gives, "or, as the case may be, the absence of such reasons."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  Moreover, the agency must offer a more detailed justification "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[20] In *Louhghalam*, which did not find a likely due process violation, the court erred in relying on *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990), which rejected a due process challenge to the revocation of a visa that had been mistakenly granted in violation of the applicable law. *See Louhghalam*, No. 17-10154-NMG at 13-14.  In *Azizi*, the Second Circuit explicitly held that *because the statute did not authorize the granting of the visa* in that case, the plaintiffs could not show they had a property right in the visa.  Here, by contrast, there is no dispute over the statutory validity of the visas, and the President therefore may not revoke them and deny entry without any due process of law.

Here, the Department of Homeland Security and the Department of State changed their policies overnight, with no factual findings indicating changed circumstances and no consideration of the serious reliance interests at issue.  As the Court noted and the government acknowledged on January 28, 2017, if the plaintiffs "had come here two days [earlier], we wouldn't be here."  Dkt. No. 17, at 8.  Nor has either the Department of State or the Department of Homeland Security offered any evidence to support the proposition that these changes in policy were rationally related to a security threat.  *See Aziz*, No. 17-0116 at 6.  Indeed, the evidence in the record from high-ranking former national security officials suggests that the Executive Order increases security threats rather than addressing them.  Espíritu Decl. Ex. B (Joint Declaration of Madeleine K. Albright, et al.).  Moreover, as the Ninth Circuit noted, even since the issuance of the Executive Order, the government has changed its policy several times without explanation.  *See Washington*, 2017 WL 526497 at *8 (noting the government's "shifting interpretations of the Executive Order").  Such arbitrary changes in policy, without detailed justification or consideration of reliance interests, violate the Administrative Procedure Act.  *See Judulang*, 565 U.S. at 64 (concluding that the Court must reject a policy "when we cannot discern a reason for it").

Thus, because the Executive Order is arbitrary and contrary to various statutory and constitutional provisions, it violates the Administrative Procedure Act.

## VII.    OTHER PRELIMINARY INJUNCTION FACTORS

Plaintiffs have already addressed and shown a likelihood of success on the merits. Accordingly, in this section, plaintiffs address only the relative harms to the parties and the public interest prong of preliminary injunction test.

### A.    Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.

34

At the time plaintiffs filed suit, they sought to certify a class of persons who, like them, were detained by the government, denied entry to the United States, and threatened with forcible return to the country from which their travel originated, notwithstanding being legally authorized to enter the United States. The future members of the class face the same irreparable harms, and thus perpetuate the controversy. *See supra* Part I (mootness).[21]

The nature of the harm threatened by the government's unconstitutional conduct is unquestionably irreparable, including religious discrimination and the lack of any process. *See Mitchell v. Cuomo*, 748 F. 2d 804, 806 (2d Cir. 1984) (affirming finding of irreparable harm where possible deprivation of constitutional rights is alleged); *Ambrose v. Malcolm*, 414 F. Supp. 485, 493 (S.D.N.Y. 1976) (observing that "the continuing daily deprivation of constitutional rights . . . is irreparable by definition") (internal quotation marks and citations omitted).

Beyond the loss of constitutional rights, many plaintiffs who are removed or denied entry would face threats of persecution, torture, and even death, as well as denial of their right to apply for asylum, 8 U.S.C. § 1158, withholding of removal, *id.* § 1231(b)(3), and relief pursuant to the CAT, *id.* § 1231 (The Foreign Affairs Reform and Restructuring Act of 1998, which implements the CAT). *See* Pet'rs. Mem. in Support of Emergency Stay of Removal, Dkt. No. 6-1, at 17-21; *see also* Espíritu Decl. Ex. Q (Decl. of Reema Khaled Dahman ¶¶ 4-16, *Ali v. Trump*, No. 17-0135 (W.D. Wash. Feb. 6, 2017)) (describing fear for son who is 16-year old minor in Syria); Espíritu Decl. Ex. R (Decl. of Babek Yaghoubi Moghadam ¶ 7, *Loughalam v. Trump*, No. 17-

---

[21] To the extent the government argues that plaintiffs cannot base their request for injunctive relief on claims of irreparable harm to class members, *see* Gov't Br. 18, they are wrong. The Supreme Court has repeatedly considered irreparable harm to class members in granting an injunction, even where the class representatives were no longer threatened with harm. *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 110-11 (1975). The only authority cited by the government is a case that did not in fact involve a class action. Gov't Br. 18. (citing *Moore v. Consolidated Edison Co. of New York, Inc.*, 409 F. 3d 506 (2d Cir. 2005)).

10154 (D. Mass. Feb. 3, 2017)) (describing fear of not being permitted to return to US from Iran).

