**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAMEED KHALID DARWEESH, et al., | |
| on behalf of themselves and others similarly situated, | Case No. 1:17-cv-00480 (CBA) |
| *Petitioners*, | |
| v. | |
| DONALD TRUMP, President of the United States, et al., | |
| *Respondents*. | |

<u>**DECLARATION OF NICHOLAS**</u>
<u>**ESPÍRITU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTION TO**</u>
<u>**DISMISS AND REPLY REGARDING PRELIMINARY INJUNCTION**</u>

I, Nicholas Espíritu, upon my personal knowledge and in accordance with 28 U.S.C. § 1746, hereby declare as follows:

1. I am an attorney with the National Immigration Law Center (NILC), and counsel of record for Plaintiffs in this action. I am licensed in the State of California and have been admitted *pro hac vice* to practice before this Court. As a witness, I could and would testify competently as to the matters set forth below.

2. Attached as Exhibit A is a true and correct copy of the Memorandum Opinion granting Motion for Preliminary Injunction in *Aziz v. Trump*, No. 17-0116 (E.D. Va. Feb. 13, 2017).

3. Attached as Exhibit B is a true and correct copy of the Joint Declaration of Madeleine K. Albright, *et. al* in *Washington v. Trump*, __ F. 3d __, No. 17-35105 (9th Cir. Feb. 6, 2017).

4. A true and correct copy of the February 3, 2017 Washington Post article by Justin Jouvenal, Rachel Weiner & Ann E. Marimow entitled "*Justice Dept. Lawyer Says*

1

*100,000 Visas Revoked Under Travel ban; State Dept. says About 60,000*," is attached hereto as Exhibit C. The article can also be found at http://tinyurl.com/jk342hm.

5.  Attached as Exhibit D is a true and correct copy of a draft Executive Order "*Protecting the Nation from Terrorist Attacks by Foreign Nationals*." The draft can also be found at https://apps.washingtonpost.com/g/documents/world/read-the-draft-of-the-executive-order-on-immigration-and-refugees/2289/.

6.  Attached as Exhibit E is a true and correct copy of the Central Intelligence Agency's World Listing Factbook website providing countries' population percentage by religious affiliation. This demographic information can also be found at https://www.cia.gov/library/publications/the-world-factbook/fields/2122.html#sy.

7.  A true and correct copy of the January 27, 2017 CBN News article entitled "*Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees*," is attached hereto as Exhibit F. The article can also be found at http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-president-trump-says-persecuted-christians-will-be-given-priority-as-refugees.

8.  A true and correct copy of the January 31, 2017 Washington Post article by Sarah Pulliam Bailey entitled "*Trump signs order limiting refugee entry, says he will prioritize Christian refugees*," is attached hereto as Exhibit G. The article can also be found at https://www.washingtonpost.com/news/acts-of-faith/wp/2017/01/27/we-dont-want-them-there-trump-signs-order-limiting-refugee-entry/?utm_term=.1238bc7f1081.

9.  A true and correct copy of the December 7, 2015 statement posted to Donald J. Trump's official campaign website entitled "*Donald J. Trump Statement On Preventing Muslim Immigration*," is attached hereto as Exhibit H. The speech can also be found at https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration.

10. A true and accurate copy of the tweet by Donald J. Trump @realDonaldTrump made on December 7, 2015 at 1:47 PM is attached hereto as Exhibit I. The tweet can also be found at https://twitter.com/realdonaldtrump/status/673982228163072000?lang=en.

11. A true and accurate copy of the December 7, 2015 Washington Post article by Jenna Johnson entitled "*Trump calls for 'total and complete shutdown of Muslims entering the United States*'" is attached hereto as Exhibit J. The article can also be found at https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/?utm_term=.b6d478b253a6.

12. A true and correct copy of the transcript of the July 24, 2016 interview of Donald Trump by Chuck Todd on "*Meet the Press*" on NBC is attached hereto as Exhibit K. The transcript can also be found at http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706.

13. A true and correct copy of the December 21, 2016 Time article by Katie Reilly entitled "*Donald Trump on Proposed Muslim Ban: 'You Know My Plans,'*" is attached hereto as Exhibit L. The article can also be found at http://time.com/4611229/donaldtrumpberlinattack/.

14. A true and correct copy of the January 29, 2017 Washington Post article by Amy B. Wang entitled "*Trump asked for a 'Muslim ban,' Guiliani says – and ordered a commission to do it 'legally,'*" is attached hereto as Exhibit M. The article can also be found at https://www.washingtonpost.com/news/the- fix/wp/2017/01/29/trump-asked-for-a-muslim-ban-giuliani-says-and-ordered-a-commission-to- do-it-legally/?utm_term=.2f88f830c54c.

15.  A true and correct copy of the December 8, 2015 Washington Post article by Jenna Johnson entitled "*Donald Trump says he is not bothered by comparisons to Hitler*" is attached hereto as Exhibit N. The article can also be found at https://www.washingtonpost.com/news/post-politics/wp/2015/12/08/donald-trump-says-he-is-not-bothered-by-comparisons-to-hitler/?utm_term=.97e412919c27.

16. A true and correct copy of the March 10, 2016 CNN article by Theodore Schliefer entitled "*Donald Trump: 'I think Islam hates us,'*" is attached hereto as Exhibit O. The article can also be found at http://www.cnn.com/2016/03/09/politics/donald-trump-islam-hates-us/.

17. A true and correct copy of the March 22, 2016 Mediate article by Alex Griswold entitled "*Trump Responds to Brussels Attacks: 'We're Having Problems With the Muslims'*" is attached hereto as Exhibit P. The article can also be found at http://www.mediaite.com/tv/trump-responds-to-brussels-attack-were-having-problems-with-the-muslims/.

18. Attached as Exhibit Q is a true and correct copy of the Declaration of Reema Khaled Dahman, *Ali v. Trump*, No. 17-0135 (W.D. Wash. Feb. 6, 2017).

19. Attached as Exhibit R is a true and correct copy of the Declaration of Babek Yaghoubi Moghadam, *Loughalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017).

20.  A true and correct copy of the January 29, 2017 New York Times article by Benjamin Mueller and Matthew Rosenberg entitled "*Disorder at Airports as Travelers Are Detained Without Lawyers*," is attached hereto as Exhibit S.  The article can also be found at https://nyti.ms/2jHM3ba.

21. Attached as Exhibit T is a true and correct copy of the Declaration of Tareq Aqel Mohamed Aziz, *Aziz v. Trump*, No. 17-0116 (E.D. Va. Feb. 8, 2017).

22. Attached as Exhibit U is a true and correct copy of the Declaration of Ali Sanie, *Louhghalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017).

23. Attached as Exhibit V is a true and correct copy of the Declaration of Leily Amirsardary, *Louhghalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017).

24. Attached as Exhibit W is a true and correct copy of the Declaration of Zahrasadat Mirrazi Renani, *Loughalam v. Trump*, No. 17-10154 (D. Mass. Feb. 3, 2017).

25. Attached as Exhibit X is a true and correct copy of the Declaration of Najwa Elyazgi, *Aziz v Trump*, No. 17-0116 (E.D. Va. filed on Feb. 8, 2017).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed at Los Angeles, California on February 16, 2017.

*Nicholas Espíritu*
_____
Nicholas Espíritu
NATIONAL IMMIGRATION LAW CENTER
3435 Wilshire Boulevard, Suite 1600
Los Angeles, CA 90010
(213) 639-3900
espiritu@nilc.org

EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TAREQ AQEL MOHAMMED AZIZ, et al.,     )
                                      )
        Plaintiffs/Petitioners       )
                                      )
     v.                          )     1:17-cv-116 (LMB/TCB)
                                        )
DONALD TRUMP, President of the United   )
    States, et al.,                  )
                                      )
        Defendants/Respondents.   )

## <u>MEMORANDUM OPINION</u>

In this civil action, the Commonwealth of Virginia ("Commonwealth") alleges that

Executive Order 13,769, entitled "Protecting the Nation from Foreign Terrorist Entry into the

United States" ("the EO"), violates the First and Fifth Amendments to the United States

Constitution, as well as the Immigration and Nationality Act and Religious Freedom Restoration

Act. Before the Court is the Commonwealth's Motion for a Preliminary Injunction, to which

defendants have responded and on which oral argument has been held. Attached to the

Commonwealth's motion were multiple exhibits and declarations. The defendants have

responded with no evidence other than the EO, which they have defended primarily with

arguments attacking the Commonwealth's standing to oppose the EO and emphasizing the

authority of the president to issue such an EO. For the reasons that follow, the Commonwealth's

Motion for a Preliminary Injunction will be granted.

### I.    FINDINGS OF FACT

#### A. The Executive Order

On January 20, 2017, Donald Trump ("Trump") was inaugurated as the 45th President of

the United States. On January 27, 2017, he signed the EO. Section 3 of the EO "proclaim[ed]

that the immigrant and nonimmigrant entry into the United States of aliens from" Syria, Iraq,

Iran, Libya, Sudan, Yemen, and Somalia "would be detrimental to the interests of the United

States" and "suspend[ed] entry into the United States, as immigrants and nonimmigrants, of such

persons for 90 days from the date of this order." [Dkt. 7-1] § 3(c). Although the EO specifically

excludes "foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization

visas, C-2 visas for travel to the United Nations, and G-1, G-2, G-3, and G-4 visas"[1] from the

ban on entry, it does not list lawful permanent residents ("LPRs") among those excluded. Id.

Section 5 of the EO suspends the United States Refugee Assistance Program ("USRAP") for

persons from all countries for 120 days. Id. at § 5(a). Once the suspension has ended, the EO

directs the Secretaries of State and Homeland Security "to the extent permitted by law, to

prioritize refugee claims made by individuals on the basis of religious-based persecution,

provided that the religion of the individual is a minority religion in the individual's country of

nationality." Id. at § 5(b).

Section 1 describes the stated purpose for the EO as follows:

> Numerous foreign-born individuals have been convicted or implicated in
> terrorism-related crimes since September 11, 2001, including foreign nationals
> who entered the United States after receiving visitor, student, or employment
> visas, or who entered through the United States refugee resettlement program.
> Deteriorating conditions in certain countries due to war, strife, disaster, and civil
> unrest increase the likelihood that terrorists will use any means possible to enter
> the United States. The United States must be vigilant during the visa-issuance
> process to ensure that those approved for admission do not intend to harm
> Americans and that they have no ties to terrorism.

[Dkt. 31-1] § 1. Section 2 goes on to declare it to be "the policy of the United States to protect

its citizens from foreign nationals who intend to commit terrorist attacks in the United States;

---

[1] The "G" series of visas are available to qualifying representatives of foreign governments and
international organizations.

and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes." Id. § 2.

The EO was initially applied to LPRs, and the defendants have since conceded that Customs and Border Patrol ("CBP") initially stopped several LPRs at the border in the 24 to 48 hours after the EO was signed, although they represent that all such persons have since been permitted to enter the United States. After initial confusion within the executive branch, [Dkt. 61-17], Homeland Security Secretary John Kelly released a statement on Sunday, January 29, announcing that he "deem[ed] the entry of lawful permanent residents to be in the national interest" and that "lawful permanent resident status will be a dispositive factor in our case-by-case determinations," [Dkt. 61-1].

The next day, White House Counsel Donald F. McGahn II issued a memorandum stating that "there has been reasonable uncertainty about whether [Section 3 of the EO] appl[ies] to lawful permanent residents of the United States. Accordingly, to remove any confusion, I now clarify that Section 3(c) . . . do[es] not apply to such individuals." [Dkt. 34-1]. Defendants have argued that in light of this memorandum, the EO cannot be interpreted to apply to LPRs; however, a voluntary change of policy cannot be taken as binding unless it is "absolutely clear" that the government will not revert to its original position. Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). As the Ninth Circuit observed in related litigation, defendants have "offered no authority establishing that the White House counsel is empowered to issue an amended order superseding the Executive Order signed by the president . . . and that proposition seems unlikely," nor have they "established that the White House counsel's interpretation of the Executive Order is binding on all executive branch officials responsible for enforcing" it. Washington v. Trump, __ F.3d __, 2017 WL 526497, at *8 (9th

3

Cir. 2017). Accordingly, the Court finds that the EO presents an ongoing risk to the status of LPRs from the seven countries covered by the EO.

### B. Injuries to the Commonwealth and its Residents

The Commonwealth has produced evidence of the EO being disruptive to the operation of its public colleges and universities. As the declaration of W. Taylor Reveley III ("Reveley"), who is president of the College of William & Mary and the chair of the Council of Presidents, a group consisting of the presidents and chancellors of Virginia's 14 public universities and colleges and 23 community colleges, [Dkt. 32] at ¶¶ 1–2, explains, the EO affects international travel of at least 350 students attending Virginia Commonwealth University, Virginia Tech, George Mason University, the University of Virginia, and William & Mary combined.[2] [Dkt. 32] at ¶ 5. That number includes at least two students who were abroad when the EO was issued and were denied reentry to the United States on its authority. Id. at ¶ 6.[3] At one university, Iranian-born faculty and students "have had to cancel their plans to present their work at an international conference on engineering" because they believe they are likely to be denied reentry to the United States. Id. at ¶ 7. The EO is also disrupting the process by which medical students "match" with academic hospitals for their residency, which takes place this month. Id. at ¶ 8. At least two Virginia universities have already had to cancel appearances by foreign scholars as a result of the EO. Id. at ¶ 9. Students have also begun withdrawing applications to attend Virginia schools as a result of the travel ban, and at least two students who had already announced an intention to enroll in Virginia schools have now abandoned those plans. Id. at

---

[2] At oral argument, the Commonwealth represented that across all of its schools its estimate of affected persons has grown to 1,000 students and 66 faculty and staff members.

[3] One of these students, Najwa Elyazgi, has since entered the United States, but only as a result of the District of Washington's order staying enforcement of the EO. [Dkt. 54] ¶ 11.

¶ 11.  The affected students and faculty "must refrain from leaving the United States for fear of not being able to return," id. at ¶ 7, and "are unsure whether they should take the trips they had planned to visit family and fulfill research obligations, whether future trips should be planned, and whether members of their family or research partners will be able to visit the United States," id. at ¶ 14.  The defendants provided no evidence to counter these representations.

The Commonwealth has also presented evidence that enforcement of § 3(c) of the EO will have a financial impact on its colleges and universities.  Most concretely, the EO will result in reduced revenue from tuition money from students who cannot return to continue their studies or who are unable to enroll.  [Dkt. 32] at ¶ 11.  Department of Homeland Security data from 2015, the most recent year available, shows that 465 student visa holders from the affected countries were enrolled in Virginia schools.  [Dkt. 61-15] at 4.  College Factual, a company that specializes in higher education analytics, estimates that this could result in up to $20.8 million in lost tuition and fees.  Id.; [Dkt. 61-16] at 1.  Although the Commonwealth has not identified any specific grants or contracts that are in immediate jeopardy, it also argues that the EO may inhibit the ability of research universities to fulfill the terms of various grants and contracts.  [Dkt. 32] at ¶ 12.

Reveley also avers that university personnel are experiencing "anxiety, confusion, and distress" because of the uncertainty introduced by the EO, such that some universities "have experienced an uptick in students, employees, and faculty using their counseling services."  Id. at ¶ 14. Finally, Reveley and other administrators are concerned that the EO could imperil Virginia students who are studying abroad, by inflaming "anti-American sentiment[.]"  Id. at ¶ 15.  Again, defendants have not tendered any evidence to refute these concerns.

## C. The Government's Asserted Rationale for the EO

Defendants have maintained that the EO is necessary to protect the United States from terrorist attacks to be carried out by nationals of the seven affected countries [Dkts. 31-1, 80]; however, they have not offered any evidence to identify the national security concerns that allegedly prompted this EO, or even described the process by which the president concluded that this action was necessary.[4]

And contrary to the national security concerns recited in the EO, the only evidence in the record on this subject is a declaration of 10 national security professionals who have served at the highest levels of the Department of State, the Department of Homeland Security, the Central Intelligence Agency, and the National Security Council through both Republican and Democratic administrations, [Dkt. 57], and at least four of whom "were current on active intelligence regarding all credible terrorist threat streams directed against the [United States] as recently as one week before the issuance of the" EO. Id. at ¶ 2. They write

> We all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. We all are nevertheless unaware of any specific threat that would justify the travel ban established by the Executive Order issued on January 27, 2017. We view the Order as one that ultimately undermines the national security of the United States, rather than making us safer. In our professional opinion, this Order cannot be justified on national security or foreign policy grounds.

Id. at ¶ 3. They also observe that since September 11, 2011, "not a single terrorist attack in the United States has been perpetrated by aliens from the countries named in the Order." Id. at ¶ 4.

---

[4] To the extent that such evidence might be classified, "the Government may provide a court with classified information. Courts regularly receive classified information under seal and maintain its confidentiality. Regulations and rules have long been in place for that." Washington, 2017 WL 526497, at *10 n.8.

**D. The President's Public Comments**

The Commonwealth's evidence also contains several statements by the president and his senior advisors on the subject of immigration to the United States by Muslims. Although defendants dispute the relevance of these statements, as discussed below, they have not contested their accuracy.

On December 7, 2015, then-candidate Trump issued a press released titled "Donald J. Trump's Statement on Preventing Muslim Immigration." [Dkt. 61-12]. In the statement, he called "for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." Id.

The latter statement is consistent with views that the president has expressed on various occasions over the last six years. A representative example[5] can be found in a 2011 interview with Fox News's Bill O'Reilly ("O'Reilly"). A portion of that interview reads:

> O'Reilly: Is there a Muslim problem in the world?
> Trump: Absolutely. Absolutely. I don't notice Swedish people knocking down the World Trade Center.
> . . .
> O'Reilly: But you do believe overall there is a Muslim problem in the world.
> Trump: Well, there is a Muslim problem. Absolutely. You just have to turn on your television set.
> O'Reilly: And do you think it encompasses all Muslims?
> Trump: No. And that's the sad part about life. Because you have fabulous Muslims. I know many Muslims and they're fabulous people. They're smart. They're industrious. They're great. Unfortunately, at this moment in time, there is a Muslim problem in the world. And by the way, and you know it and I [sic] and I know it and some people don't like saying it because they think it's not politically correct.