The irreparable harm from the Order also includes being subjected to periods of unlawful detention in airports across the country. *See, e.g.,* Dkt. No. 53-5 (Sara Yarjani Decl.) ¶ 34 (detained for 23 hours at Los Angeles International Airport); Dkt. No. 53-7 (Suha Amin Abdullah Abushamma Decl.) ¶ 20 (detained for 10 hours); Dkt. No. 53-8 (Hind Mohamed Hassan Ahmed Elbashir Decl.) ¶ 24 (detained for 10 hours). During such detention prospective class members are at risk of being denied basic necessities, such as food, medications, personal hygiene products, and adequate accommodations to rest. *See, e.g.,* Yarjani Decl. ¶¶ 22-25 (held overnight in room with no bathroom and given only an applesauce and juice); Abushamma Decl. ¶ 20 (not offered food until she signed a form withdrawing her application for admission); Elbashir Decl. ¶ 13 (denied medication); Dkt. No. 53-12 (Manar Decl.) ¶¶ 10, 14, 16 (held for hours without food or anywhere to rest); Espíritu Decl. Ex. S (article detailing the conditions suffered by individuals detained at LAX, including an elderly Iranian woman).

During such detention, class members are also at risk of being subjected to complete isolation with no means of communicating with anyone in the outside world, including worried family members and legal counsel. *See, e.g.,* Yarjani Decl. ¶¶ 16, 28, 30 (told she could only use her cell phone after formally withdrawing her application for admission); Dkt. No. 53-6 (Ramez Snober Decl.) ¶ 17 (prevented from contacting anyone); Abushamma Decl. ¶ 9 (never permitted to speak on the phone with her attorney); Elbashir Decl. ¶ 15 (denied permission to call his family); Dkt. No. 53-9 (Rashid Ahmed Gibril Ali Decl.) ¶ 4 (detained with other families and not given any information or permitted to use his cell phone).

Given these coercive detention conditions, prospective class members are also at risk of

being pressured into signing away their legal authorization to enter the United States.  For example, numerous individuals reported being forced to sign forms they did not understand, or otherwise being told that if they did not withdraw their application for admission they would be deported and be barred from entering the United States for five years or more.  *See, e.g.,* Yarjani Decl. ¶¶ 15-18, 23; Abushamma Decl. ¶¶ 13, 15-18; Snober Decl. ¶¶ 15-16; Elbashir Decl. ¶¶ 16-19; Ali Decl. ¶¶ 5-6; Dkt. No. 53-11 (Nabila Alhaffar Decl.) ¶¶ 8-10; *see also* Manar Decl. ¶¶ 14-16 (describing being scared, crying, and being told she had to sign something or she would not be allowed to the return to the United States for five years); Espíritu Decl. Ex. T (Decl. of Tareq Aqel Mohamed Aziz ¶¶ 12-14, *Aziz v. Trump*, No. 17-0116 (E.D. Va. filed on Feb. 8, 2017)) (denied request for translator or phone calls and told he had to sign a form that he did not understand).

Prospective class members also face irreparable harms resulting from the Executive Order's bar on entry to the United States.  The ban on entry has inflicted and will continue to inflict emotional distress on class members who seek entry to the United States to visit or reunite with family members.  *See, e.g.,* Elbashir Decl. ¶¶ 4-8 (prevented from visiting her sister and her family after careful planning to be present for the birth of her baby); Espíritu Decl. Ex. Q (Dahman Decl. ) ¶¶ 8-17 (prevented from being reunited with her minor son); Alhaffar Decl. ¶¶ 1-2, 5, 15 (prevented from returning home to Virginia and reuniting with her husband after travel abroad); Dkt. No. 53-10 (Yahya Aburomman Decl.) ¶ 2 (prevented from visiting her brothers, uncles, and aunt); Espíritu Decl. Ex. U (Ali Sanie Decl.) ¶¶ 1, 9 (*Louhghalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017)) (legal permanent resident who cancelled planned travel to Iran for surgery and to visit family because of fear of inability to return).

Some class members who have authorization to enter the United States based on their

employment would face irreparable harm to their employment if denied entry.  *See, e.g.,* Abushamma Decl. ¶¶ 1, 14 (a doctor at a medical clinic in Cleveland fearful over being unable to finish her residency); Ali Decl. ¶ 3 (medical professional prevented from attending a conference related to his work); Manar Decl. ¶ 6 (law student prevented from attending the 2017 Winter Youth Assembly at the United Nations, where she was to attend as a chosen delegate); Espíritu Decl. Ex. V (Decl. of Leila Amirsardary ¶¶ 1, 4-11, *Loughalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017) (business owner who needs to travel abroad for work but unable to do so out of fear she will not be permitted to return)).

Other class members with authority to enter the United States on a student visa would be prevented from continuing their education if denied entry.  *See, e.g.,* Yarjani Decl. ¶ 27 (describing how she had only 8 months of studies left to finish her master's degree); Espíritu Decl. Ex. W (Zahrasadat Mirrazi Renani Decl.) ¶ 1, 9, 11, *Loughalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017)) (doctoral student unable to visit family abroad and attend educational conference out of fear he will be prevented from returning); Espíritu Decl. Ex. X (Najwa Elyazgi Decl.) ¶¶ 4-6, 8-10, 15-16,  *Aziz v Trump*, No. 17-0116 (E.D. Va. Feb. 8, 2017)) (student denied ability to board flight after travel abroad and stranded in Instanbul for six days).