[Dkt. 61-19] at 5.

---

[5] The attachments to the Declaration of Mona Siddiqui [Dkt. 61] collect several other examples, although the Court does not consider every document in the Siddiqui declaration to be relevant.

7

As the campaign proceeded, there were fewer references to an outright ban on Muslim immigration, with the focus switched to a ban on persons from territories that have a Muslim majority. Mr. Trump and then-vice-presidential candidate Mike Pence ("Pence") were asked about this evolution in an interview with Lesley Stahl ("Stahl") on July 17, 2016. The relevant portion reads:

> Stahl: [I]n December, you [i.e., Pence] tweeted, and I quote you, "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional."
> Trump: So you call it territories. OK? We're gonna do territories. We're not gonna let people come in from Syria that nobody knows who they are.
> . . .
> Stahl: [S]o you're changing . . . your position.
> Trump: --No, I—call it whatever you want. We'll call it territories, OK?
> Stahl: So not Muslims?
> Trump: You know—the Constitution—there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country.

[Dkt. 61-22] at 9–10.

On the morning of Friday, January 27, 2017, the president gave an interview with the Christian Broadcasting Network's David Brody ("Brody"):

> Brody: Persecuted Christians, we've talked about this, the refugees overseas. The refugee program, or the refugee changes you're looking to make. As it relates to persecuted Christians, do you see them as kind of a priority here?
> Trump: Yes.
> Brody: You do?
> Trump: They've been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair [sic], everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them.

[Dkt. 61-6] at 2. That evening, the EO was signed.

8

On Sunday, January 29, 2017, two days after the EO was signed, former Mayor of New York City Rudolph Giuliani ("Giuliani") said in an interview on Fox News, "'I'll tell you the whole history of it[.]' . . . 'So when [Trump] first announced it, he said 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.' . . . 'And what we did was, we focused on, instead of religion, <u>danger</u>—the areas of the world that create danger for us[.]' . . . 'Which is a <u>factual</u> basis, not a religious basis. Perfectly legal, perfectly sensible. And that's what the ban is based on. It's not based on religion. It's based on places where there are [<u>sic</u>] substantial evidence that people are sending terrorists into our country.'" [Dkt. 61-4] at 1–2 (emphasis in original).

The president and his advisors deny that the EO represents the Muslim ban that the president spoke about during his campaign. Secretary Kelly said in an interview on Tuesday, January 31, 2017, "'This is not, I repeat not, a ban on Muslims.' . . . 'We cannot gamble with American lives. I will not gamble with American lives. These orders are a matter of national security, and it is my sworn responsibility as secretary of homeland security to protect and defend the American people.'" [Dkt. 61-17] at 3.

## II.    CONCLUSIONS OF LAW

### A.  <u>Justiciability</u>

As a threshold matter, defendants argue that courts "lack jurisdiction to review the Executive Branch's decisions concerning visa revocation and entry," at least in part because those decisions involve national security judgments. [Dkt. 80] at 14.

The word "jurisdiction" was once a "word of many, too many, meanings." <u>Steel Co. v. Citizens for a Better Environment</u>, 523 U.S. 83, 90 (1998) (internal citation and quotation marks omitted). Accordingly, the Supreme Court "has endeavored in recent years to 'bring some

discipline' to the use of the term 'jurisdictional.'" Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) (quoting Henderson v. Shinseki, 562 U.S. 428, 435 (2011)). Because the modern concept addresses "a court's adjudicatory capacity," it refers to either "subject matter jurisdiction" or "personal jurisdiction." Henderson, 562 U.S. at 435.

Defendants have argued that exercising jurisdiction in this case would be "an impermissible intrusion on the political branches' plenary constitutional authority over foreign affairs, national security, and immigration." [Dkt. 80] at 14. By advancing this argument, defendants appear to be invoking the political question doctrine, under which a court lacks subject matter jurisdiction over "a controversy . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it[.]" Zivotofsky v. Clinton, 566 U.S. 189, 195 (2012) (internal quotation marks and citations omitted).

The issues in this case are not textually committed to another department by the Constitution. To the contrary, the Commonwealth argues that the EO is in violation of constitutional and statutory law, and that resolving these claims requires interpreting the EO, the Immigration and Nationality Act, and the Constitution. "This is a familiar judicial exercise." Zivotofsky, 566 U.S. at 196. "At least since Marbury v. Madison, [the Supreme Court has] recognized that when" government action "is alleged to conflict with the Constitution, 'it is emphatically the province and duty of the judicial department to say what the law is.'" Id. (quoting Marbury, 1 Cranch 137, 177 (1803)). "That duty will sometimes involve the '[r]esolution of litigation challenging the constitutional authority of one of the three branches,' but courts cannot avoid their responsibility merely 'because the issues have political implications.'" Id. (quoting INS v. Chadha, 462 U.S. 919, 943 (1983)).

At oral argument, defendants suggested that their justiciability arguments were limited to the context of 8 U.S.C. § 1182(f), which is the statutory authority that the president invokes for the EO. Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants[.]" Defendants urge that this statutory grant of authority places the president at the zenith of his power, citing the framework first articulated by Justice Jackson in his concurrence in <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579 (1952). Under <u>Youngstown Sheet & Tube</u>, "[w]hen the President acts pursuant to an express . . . authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." 343 U.S. at 635.

Maximum power does not mean absolute power. Every presidential action must still comply with the limits set by Congress' delegation of power and the constraints of the Constitution, including the Bill of Rights.[6] It is a bedrock principle of this nation's legal system that "the Constitution ought to be the standard of construction for the laws, and that wherever there is evident opposition, the laws ought to give place to the Constitution." The Federalist No. 81, at 481 (Alexander Hamilton) (Clinton Rossiter ed., 1999). Defendants have cited no authority for the proposition that Congress can delegate to the president the power to violate the

---

[6] <u>Youngstown Sheet & Tube</u> is better known as the <u>Steel Seizure Case</u>. In that case, President Truman ordered the Secretary of Commerce to seize control of most of the country's steel mills because he felt that an impending strike would jeopardize the military's ability to wage the Korean War. The Supreme Court struck the order, holding that although "[t]he power of Congress to . . . authorize the taking of private property for public use" was beyond question, the president did not have power to do so without Congress' approval, even in wartime. <u>Id.</u> at 588.

Constitution and its amendments and the Supreme Court has made it clear that even in the context of immigration law, congressional and executive power "is subject to important constitutional limitations." Zadvydas v. Davis, 533 U.S. 678, 695 (2001).

Indeed, the Supreme Court has refused to hold that the president is exempt from compliance with the Due Process Clause even when he is exercising a pure Article II power, such as the detention of persons deemed "enemy combatants." In Hamdi v. Rumsfeld, 542 U.S. 507, 509 (2004), for example, the Supreme Court was confronted with the constitutional claims of an "enemy combatant." The Court recognized the government's "critical . . . interest in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict," id., but still held that the president must comply with the Fifth Amendment, id. at 524. If the president's actions can be subject to judicial review when he is exercising his core Article II powers, as in Hamdi, it follows that his actions are also subject to such review when he exercises Article I powers delegated to him by Congress. As the Ninth Circuit has explained, "the Supreme Court has repeatedly and explicitly rejected the notion that the political branches . . . are not subject to the Constitution when policymaking in [the immigration] context." Washington, 2017 WL 526497, at *5.

The defendants also continue to dispute the Commonwealth's Article III standing to challenge the EO. The Court has already held that the Commonwealth has pleaded facts sufficient to establish standing under both a parens patriae theory and proprietary theory. See Mem. Op., [Dkt. 42] at 11. Because the pending motion is for a preliminary injunction, the Commonwealth may no longer rest on its pleadings but must "set forth by affidavit or other evidence specific facts, which for purposes of the [preliminary injunction] will be taken to be true." Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (internal quotation marks and

citations omitted). As discussed above, the Commonwealth has submitted sufficient evidence in the form of Reveley's declaration to establish at this early point in the litigation standing under the standards articulated in this Court's memorandum opinion dated February 3, 2017. See Mem. Op., [Dkt. 42] at 11.

### B. Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation marks and citation omitted).

### C. Likelihood of Success on the Merits

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.[7] "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982). The Supreme Court has articulated various tests for determining whether that command has been violated. The first such test is that the law "must have a secular . . . purpose." Lemon v. Kurtzman, 403 U.S. 602, 612 (1971).

---

[7] Although the First Amendment only addresses Congress by its terms, it has long been held to apply to executive action as well. See, e.g., New York Times Co. v. United States, 403 U.S. 713, 714 (1971).

"In the past, [this] test has not been fatal very often, presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing" one religion over another. McCreary County v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 863 (2005). The secular purpose requirement "'nevertheless serves an important function,'" id. at 859 (quoting Wallace v. Jaffree, 472 U.S. 38, 75 (1985) (O'Connor, J., concurring in the judgment)), because "[b]y showing a purpose to favor religion, the government sends the . . . message to . . . nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members," id. at 860 (internal citations and quotation marks omitted). This message of exclusion from the political community is all the more conspicuous when the government acts with a specific purpose to disfavor a particular religion.

Defendants have argued that the Court may not go beyond the text of the EO in assessing its purpose, or look behind its proffered national security rationale,[8] but the Supreme Court has rejected that position. Although courts "often . . . accept governmental statements of purpose, in keeping with the respect owed in the first instance to such official claims, . . . in those unusual cases where the claim was an apparent sham, or the secular purpose secondary, the unsurprising results have been findings of no adequate secular object." McCreary, 545 U.S. at 865. When determining what purpose motivates governmental action, "an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." McCreary, 545 U.S. at 862. In other words, what matters is what an "objective observer" would draw from the text of the policy, enlightened by historical context and "the

_____

[8] The District of Massachusetts apparently agreed in Louhghalam v. Trump, as it referred only to the text of the EO, but the court did not explain why it did not consider any other evidence. See __ F. Supp. 3d __, 2017 WL 479779, at *4–*5 (D. Mass 2017).

specific sequence of events leading to" its adoption.  Id. (internal citations and quotation marks omitted).  This historical context can include statements by relevant policymakers.  Id. at 870 (considering resolutions authorizing a Ten Commandments display by county boards); see also Washington, 2017 WL 526497 at *10 (sanctioning the consideration of "statements by decisionmakers").

Defendants argue that an elected official's statements before he took the oath of office are irrelevant, but that position also runs counter to McCreary. 545 U.S. at 866.  Just as the Supreme Court has held that "the world is not made brand new every morning[,]" id.,  a person is not made brand new simply by taking the oath of office.  Limiting the temporal scope of the purpose inquiry "bucks common sense: reasonable observers have reasonable memories, and [Supreme Court] precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'"  Id. (quoting Santa Fe Ind. Sch. Dist. v. Doe, 530 U.S. 290, 315 (2000)).  For example, in McCreary, the American Civil Liberties Union ("ACLU") sought to enjoin a display including the Ten Commandments in two counties' courthouses. Id. at 855.  The Supreme Court examined the history of interactions between county executives, the ACLU, and the federal district court for a one-year period before the challenged display was erected, id. at 851–57, and determined from that history that "the [c]ounties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody religious neutrality," id. at 873.  Further, in Santa Fe, the Court examined over a year's worth of events leading up to a school district's adoption of the challenged "Prayer at Football Games" policy to conclude that it "unquestionably ha[d] the purpose and create[d] the perception of encouraging the delivery of prayer at a series of important school events."  Santa Fe, 530 U.S. at 294–98, 317.

This Court is similarly not free to "ignore perfectly probative evidence" from statements made by the president before he took office. See McCreary, 545 U.S. at 866.

Defendants have repeatedly cited Kleindienst v. Mandel, 408 U.S. 753 (1972), arguing that when facing constitutional scrutiny in an immigration context, the government must only supply a "facially legitimate and bona fide reason" for its action, but Mandel is inapplicable to this litigation. By its terms, Mandel does not apply to the persons who have already been granted visas because it involved an as-applied challenge to executive action by a person who had not been granted a visa. Id. at 758–60. Here, by contrast, the allegations involve persons who have passed through extensive vetting requirements and been granted visas. Accordingly, the limitation Mandel imposes on constitutional review of executive action does not apply to the class of persons relevant to this action. Moreover, even if Mandel did apply, it requires that the proffered executive reason be "bona fide." Id. at 770. As the Second and Ninth Circuits have persuasively held, if the proffered "facially legitimate" reason has been given in "bad faith," it is not "bona fide." Am. Academy of Religion v. Napolitano, 573 F.3d 115, 126 (2d Cir. 2009); Bustamente v. Mukasey, 531 F.3d 1059, 1062 (9th Cir. 2008). That leaves the Court in the same position as in an ordinary secular purpose case: determining whether the proffered reason for the EO is the real reason.

Defendants argue that permitting a court to "look behind" the president's national security judgments will result in a trial de novo of the president's national security determinations.[9] No party has asked the Court to engage in such an exercise, nor would

---

[9] Similar concerns were raised in one of the wartime detention cases, Boumediene v. Bush, 553 U.S. 723, 831 (2008) (Scalia, J., dissenting), but lower courts have proven capable of conducting the required due process analysis without supplanting the executive branch, see e.g., Bensayah v. Obama, 610 F.3d 718, 723–27 (D.C. Cir. 2010).

precedent permit it to do so. As in the Ninth Circuit, this court's "jurisprudence has long counseled deference to the political branches on matters of immigration and national security[.]" Washington, 2017 WL 526497, at *5. The Establishment Clause concerns discussed above do not involve an assessment of the merits of the president's national security judgment. Instead, the question is whether the EO was animated by national security concerns at all, as opposed to the impermissible motive of, in the context of entry, disfavoring one religious group and, in the area of refugees, favoring another religious group.

The Commonwealth has produced unrebutted evidence supporting its position that it is likely to succeed on an Establishment Clause claim. The "Muslim ban" was a centerpiece of the president's campaign for months, and the press release calling for it was still available on his website as of the day this Memorandum Opinion is being entered. See [Dkt. 61-12]. The president connected that policy to this EO when, asked last July if he had abandoned his plan for a Muslim ban, he responded "Call it whatever you want. We'll call it territories, OK?" [Dkt. 61-22] at 10. Giuliani said two days after the EO was signed that Trump's desire for a Muslim ban was the impetus for this policy. [Dkt. 61-4] at 1. And on the same day that the president signed the EO, he lamented that under the old policy, "If you were a Muslim you could come in, but if you were a Christian, it was almost impossible," and said his administration was "going to help" make persecuted Christians a priority. [Dkt. 61-6] at 2. Defendants have not denied any of these statements or produced any evidence, beyond the text of the EO itself, to support their contention that the EO was primarily motivated by national security concerns.[10]

---

[10] The Court gives little weight to the post hoc statements by Secretary Kelly and other administration officials that this is not a Muslim ban. See [Dkt. 61-17] at 3. Such rationalizations, coming after the litigation had already been challenged on First Amendment and other legal grounds, are typically afforded little weight in an intent inquiry. See Peacock v. Duval, 694 F.2d 644, 646 (9th Cir. 1982).

The "specific sequence of events" leading to the adoption of the EO bolsters the Commonwealth's argument that the EO was not motivated by rational national security concerns. As the declaration from the national security experts states, ordinarily an executive order prioritizing national security is based "on cleared views from expert agencies with broad experience on the matters presented to [the president]." [Dkt. 57] at ¶ 7. But here there is no evidence that such a deliberative process took place. Id. To the contrary, there is evidence that the president's senior national security officials were taken by surprise. See [Dkt. 61-17]. Although Giuliani suggested that the EO was formulated by a "whole group of very expert lawyers" and at least two members of Congress, this process appears to have taken place during the campaign and there is no evidence that this commission was privy to any national security information when developing the policy. See [Dkt. 61-4]. Once again, defendants have offered no evidence to the contrary.

Defendants argue that the list of countries affected by the EO was singled out by Congress and the previous administration for special scrutiny and therefore cannot reflect religious prejudice. Giuliani advanced a similar argument in his interview after the EO was signed—that as long as the policy was given an outwardly legal form, it is constitutional. [Dkt. 61-4] at 1–2. Once again, McCreary is to the contrary:

> One consequence of taking account of the purpose underlying past actions is that the same government action may be constitutional if taken in the first instance and unconstitutional if it has a sectarian heritage. This presents no incongruity, however, because purpose matters.

545 U.S. at 866 n.14. Absent the direct evidence of animus presented by the Commonwealth, singling out these countries for additional scrutiny might not raise Establishment Clause concerns; however, with that direct evidence, a different picture emerges. In Giuliani's own account, the origin of this EO was a statement by the president that he wanted a legal way to

18

impose a ban on Muslims entering the United States. [Dkt. 61-4] at 1. The president himself acknowledged the conceptual link between a Muslim ban and the EO when, asked if he had changed his position, he said "Call it whatever you want. We'll call it territories, OK?" [Dkt. 61-22] at 10. That the same list might have been created by constitutionally legitimate concerns does not alter the legal analysis under McCreary.

The argument has also been made that the Court cannot infer an anti-Muslim animus because the EO does not affect all, or even most, Muslims. The major premise of that argument—that one can only demonstrate animus toward a group of people by targeting all of them at once—is flawed. For example, it is highly unlikely that the Supreme Court considered the displays of the Ten Commandments erected by the Kentucky counties in McCreary, which had a localized impact, to be targeted at all persons outside the Judeo-Christian traditions. See 545 U.S. at 851. Moreover, the Supreme Court has never reduced its Establishment Clause jurisprudence to a mathematical exercise. It is a discriminatory purpose that matters, no matter how inefficient the execution. See id. at 860.