Finally, the ban inflicts social stigma on plaintiffs and class members by treating them presumptively as terrorists on the basis of their religion.  The President's denigrating statements about Islam, in combination with a policy that disadvantages Muslim noncitizens, also subject plaintiffs to a category of suspicion from which they cannot escape, thereby impugning their reputation and integrity.

In short, both before and after this Court enjoined the removal of putative class members pursuant to the Executive Order, examples of the irreparable harms suffered by putative class

members resulting from detention and denial of entry were widespread.  Absent an injunction from this Court, putative class members are at risk of continued, irreparable harm.

**B.      The Balance Of Harms And Public Interest Militate Heavily In Favor Of An Injunction.**

The balance of harms and public interest weigh strongly in favor of granting a preliminary injunction.  *See Winter*, 555 U.S. at 24.  In contrast to the irreparable injury facing plaintiffs, the government has presented no evidence of harm resulting from an injunction.  The only argument offered by the government is a general reference to the federal government's interest in enforcing laws related to national security.  *See* Gov't Br. 18.  This argument was resoundingly rejected by the Ninth Circuit.  *Washington*, 2017 WL 526497 at *10 (dismissing the government's claim of irreparable injury and noting that "the Government has done little more than reiterate" its general interest in combatting terrorism) (internal citations omitted).  Likewise, the district court in Virginia found that "[i]ronically, the only evidence of in this record concerning national security indicates that the EO may actually make the country less safe."  *Aziz*, No. 17-0116 at *21; *see also* Espíritu Decl. Ex. B (Joint Declaration of Madeleine K. Albright, et al.); Dkt. No. 137 (Amicus Brief of Former National Security Officials).

Finally, the public interest also strongly favors a preliminary injunction.  As the Ninth Circuit found, "the public . . . has an interest in free flow of travel, in avoiding separation of families, and in freedom from discrimination."  *Washington*, 2017 WL 526497 at *11.  The Court should therefore issue a preliminary injunction.

## CONCLUSION

The Court should deny the motion to dismiss and grant a preliminary injunction.

Dated: February 16, 2017

Respectfully submitted,

/s/ Lee Gelernt

Michael J. Wishnie (MW 1952)
Muneer I. Ahmad[†]
Elora Mukherjee (EM 4011)
Marisol Orihuela[†]
JEROME N. FRANK LEGAL SERVICES
ORGANIZATION
YALE LAW SCHOOL[‡]
P.O. Box 209090
New Haven, CT 06520-9090
Phone: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@yale.edu

Mark Doss
Rebecca Heller
Julie Kornfeld
Stephen Poellot
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
URBAN JUSTICE CENTER
40 Rector St, 9th Floor
New York, NY 10006
Tel. (646)-602-5600
mdoss@refugeerights.org
bheller@refugeerights.org
jkornfeld@refugeerights.org
spoellot@refugeerights.org

Karen C. Tumlin[††]
Nicholas Espíritu[††]
Melissa S. Keaney[†]
Esther Sung[†]
NATIONAL IMMIGRATION
LAW CENTER
3435 Wilshire Boulevard, Suite 1600

Lee Gelernt (LG-8511)
Omar C. Jadwat (OJ-7925)
Cecillia D. Wang (CW-8359)
Andre I. Segura[†]
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
lgelernt@aclu.org
ojadwat@aclu.org
cwang@aclu.org
asegura@aclu.org

Jennifer Chang Newell[††]
Cody H. Wofsy[††]
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Tel. (415) 343-0770
jnewell@aclu.org
cwofsy@aclu.org

Jonathan Polonsky
KILPATRICK TOWNSEND & STOCKTON LLP
1114 Avenue of the Americas
New York, NY 10036-7703
Tel. (212) 775 8703
jpolonsky@kilpatricktownsend.com

Justin B. Cox[†]
NATIONAL IMMIGRATION
LAW CENTER
1989 College Ave. NE

40

Los Angeles, CA 90010                    Atlanta, GA 30317
Phone: (213) 639-3900                    Phone: (678) 404-9119
tumlin@nilc.org                          cox@nilc.org
espiritu@nilc.org
keaney@nilc.org
sung@nilc.org

** Application for admission forthcoming.
† Motion for admission *pro hac vice* forthcoming.
†† Appearing *pro hac vice*.
‡ For identification purposes only.

*Counsel for Petitioners*

**Certificate of Service**

I hereby certify that on February 16, 2017, I electronically filed the Opposition to the Motion to Dismiss and Reply Regarding Preliminary Injunction for Plaintiffs with the Court Clerk using the ECF system, which will send notification to Defendants' registered counsel.


Dated: February 16, 2017                              /s/ Lee Gelernt
                                                      Lee Gelernt