Finally, defendants argue that the evidence on which the Commonwealth relies proves too much, because it would render every policy that the president makes related to Muslim-majority countries open to challenge. This fear is exaggerated. The Court's conclusion rests on the highly particular "sequence of events" leading to this specific EO and the dearth of evidence indicating a national security purpose. See McCreary, 545 U.S. at 862. The evidence in this record focuses on the president's statements about a "Muslim ban" and the link Giuliani established between those statements and the EO. Based on that evidence, at this preliminary

19

of the litigation, the Court finds that the Commonwealth has established a likelihood of success on the merits.[11]

### D. Irreparable Harm

As a matter of law, the threat of an Establishment Clause violation in and of itself constitutes irreparable harm. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)). But it is not the only irreparable harm that the Commonwealth is experiencing. As discussed above, the travel ban applies to hundreds of students at the Commonwealth's universities, and is already preventing the exchange of faculty on which such universities thrive, by significantly straining freedom of movement. Moreover, Virginia's schools have begun to lose students, and have credibly stated that they expect to continue losing students and medical residents in the coming months if the travel ban is not lifted. Students are not fungible, thus these losses cannot be compensated by money damages, even if money damages were available in this civil action, which they are not. In light of the likelihood of an Establishment Clause violation and the restraint on liberty imposed by the travel ban, the Commonwealth has established irreparable harm.

### E. Balance of the Equities

As the Fourth Circuit has held, "a state is in no way harmed by the issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional[.]" Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks and citation omitted). Moreover, in contrast to the evidence of irreparable harm to the Commonwealth from the EO, the defendants have failed to present any

---

[11] Because the Commonwealth has established a likelihood of success on its Establishment Clause claim, the Court does not need to address its equal protection, due process, or statutory claims at this stage.

evidence of harm they or the nation will suffer if enforcement of § 3(c) of the EO is preliminarily enjoined beyond bare assertions that the EO is necessary for national security. Although there is no interest more weighty than a bona fide national security concern, the defendants have presented no evidence to support their contention that the EO is necessary to national security. And as the Ninth Circuit observed, there is no evidence that the procedures in place before the EO was signed were inadequate, as the government has not pointed to any attacks perpetrated by nationals of the affected countries since September 11, 2001. Washington, 2017 WL 526497 at *10. Ironically, the only evidence in this record concerning national security indicates that the EO may actually make the country less safe. As the former national security officials have stated: "[The EO] ultimately undermines the national security of the United States, rather than mak[ing] us safer. In our professional opinion, this Order cannot be justified on national security or foreign policy grounds." [Dkt. 57] at ¶ 3. The Commonwealth therefore prevails on the balance of the equities.

### F. Public Interest

The Fourth Circuit has held that "upholding constitutional rights surely serves the public interest." Giovani Carandola, 303 F.3d at 521 (internal quotation marks and citation omitted). The Court therefore finds that enjoining an action that is likely a violation of the Establishment Clause serves the public interest, particularly in the absence of evidence to support the government's asserted national security interest as discussed above.

### G. Scope of Relief

The Commonwealth originally sought an order enjoining enforcement of § 3(c) of the EO at any port of entry against Virginia residents who lawfully held either LPR status, a valid student visa, or a valid work visa at the time that the EO was signed. At oral argument, it

amended its request to include a request for a nationwide injunction applying to all persons, not just Virginia residents. Although "[n]ationwide injunctions are appropriate if necessary to afford relief to the prevailing party," Va. Soc'y for Human Life v. Fed. Election Comm'n, 263 F.3d 379, 393 (2001), injunctive relief must be no broader than necessary to avoid encroaching "on the ability of other circuits to consider the" questions raised. Id. The relief originally requested by the Commonwealth is appropriately tailored to the basis for the Commonwealth's standing and its claims relating to its residents, colleges, and universities. Moreover, the nationwide temporary restraining order entered in the District of Washington provides the broader protection sought by the Commonwealth. To avoid any claim that the preliminary injunction to be entered in this litigation is defective because of overbreadth, this Court declines the Commonwealth's invitation to impose broader relief.

### III.    CONCLUSION

For the reasons discussed in this Memorandum Opinion, the Court holds that the unrefuted evidence presented by the Commonwealth establishes that there is a likelihood the Commonwealth will prevail on the merits of its Establishment Clause claim; that it will suffer irreparable injury if the enforcement of § 3(c) of the EO is not enjoined as it relates to Virginia residents, Virginia institutions, and persons connected to those persons and institutions; that the defendants will not suffer any harm from imposing the injunction; and that enjoining unconstitutional action by the Executive Branch is always in the public's interest. Accordingly, the Court will enter a separate order granting a modified version of the injunction sought by the Commonwealth.

Entered this 13 day of February, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

22

EXHIBIT  B

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 17-35105

| | | |
|---|---|---|
| STATE OF WASHINGTON, et al. | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | **JOINT DECLARATION OF** |
| vs. | ) | **MADELEINE K. ALBRIGHT,** |
| | **)** | **AVRIL D. HAINES** |
| | **)** | **MICHAEL V. HAYDEN** |
| | **)** | **JOHN F. KERRY** |
| | **)** | **JOHN E. McLAUGHLIN** |
| DONALD J. TRUMP, President of the | **)** | **LISA O. MONACO** |
| United States, et al., | **)** | **MICHAEL J. MORELL** |
| | **)** | **JANET A. NAPOLITANO** |
| Defendants-Appellants. | **)** | **LEON E. PANETTA** |
| | **)** | **SUSAN E. RICE** |
| | ) | |
| | ) | |
| | ) | |

We, Madeleine K. Albright, Avril D. Haines, Michael V. Hayden, John F. Kerry, John E. McLaughlin, Lisa O. Monaco, Michael J. Morell, Janet A. Napolitano, Leon E. Panetta, and Susan E. Rice declare as follows:

1.     We are former national security, foreign policy, and intelligence officials in the United States Government:

   a.  Madeleine K. Albright served as Secretary of State from 1997 to 2001.  A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997 and has been a member of the Central Intelligence Agency External Advisory Board since 2009 and the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

   b.  Avril D. Haines served as Deputy Director of the Central Intelligence Agency from 2013 to 2015, and as Deputy National Security Advisor from 2015 to January 20, 2017.

   c.  Michael V. Hayden served as Director of the National Security Agency from 1999 to 2005, and Director of the Central Intelligence Agency from 2006 to 2009.

   d.  John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

e.  John E. McLaughlin served as Deputy Director of the Central Intelligence Agency from 2000-2004 and Acting Director of CIA in 2004.  His duties included briefing President-elect Bill Clinton and President George W. Bush.

f.  Lisa O. Monaco served as Assistant to the President for Homeland Security and Counterterrorism and Deputy National Security Advisor from 2013 to January 20, 2017.

g.  Michael J. Morell served as Acting Director of the Central Intelligence Agency in 2011 and from 2012 to 2013, Deputy Director from 2010 to 2013, and as a career official of the CIA from 1980.  His duties included briefing President George W. Bush on September 11, 2001, and briefing President Barack Obama regarding the May 2011 raid on Osama bin Laden.

h.  Janet A. Napolitano served as Secretary of Homeland Security from 2009 to 2013.

i.  Leon E. Panetta served as Director of the Central Intelligence Agency from 2009-11 and as Secretary of Defense from 2011-13.

j.  Susan E. Rice served as U.S. Permanent Representative to the United Nations from 2009-13 and as National Security Advisor from 2013 to January 20, 2017.

2.     We have collectively devoted decades to combatting the various terrorist threats that the United States faces in a dynamic and dangerous world.  We have all held the highest security clearances.  A number of us have worked at senior levels in administrations of both political parties.  Four of us (Haines, Kerry, Monaco and Rice) were current on active intelligence regarding all credible terrorist threat streams directed against the U.S. as recently as one week before the issuance of the Jan. 27, 2017 Executive Order on "Protecting the Nation from Foreign Terrorist Entry into the United States" ("Order").

3.     We all agree that the United States faces real threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States.  We all are nevertheless unaware of any specific threat that would justify the travel ban established by the Executive Order issued on January 27, 2017.  We view the Order as one that ultimately undermines the national security of the United States, rather than making us safer.  In our professional opinion, this Order cannot be justified on national security or foreign policy grounds.  It does not perform its declared task of "protecting the nation from foreign terrorist entry into the United States."  To the contrary, the Order disrupts thousands of lives, including those of refugees and visa holders all previously vetted by standing procedures that the Administration has not shown to be inadequate.  It could do long-term damage to our national security and foreign policy interests, endangering U.S. troops in the field and disrupting counterterrorism and national security partnerships.  It will aid ISIL's propaganda effort and serve its recruitment message by feeding into the narrative that the United States is at war with Islam.  It will hinder relationships with the very communities that law enforcement professionals need to address the threat.  It will have a damaging humanitarian and economic impact on the lives and jobs of American citizens and residents.  And apart from all of these concerns, the Order offends our nation's laws and values.

2

4.      There is no national security purpose for a total bar on entry for aliens from the seven named countries.  Since September 11, 2001, not a single terrorist attack in the United States has been perpetrated by aliens from the countries named in the Order.  Very few attacks on U.S. soil since September 11, 2001 have been traced to foreign nationals at all.  The overwhelming majority of attacks have been committed by U.S. citizens.  The Administration has identified no information or basis for believing there is now a heightened or particularized future threat from the seven named countries.  Nor is there any rational basis for exempting from the ban particular religious minorities (e.g., Christians), suggesting that the real target of the ban remains one religious group (Muslims).  In short, the Administration offers no reason why it abruptly shifted to group-based bans when we have a tested individualized vetting system developed and implemented by national security professionals across the government to guard the homeland, which is continually re-evaluated to ensure that it is effective.

5.      In our professional opinion, the Order will harm the interests of the United States in many respects:

a.   The Order will endanger U.S. troops in the field.  Every day, American soldiers work and fight alongside allies in some of the named countries who put their lives on the line to protect Americans.  For example, allies who would be barred by the Order work alongside our men and women in Iraq fighting against ISIL.  To the extent that the Order bans travel by individuals cooperating against ISIL, we risk placing our military efforts at risk by sending an insulting message to those citizens and all Muslims.

b.   The Order will disrupt key counterterrorism, foreign policy, and national security partnerships that are critical to our obtaining the necessary information sharing and collaboration in intelligence, law enforcement, military, and diplomatic channels to address the threat posed by terrorist groups such as ISIL.  The international criticism of the Order has been intense, and it has alienated U.S. allies.  It will strain our relationships with partner countries in Europe and the Middle East, on whom we rely for vital counterterrorism cooperation, undermining years of effort to bring them closer.  By alienating these partners, we could lose access to the intelligence and resources necessary to fight the root causes of terror or disrupt attacks launched from abroad, before an attack occurs within our borders.

c.   The Order will endanger intelligence sources in the field.  For current information, our intelligence officers may rely on human sources in some of the countries listed.  The Order breaches faith with those very sources, who have risked much or all to keep Americans safe – and whom our officers had promised always to protect with the full might of our government and our people.

d.   Left in place, the Executive Order will likely feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam.  As government officials, we took every step we could to counter violent extremism.  Because of the Order's disparate impact against Muslim travelers and immigrants, it feeds ISIL's narrative and sends the wrong message to the Muslim community here at home and all over the world:  that

the U.S. government is at war with them based on their religion. The Order may even endanger Christian communities, by handing ISIL a recruiting tool and propaganda victory that spreads their message that the United States is engaged in a religious war.

e. The Order will disrupt ongoing law enforcement efforts. By alienating Muslim-American communities in the United States, it will harm our efforts to enlist their aid in identifying radicalized individuals who might launch attacks of the kind recently seen in San Bernardino and Orlando.

f. The Order will have a devastating humanitarian impact. When the Order issued, those disrupted included women and children who had been victimized by actual terrorists. Tens of thousands of travelers today face deep uncertainty about whether they may travel to or from the United States: for medical treatment, study or scholarly exchange, funerals or other pressing family reasons. While the Order allows for the Secretaries of State and Homeland Security to agree to admit travelers from these countries on a case-by-case basis, in our experience it would be unrealistic for these overburdened agencies to apply such procedures to every one of the thousands of affected individuals with urgent and compelling needs to travel.

g. The Order will cause economic damage to American citizens and residents. The Order will affect many foreign travelers, particularly students, who annually inject hundreds of billions into the U.S. economy, supporting well over a million U.S. jobs. Since the Order issued, affected companies have noted its adverse impacts on many strategic economic sectors, including defense, technology, medicine, culture and others.

6.      As a national security measure, the Order is unnecessary. National security-based immigration restrictions have consistently been tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review. This Order rests not on such tailored grounds, but rather, on (1) general bans (2) not supported by any new intelligence that the Administration has claimed, or of which we are aware, and (3) not vetted through careful interagency legal and policy review. Since the 9/11 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities. This vetting is applied to travelers not once, but multiple times. Refugees receive the most thorough vetting of any traveler to the United States, taking on the average more than a year. Successive administrations have continually worked to improve this vetting through robust information-sharing and data integration to identify potential terrorists without resorting to a blanket ban on all aliens and refugees. Because various threat streams are constantly mutating, as government officials, we sought continually to improve that vetting, as was done in response to particular threats identified by U.S. intelligence in 2011 and 2015. Placing additional restrictions on individuals from certain countries in the visa waiver program –as has been done on occasion in the past – merely allows for more individualized vettings before individuals with particular passports are permitted to travel to the United States.

7.      In our professional opinion, the Order was ill-conceived, poorly implemented and ill-explained. The "considered judgment" of the President in the prior cases where courts have

4

deferred was based upon administrative records showing that the President's decision rested on cleared views from expert agencies with broad experience on the matters presented to him. Here, there is little evidence that the Order underwent a thorough interagency legal and policy processes designed to address current terrorist threats, which would ordinarily include a review by the career professionals charged with implementing and carrying out the Order, an interagency legal review, and a careful policy analysis by Deputies and Principals (at the cabinet level) before policy recommendations are submitted to the President. We know of no interagency process underway before January 20, 2017 to change current vetting procedures, and the repeated need for the Administration to clarify confusion after the Order issued suggest that that Order received little, if any advance scrutiny by the Departments of State, Justice, Homeland Security or the Intelligence Community. Nor have we seen any evidence that the Order resulted from experienced intelligence and security professionals recommending changes in response to identified threats.

8. The Order is of unprecedented scope. We know of no case where a President has invoked his statutory authority to suspend admission for such a broad class of people. Even after 9/11, the U.S. Government did not invoke the provisions of law cited by the Administration to broadly bar entrants based on nationality, national origin, or religious affiliation. In past cases, suspensions were limited to particular individuals or subclasses of nationals who posed a specific, articulable threat based on their known actions and affiliations. In adopting this Order, the Administration alleges no specific derogatory factual information about any particular recipient of a visa or green card or any vetting step omitted by current procedures.

9. Maintaining the district court's temporary restraining order while the underlying legal issues are being adjudicated would not jeopardize national security. It would simply preserve the status quo ante, still requiring that individuals be subjected to all the rigorous legal vetting processes that are currently in place. Reinstating the Executive Order would wreak havoc on innocent lives and deeply held American values. Ours is a nation of immigrants, committed to the faith that we are all equal under the law and abhor discrimination, whether based on race, religion, sex, or national origin. As government officials, we sought diligently to protect our country, even while maintaining an immigration system free from intentional discrimination, that applies no religious tests, and that measures individuals by their merits, not stereotypes of their countries or groups. Blanket bans of certain countries or classes of people are beneath the dignity of the nation and Constitution that we each took oaths to protect. Rebranding a proposal first advertised as a "Muslim Ban" as "Protecting the Nation from Foreign Terrorist Entry into the United States" does not disguise the Order's discriminatory intent, or make it necessary, effective, or faithful to America's Constitution, laws, or values.

10.    For all of the foregoing reasons, in our professional opinion, the January 27 Executive Order does not further – but instead harms – sound U.S. national security and foreign policy.

Respectfully submitted,

**s/MADELEINE K. ALBRIGHT***
**s/AVRIL D. HAINES**
**s/MICHAEL V. HAYDEN**
**s/JOHN F. KERRY**
**s/JOHN E. McLAUGHLIN**
**s/LISA O. MONACO**
**s/MICHAEL J. MORELL**
**s/JANET A. NAPOLITANO**
**s/LEON E. PANETTA**
**s/SUSAN E. RICE**

*All original signatures are on file with Harold Hongju Koh, Rule of Law Clinic, Yale Law School, New Haven, CT. 06520-8215 203-432-4932

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. [Individual signature pages follow]

EXECUTED this 5th day of February, 2017

_Madeleine Albright_

_____

**MADELEINE K. ALBRIGHT**



EXECUTED this 9th day of February, 2017

**AVRIL D. HAINES**

EXECUTED this 5th day of February, 2017

MICHAEL V. HAYDEN

EXECUTED this 5th day of February, 2017

_____
JOHN F. KERRY

EXECUTED this 9th day of February, 2017.

_____
**JOHN E. McLAUGHLIN**

EXECUTED this 5th day of February, 2017

**LISA O. MONACO**



EXECUTED this 5th day of February, 2017

MICHAEL J. MORRELL

EXECUTED this 5th day of February, 2017

_____
/s/
**JANET A. NAPOLITANO**

13

EXECUTED this 5th day of February, 2017

LEON E. PANETTA

EXECUTED this 5th day of February, 2017

_____
/s/
**SUSAN E. RICE**

EXHIBIT  C

**News**Room

2/3/17 WashingtonPost.com (Pg. Unavail. Online)
2017 WLNR 3564726

WashingtonPost.com
Copyright (c) 2017 The Washington Post

February 3, 2017

Section: /local/public-safety

Justice Dept. lawyer says 100,000 visas revoked under travel ban; State Dept. says about 60,000
The revelation, disputed by another agency, came in a court case
involving Yemeni brothers turned away from Dulles Airport in Virginia.

Justin Jouvenal;Rachel Weiner;Ann E. Marimow

More than 100,000 visas have been revoked as a result of President Trump's ban on travel from seven predominantly Muslim countries, an attorney for the government asserted Friday in federal court in Alexandria, Va.

The number came out during a hearing in a lawsuit by two Yemeni brothers who arrived at Dulles International Airport last Saturday and were quickly put on a return flight to Ethiopia because of the new restrictions. While the government is working to resolve that case and return the brothers to the United States, lawyers at the hearing addressed the broader impact of the ban.

The 100,000 figure was immediately disputed by the State Department, which said the number of visas revoked was roughly 60,000. A spokeswoman said the revocations have no impact on the legal status of people already in the United States. If those people leave the United States, though, their visas will no longer be valid.

Immigrant advocates, attorneys and the media have been pushing the Trump administration to offer an accounting of how many people were affected by the controversial executive order.

In response to a question from a judge, Erez Reuveni, of the Justice Department's Office of Immigration Litigation, told the U.S. District Court that there were tens of thousands abroad holding visas when Trump signed his order a week ago.

"Over 100,000 visas were revoked on Friday at 6:30 p.m.," Reuveni told the court, speaking of Jan. 27.

Reuveni offered no other details about the group of people. He said that he did not know how many people had been detained at the nation's airports because of the order but that it could be 100 to 200. It was not immediately clear how the Justice Department and State Department arrived at such different tallies for the broader number of people affected.

"The number 100,000 sucked the air out of my lungs," said Simon Sandoval-Moshenberg of the Legal Aid Justice Center, who represents the Yemeni brothers.

During the hearing, U.S. District Court Judge Leonie M. Brinkema said she was heartened to see that the government was working to return the brothers, Tareq and Ammar Aqel Mohammed Aziz, to the United States and reinstate their visas in exchange for dropping their case. The government appears to be attempting similar case-by-case reprieves across the nation.

But Brinkema offered a stern rebuke to the Trump administration in its overall handling of the travel ban. Brinkema said the case had drawn an even larger public outpouring than another high profile one she handled: the trial of 9/11 conspirator Zacarias Moussaoui.

"This order was issued quite quickly. It's quite clear that not all the thought went into it that should have gone into it," Brinkema said. "It was chaos."

She said people had relied on their visas as valid and families had expected to be reunited with loved ones. Brinkema said there was no evidence that the travel restrictions were necessary.

She urged the government to work "globally" to resolve all the cases of those affected by the travel ban. Lawsuits have been playing out over individual cases in at least 10 courts across the country.

The Trump administration has argued that the travel ban is necessary to keep Americans safe from terrorism as it institutes more restrictive vetting of visitors and refugees, but it has drawn protests at airport's nationwide and condemnation from Democrats, many of whom call the executive action a "Muslim ban."

Brinkema on Friday extended a temporary restraining order she had issued blocking the removal of any green-card holders being detained at Dulles and requiring that people held there because of the ban have access to lawyers.

The judge also allowed the state of Virginia to join the lawsuit. State officials argued in court that more than 350 students from a handful of state universities had been affected by the travel ban, along with professors and other workers.

The officials said they include a Libyan woman from George Mason University who was stuck in Turkey and an Iranian doctoral student who is unable to travel to the United States to defend his dissertation. In addition, Brinkema ordered the government to turn over a list of the state's lawful permanent residents and visa holders who were affected by the ban.

Outside the courthouse, Virginia Attorney General Mark R. Herring (D) said he was "really pleased the judge recognized real harm is happening in Virginia."

Herring's office had also been seeking to hold government officials in contempt for the way they handled travelers from the seven countries over the weekend, but Brinkema declined, saying she did not know enough Friday to make that determination.

Virginia officials had cited news reports and affidavits from lawmakers saying that, contrary to the order Brinkema issued last weekend, Customs and Border Patrol officers had denied immigrants access to lawyers.

"There were so many lawyers there willing to help, and not a single one got access," Virginia Solicitor General Stuart A. Raphael said during the hearing.

Reuveni said that security at Dulles bars lawyers from anything but telephone access to people who are in screening. Separately, affiliates of the American Civil Liberties Union in all 50 states have filed freedom-of-information requests to gain a greater understanding of how customs officials are implementing Trump's order.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Justice Dept. lawyer says 100,000 visas revoked under travel..., 2017 WLNR 3564726

Brinkema also allowed a Sudanese woman to join the lawsuit. Sahar Kamal Ahmed Fadul was traveling on the same flight as the Aziz brothers and was sent on a return flight to Ethiopia by customs officials. She had plans to meet her fiance in Colorado and get married.

"Too suddenly, at the stroke of a pen, that dream was dashed," said her attorney, Timothy Heaphy. "It's tremendously traumatic.

justin.jouvenal@washpost.com

rachel.weiner@washpost.com

ann.marimow@washpost.com

---- Index References ----

News Subject: (Government Litigation (1GO18); Immigration & Naturalization (1IM88); Judicial Cases & Rulings (1JU36); Legal (1LE33); Social Issues (1SO05))

Industry: (Air Transportation (1AI53); Airports (1AI61); Transportation (1TR48))

Region: (Americas (1AM92); Arab States (1AR46); Middle East (1MI23); North America (1NO39); Yemen (1YE36))

Language: EN

Other Indexing: (Virginia Attorney General Mark R.) (Virginia Solicitor; Tareq Aqel Mohammed Aziz; Trump; Stuart Raphael; Simon Sandoval-Moshenberg; Ammar Aqel Mohammed Aziz; Leonie Brinkema; Timothy Heaphy; Sahar Kamal Ahmed Fadul; Erez Reuveni; Zacarias Moussaoui)

Word Count: 954

**End of Document**                                  © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.



EXHIBIT  D

Executive Order—Protecting the Nation from Terrorist Attacks by Foreign Nationals

EXECUTIVE ORDER
- - - - - -

## PROTECTING THE NATION FROM TERRORIST ATTACKS BY FOREIGN NATIONALS

By the authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (8 U.S.C. 1001 et seq.) (INA), and section 301 of title 3, United States Code, and to protect the American people from terrorist attacks by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1.** *Purpose.* The visa-issuance process plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States. Perhaps in no instance was that more apparent than with the terrorist attacks of September 11, 2001, when State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals who went on to murder nearly 3,000 Americans. And while the visa-issuance process was reviewed and amended after the September 11 attacks to better detect would-be terrorists from receiving visas, these measures did not stop attacks by foreign nationals who were admitted to the United States.

Hundreds of foreign-born individuals have been convicted or implicated in terrorism-related crimes since September 11, 2001, including foreign nationals who entered the United States after claiming asylum; after receiving visitor, student, or employment visas; or through the U.S. refugee resettlement program. Deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest increase the likelihood that terrorists will use any means possible to enter our country. The United States must be vigilant during the visa-issuance process to ensure that those approved for admission do not intend to harm Americans and that they have no ties to terrorism.

In order to protect Americans, we must ensure that those admitted to this country do not bear hostile attitudes toward our country and its founding principles. We cannot, and should not, admit into our country those who do not support the U.S. Constitution, or those who would place violent religious edicts over American law. In addition, the United States should not admit those who engage in acts of bigotry and hatred (including "honor" killings, other forms of violence against women, or the persecution of those who practice other religions) or those who would oppress members of one race, one gender, or sexual orientation.

**Sec. 2.** *Policy.* It is the policy of the United States to: (a) protect our citizens from foreign nationals who intend to commit terrorist attacks in the United States; and

3

(b) prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.

**Sec. 3.** *Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall immediately conduct a review to determine the information needed from any country for adjudication of any visa, admission, or other benefit under the INA (adjudications) adequate to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National intelligence, shall submit to the President a report on the results of the review described in subsection (a), including the Secretary of Homeland Security's determination of the information needed for adjudications and a list of countries that do not provide adequate information, within 30 days of the date of this order  (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, and C-2 visas for travel to the United Nations).  The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State and Director of National Intelligence.

(c) To temporarily reduce investigative burdens to relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent the terrorist or criminal infiltration of foreign nationals, pursuant to section 212(f) of the INA  I hereby find that the immigrant and nonimmigrant entry into the United States of aliens from countries designated pursuant to Division O, Title II, Section 203 of the 2016 consolidated Appropriations Act (H.R. 2029, P.L. 114-113), would be detrimental to the interests of the United States, and I hereby suspend entry into the United States, as immigrants and nonimmigrants, of such persons for 30 days from the date of this order.

(d) Immediately upon receipt of the report described in subsection (b) of this section regarding the information needed for adjudications, the Secretary of State shall request all foreign governments that do not supply such information to start providing such information regarding their nationals within 60 days of notification.

(e) After the 60-day period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit the entry of foreign nationals (excluding those foreign nationals traveling on diplomatic visas, North Atlantic Treaty Organization visas, and C-2 visas for travel to the United Nations) from countries that do not provide the information requested pursuant to subsection (d) of this order until compliance occurs.

4

(f) At any point after submitting the list described in subsection (e) of this section, the Secretary of State or the Secretary of Homeland Security may submit to the President the names of any additional countries recommended for similar treatment.

(g) Notwithstanding a suspension pursuant to subsection (c) of this section or pursuant to a Presidential proclamation described in subsection (e) of this section, the Secretaries of State and Homeland Security may, on a case-by-case basis, and when in the national interest, issue visas or other immigration benefits to nationals of countries for which visas and benefits are otherwise blocked.

(h) The Secretaries of State and Homeland Security shall submit to the President a joint report on the progress in implementing this order within 30 days of the date of this order, a second report within 60 days of the date of this order, a third report within 90 days of the date of this order, and a fourth report within 120 days of the date of this order.

**Sec. 4.** *Implementing Uniform Screening Standards for all Immigration Programs.* (a) The Secretary of State, the Secretary of Homeland Security, the Director of National Intelligence, and the Director of the Federal Bureau of Investigation shall implement a program during the adjudication process for immigration benefits to identify individuals seeking to enter the United States on a fraudulent basis, with the intent to cause harm, or who are at risk of causing harm subsequent to their admission . This program will include the development of uniform screening standards and procedures, such as in-person interviews; the creation of a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that the applicant is who the applicant claims to be; a process to evaluate the applicant's likelihood of becoming a positive contributing member of society, and the applicant's ability to make contributions to the national interest; and, a mechanism to assess whether or not the applicant has the intent to commit criminal or terrorist acts after entering the United States.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, Director of National Intelligence, and the Director of the Federal Bureau of Investigation, shall submit to the President an initial report on the progress of this directive within 60 days of the date of this order, a second report within 100 days of the date of this order, and a third report within 200 days of the date of this order.

**Sec. 5.** *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.* (a) The Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security, shall review the USRAP application and adjudication process to determine what additional procedures can be taken to ensure that those approved for refugee admission do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. Refugee applicants who are already in the USRAP process may be admitted upon the initiation and completion of these revised procedures. Upon the date that is 120 days after this order, the Secretary of

State shall resume USRAP admissions only for nationals of countries for whom the Secretary of Homeland Security, the Secretary of State, and the Director of National Intelligence have jointly determined that sufficient safeguards are in place to ensure the security and welfare of the United States.

(b) Upon the resumption of USRAP admissions, the Secretary of State, in consultation with the Secretary of Homeland Security, is further directed to make changes, to the extent permitted by law, to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality.  Where necessary and appropriate, the Secretaries of State and Homeland Security shall recommend legislation to the President to assist with such prioritization.

(c) The Secretaries of State and Homeland Security, as appropriate, shall cease refugee processing of and the admittance of nationals of Syria as refugees until such time as I have determined that sufficient changes have been made to the USRAP to ensure its alignment with the national interest.

(d) Notwithstanding any previous Presidential determination regarding the number of refugee admissions for Fiscal Year 2017, the Secretaries of State and Homeland Security may only process and admit a total of 50,000 refugees during Fiscal Year 2017.  During the 120-day suspension provided by section 5(a), the Secretary of State and the Secretary of Homeland Security shall initiate appropriate consultations in connection with this determination, including with respect to the allocation among refugees of special humanitarian concern to the United States.

(f) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretaries of State and Homeland Security may admit individuals to the United States as refugees on a case-by-case basis when in the national interest. Further, during the temporary suspension period described in subsection (a), the Secretaries of State and Homeland Security may continue to process as refugees those refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality.

(g) The Secretary of State shall submit to the President an initial report on the progress of the directive in subsection (b) of this section regarding prioritization of claims made by individuals on the basis of religious-based persecution within 100 days of the date of this order and shall submit a second report within 200 days of the date of this order.

**Sec. 6.** *Establishment of Safe Zones to Protect Vulnerable Syrian Populations.* Pursuant to the cessation of refugee processing for Syrian nationals, the Secretary of State, in conjunction with the Secretary of Defense, is directed within 90 days of the date of this order to produce a plan to provide safe areas in Syria and in the surrounding region in which Syrian nationals displaced from their homeland can await firm settlement, such as repatriation or potential third-country resettlement.

6

**Sec. 7.** *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.* The Secretaries of State and Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority in section 212 of the INA relating to the terrorism grounds of inadmissibility, as well as any related implementing memoranda. .

**Sec. 8.** *Expedited Completion of the Biometric Entry-Exit Tracking System.* (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for all travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive contained in subsection (a) of this section. The initial report shall be submitted within 100 days of the date of this order, a second report shall be submitted within 200 days of the date of this order, and a third report shall be submitted within 365 days of the date of this order. Further, the Secretary shall submit a report every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9.** *Visa Interview Security.* (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, which requires that all individuals seeking a nonimmigrant visa, undergo an in-person interview, subject to specific statutory exceptions.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that non-immigrant visa interview wait times are not unduly affected.

**Sec. 10.** *Visa Validity Reciprocity.* The Secretary of State shall review all nonimmigrant visa reciprocity agreements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as urged by sections 221(c) and 281 of the INA, and other treatment. If a country does not treat U.S. nationals seeking nonimmigrant visas in a reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of U.S. nationals by the foreign country, to the extent practicable.

**Sec. 11.** *Transparency and Data Collection.* To be more transparent with the American people, and in order to more effectively implement policies and practices that serve the national interest, the Secretary of Homeland Security shall, consistent with applicable law, collect and make publicly available within 180 days, and every 180 days thereafter:

(a) information regarding the number of foreign-born individuals in the United States who have been charged with terrorism-related offenses; convicted of terrorism-related offenses; or removed from the United States based on terrorism-related activity,

affiliation, or material support to a terrorism-related organization, or any other national security reasons;

(b) information regarding the number of foreign-born individuals in the United States who have been radicalized after entry into the United States and engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States; and

(c) information regarding the number and types of acts of gender-based violence against women or honor killings by foreign-born individuals in the United States.

**Sec. 12.** *General Provisions.*(a) Nothing in this order shall be construed to impair or otherwise affect:

   (i) the authority granted by law to an executive department, agency, or the head thereof; or

   (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

EXHIBIT  E



CENTRAL
INTELLIGENCE
AGENCY

Contact (/contact-cia)

**(/)**

Library

Library (/library)
Publications (/library/publications)
Center for the Study of Intelligence (/library/center-for-the-study-of-intelligence)
Freedom of Information Act Electronic Reading Room (/library/foia)
Kent Center Occasional Papers (/library/kent-center-occasional-papers)
Intelligence Literature (/library/intelligence-literature)
Reports (/library/reports)
Related Links (/library/related-links.html)
Video Center (/library/video-center)

# THE WORLD FACTBOOK

Please select a country to view   ⌄

FIELD LISTING :: **RELIGIONS**

| COUNTRY | RELIGIONS(%) |
| --- | --- |
| **Afghanistan (../geos/af.html)** | Muslim 99.7% (Sunni 84.7 - 89.7%, Shia 10 - 15%), other 0.3% (2009 est.) |
| **Albania (../geos/al.html)** | Muslim 56.7%, Roman Catholic 10%, Orthodox 6.8%, atheist 2.5%, Bektashi (a Sufi order) 2.1%, other 5.7%, unspecified 16.2% **note:** all mosques and churches were closed in 1967 and religious observances prohibited; in November 1990, Albania began allowing private religious practice (2011 est.) |
| **Algeria (../geos/ag.html)** | Muslim (official; predominantly Sunni) 99%, other (includes Christian and Jewish) <1% (2012 est.) |
| **American Samoa (../geos/aq.html)** | Christian 98.3%, other 1%, unaffiliated 0.7% (2010 est.) |
| **Andorra (../geos/an.html)** | Roman Catholic (predominant) |
| **Angola (../geos/ao.html)** | Roman Catholic 41.1%, Protestant 38.1%, other 8.6%, none 12.3% (2014 est.) |
| **Anguilla (../geos/av.html)** | Protestant 73.2% (includes Anglican 22.7%, Methodist 19.4%, Pentecostal 10.5%, Seventh Day Adventist 8.3%, Baptist 7.1%, Church of God 4.9%, Presbytarian 0.2%, Brethren 0.1%), Roman Catholic 6.8%, Jehovah's Witness 1.1%, other Christian 10.9%, other 3.2%, unspecified 0.3%, none 4.5% (2011 est.) |
| **Antigua and Barbuda (../geos/ac.html)** | Protestant 68.3% (Anglican 17.6%, Seventh Day Adventist 12.4%, Pentecostal 12.2%, Moravian 8.3%, Methodist 5.6%, Wesleyan Holiness 4.5%, Church of God 4.1%, Baptist 3.6%), Roman Catholic 8.2%, other 12.2%, unspecified 5.5%, none 5.9% (2011 est.) |
| **Argentina (../geos/ar.html)** | nominally Roman Catholic 92% (less than 20% practicing), Protestant 2%, Jewish 2%, other 4% |

**Armenia (../geos/am.html)**

Armenian Apostolic 92.6%, Evangelical 1%, other 2.4%, none 1.1%, unspecified 2.9% (2011 est.)

**Aruba (../geos/aa.html)**

Roman Catholic 75.3%, Protestant 4.9% (includes Methodist 0.9%, Adventist 0.9%, Anglican 0.4%, other Protestant 2.7%), Jehovah's Witness 1.7%, other 12%, none 5.5%, unspecified 0.5% (2010 est.)

**Australia (../geos/as.html)**

Protestant 30.1% (Anglican 17.1%, Uniting Church 5.0%, Presbyterian and Reformed 2.8%, Baptist, 1.6%, Lutheran 1.2%, Pentecostal 1.1%, other Protestant 1.3%), Catholic 25.3% (Roman Catholic 25.1%, other Catholic 0.2%), other Christian 2.9%, Orthodox 2.8%, Buddhist 2.5%, Muslim 2.2%, Hindu 1.3%, other 1.3%, none 22.3%, unspecified 9.3% (2011 est.)

**Austria (../geos/au.html)**

Catholic 73.8% (includes Roman Catholic 73.6%, other Catholic 0.2%), Protestant 4.9%, Muslim 4.2%, Orthodox 2.2%, other 0.8% (includes other Christian), none 12%, unspecified 2% (2001 est.)

**Azerbaijan (../geos/aj.html)**

Muslim 96.9% (predominantly Shia), Christian 3%, other <0.1, unaffiliated <0.1 (2010 est.)

**note:** religious affiliation is still nominal in Azerbaijan; percentages for actual practicing adherents are much lower

**Bahamas, The (../geos/bf.html)**

Protestant 69.9% (includes Baptist 34.9%, Anglican 13.7%, Pentecostal 8.9% Seventh Day Adventist 4.4%, Methodist 3.6%, Church of God 1.9%, Brethren 1.6%), Roman Catholic 12%, other Christian 13% (includes Jehovah's Witness 1.1%), other 0.6%, none 1.9%, unspecified 2.6% (2010 est.)

**Bahrain (../geos/ba.html)**

Muslim 70.3%, Christian 14.5%, Hindu 9.8%, Buddhist 2.5%, Jewish 0.6%, folk religion <.1, unaffiliated 1.9%, other 0.2% (2010 est.)

**Bangladesh (../geos/bg.html)**

Muslim 89.1%, Hindu 10%, other 0.9% (includes Buddhist, Christian) (2013 est.)

**Barbados (../geos/bb.html)**

Protestant 66.4% (includes Anglican 23.9%, other Pentecostal 19.5%, Adventist 5.9%, Methodist 4.2%, Wesleyan 3.4%, Nazarene 3.2%, Church of God 2.4%, Baptist 1.8%, Moravian 1.2%, other Protestant 0.9%), Roman Catholic 3.8%, other Christian 5.4% (includes Jehovah's Witness 2.0%, other 3.4%), Rastafarian 1%, other 1.5%, none 20.6%, unspecified 1.2% (2010 est.)

**Belarus (../geos/bo.html)**

Orthodox 48.3%, Catholic 7.1%, other 3.5%, non-believers 41.1% (2011 est.)

**Belgium (../geos/be.html)**

Roman Catholic 75%, other (includes Protestant) 25%

**Belize (../geos/bh.html)**

Roman Catholic 40.1%, Protestant 31.5% (includes Pentecostal 8.4%, Seventh Day Adventist 5.4%, Anglican 4.7%, Mennonite 3.7%, Baptist 3.6%, Methodist 2.9%, Nazarene 2.8%), Jehovah's Witness 1.7%, other 10.5% (includes Baha'i, Buddhist, Hindu, Morman, Muslim, Rastafarian), unknown 0.6%, none 15.5% (2010 est.)

**Benin (../geos/bn.html)**

Muslim 27.7%, Catholic 25.5%, Protestant 13.5% (Celestial 6.7%, Methodist 3.4%, other Protestant 3.4%), Vodoun 11.6%, other Christian 9.5%, other traditional religions 2.6%, other 2.6%, none 5.8% (2013 est.)

**Bermuda (../geos/bd.html)**

Protestant 46.2% (includes Anglican 15.8%, African Methodist Episcopal 8.6%, Seventh Day Adventist 6.7, Pentecostal 3.5%, Methodist 2.7%, Presbyterian 2.0%, Church of God 1.6%, Baptist 1.2%, Salvation Army 1.1%, Brethren 1.0%, other Protestant 2.0%), Roman Catholic 14.5%, Jehovah's Witness 1.3%, other Christian 9.1%, Muslim 1%, other 3.9%, none 17.8%, unspecified 6.2% (2010 est.)

**Bhutan (../geos/bt.html)**

Lamaistic Buddhist 75.3%, Indian- and Nepalese-influenced Hinduism 22.1%, other 2.6% (2005 est.)

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 59 of 88 PageID #: 2208

**Bolivia (../geos/bl.html)**
Roman Catholic 76.8%, Evangelical and Pentecostal 8.1%, Protestant 7.9%, other 1.7%, none 5.5% (2012 est.)

**Bosnia and Herzegovina (../geos/bk.html)**
Muslim 50.7%, Orthodox 30.7%, Roman Catholic 15.2%, atheist 0.8%, agnostic 0.3%, other 1.2%, undeclared/no answer 1.1% (2013 est.)

**Botswana (../geos/bc.html)**
Christian 79.1%, Badimo 4.1%, other 1.4% (includes Baha'i, Hindu, Muslim, Rastafarian), none 15.2%, unspecified 0.3% (2011 est.)

**Brazil (../geos/br.html)**
Roman Catholic 64.6%, other Catholic 0.4%, Protestant 22.2% (includes Adventist 6.5%, Assembly of God 2.0%, Christian Congregation of Brazil 1.2%, Universal Kingdom of God 1.0%, other Protestant 11.5%), other Christian 0.7%, Spiritist 2.2%, other 1.4%, none 8%, unspecified 0.4% (2010 est.)

**British Virgin Islands (../geos/vi.html)**
Protestant 70.2% (Methodist 17.6%, Church of God 10.4%, Anglican 9.5%, Seventh Day Adventist 9.0%, Pentecostal 8.2%, Baptist 7.4%, New Testament Church of God 6.9%, other Protestant 1.2%), Roman Catholic 8.9%, Jehovah's Witness 2.5%, Hindu 1.9%, other 6.2%, none 7.9%, unspecified 2.4% (2010 est.)

**Brunei (../geos/bx.html)**
Muslim (official) 78.8%, Christian 8.7%, Buddhist 7.8%, other (includes indigenous beliefs) 4.7% (2011 est.)

**Bulgaria (../geos/bu.html)**
Eastern Orthodox 59.4%, Muslim 7.8%, other (including Catholic, Protestant, Armenian Apostolic Orthodox, and Jewish) 1.7%, none 3.7%, unspecified 27.4% (2011 est.)

**Burkina Faso (../geos/uv.html)**
Muslim 61.6%, Catholic 23.2%, traditional/animist 7.3%, Protestant 6.7%, other/no answer 0.2%, none 0.9% (2010 est.)

**Burma (../geos/bm.html)**
Buddhist 87.9%, Christian 6.2%, Muslim 4.3%, Animist 0.8%, Hindu 0.5%, other 0.2%, none 0.1%
**note:** religion estimate is based on the 2014 national census, including an estimate for the non-enumerated population of Rakhine State, which is assumed to mainly affiliate with the Islamic faith (2014 est.)

**Burundi (../geos/by.html)**
Catholic 62.1%, Protestant 23.9% (includes Adventist 2.3% and other Protestant 21.6%), Muslim 2.5%, other 3.6%, unspecified 7.9% (2008 est.)

**Cabo Verde (../geos/cv.html)**
Roman Catholic 77.3%, Protestant 4.6% (includes Church of the Nazarene 1.7%, Adventist 1.5%, Assembly of God 0.9%, Universal Kingdom of God 0.4%, and God and Love 0.1%), other Christian 3.4% (includes Christian Rationalism 1.9%, Jehovah's Witness 1%, and New Apostolic 0.5%), Muslim 1.8%, other 1.3%, none 10.8%, unspecified 0.7% (2010 est.)

**Cambodia (../geos/cb.html)**
Buddhist (official) 96.9%, Muslim 1.9%, Christian 0.4%, other 0.8% (2008 est.)

**Cameroon (../geos/cm.html)**
Catholic 38.4%, Protestant 26.3%, other Christian 4.5%, Muslim 20.9%, animist 5.6%, other 1%, non-believer 3.2% (2005 est.)

**Canada (../geos/ca.html)**
Catholic 39% (includes Roman Catholic 38.8%, other Catholic .2%), Protestant 20.3% (includes United Church 6.1%, Anglican 5%, Baptist 1.9%, Lutheran 1.5%, Pentecostal 1.5%, Presbyterian 1.4%, other Protestant 2.9%), Orthodox 1.6%, other Christian 6.3%, Muslim 3.2%, Hindu 1.5%, Sikh 1.4%, Buddhist 1.1%, Jewish 1%, other 0.6%, none 23.9% (2011 est.)

**Cayman Islands (../geos/cj.html)**
Protestant 67.8% (includes Church of God 22.6%, Seventh Day Adventist 9.4%, Presbyterian/United Church 8.6%, Baptist 8.3%, Pentecostal 7.1%, non-denominational 5.3%, Anglican 4.1%, Wesleyan Holiness 2.4%), Roman Catholic 14.1%, Jehovah's Witness 1.1%, other 7%, none 9.3%, unspecified 0.7% (2010 est.)

**Central African Republic (../geos/ct.html)**
indigenous beliefs 35%, Protestant 25%, Roman Catholic 25%, Muslim 15%
**note:** animistic beliefs and practices strongly influence the Christian majority

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 60 of 88 PageID #: 2209

**Chad (../geos/cd.html)** — Muslim 58.4%, Catholic 18.5%, Protestant 16.1%, animist 4%, other 0.5%, none 2.4% (2009 est.)

**Chile (../geos/ci.html)** — Roman Catholic 66.7%, Evangelical or Protestant 16.4%, Jehovah's Witnesses 1%, other 3.4%, none 11.5%, unspecified 1.1% (2012 est.)

**China (../geos/ch.html)** — Buddhist 18.2%, Christian 5.1%, Muslim 1.8%, folk religion 21.9%, Hindu < 0.1%, Jewish < 0.1%, other 0.7% (includes Daoist (Taoist)), unaffiliated 52.2% **note:** officially atheist (2010 est.)

**Christmas Island (../geos/kt.html)** — Buddhist 16.9%, Christian 16.4%, Muslim 14.8%, other 1.3%, none 9.2%, unspecified 41.5% (2011 est.)

**Cocos (Keeling) Islands (../geos/ck.html)** — Sunni Muslim 80%, other 20% (2002 est.)

**Colombia (../geos/co.html)** — Roman Catholic 90%, other 10%

**Comoros (../geos/cn.html)** — Sunni Muslim 98%, Roman Catholic 2% **note:** Islam is the state religion

**Congo, Democratic Republic of the (../geos/cg.html)** — Roman Catholic 50%, Protestant 20%, Kimbanguist 10%, Muslim 10%, other (includes syncretic sects and indigenous beliefs) 10%

**Congo, Republic of the (../geos/cf.html)** — Roman Catholic 33.1%, Awakening Churches/Christian Revival 22.3%, Protestant 19.9%, Salutiste 2.2%, Muslim 1.6%, Kimbanguiste 1.5%, other 8.1%, none 11.3% (2010 est.)

**Cook Islands (../geos/cw.html)** — Protestant 62.8% (Cook Islands Christian Church 49.1%, Seventh Day Adventist 7.9%, Assemblies of God 3.7%, Apostolic Church 2.1%), Roman Catholic 17%, Mormon 4.4%, other 8%, none 5.6%, no response 2.2% (2011 est.)

**Costa Rica (../geos/cs.html)** — Roman Catholic 76.3%, Evangelical 13.7%, Jehovah's Witness 1.3%, other Protestant 0.7%, other 4.8%, none 3.2%

**Cote d'Ivoire (../geos/iv.html)** — Muslim 40.2%, Catholic 19.4%, Evangelical 19.3%, Methodist 2.5%, other Christian 4.5%, animist or no religion 12.8%, other religion/unspecified 1.4% (2011-12 est.) **note:** the majority of foreign migrant workers are Muslim (72%) and Christian (18%) (2014 est.)

**Croatia (../geos/hr.html)** — Roman Catholic 86.3%, Orthodox 4.4%, Muslim 1.5%, other 1.5%, unspecified 2.5%, not religious or atheist 3.8% (2011 est.)

**Cuba (../geos/cu.html)** — nominally Roman Catholic 85%, Protestant, Jehovah's Witnesses, Jewish, Santeria **note:** prior to CASTRO assuming power

**Curacao (../geos/cc.html)** — Roman Catholic 72.8%, Pentecostal 6.6%, Protestant 3.2%, Adventist 3%, Jehovah's Witness 2%, Evangelical 1.9%, other 3.8%, none 6%, unspecified 0.6% (2011 est.)

**Cyprus (../geos/cy.html)** — Orthodox Christian 89.1%, Roman Catholic 2.9%, Protestant/Anglican 2%, Muslim 1.8%, Buddhist 1%, other (includes Maronite, Armenian Church, Hindu) 1.4%, unknown 1.1%, none/atheist 0.6% **note:** data represent only the government-controlled area of Cyprus (2011 est.)

**Czechia (../geos/ez.html)** — Roman Catholic 10.4%, Protestant (includes Czech Brethren and Hussite) 1.1%, other and unspecified 54%, none 34.5% (2011 est.)

**Denmark (../geos/da.html)** — Evangelical Lutheran (official) 80%, Muslim 4%, other (denominations of less than 1% each, includes Roman Catholic, Jehovah's Witness, Serbian Orthodox Christian, Jewish, Baptist, and Buddhist) 16% (2012 est.)

**Djibouti (../geos/dj.html)** — Muslim 94%, Christian 6%

**Dominica (../geos/do.html)** — Roman Catholic 61.4%, Protestant 28.6% (includes Evangelical 6.7%, Seventh Day Adventist 6.1%, Pentecostal 5.6%, Baptist 4.1%, Methodist 3.7%, Church of God 1.2%, other 1.2%), Rastafarian 1.3%, Jehovah's Witness 1.2%, other 0.3%, none 6.1%, unspecified 1.1% (2001 est.)

**Dominican Republic (../geos/dr.html)** — Roman Catholic 95%, other 5%

**Ecuador (../geos/ec.html)** — Roman Catholic 74%, Evangelical 10.4%, Jehovah's Witness 1.2%, other 6.4% (includes Mormon Buddhist, Jewish, Spiritualist, Muslim, Hindu, indigenous religions, African American religions, Pentecostal), atheist 7.9%, agnostic 0.1% **note:** data represents persons at least 16 years of age from five Ecuadoran cities (2012 est.)

**Egypt (../geos/eg.html)** — Muslim (predominantly Sunni) 90%, Christian (majority Coptic Orthodox, other Christians include Armenian Apostolic, Catholic, Maronite, Orthodox, and Anglican) 10% (2012 est.)

**El Salvador (../geos/es.html)** — Roman Catholic 57.1%, Protestant 21.2%, Jehovah's Witnesses 1.9%, Mormon 0.7%, other religions 2.3%, none 16.8% (2003 est.)

**Equatorial Guinea (../geos/ek.html)** — nominally Christian and predominantly Roman Catholic, pagan practices

**Eritrea (../geos/er.html)** — Muslim, Coptic Christian, Roman Catholic, Protestant

**Estonia (../geos/en.html)** — Lutheran 9.9%, Orthodox 16.2%, other Christian (including Methodist, Seventh-Day Adventist, Roman Catholic, Pentecostal) 2.2%, other 0.9%, none 54.1%, unspecified 16.7% (2011 est.)

**Ethiopia (../geos/et.html)** — Ethiopian Orthodox 43.5%, Muslim 33.9%, Protestant 18.5%, traditional 2.7%, Catholic 0.7%, other 0.6% (2007 est.)

**European Union (../geos/ee.html)** — Roman Catholic 48%, Protestant 12%, Orthodox 8%, other Christian 4%, Muslim 2%, other 1% (includes Jewish, Sikh, Buddhist, Hindu), atheist 7%, non-believer/agnostic 16%, unspecified 2% (2012 est.)

**Falkland Islands (Islas Malvinas) (../geos/fk.html)** — Christian 66%, none 32%, other 2% (2012 est.)

**Faroe Islands (../geos/fo.html)** — Christian 89.3% (predominantly Evangelical Lutheran), other 0.7%, more than one religion 0.2%, none 3.8%, unspecified 6% (2011 est.)

**Fiji (../geos/fj.html)** — Protestant 45% (Methodist 34.6%, Assembly of God 5.7%, Seventh Day Adventist 3.9%, and Anglican 0.8%), Hindu 27.9%, other Christian 10.4%, Roman Catholic 9.1%, Muslim 6.3%, Sikh 0.3%, other 0.3%, none 0.8% (2007 est.)

**Finland (../geos/fi.html)** — Lutheran 73.8%, Orthodox 1.1%, other or none 25.1% (2014 est.)

**France (../geos/fr.html)** — Christian (overwhelmingly Roman Catholic) 63-66%, Muslim 7-9%, Buddhist 0.5-0.75%, Jewish 0.5-0.75%, other 0.5-1.0%, none 23-28% **note:** France maintains a tradition of secularism and has not officially collected data on religious affiliation since the 1872 national census, which complicates assessments of France's religious composition; an 1872 law prohibiting state authorities from collecting data on individuals' ethnicity or religious beliefs was reaffirmed by a 1978 law emphasizing the prohibition of the collection or exploitation of personal data revealing an individual's race, ethnicity, or political, philosophical, or religious opinions; a 1905 law codified France's separation of church and state (2015 est.)

**French Polynesia (../geos/fp.html)** — Protestant 54%, Roman Catholic 30%, other 10%, no religion 6%

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 62 of 88 PageID #: 2211

**Gabon (../geos/gb.html)** — Catholic 41.9%, Protestant 13.7%, other Christian 32.4%, Muslim 6.4%, animist 0.3%, other 0.3%, none/no answer 5% (2012 est.)

**Gambia, The (../geos/ga.html)** — Muslim 95.7%, Christian 4.2%, none 0.1%, no answer 0.1% (2013 est.)

**Gaza Strip (../geos/gz.html)** — Muslim 98.0 - 99.0% (predominantly Sunni), Christian <1.0%, other, unaffiliated, unspecified <1.0%

**note:** dismantlement of Israeli settlements was completed in September 2005; Gaza has had no Jewish population since then (2012 est.)

**Georgia (../geos/gg.html)** — Orthodox (official) 83.4%, Muslim 10.7%, Armenian Apostolic 2.9%, other 1.2% (includes Catholic, Jehovah's Witness, Yazidi, Protestant, Jewish), none 0.5%, unspecified/no answer 1.2% (2014 est.)

**Germany (../geos/gm.html)** — Protestant 34%, Roman Catholic 34%, Muslim 3.7%, unaffiliated or other 28.3%

**Ghana (../geos/gh.html)** — Christian 71.2% (Pentecostal/Charismatic 28.3%, Protestant 18.4%, Catholic 13.1%, other 11.4%), Muslim 17.6%, traditional 5.2%, other 0.8%, none 5.2% (2010 est.)

**Gibraltar (../geos/gi.html)** — Roman Catholic 78.1%, Church of England 7%, Muslim 4%, other Christian 3.2%, Jewish 2.1%, Hindu 1.8%, other 0.9%, none 2.9% (2001 est.)

**Greece (../geos/gr.html)** — Greek Orthodox (official) 98%, Muslim 1.3%, other 0.7%

**Greenland (../geos/gl.html)** — Evangelical Lutheran, traditional Inuit spiritual beliefs

**Grenada (../geos/gj.html)** — Roman Catholic 44.6%, Protestant 43.5% (includes Anglican 11.5%, Pentecostal 11.3%, Seventh Day Adventist 10.5%, Baptist 2.9%, Church of God 2.6%, Methodist 1.8%, Evangelical 1.6%, other 1.3%), Jehovah's Witness 1.1%, Rastafarian 1.1%, other 6.2%, none 3.6%

**Guam (../geos/gq.html)** — Roman Catholic 85%, other 15% (1999 est.)

**Guatemala (../geos/gt.html)** — Roman Catholic, Protestant, indigenous Mayan beliefs

**Guernsey (../geos/gk.html)** — Protestant (Anglican, Presbyterian, Baptist, Congregational, Methodist), Roman Catholic

**Guinea-Bissau (../geos/pu.html)** — Muslim 45.1%, Christian 22.1%, animist 14.9%, none 2%, unspecified 15.9% (2008 est.)

**Guinea (../geos/gv.html)** — Muslim 86.7%, Christian 8.9%, animist/other/none 4.4% (2012 est.)

**Guyana (../geos/gy.html)** — Protestant 30.5% (Pentecostal 16.9%, Anglican 6.9%, Seventh Day Adventist 5%, Methodist 1.7%), Hindu 28.4%, Roman Catholic 8.1%, Muslim 7.2%, Jehovah's Witness 1.1%, other Christian 17.7%, other 1.9%, none 4.3%, unspecified 0.9% (2002 est.)

**Haiti (../geos/ha.html)** — Roman Catholic (official) 54.7%, Protestant 28.5% (Baptist 15.4%, Pentecostal 7.9%, Adventist 3%, Methodist 1.5%, other 0.7%), voodoo (official) 2.1%, other 4.6%, none 10.2%

**note:** many Haitians practice elements of voodoo in addition to another religion, most often Roman Catholicism; voodoo was recognized as an official religion in 2003

**Holy See (Vatican City) (../geos/vt.html)** — Roman Catholic

**Honduras (../geos/ho.html)** — Roman Catholic 97%, Protestant 3%

**Hong Kong (../geos/hk.html)** — eclectic mixture of local religions 90%, Christian 10%

**Hungary (../geos/hu.html)**

Roman Catholic 37.2%, Calvinist 11.6%, Lutheran 2.2%, Greek Catholic 1.8%, other 1.9%, none 18.2%, unspecified 27.2% (2011 est.)

**Iceland (../geos/ic.html)**

Evangelical Lutheran Church of Iceland (official) 73.8%, Roman Catholic 3.6%, Reykjavik Free Church 2.9%, Hafnarfjorour Free Church 2%, The Independent Congregation 1%, other religions 3.9% (includes Pentecostal and Asatru Association), none 5.6%, other or unspecified 7.2% (2015 est.)

**India (../geos/in.html)**

Hindu 79.8%, Muslim 14.2%, Christian 2.3%, Sikh 1.7%, other and unspecified 2% (2011 est.)

**Indonesia (../geos/id.html)**

Muslim 87.2%, Christian 7%, Roman Catholic 2.9%, Hindu 1.7%, other 0.9% (includes Buddhist and Confucian), unspecified 0.4% (2010 est.)

**Iran (../geos/ir.html)**

Muslim (official) 99.4% (Shia 90-95%, Sunni 5-10%), other (includes Zoroastrian, Jewish, and Christian) 0.3%, unspecified 0.4% (2011 est.)

**Iraq (../geos/iz.html)**

Muslim (official) 99% (Shia 60%-65%, Sunni 32%-37%), Christian 0.8%, Hindu <0.1, Buddhist <0.1, Jewish <0.1, folk religion <0.1, unafilliated 0.1, other <0.1 **note:** while there has been voluntary relocation of many Christian families to northern Iraq, recent reporting indicates that the overall Christian population may have dropped by as much as 50 percent since the fall of the SADDAM Husayn regime in 2003, with many fleeing to Syria, Jordan, and Lebanon (2010 est.)

**Ireland (../geos/ei.html)**

Roman Catholic 84.7%, Church of Ireland 2.7%, other Christian 2.7%, Muslim 1.1%, other 1.7%, unspecified 1.5%, none 5.7% (2011 est.)

**Isle of Man (../geos/im.html)**

Protestant (Anglican, Methodist, Baptist, Presbyterian, Society of Friends), Roman Catholic

**Israel (../geos/is.html)**

Jewish 74.8%, Muslim 17.6%, Christian 2%, Druze 1.6%, other 4% (2015 est.)

**Italy (../geos/it.html)**

Christian 80% (overwhelmingly Roman Catholic with very small groups of Jehovah's Witnesses and Protestants), Muslim (about 800,000 to 1 million), atheist and agnostic 20%

**Jamaica (../geos/jm.html)**

Protestant 64.8% (includes Seventh Day Adventist 12.0%, Pentecostal 11.0%, Other Church of God 9.2%, New Testament Church of God 7.2%, Baptist 6.7%, Church of God in Jamaica 4.8%, Church of God of Prophecy 4.5%, Anglican 2.8%, United Church 2.1%, Methodist 1.6%, Revived 1.4%, Brethren 0.9%, and Moravian 0.7%), Roman Catholic 2.2%, Jehovah's Witness 1.9%, Rastafarian 1.1%, other 6.5%, none 21.3%, unspecified 2.3% (2011 est.)

**Japan (../geos/ja.html)**

Shintoism 79.2%, Buddhism 66.8%, Christianity 1.5%, other 7.1% **note:** total adherents exceeds 100% because many people practice both Shintoism and Buddhism (2012 est.)

**Jersey (../geos/je.html)**

Protestant (Anglican, Baptist, Congregational New Church, Methodist, Presbyterian), Roman Catholic

**Jordan (../geos/jo.html)**

Muslim 97.2% (official; predominantly Sunni), Christian 2.2% (majority Greek Orthodox, but some Greek and Roman Catholics, Syrian Orthodox, Coptic Orthodox, Armenian Orthodox, and Protestant denominations), Buddhist 0.4%, Hindu 0.1%, Jewish <0.1, folk religionist <0.1, unaffiliated <0.1, other <0.1 (2010 est.)

**Kazakhstan (../geos/kz.html)**

Muslim 70.2%, Christian 26.2% (mainly Russian Orthodox), other 0.2%, atheist 2.8%, unspecified 0.5% (2009 est.)

**Kenya (../geos/ke.html)**

Christian 83% (Protestant 47.7%, Catholic 23.4%, other Christian 11.9%), Muslim 11.2%, Traditionalists 1.7%, other 1.6%, none 2.4%, unspecified 0.2% (2009 est.)

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 64 of 88 PageID #: 2213

**Kiribati (../geos/kr.html)** — Roman Catholic 55.8%, Kempsville Presbyterian Church 33.5%, Mormon 4.7%, Baha'i 2.3%, Seventh Day Adventist 2%, other 1.5%, none 0.2%, unspecified 0.05% (2010 est.)

**Korea, North (../geos/kn.html)** — traditionally Buddhist and Confucianist, some Christian and syncretic Chondogyo (Religion of the Heavenly Way)
**note:** autonomous religious activities now almost nonexistent; government-sponsored religious groups exist to provide illusion of religious freedom

**Korea, South (../geos/ks.html)** — Christian 31.6% (Protestant 24.0%, Catholic 7.6%), Buddhist 24.2%, other or unknown 0.9%, none 43.3% (2010 est.)

**Kosovo (../geos/kv.html)** — Muslim 95.6%, Roman Catholic 2.2%, Orthodox 1.5%, other 0.07%, none 0.07%, unspecified 0.6% (2011 est.)

**Kuwait (../geos/ku.html)** — Muslim (official) 76.7%, Christian 17.3%, other and unspecified 5.9%
**note:** represents the total population; about 69% of the population consists of immigrants (2013 est.)

**Kyrgyzstan (../geos/kg.html)** — Muslim 75%, Russian Orthodox 20%, other 5%

**Laos (../geos/la.html)** — Buddhist 66.8%, Christian 1.5%, other 31%, unspecified 0.7% (2005 est.)

**Latvia (../geos/lg.html)** — Lutheran 19.6%, Orthodox 15.3%, other Christian 1%, other 0.4%, unspecified 63.7% (2006)

**Lebanon (../geos/le.html)** — Muslim 54% (27% Sunni, 27% Shia), Christian 40.5% (includes 21% Maronite Catholic, 8% Greek Orthodox, 5% Greek Catholic, 6.5% other Christian), Druze 5.6%, very small numbers of Jews, Baha'is, Buddhists, Hindus, and Mormons
**note:** 18 religious sects recognized (2012 est.)

**Lesotho (../geos/lt.html)** — Christian 80%, indigenous beliefs 20%

**Liberia (../geos/li.html)** — Christian 85.6%, Muslim 12.2%, Traditional 0.6%, other 0.2%, none 1.4% (2008 Census)

**Libya (../geos/ly.html)** — Muslim (official; virtually all Sunni) 96.6%, Christian 2.7%, Buddhist 0.3%, Hindu <0.1, Jewish <0.1, folk religion <0.1, unafilliated 0.2%, other <0.1
**note:** non-Sunni Muslims include native Ibadhi Muslims (<1% of the population) and foreign Muslims (2010 est.)

**Liechtenstein (../geos/ls.html)** — Roman Catholic (official) 75.9%, Protestant Reformed 6.5%, Muslim 5.4%, Lutheran 1.3%, other 2.9%, none 5.4%, unspecified 2.6% (2010 est.)

**Lithuania (../geos/lh.html)** — Roman Catholic 77.2%, Russian Orthodox 4.1%, Old Believer 0.8%, Evangelical Lutheran 0.6%, Evangelical Reformist 0.2%, other (including Sunni Muslim, Jewish, Greek Catholic, and Karaite) 0.8%, none 6.1%, unspecified 10.1% (2011 est.)

**Luxembourg (../geos/lu.html)** — Roman Catholic 87%, other (includes Protestant, Jewish, and Muslim) 13% (2000)

**Macau (../geos/mc.html)** — Buddhist 50%, Roman Catholic 15%, none or other 35% (1997 est.)

**Macedonia (../geos/mk.html)** — Macedonian Orthodox 64.8%, Muslim 33.3%, other Christian 0.4%, other and unspecified 1.5% (2002 est.)

**Madagascar (../geos/ma.html)** — Christian, indigenous believer, Muslim
**note:** population largely practices Christianity or an indigenous religion; small share of population is Muslim

**Malawi (../geos/mi.html)** — Christian 82.6%, Muslim 13%, other 1.9%, none 2.5% (2008 est.)

**Malaysia (../geos/my.html)**

Muslim (official) 61.3%, Buddhist 19.8%, Christian 9.2%, Hindu 6.3%, Confucianism, Taoism, other traditional Chinese religions 1.3%, other 0.4%, none 0.8%, unspecified 1% (2010 est.)

**Maldives (../geos/mv.html)**

Sunni Muslim (official)

**Mali (../geos/ml.html)**

Muslim 94.8%, Christian 2.4%, Animist 2%, none 0.5%, unspecified 0.3% (2009 est.)

**Malta (../geos/mt.html)**

Roman Catholic (official) more than 90% (2011 est.)

**Marshall Islands (../geos/rm.html)**

Protestant 54.8%, Assembly of God 25.8%, Roman Catholic 8.4%, Bukot nan Jesus 2.8%, Mormon 2.1%, other Christian 3.6%, other 1%, none 1.5% (1999 census)

**Mauritania (../geos/mr.html)**

Muslim (official) 100%

**Mauritius (../geos/mp.html)**

Hindu 48.5%, Roman Catholic 26.3%, Muslim 17.3%, other Christian 6.4%, other 0.6%, none 0.7%, unspecified 0.1% (2011 est.)

**Mexico (../geos/mx.html)**

Roman Catholic 82.7%, Pentecostal 1.6%, Jehovah's Witness 1.4%, other Evangelical Churches 5%, other 1.9%, none 4.7%, unspecified 2.7% (2010 est.)

**Micronesia, Federated States of (../geos/fm.html)**

Roman Catholic 54.7%, Protestant 41.1% (includes Congregational 38.5%, Baptist 1.1%, Seventh Day Adventist 0.8%, Assembly of God 0.7%), Mormon 1.5%, other 1.9%, none 0.7%, unspecified 0.1% (2010 est.)

**Moldova (../geos/md.html)**

Orthodox 93.3%, Baptist 1%, other Christian 1.2%, other 0.9%, atheist 0.4%, none 1%, unspecified 2.2% (2004 est.)

**Monaco (../geos/mn.html)**

Roman Catholic 90% (official), other 10%

**Mongolia (../geos/mg.html)**

Buddhist 53%, Muslim 3%, Christian 2.2%, Shamanist 2.9%, other 0.4%, none 38.6% (2010 est.)

**Montenegro (../geos/mj.html)**

Orthodox 72.1%, Muslim 19.1%, Catholic 3.4%, atheist 1.2%, other 1.5%, unspecified 2.6% (2011 est.)

**Montserrat (../geos/mh.html)**

Protestant 67.1% (includes Anglican 21.8%, Methodist 17%, Pentecostal 14.1%, Seventh Day Adventist 10.5%, and Church of God 3.7%), Roman Catholic 11.6%, Rastafarian 1.4%, other 6.5%, none 2.6%, unspecified 10.8% (2001 est.)

**Morocco (../geos/mo.html)**

Muslim 99% (official; virtually all Sunni, <0.1% Shia), other 1% (includes Christian, Jewish, and Baha'i); note - Jewish about 6,000 (2010 est.)

**Mozambique (../geos/mz.html)**

Roman Catholic 28.4%, Muslim 17.9%, Zionist Christian 15.5%, Protestant 12.2% (includes Pentecostal 10.9% and Anglican 1.3%), other 6.7%, none 18.7%, unspecified 0.7% (2007 est.)

**Namibia (../geos/wa.html)**

Christian 80% to 90% (at least 50% Lutheran), indigenous beliefs 10% to 20%

**Nauru (../geos/nr.html)**

Protestant 60.4% (includes Nauru Congregational 35.7%, Assembly of God 13%, Nauru Independent Church 9.5%, Baptist 1.5%, and Seventh Day Adventist 0.7%), Roman Catholic 33%, other 3.7%, none 1.8%, unspecified 1.1% (2011 est.)

**Nepal (../geos/np.html)**

Hindu 81.3%, Buddhist 9%, Muslim 4.4%, Kirant 3.1%, Christian 1.4%, other 0.5%, unspecifed 0.2% (2011 est.)

**Netherlands (../geos/nl.html)**

Roman Catholic 28%, Protestant 19% (includes Dutch Reformed 9%, Protestant Church of The Netherlands, 7%, Calvinist 3%), other 11% (includes about 5% Muslim and fewer numbers of Hindu, Buddhist, Jehovah's Witness, and Orthodox), none 42% (2009 est.)

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 66 of 88 PageID #: 2215

**New Caledonia (../geos/nc.html)**
Roman Catholic 60%, Protestant 30%, other 10%

**New Zealand (../geos/nz.html)**
Christian 44.3% (Catholic 11.6%, Anglican 10.8%, Presbyterian and Congregational 7.8%, Methodist, 2.4%, Pentecostal 1.8%, other 9.9%), Hindu 2.1%, Buddhist 1.4%, Maori Christian 1.3%, Islam 1.1%, other religion 1.4% (includes Judaism, Spiritualism and New Age religions, Baha'i, Asian religions other than Buddhism), no religion 38.5%, not stated or unidentified 8.2%, objected to answering 4.1%
**note:** based on the 2013 census of the usually resident population; percentages add up to more than 100% because people were able to identify more than one religion (2013 est.)

**Nicaragua (../geos/nu.html)**
Roman Catholic 58.5%, Protestant 23.2% (Evangelical 21.6%, Moravian 1.6%), Jehovah's Witnesses 0.9%, other 1.6%, none 15.7% (2005 est.)

**Nigeria (../geos/ni.html)**
Muslim 50%, Christian 40%, indigenous beliefs 10%

**Niger (../geos/ng.html)**
Muslim 80%, other (includes indigenous beliefs and Christian) 20%

**Niue (../geos/ne.html)**
Ekalesia Niue (Congregational Christian Church of Niue - a Protestant church founded by missionaries from the London Missionary Society) 67%, other Protestant 3% (includes Seventh Day Adventist 1%, Presbyterian 1%, and Methodist 1%), Mormon 10%, Roman Catholic 10%, Jehovah's Witnesses 2%, other 6%, none 2% (2011 est.)

**Norfolk Island (../geos/nf.html)**
Protestant 49.6% (Anglican 31.8%, Uniting Church in Australia 10.6%, Seventh Day Adventist 3.2%), Roman Catholic 11.7%, other 8.6%, none 23.5%, unspecified 6.6% (2011 est.)

**Northern Mariana Islands (../geos/cq.html)**
Christian (Roman Catholic majority, although traditional beliefs and taboos may still be found)

**Norway (../geos/no.html)**
Church of Norway (Evangelical Lutheran - official) 82.1%, other Christian 3.9%, Muslim 2.3%, Roman Catholic 1.8%, other 2.4%, unspecified 7.5% (2011 est.)

**Oman (../geos/mu.html)**
Muslim (official; majority are Ibadhi, lesser numbers of Sunni and Shia) 85.9%, Christian 6.5%, Hindu 5.5%, Buddhist 0.8%, Jewish <0.1%, other 1%, unaffiliated 0.2% (2010 est.)
**note:** approximately 75% of Omani citizens, who compose almost 70% of the country's total population, are Ibadhi Muslims; the Omani government does not keep statistics on religious affiliation (2013)

**Pakistan (../geos/pk.html)**
Muslim (official) 96.4% (Sunni 85-90%, Shia 10-15%), other (includes Christian and Hindu) 3.6% (2010 est.)

**Palau (../geos/ps.html)**
Roman Catholic 49.4%, Protestant 30.9% (includes Protestant (general) 23.1%, Seventh Day Adventist 5.3%, and other Protestant 2.5%), Modekngei 8.7% (indigenous to Palau), Jehovah's Witnesses 1.1%, other 8.8%, none or unspecified 1.1% (2005 est.)

**Panama (../geos/pm.html)**
Roman Catholic 85%, Protestant 15%

**Papua New Guinea (../geos/pp.html)**
Roman Catholic 27%, Protestant 69.4% (Evangelical Lutheran 19.5%, United Church 11.5%, Seventh-Day Adventist 10%, Pentecostal 8.6%, Evangelical Alliance 5.2%, Anglican 3.2%, Baptist 2.5%, other Protestant 8.9%), Baha'i 0.3%, indigenous beliefs and other 3.3% (2000 census)

**Paraguay (../geos/pa.html)**
Roman Catholic 89.6%, Protestant 6.2%, other Christian 1.1%, other or unspecified 1.9%, none 1.1% (2002 census)

**Peru (../geos/pe.html)**
Roman Catholic 81.3%, Evangelical 12.5%, other 3.3%, none 2.9% (2007 est.)

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 67 of 88 PageID #: 2216

**Philippines (../geos/rp.html)**

Catholic 82.9% (Roman Catholic 80.9%, Aglipayan 2%), Muslim 5%, Evangelical 2.8%, Iglesia ni Kristo 2.3%, other Christian 4.5%, other 1.8%, unspecified 0.6%, none 0.1% (2000 census)

**Pitcairn Islands (../geos/pc.html)**

Seventh-Day Adventist 100%

**Poland (../geos/pl.html)**

Catholic 87.2% (includes Roman Catholic 86.9% and Greek Catholic, Armenian Catholic, and Byzantine-Slavic Catholic .3%), Orthodox 1.3% (almost all are Polish Autocephalous Orthodox), Protestant 0.4% (mainly Augsburg Evangelical and Pentacostal), other 0.4% (includes Jehovah's Witness, Buddhist, Hare Krishna, Gaudiya Vaishnavism, Muslim, Jewish, Mormon), unspecified 10.8% (2012 est.)

**Portugal (../geos/po.html)**

Roman Catholic 81%, other Christian 3.3%, other (includes Jewish, Muslim, other) 0.6%, none 6.8%, unspecified 8.3%
**note:** represents population 15 years of age and older (2011 est.)

**Puerto Rico (../geos/rq.html)**

Roman Catholic 85%, Protestant and other 15%

**Qatar (../geos/qa.html)**

Muslim 77.5%, Christian 8.5%, other (includes mainly Hindu and other Indian religions) 14% (2004 est.)

**Romania (../geos/ro.html)**

Eastern Orthodox (including all sub-denominations) 81.9%, Protestant (various denominations including Reformed and Pentecostal) 6.4%, Roman Catholic 4.3%, other (includes Muslim) 0.9%, none or atheist 0.2%, unspecified 6.3% (2011 est.)

**Russia (../geos/rs.html)**

Russian Orthodox 15-20%, Muslim 10-15%, other Christian 2% (2006 est.)
**note:** estimates are of practicing worshipers; Russia has large populations of non-practicing believers and non-believers, a legacy of over seven decades of Soviet rule; Russia officially recognizes Orthodox Christianity, Islam, Judaism, and Buddhism as traditional religions

**Rwanda (../geos/rw.html)**

Roman Catholic 49.5%, Protestant 39.4% (includes Adventist 12.2% and other Protestant 27.2%), other Christian 4.5%, Muslim 1.8%, animist 0.1%, other 0.6%, none 3.6% (2001), unspecified 0.5% (2002 est.)

**Saint Barthelemy (../geos/tb.html)**

Roman Catholic, Protestant, Jehovah's Witnesses

**Saint Helena, Ascension, and Tristan da Cunha (../geos/sh.html)**

Protestant 75.9% (includes Anglican 68.9, Baptist 2.1%, Seventh Day Adventist 1.8%, Salvation Army 1.7%, New Apostolic 1.4%), Jehovah's Witness 4.1%, Roman Catholic 1.2%, other 2.5% (includes Baha'i), unspecified 0.8%, none 6.1%, no response 9.4%
**note:** data represent Saint Helena only (2016 est.)

**Saint Kitts and Nevis (../geos/sc.html)**

Anglican, other Protestant, Roman Catholic

**Saint Lucia (../geos/st.html)**

Roman Catholic 61.5%, Protestant 25.5% (includes Seventh Day Adventist 10.4%, Pentecostal 8.9%, Baptist 2.2%, Anglican 1.6%, Church of God 1.5%, other Protestant 0.9%), other Christian 3.4% (includes Evangelical 2.3% and Jehovah's Witness 1.1%), Rastafarian 1.9%, other 0.4%, none 5.9%, unspecified 1.4% (2010 est.)

**Saint Martin (../geos/rn.html)**

Roman Catholic, Jehovah's Witnesses, Protestant, Hindu

**Saint Pierre and Miquelon (../geos/sb.html)**

Roman Catholic 99%, other 1%

**Saint Vincent and the Grenadines (../geos/vc.html)**

Protestant 75% (Anglican 47%, Methodist 28%), Roman Catholic 13%, other (includes Hindu, Seventh-Day Adventist, other Protestant) 12%

**Samoa (../geos/ws.html)**
Protestant 57.4% (Congregationalist 31.8%, Methodist 13.7%, Assembly of God 8%, Seventh-Day Adventist 3.9%), Roman Catholic 19.4%, Mormon 15.2%, Worship Centre 1.7%, other Christian 5.5%, other 0.7%, none 0.1%, unspecified 0.1% (2011 est.)

**San Marino (../geos/sm.html)**
Roman Catholic

**Sao Tome and Principe (../geos/tp.html)**
Catholic 55.7%, Adventist 4.1%, Assembly of God 3.4%, New Apostolic 2.9%, Mana 2.3%, Universal Kingdom of God 2%, Jehovah's Witness 1.2%, other 6.2%, none 21.2%, unspecified 1% (2012 est.)

**Saudi Arabia (../geos/sa.html)**
Muslim (official; citizens are 85-90% Sunni and 10-15% Shia), other (includes Eastern Orthodox, Protestant, Roman Catholic, Jewish, Hindu, Buddhist, and Sikh) (2012 est.)
**note:** despite having a large expatriate community of various faiths (more than 30% of the population), most forms of public religious expression inconsistent with the government-sanctioned interpretation of Sunni Islam are restricted; non-Muslims are not allowed to have Saudi citizenship and non-Muslim places of worship are not permitted (2013)

**Senegal (../geos/sg.html)**
Muslim 95.4% (most adhere to one of the four main Sufi brotherhoods), Christian 4.2% (mostly Roman Catholic), animist 0.4% (2010-11 est.)

**Serbia (../geos/ri.html)**
Serbian Orthodox 84.6%, Catholic 5%, Muslim 3.1%, Protestant 1%, atheist 1.1%, other 0.8%, undeclared or unknown 4.5% (2011 est.)

**Seychelles (../geos/se.html)**
Roman Catholic 76.2%, Protestant 10.6% (Anglican 6.1%, Pentecoastal Assembly 1.5%, Seventh-Day Adventist 1.2%, other Protestant 1.6), other Christian 2.4%, Hindu 2.4%, Muslim 1.6%, other non-Christian 1.1%, unspecified 4.8%, none 0.9% (2010 est.)

**Sierra Leone (../geos/sl.html)**
Muslim 60%, Christian 10%, indigenous beliefs 30%

**Singapore (../geos/sn.html)**
Buddhist 33.9%, Muslim 14.3%, Taoist 11.3%, Catholic 7.1%, Hindu 5.2%, other Christian 11%, other 0.7%, none 16.4% (2010 est.)

**Sint Maarten (../geos/sk.html)**
Protestant 41.9% (Pentecostal 14.7%, Methodist 10.0%, Seventh Day Adventist 6.6%, Baptist 4.7%, Anglican 3.1%, other Protestant 2.8%), Roman Catholic 33.1%, Hindu 5.2%, Christian 4.1%, Jehovah's Witness 1.7%, Evangelical 1.4%, Muslim/Jewish 1.1%, other 1.3% (includes Buddhist, Sikh, Rastafarian), none 7.9%, no response 2.4% (2011 est.)

**Slovakia (../geos/lo.html)**
Roman Catholic 62%, Protestant 8.2%, Greek Catholic 3.8%, other or unspecified 12.5%, none 13.4% (2011 est.)

**Slovenia (../geos/si.html)**
Catholic 57.8%, Muslim 2.4%, Orthodox 2.3%, other Christian 0.9%, unaffiliated 3.5%, other or unspecified 23%, none 10.1% (2002 census)

**Solomon Islands (../geos/bp.html)**
Protestant 73.4% (Church of Melanesia 31.9%, South Sea Evangelical 17.1%, Seventh Day Adventist 11.7%, United Church 10.1%, Christian Fellowship Church 2.5%), Roman Catholic 19.6%, other Christian 2.9%, other 4%, none 0.03%, unspecified 0.1% (2009 est.)

**Somalia (../geos/so.html)**
Sunni Muslim (Islam) (official, according to the Transitional Federal Charter)

**South Africa (../geos/sf.html)**
Protestant 36.6% (Zionist Christian 11.1%, Pentecostal/Charismatic 8.2%, Methodist 6.8%, Dutch Reformed 6.7%, Anglican 3.8%), Catholic 7.1%, Muslim 1.5%, other Christian 36%, other 2.3%, unspecified 1.4%, none 15.1% (2001 census)

**South Sudan (../geos/od.html)**
animist, Christian

**Spain (../geos/sp.html)**
Roman Catholic 94%, other 6%

**Sri Lanka (../geos/ce.html)**
Buddhist (official) 70.2%, Hindu 12.6%, Muslim 9.7%, Roman Catholic 6.1%, other Christian 1.3%, other 0.05% (2012 est.)

**Sudan (../geos/su.html)**
Sunni Muslim, small Christian minority

**Suriname (../geos/ns.html)**
Hindu 27.4%, Protestant 25.2% (predominantly Moravian), Roman Catholic 22.8%, Muslim 19.6%, indigenous beliefs 5%

**Swaziland (../geos/wz.html)**
Zionist 40% (a blend of Christianity and indigenous ancestral worship), Roman Catholic 20%, Muslim 10%, other 30% (includes Anglican, Baha'i, Methodist, Mormon, Jewish)

**Sweden (../geos/sw.html)**
Lutheran 87%, other (includes Roman Catholic, Orthodox, Baptist, Muslim, Jewish, and Buddhist) 13%

**Switzerland (../geos/sz.html)**
Roman Catholic 38.2%, Protestant 26.9%, other Christian 5.6%, Muslim 5%, other 1.6%, none 21.4%, unspecified 1.3% (2013 est.)

**Syria (../geos/sy.html)**
Muslim 87% (official; includes Sunni 74% and Alawi, Ismaili, and Shia 13%), Christian 10% (includes Orthodox, Uniate, and Nestorian), Druze 3%, Jewish (few remaining in Damascus and Aleppo)

**Taiwan (../geos/tw.html)**
mixture of Buddhist and Taoist 93%, Christian 4.5%, other 2.5%

**Tajikistan (../geos/ti.html)**
Sunni Muslim 85%, Shia Muslim 5%, other 10% (2003 est.)

**Tanzania (../geos/tz.html)**
Christian 61.4%, Muslim 35.2%, folk religion 1.8%, other 0.2%, unaffiliated 1.4%
**note:** Zanzibar is almost entirely Muslim (2010 est.)

**Thailand (../geos/th.html)**
Buddhist (official) 93.6%, Muslim 4.9%, Christian 1.2%, other 0.2%, none 0.1% (2010 est.)

**Timor-Leste (../geos/tt.html)**
Roman Catholic 96.9%, Protestant/Evangelical 2.2%, Muslim 0.3%, other 0.6% (2005)

**Togo (../geos/to.html)**
Christian 29%, Muslim 20%, indigenous beliefs 51%

**Tokelau (../geos/tl.html)**
Congregational Christian Church 58.2%, Roman Catholic 36.6%, Presbyterian 1.8%, other Christian 2.8%, Spiritualism and New Age 0.1%, unspecified 0.5% (2011 est.)

**Tonga (../geos/tn.html)**
Protestant 64.9% (includes Free Wesleyan Church 37.3%, Free Church of Tonga 11.4%, Church of Tonga 7.2%, Tokaikolo Christian Church 2.6%, Assembly of God 2.3%, Seventh Day Adventist 2.2%, Constitutional Church of Tonga 0.9%, Anglican 0.8% and Full Gospel Church 0.2%), Mormon 16.8%, Roman Catholic 15.6%, other 1.1%, none 0.03%, unspecified 1.7% (2006 est.)

**Trinidad and Tobago (../geos/td.html)**
Protestant 32.1% (Pentecostal/Evangelical/Full Gospel 12%, Baptist 6.9%, Anglican 5.7%, Seventh-Day Adventist 4.1%, Presbyterian/Congretational 2.5%, other Protestant 0.9%), Roman Catholic 21.6%, Hindu 18.2%, Muslim 5%, Jehovah's Witness 1.5%, other 8.4%, none 2.2%, unspecified 11.1% (2011 est.)

**Tunisia (../geos/ts.html)**
Muslim (official; Sunni) 99.1%, other (includes Christian, Jewish, Shia Muslim, and Baha'i) 1%

**Turkey (../geos/tu.html)**
Muslim 99.8% (mostly Sunni), other 0.2% (mostly Christians and Jews)

**Turkmenistan (../geos/tx.html)**
Muslim 89%, Eastern Orthodox 9%, unknown 2%

**Turks and Caicos Islands (../geos/tk.html)**
Protestant 72.8% (Baptist 35.8%, Church of God 11.7%, Anglican 10%, Methodist 9.3%, Seventh-Day Adventist 6%), Roman Catholic 11.4%, Jehovah's Witnesses 1.8%, other 14%

**Tuvalu (../geos/tv.html)**
Protestant 98.4% (Church of Tuvalu (Congregationalist) 97%, Seventh-Day Adventist 1.4%), Baha'i 1%, other 0.6%

**Uganda (../geos/ug.html)** Protestant 45.1% (Anglican 32.0%, Pentecostal/Born Again/Evangelical 11.1%, Seventh Day Adventist 1.7%, Baptist .3%), Roman Catholic 39.3%, Muslim 13.7%, other 1.6%, none 0.2% (2014 est.)

**Ukraine (../geos/up.html)** Orthodox (includes Ukrainian Autocephalous Orthodox (UAOC), Ukrainian Orthodox - Kyiv Patriarchate (UOC-KP), Ukrainian Orthodox - Moscow Patriarchate (UOC-MP), Ukrainian Greek Catholic, Roman Catholic, Protestant, Muslim, Jewish

**note:** Ukraine's population is overwhelmingly Christian; the vast majority - up to two-thirds - identify themselves as Orthodox, but many do not specify a particular branch; the UOC-KP and the UOC-MP each represent less than a quarter of the country's population, the Ukrainian Greek Catholic Church accounts for 8-10%, and the UAOC accounts for 1-2%; Muslim and Jewish adherents each compose less than 1% of the total population (2013 est.)

**United Arab Emirates (../geos/ae.html)** Muslim (official) 76%, Christian 9%, other (primarily Hindu and Buddhist, less than 5% of the population consists of Parsi, Baha'i, Druze, Sikh, Ahmadi, Ismaili, Dawoodi Bohra Muslim, and Jewish) 15%

**note:** represents the total population; about 85% of the population consists of noncitizens (2005 est.)

**United Kingdom (../geos/uk.html)** Christian (includes Anglican, Roman Catholic, Presbyterian, Methodist) 59.5%, Muslim 4.4%, Hindu 1.3%, other 2%, unspecified 7.2%, none 25.7% (2011 est.)

**United States (../geos/us.html)** Protestant 46.5%, Roman Catholic 20.8%, Mormon 1.6%, Jehovah's Witness 0.8%, other Christian 0.9%, Jewish 1.9%, Muslim 0.9%, Buddhist 0.7%, Hindu 0.7%, other 1.8%, unaffiliated 22.8%, don't know/refused 0.6% (2014 est.)

**Uruguay (../geos/uy.html)** Roman Catholic 47.1%, non-Catholic Christians 11.1%, nondenominational 23.2%, Jewish 0.3%, atheist or agnostic 17.2%, other 1.1% (2006)

**Uzbekistan (../geos/uz.html)** Muslim 88% (mostly Sunni), Eastern Orthodox 9%, other 3%

**Vanuatu (../geos/nh.html)** Protestant 70% (includes Presbyterian 27.9%, Anglican 15.1%, Seventh Day Adventist 12.5%, Assemblies of God 4.7%, Church of Christ 4.5%, Neil Thomas Ministry 3.1%, and Apostolic 2.2%), Roman Catholic 12.4%, customary beliefs 3.7% (including Jon Frum cargo cult), other 12.6%, none 1.1%, unspecified 0.2% (2009 est.)

**Venezuela (../geos/ve.html)** nominally Roman Catholic 96%, Protestant 2%, other 2%

**Vietnam (../geos/vm.html)** Buddhist 7.9%, Catholic 6.6%, Hoa Hao 1.7%, Cao Dai 0.9%, Protestant 0.9%, Muslim 0.1%, none 81.8% (2009 est.)

**Virgin Islands (../geos/vq.html)** Protestant 59% (Baptist 42%, Episcopalian 17%), Roman Catholic 34%, other 7%

**Wallis and Futuna (../geos/wf.html)** Roman Catholic 99%, other 1%

**West Bank (../geos/we.html)** Muslim 80-85% (predominantly Sunni), Jewish 12-14%, Christian 1-2.5% (mainly Greek Orthodox), other, unaffiliated, unspecified <1%

**note:** the proportion of Christians continues to fall mainly as a result of the growth of the Muslim population but also because of migration and the declining birth rate of the Christian population (2012 est.)

**Western Sahara (../geos/wi.html)** Muslim

**World (../geos/xx.html)** Christian 31.4%, Muslim 23.2%, Hindu 15%, Buddhist 7.1%, folk religions 5.9%, Jewish 0.2%, other 0.8%, unaffiliated 16.4% (2010 est.)

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 71 of 88 PageID #: 2220

**Yemen (../geos/ym.html)** Muslim 99.1% (official; virtually all are citizens, an estimated 65% are Sunni and 35% are Shia), other 0.9% (includes Jewish, Baha'i, Hindu, and Christian; many are refugees or temporary foreign residents) (2010 est.)

**Zambia (../geos/za.html)** Protestant 75.3%, Roman Catholic 20.2%, other 2.7% (includes Muslim Buddhist, Hindu, and Baha'i), none 1.8% (2010 est.)

**Zimbabwe (../geos/zi.html)** Protestant 75.9% (includes Apostolic 38%, Pentecostal 21.1%, other 16.8%), Roman Catholic 8.4%, other Christian 8.4%, other 1.2% (includes traditional, Muslim), none 6.1% (2011 est.)

Privacy (/about-cia/site-policies/#privacy-notice)          Copyright (/about-cia/site-policies/#copy)

Site Policies (/about-cia/site-policies/)          USA.gov (http://www.usa.gov/)

FOIA (http://www.foia.cia.gov/)          DNI.gov (http://www.dni.gov/)

NoFEAR Act (/about-cia/no-fear-act/)          Inspector General (/offices-of-cia/inspector-general/)

Contact CIA (/contact-cia/)          Site Map (/sitemap.html)



(/open/)

EXHIBIT  F





Watch About/Follow

## Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees

  


blogs
thebrodyfile

## Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees

01-27-2017
David Brody

Share          Tweet          Email

    +126



In an exclusive interview with The Brody File, President Donald Trump says persecuted Christians will be given priority when it comes to applying for refugee status in the United States. "We are going to help them," President Trump tells CBN News. "They've been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair."

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 74 of 88 PageID #: 2223

The Brody File conducted the interview Friday morning in the Blue Room at The White House. More newsworthy clips are coming soon. The entire interview can be seen this Sunday at 11pm on Freeform (cable TV, formerly ABC Family Channel) during our special CBN News show. This is just the third interview President Trump has done from The White House and it will be the only interview that will air in its' entirety this weekend.

**MANDATORY VIDEO AND COURTESY: CBN NEWS/THE BRODY FILE**

*DAVID BRODY: "Persecuted Christians, we've talked about this, the refugees overseas. The refugee program, or the refugee changes you're looking to make. As it relates to persecuted Christians, do you see them as kind of a priority here?"*

*PRESIDENT TRUMP: "Yes."*

*DAVID BRODY: "You do?"*

*PRESIDENT TRUMP: "They've been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."*

**While you are here...**

We'd like to ask for your help. At CBN News, we strive to bring you the most current, pertinent and reliable news possible. We are able to bring you this important news from a Christian perspective because of the help of friends like you who know how vital it is to have an alternative to the news you hear from major media outlets. Would you help ensure that we can continue to provide this important service to you and our country by considering a special gift today? Or would you become a monthly partner so we know we can count on the resources we need to bring you the best news possible?

Thanks for being a part of the dynamic future of CBN News, as well as helping The Christian Broadcasting Network share the love of Jesus with hurting people everywhere.

Become a Partner     Give a special gift

Share     Tweet     Email     +126

## JOIN THE CONVERSATION



Login

Write a comment

**126 Comments**                                          Subscribe   RSS

**Steve**                                                    12 days ago
Christian persecution is running at about 100,000 deaths per month. I'm so glad that our President is cognizant of this and willing to alleviate some of the pain and suffering of these people.

Like  Reply  Share                                                      0

**Israel Friend Di**                                         13 days ago
Our President Donald Trump is doing his Christian duty by banning terrorists Muslims and illegals into the USA that want to promote Sharia laws upon us and terrorize this country.  Isis and Hamas chop of the heads of their own people if they are found to be worshipping the GOD OF ISRAEL, our GOD, KING JESUS. This has to be stopped before they completely destroy the entire USA and all Christians and Jews, including ISRAEL. The Muslim religion is a hate religion unlike our Judea, Christianity.  We love all people of every race and don't kill to please our GOD. Our GOD died, shed HIS innocent blood as the final Lamb of GOD sacrifice  and was resurrected to save us from our sins.

Like  Reply  Share                                                      0

EXHIBIT  G

Trump signs order limiting refugee entry, says he will prioritize Christian refugees - The ...

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 76 of 88 PageID #: 2225

# The Washington Post

**Acts of Faith**

# Trump signs order limiting refugee entry, says he will prioritize Christian refugees

By **Sarah Pulliam Bailey**  January 27

President Trump signed an executive order Friday instituting "extreme vetting" of refugees, aimed at keeping out "radical Islamic terrorists."

"I'm establishing a new vetting measure to keep radical Islamic terrorists out of the United States of America," Trump said during his signing of the order. "We don't want them here. We want to make sure we are not admitting into our country the very threats our soldiers are fighting overseas."

According to drafts of the executive action, the order bars people from the Muslim-majority countries of Iraq, Syria, Iran, Sudan, Libya, Somalia or Yemen from entering the United States for 30 days and suspends the U.S. Refugee Admissions Program for 120 days. The program will be reinstated "only for nationals of countries for whom" members are vetted by Trump's administration.

In an interview Friday with the Christian Broadcast Network, Trump said he plans to help persecuted Christians.

"Do you know if you were a Christian in Syria it was impossible, at least very tough, to get into the United States?" Trump said. "If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair."

Trump signs order limiting refugee entry, says he will prioritize Christian refugees - The ...

Case 1:17-cv-00480-CBA    Document 159-1    Filed 02/16/17    Page 77 of 88 PageID #: 2226

In a statement, the American Civil Liberties Union declared Trump's action "just a euphemism for discrimination against Muslims."

From both legal and historical perspectives, the plan to ban refugees from specific countries is within the powers granted to the president under current law and historical precedent, according to Charles Haynes, vice president of the Newseum Institute's Religious Freedom Center. However, whether the president can limit the ban to one religious group is another question.

Many Muslims, especially Shiites, are among the religious minorities under attack, Haynes said. This "raises moral and humanitarian concerns about excluding them from entrance to the U.S. while permitting people of other faiths," he said. "Whether this policy rises to the level of a constitutional violation is uncertain and will be debated by constitutional scholars in the coming weeks."

Issues related to the Constitution and religion are usually associated with matters of sex, such as contraceptives and LGBT discrimination, but some observers said they expect Trump's actions on immigration to raise new challenges for religious freedom, according to Chelsea Langston Bombino of the Institutional Religious Freedom Alliance at the Center for Public Justice. Several organizations, she noted, are speaking out against orders that "will hurt the very people that their organizations were established, out of a religious calling, to serve," she said.

Trump's actions have been decried by several religious groups this week. "The expected cutbacks to U.S. refugee programs and funding will compromise our ability to do this work and the infrastructure needed to serve refugees in the years to come," evangelical ministry World Relief said in a statement.

**Acts of Faith newsletter**

Conversations about faith and values.

**Sign up**

And in a strongly worded statement, Rabbi Jack Moline, the Interfaith Alliance president, noted that this decision was announced on International Holocaust Remembrance Day.

"For decades, the United States has prided itself as a safe bastion for refugees around the globe escaping war and persecution," he said. "President Trump is poised to trample upon that great legacy with a de facto Muslim ban."

The Council on American-Islamic Relations will on Monday announce a federal lawsuit on behalf of more than 20 people challenging the constitutionality of the executive order.

Trump signs order limiting refugee entry, says he will prioritize Christian refugees - The ...

Case 1:17-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 78 of 88 PageID #: 2227

"There is no evidence that refugees – the most thoroughly vetted of all people entering our nation – are a threat to national security," said CAIR national litigation director Lena F. Masri. "This is an order that is based on bigotry, not reality."

*This post has been updated.*

Sarah Pulliam Bailey is a religion reporter, covering how faith intersects with politics, culture and...everything. 🐦 Follow @spulliam

**The Post Recommends**

## An 'America first' philosophy? During May's visit, it's more like 'Trump first.'

The new president's view of the world seems to revolve around him and his personal relationships.

## Facing criticism, Trump administration has no regrets about leaving out Jews in Holocaust statement

What might have been seen as an oversight was confirmed by White House spokeswoman Hope Hicks to have been an intentional decision.

## Trump orders Pentagon to draft ISIS strategy, restructuring of security council

New rules concerning lobbying are also among executive orders signed Saturday.

**PAID PROMOTED STORIES**                                  Recommended by

EXHIBIT  H





- DECEMBER 07, 2015 -

## DONALD J. TRUMP STATEMENT ON PREVENTING MUSLIM IMMIGRATION

(New York, NY) December 7th, 2015, -- Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on. According to Pew Research, among others, there is great hatred towards Americans by large segments of the Muslim population. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad" and 51% of those polled, "agreed that Muslims in America should have the choice of being governed according to Shariah." Shariah authorizes such atrocities as murder against non-believers who won't convert, beheadings and more unthinkable acts that pose great harm to Americans, especially women.

Mr. Trump stated, "Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension. Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life. If I win the election for President, we are going to Make America Great Again." - *Donald J. Trump*

Next Release: Donald J. Trump Announces State Directors in

★ ★ ★ **CATEGORIES** ★ ★ ★

**VIEW ALL**

**STATEMENTS**

**ANNOUNCEMENTS**

**ENDORSEMENTS**

**ADS**

★ ★ ★ **ARCHIVE** ★ ★ ★

**NOVEMBER 2016**

**OCTOBER 2016**

**SEPTEMBER 2016**

**AUGUST 2016**

**JULY 2016**

**JUNE 2016**

**MAY 2016**

**APRIL 2016**

**MARCH 2016**

**FEBRUARY 2016**

EXHIBIT  I

Case 1:11-cv-00480-CBA   Document 159-1   Filed 02/16/17   Page 82 of 88 PageID #: 2231

 **Donald J. Trump** ✔
@realDonaldTrump

 **Follow**    ⌄

Just put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country. We must be vigilant!

RETWEETS
**2,460**

LIKES
**5,679**

1:47 PM - 7 Dec 2015

↩ **2.0K**    ⬆ **2.5K**    **5.7K**

EXHIBIT  J

**News**Room

12/7/15 WashingtonPost.com (Pg. Unavail. Online)
2015 WLNR 36216212

WashingtonPost.com
Copyright (c) 2015 The Washington Post

December 7, 2015

Section: post-politics

Trump calls for 'total and complete shutdown of Muslims entering the United States'
"We have no choice. We have no choice," Trump said Monday. "We have no choice."

Jenna Johnson

Updated at 7:43 p.m.

Donald Trump called Monday for a "total and complete shutdown" of the entry of Muslims to the United States "until our country's representatives can figure out what is going on."

In a statement released by his campaign Monday afternoon, Trump included recent poll findings that he says show that a sizable segment of the Muslim population has "great hatred towards Americans."

"Without looking at the various polling data, it is obvious to anybody the hatred is beyond comprehension," Trump is quoted as saying in the statement. "Where this hatred comes from and why we will have to determine. Until we are able to determine and understand this problem and the dangerous threat it poses, our country cannot be the victims of horrendous attacks by people that believe only in Jihad, and have no sense of reason or respect for human life."

At a rally in Mount Pleasant, South Carolina on Monday evening, Trump pointed to the statement he released earlier in the day.

"Should I read you the statement?" he asked.

The crowd enthusiastically agreed that he should.

"Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what the hell is going on," he said, adding the word "hell" for emphasis this time.

Supporters erupted in applause.

"We have no choice. We have no choice," Trump said. "We have no choice."

Earlier in the rally, which was interrupted by protests, Trump said, "I have friends that are Muslims. They are great people -- but they know we have a problem."

Trump campaign manager Corey Lewandowski told the Associated Press that the ban would apply to "everybody," including both immigrants and tourists. Soon after the statement was released, Trump tweeted that he had "just put out a very important policy statement on the extraordinary influx of hatred and danger coming into our country." He added in the tweet: "We must be vigilant!"

In an interview on Fox News Channel shortly ahead of his campaign rally, Trump was asked whether his policy would apply to Muslim military personnel stationed overseas who want to come home.

"They will come home. We have to be vigilant," he responded. "We have to take care of the Muslims that are living here. But we have to be vigilant."

He later added: "Anybody here stays, but we have to be very vigilant... This does not apply to people living in the country except that we have to be vigilant."

In the past month, particularly following the recent mass shooting in Southern California that is believed to have been inspired by the Islamic State terrorist group, Trump has called for greater scrutiny of Muslims -- including Muslim Americans who are legal residents of the country. He has said he would support heavy surveillance of mosques, bar Syrian refugees of all religions from entering the country and would consider establishing a database to track all Muslims in the country. But Trump's statement on Monday was his most controversial proposal yet.

Trump typically announces major positions like this in media interviews or at rallies, rarely issuing formal statements. The statement immediately sparked rounds of questions about how such a policy would work, along with strong criticism.

"Oh, my goodness," said Ibrahim Hooper, national communications director at the Council on American-Islamic Relations. "One has to wonder what Donald Trump will say next as he ramps up his anti-Muslim bigotry. Where is there left for him to go? Are we talking internment camps? Are we talking the final solution to the Muslim question? I feel like I'm back in the 1930s."

What worried Hooper, he said, was the premeditated nature of Trump's statement.

"He feels perfectly okay saying this," said Hooper. "It's not an open mic moment, where he has to walk something back. This was a statement from his campaign. They had to believe that this would be well received by his supporters. We've always had anti-Muslim bigots, but they've always been at the fringes of society. Now they want to lead it. In saner times, his campaign would be over. In insane times, his campaign can gain support. And that's why he put it out."

David Weigel and Sean Sullivan contributed to this report.


**---- Index References ----**

News Subject: (Civil Rights Law (1CI34); Intellectual Freedoms & Civil Liberties (1IN08); International Terrorism (1IN37); Legal (1LE33); Minority & Ethnic Groups (1MI43); Race Relations (1RA49); Social Issues (1SO05); Top World News (1WO62))

Industry: (Celebrities (1CE65); Entertainment (1EN08))

Region: (Americas (1AM92); North America (1NO39))

Language: EN

Other Indexing: (Donald Trump; Ibrahim Hooper; David Weigel; Sean Sullivan; Donald Trump; Corey Lewandowski)

Word Count: 719

---

**End of Document**                    © 20  7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

**News**Room

---

EXHIBIT  K

MEET THE PRESS JUL 24 2016, 11:47 AM ET

# Meet the Press - July 24, 2016

Meet the Press - July 24, 2016

CHUCK TODD:

This Sunday, the Democratic National Convention gets underway here in Philadelphia, after a raucous and unpredictable Republican convention. That ended with the nomination of Donald Trump.

DONALD TRUMP:

I am with you, I will fight for you, and I will win for you.

CHUCK TODD:

This morning, my sit-down with Donald Trump on his convention speech.

DONALD TRUMP:

The only negative reviews were a little dark.

CHUCK TODD:

On whether he's backing off on his Muslim band.

DONALD TRUMP:

I actually don't think it's a pull-back. In fact, you could say it's an expansion.

CHUCK TODD:

And on Hillary Clinton's choice of Tim Kaine.

DONALD TRUMP:

Tim Kaine was a slap in the face to Bernie Sanders.

CHUCK TODD:

Plus Hillary Clinton and Tim Kaine hit the road in Florida.

HILLARY CLINTON:

Tim Kaine is everything Donald Trump and Mike Pence are not.

CHUCK TODD:

But some Bernie Sanders supporters are criticizing the Kaine pick as a sellout to moderates. I'll talk to Sanders and get his reaction to that and to the DNC Wikileaks e-mail release. Joining me for insight and analysis are MSNBC's Rachel Maddow, former chairman of the RNC, Michael Steele, NBC News Chief Foreign Affairs Correspondent, Andrea Mitchell, and host of Hardball and Philadelphia hometown boy, Chris Matthews. Trump, Sanders and reactions to the new Democratic ticket. Welcome to Sunday, in a special edition of Meet the Press at the Democratic National Convention.

CHUCK TODD:

Good Sunday morning. We are at the Wells Fargo Center here in South Philadelphia, home of the NBA 76ers and the NHL Broad Street Bullies, the Fliers. Democrats have begun to arrive, along with a pretty bad heat wave. And beginning tomorrow, they will gather to officially nominate Hillary Clinton as their presidential candidate.